**Dr. Steven MACARTHUR, et al., Plaintiffs,**

v.

**SAN JUAN COUNTY, et al., Defendants.**

**No. 2:00 CV 00584 BSJ.**

United States District Court, D. Utah, Central Division.

June 13, 2005.

Blaine J. Benard, Holme Roberts & Owen (UT), Salt Lake City, UT, for San Juan Health Services District, Laurie Schafer, Health District Defendants, Bill Redd, Cleal Bradford, Gary Holladay, John Housekeeper, John Lewis, Karen Adams, Patsy Shumway, Roger Atcitty, Carla Grimshaw, Gloria Yanito, Julie Bronson, L. Val Jones, Lori Wallace, Manfred R. Nelson, Marilee Bailey, Ora Lee Black, James D. Redd, Reid M. Wood, San Juan Health Defendants Group 2, Defendants.

Carolyn Cox, Holme Roberts & Owen (UT), Salt Lake City, UT, for San Juan Health Services District, Patsy Shumway, Reid M. Wood, Roger Atcitty, Health District Defendants, Laurie Schafer, Bill Redd, Cleal Bradford, Gary Holladay, John Housekeeper, John Lewis, Karen Adams, Carla Grimshaw, Gloria Yanito, Julie Bronson, L. Val Jones, Lori Wallace, Manfred R. Nelson, Marilee Bailey, Ora Lee Black, James D. Redd, San Juan Health Defendants Group 2, Defendants.

Kyle M Finch, Finch & Olson, Farmington, NM, for Farmer's/Truck Insurance, Defendant.

Christine T. Greenwood, Magleby & Greenwood PC, Salt Lake City, UT, for San Juan Health Services District, Gary Holladay, John Housekeeper, John Lewis, Karen Adams, Patsy Shumway, Roger Atcitty, San Juan Health Defendants Group 2, Defendants.

Robert R. Harrison, Snow Christensen & Martineau, Salt Lake City, UT, for Health District Defendants, San Juan County, Bill Redd, Craig Halls, Richard Bailey, J Tyron Lewis, Laurie Schafer, San Juan Health Services District, Carla Grimshaw, Cleal Bradford, Gloria Yanito, James D. Redd, Julie Bronson, L. Val Jones, Lori Wallace, Manfred R. Nelson, Marilee Bailey, Ora Lee Black, Reid M. Wood, Defendants.

Jean P Hendrickson, Utah Attorney General's, Office (160–140857), Salt Lake City, UT, for Health, Mr. Masotti, Don Beckwith, FNU Wilson, James(Harry) Boley, Marilyn Brokoop, Sandra Assasnik, Interested Party.

Michael W Homer, Suitter Axland, Salt Lake City, UT, for San Juan County, San Juan County Defendants, Bill Redd, Craig Halls, J Tyron Lewis, Richard Bailey, Mark Maryboy, Lyn Stevens, Defendants.

Judith A. Jensen, Utah Attorney General's Office, Salt Lake City, UT, for Utah Division of Occupational and Professional Licensing, Interested Party.

Dan R. Larsen, Snell & Wilmer (UT), Salt Lake City, UT, for Mark Shurtleff, Stewart M. Hanson, Mark Shurtleff, Stewart M. Hanson, Interested Party.

Kathleen M. Liuzzi, Dunn & Dunn, Salt Lake City, UT, for San Juan County, San Juan County Defendants, Bill Redd, Craig Halls, J Tyron Lewis, Richard Bailey, Mark Maryboy, Defendants.

Thomas B. Price, Suitter Axland, Salt Lake City, UT, for San Juan County, San Juan County Defendants, Bill Redd, Craig Halls, J Tyron Lewis, Richard Bailey, Mark Maryboy, Defendants.

Susan Rose, Sandy, UT, for Alison Dickson, Amy Terlaak, Candace Holiday, Candace Laws, Donna Singer, Fred Riggs, Helen Valdez, Linda Cacapardo, Michelle Lyman, Nathaniel Penn, Nicole Roberts, Steven MacArthur, Sue Burton, Dorothy Keith, Paul Keith, Plaintiffs.

Kenneth J Sheppard, Melaleuca, Inc., Idaho Falls, ID, for Melaleuca, Interested Party.

Douglas R Short, Bennett & Deloney, Midvale, UT, for Mark Maryboy, Defendant.

David W Slagle, Snow Christensen & Martineau, Salt Lake City, UT, for Health District Defendants, All Defendants.

Jesse C Trentadue, Suitter Axland, Salt Lake City, UT, for San Juan County, San Juan County Defendants, Bill Redd, Craig Halls, J Tyron Lewis, Richard Bailey, Mark Maryboy, Lyn Stevens, Defendants.

Robert R Wallace, Kirton & McConkie, Salt Lake City, UT, for San Juan Foundation, Defendant.

# MEMORANDUM DECISION & ORDER

JENKINS, Senior District Judge.

THE FINAL PRETRIAL CONFERENCE (Fed.R.Civ.P. 16(c)) ....................1112
 Fed.R.Civ.P. 16(c)(1) .........................................................1112

THE PART I PLAINTIFFS ......................................................1114
 Dr. Steven MacArthur, M.D. ..............................................1114
 Ms. Michele Lyman, P.A. .................................................1115
 Ms. Helen Valdez .......................................................1118

THE PART I PLAINTIFFS' ALLEGATIONS AGAINST THE INDIVIDUAL
 DEFENDANTS .............................................................1119
 The County Commissioners ..............................................1120
 County Attorney Craig Halls .............................................1120
 SJHSD Board Members: Atcitty, Lewis, Housekeeper, Adams, Shumway &
 Holliday ..............................................................1121
 The SJHSD Administrators: Wood, Bailey & Bradford .....................1122
 Laurie Schafer (a/k/a Laurie Shafer) .....................................1123
 Marilee Bailey, R.N. .....................................................1124
 Ora Lee Black ..........................................................1124
 Carla Grimshaw .........................................................1124
 Gloria Yanito ...........................................................1125
 Julie Bronson ...........................................................1126
 Lori Wallace, R.N. a/k/a Laurie Walker ...................................1126
 Dr. Lloyd Val Jones, M.D. ...............................................1126
 Dr. Manfred Nelson, M.D. ...............................................1128
 Dr. James Redd, M.D. ...................................................1128

THE PART I PLAINTIFFS' THEORIES OF LIABILITY .........................1129
 (1) Plaintiffs' Civil RICO Claims (18 U.S.C. §§ 1961 et seq.) .................1130
 Predicate Acts of "Racketeering Activity" (18 U.S.C. § 1961(1)) ...........1130
 (a) 18 U.S.C. § 1341—Mail Fraud .......................................1131
 (b) 18 U.S.C. § 1512—Witness Tampering .............................1133
 (c) 18 U.S.C. § 1951—Interference with Commerce by Threats ...........1134
 (2) Freedom of Access to Clinic Entrances Act of 1994 (18 U.S.C. § 248)....1137
 (3) Health Care Quality Improvement Act, 42 U.S.C. § 11112 (2000)..........1138
 (4) Emergency Medical Treatment and Active Labor Act (EMTALA), 42
 U.S.C. § 1395dd (2000) ...............................................1139
 (5) "Medicare Patient Bill of Rights" (42 U.S.C. § 1395a) ...................1141
 (6) 42 U.S.C. § 1981 .......................................................1142
 (7) 42 U.S.C. § 1985(3) .....................................................1144
 (8) 42 U.S.C. § 1983 .......................................................1145
 § 1983 Conspiracy ........................................................1146
 Liability of the SJHSD & San Juan County ................................1147
 Plaintiffs' § 1983 Claims Against the County Commissioners & SJHSD
 Board Members .........................................................1149
 Vicarious Liability, Respondeat Superior & § 1983 .........................1149
 The SJHSD Board & the SJHSD Medical Staff's "Policy" re: Physician
 Assistants ..............................................................1151

Qualified Immunity & Plaintiffs' § 1983 Claims ............................1152
Dr. MacArthur's § 1983 Claim ...........................................1154
Dr. MacArthur's "Right" to Practice at SJHSD Facilities ....................1154
Dr. MacArthur's Request for Privileges & Procedural Due Process ............1157
Ms. Lyman's § 1983 Claim .............................................1160
Substantive Due Process ...............................................1160
Misogyny & "Hostile Environment" under § 1983...........................1163
Qualified Immunity & Ms. Lyman's § 1983 Claim ...........................1166
Ms. Helen Valdez' § 1983 Claim .......................................1166
(9) Federal Antitrust Laws (15 U.S.C. §§ 1 *et seq.*) .......................1169
The Local Government Antitrust Act (15 U.S.C. §§ 34–36)...................1172
Dr. MacArthur's Federal Antitrust Law Claim .............................1173
Ms. Lyman's Federal Antitrust Law Claim ................................1174
(10) Utah Constitution, art. I, §§ 1, 7, 25, 26, 27 ........................1176
(11) Utah Unfair Practices Act (Utah Code Ann. §§ 13–5–1 *et seq.* (2001))....1179
(12) Utah Civil Rights Act (Utah Code Ann. §§ 13–7–1 *et seq.* (2001)) .........1181
(13) Interference with Contract and with Prospective Business Relations....1182
(14) "state *common law* defamation (also a U.S. Constitutional right to
 reputation as guaranteed by the Ninth Amendment)" .................1183
 (a) Utah Law of Defamation ........................................1183
 (b) Defamation & the Ninth Amendment ..............................1184
(15) "Federal common law and Utah contract common law and statutory
 provisions that prohibit contracts of adhesion, bad faith, and lack of
 fair dealing. Utah Code Ann. 78–12–25(1) (1996)," including the
 Implied Covenant of Good Faith and Fair Dealing ..................1187
 (a) Contracts of Adhesion.........................................1187
 (b) Implied Covenant of Good Faith and Fair Dealing ...................1187
(16) "privacy rights and statutory entitlements to have their credential
 files and patient files accurately kept by the district under Medicaid
 and Utah Health Department statutes and regulations"...............1190
(17) Negligent and Intentional Infliction of Emotional Distress ..............1193
 (a) Intentional Infliction of Emotional Distress ......................1193
 (b) Negligent Infliction of Emotional Distress ..........................1194
 (c) The Part I Plaintiffs' Emotional Distress Claims ...................1195
(18) Fraud ...........................................................1195
Summary re: the Part I Plaintiffs' Causes of Action .........................1198
PRETRIAL DETERMINATION OF THE PART I PLAINTIFFS' CLAIMS....1200
Claims Against San Juan County and the SJHSD........................1201
Claims Against the Individual Defendants .............................1201
Dr. MacArthur's State Law Tort Claims ...............................1202
Ms. Lyman's State Law Tort Claims ..................................1202
Summary re: the Final Pretrial Conference ...........................1204

PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT....1205

THE PART I PLAINTIFFS' MOTIONS FOR RECONSIDERATION ..............1206

CONCLUSION ........................................................1208

This case involves a potpourri of individual claims with individual histories and individual times and contexts, held together, if at all, by a common defendant, or common defendants. It has an erratic procedural history, complicated by prolix pleadings and appendices, evolving arguments, and motions to reconsider matters already decided. In an effort to deal with this matter as completely as we can—extended though it may be—the court in the context of pretrial has considered in detail each of the plaintiffs' legal theories, and the factual allegations advanced as the basis for those theories, all in an effort to

identify any genuine issues that would require a trial.

The original complaint filed in this action asserted claims by fifteen individual plaintiffs against San Juan County, the San Juan Health Services District, and various individual defendants. Some of those claims were decided upon motion, and some have been resolved by agreement; several of the original plaintiffs and defendants are no longer parties to this case. (*See* Order on Motions Heard on July 2, 2002, filed August 22, 2002 (dkt. no. 417); Order on Motion of Defendant San Juan Foundation to Dismiss, filed June 5, 2002 (dkt. no. 366); Order of Dismissal with Prejudice, filed March 28, 2002 (dkt. no. 309); Order of Dismissal with Prejudice, filed March 25, 2002 (dkt. no. 306); Order of Dismissal with Prejudice, filed March 11, 2002 (dkt. no. 298); Order, filed February 12, 2002 (dkt. no. 272); Order, filed November 29, 2001 (dkt. no. 234); *see also* Order, filed February 15, 2002 (dkt. no. 279).) Some of the questions decided by the district judge initially assigned this case became the subject of an interlocutory appeal, and are now back before this court on remand. *See MacArthur v. San Juan County*, 309 F.3d 1216 (10th Cir. 2002).

By the time of the Final Pretrial Conference on November 14–15, 2002, there remained six named plaintiffs, whose claims fall into two discrete groups: plaintiffs Donna Singer, Fred Riggs and Al Dickson, who seek enforcement of three orders against several of the defendants previously obtained in Navajo Tribal Court—the matter now before this court on remand from the court of appeals—and plaintiffs Dr. Steven MacArthur, Michelle Lyman and Helen Valdez, who assert individual claims against the defendants arising from various events and alleged acts of one or more of the defendants. The claims of these six remaining plaintiffs were detailed in a proposed Amended Complaint submitted by counsel a few days before the Final Pretrial Conference. (*See* "Amended Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," *annexed to* "Plaintiffs' Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," and "Memorandum of Fact and Law in Support," filed November 6, 2002 (dkt. no. 438) (hereinafter "Proposed Amended Complaint").) [1] "Part I" of the Proposed Amended Complaint sets forth the claims of MacArthur, Lyman and Valdez (*id.* at 2–98 ¶¶ 1–254); "Part II" of the same pleading spells out the relief sought by Singer, Riggs and Dickson. (*Id.* at 98–120.)

The claims and defenses involving the "Part I Plaintiffs," MacArthur, Lyman and Valdez, were also delineated in an agreed form of proposed Pretrial Order submitted six days later as contemplated by the court's local rules, *see* DUCivR 16–1(e), and by the schedule previously established by the court in this case.[2] (*See* Proposed

---

1. As noted in a November 8, 2002 remark on the docket, the Proposed Amended Complaint was accompanied by a separate addendum of "Pertinent Parts of the Navajo Court Record as Attachment to the Amended Complaint," received by the Clerk of the Court on November 8, 2002 and lodged in the case file.

2. (*See* Minute Entry, dated October 8, 2002 (dkt. no. 427).) At the request of plaintiffs' counsel, the dates for submission of the draft

Pretrial Order (11/1/2002) and the Final Pretrial Conference (11/5/2002) were reset by amended notice of hearing, with the conference to commence on November 12, then November 14. (*See* Motion for a Short Extension of Time to Submit the Final Pretrial Order for Medical Reasons, filed October 28, 2002 (dkt. no. 434); Notice of Hearing, filed October 31, 2002 (dkt. no. 435); Motion to Extend Time for Pretrial Proceedings, filed November 8, 2002 (dkt. no. 439); Amended

Pretrial Order, received November 12, 2002.[3]) On the eve of pretrial, the San Juan Health District defendants filed motions to dismiss those plaintiffs' RICO, Health Care Quality Improvement Act and EMTALA claims (dkt. nos. 443, 445, 447), followed the next day by motions to dismiss those plaintiffs' claims of interference with commerce by threats, mail fraud, witness tampering and federal antitrust law violations (dkt. nos. 450, 452, 456, 454).

## THE FINAL PRETRIAL CONFERENCE (Fed.R.Civ.P. 16(c))

At the Final Pretrial Conference, court and counsel explored in some detail the factual footing and legal theories underlying the claims of the Part I plaintiffs, engaging in an extended colloquy that sought to identify, formulate and simplify the issues; and to pinpoint any genuine issues of material fact—issues requiring a trial.

### Fed.R.Civ.P. 16(c)(1)

At a pretrial conference, "consideration may be given, and the court may take appropriate action, with respect to (1) the formulation and simplification of the issues, including the elimination of frivolous claims or defenses; ...." Fed.R.Civ.P. 16(c)(1).

The reference in Rule 16(c)(1) to "formulation" is intended to clarify and confirm the court's power to identify the litigable issues. It has been added in the hope of promoting efficiency and conserving judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone.... The notion is emphasized by expressly authorizing the elimination of frivolous claims or defenses at a pretrial conference. There is no reason to require that this await a formal motion for summary judgment. Nor is there any reason for the court to wait for the parties to initiate the process called for in Rule 16(c)(1).

Fed.R.Civ.P. 16 advisory committee note to 1983 amendment (citation omitted). "The court thus is directed to define the issues, facts, and theories actually in contention, which means that extraneous issues should be weeded out ...." 6A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1525, at 242 (2d ed.1990) (footnotes omitted). As the court of appeals explained some years ago: "The salutary, indeed the desirable and efficacious, purpose of a pretrial conference is to sift the discovered and discoverable facts to determine the triable issues, both factual and legal, and to chart the course of the lawsuit accordingly." *Lynch v. Call*, 261 F.2d 130, 132 (10th Cir.1958).

■ It follows that "[a]s a case takes shape and the court struggles to narrow and pinpoint the issues, the parties have an unflagging obligation to spell out squarely and distinctly those claims they desire to advance at the trial proper. Good-faith compliance with Civil Rule 16 plays an important role in this process." *Veranda Beach Club Limited Partnership v. Western Surety Co.*, 936 F.2d 1364, 1371 (1st Cir.1991) (citation omitted). Rule 16(c)(1) places upon counsel "a substantial responsibility for assisting the court in identifying the factual issues worthy of trial." Fed.R.Civ.P. 16 advisory committee note to 1983 amendment; *cf. Erff v.*

Notice of Hearing, filed November 12, 2002 (dkt. no. 441).)

3. The Proposed Pretrial Order ultimately was neither signed by the court nor docketed and filed in this case. To ensure a complete record of the Final Pretrial Conference in this action, a copy of the Proposed Pretrial Order in .pdf file format is annexed to this Memorandum Decision & Order as an Appendix.

*MarkHon Industries, Inc.*, 781 F.2d 613, 617 (7th Cir.1986) ("Attorneys at a pretrial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be."); *see also* DUCivR 7–1(d).[4]

> Rule 16(c) has confirmed the court's power to identify the litigable issues, and to eliminate frivolous claims or defenses without awaiting the making of a summary judgment or other motion by the parties. But at the same time, counsel bear a substantial responsibility in formulating the triable issues in that they must identify these issues for the court or they waive the right to have them tried.

3 James W. Moore, et al., *Moore's Federal Practice* ¶ 16.11, at 16–49 (2d ed. Rev. 1994) (footnotes omitted).

Both the Proposed Amended Complaint (Part I) and the Proposed Pretrial Order recite an extended litany of grievances against San Juan County, the San Juan Health Services District ("SJHSD") and various individual defendants, ranging from allegations of nepotism in the administration of the SJHSD and San Juan County government to an individual physician's ill-tempered use of derogatory language in referring to medical support staff and patients and his unavailability for specific patient emergencies. (*See* Proposed Amended Complaint at 35 ¶ 58, 35 ¶¶ 50–52,[5] 60 ¶ 146, 63 ¶¶ 156–58, 64 ¶ 159, 66–67 ¶¶ 163–164, 67–68 ¶¶ 165–166; Proposed Pretrial Order at 1220 ¶ 58, 1220 ¶¶ 51–52, 1231 ¶ 146, 1232 ¶¶ 156–59, 1233 ¶¶ 163–164, 1233 ¶¶ 165–166.) Even so, the Proposed Amended Complaint represented a significant narrowing of the scope of plaintiffs' claims from that of the original complaint—a pleading that alleged a wide range of grievances involving the operation of San Juan County government and the SJHSD,[6] and sought the entry of sweeping declaratory judgments and writs of mandamus requiring, *inter alia*, a GAO[7] audit of federal funds expended in the county in

---

4. DUCivR 7–1(d) reads:

> **(d) Final Pretrial Conference.** Trial counsel must attend the final pretrial conference with the court. Preparation for this final pretrial conference should proceed pursuant to Fed.R.Civ.P. 16 and should include (i) preparation by plaintiff's counsel of a recommended pretrial order that is submitted to other counsel at least five (5) days prior to the final pretrial date, and (ii) preparation for resolution of unresolved issues in the case.

Our local rules thus anticipate that trial counsel will be fully prepared to participate in the pretrial examination of the issues contemplated by Fed.R.Civ.P. 16(c).

5. Part I of the Proposed Amended Complaint includes two series of paragraphs numbered 50 through 58 at pages 34 and 35, and a second sequence of paragraphs 125–168 at pages 54–69; the Proposed Pretrial Order incorporates two similar sequences at pages 1220 and 1229–34, reflective of the fact that counsel simply reiterated almost all of the allegations of Part I of the Proposed Amended Complaint as "Plaintiffs' Statement of Contested Issues of Fact" in Section 5 of the Proposed Pretrial Order.

In this Memorandum Decision & Order, for the sake of clarity, any citations to these numbered paragraphs in either document refer to both the page and paragraph number(s) of the reference.

6. (*See, e.g.*, Complaint (Verified), filed July 25, 2000 (dkt. no. 1), at 141 ¶ 472 ("County Commissioners have laughed at Taxpayers who sought to have San Juan County Commissioners account for what they are spending [and] notice budget items prior to meetings by at least 24 hours.")); *id.* at 150–151 ¶ 514 ("San Juan County has treated the taxpayers with disdain and disrespect and laughed at those taxpayers bringing to the County Commission's attention the statutory provisions the taxpayers believed the County was violating.").

7. Apparently referring to the General Accounting Office (now the Government Accountability Office). *See What is GAO?, at* http://www.gao.gov/about/what.html.

the previous ten years, an IRS audit of payroll tax withholding, the convening of a federal grand jury investigation, and the immediate seizure or sequestration of the defendant entities' financial records by the U.S. Marshal pending that investigation and the GAO and IRS audits. (*See* Complaint, filed July 25, 2000 (dkt. no. 1), at 156 ¶¶ 3, 5 (Prayer for Relief).)

A grievance involving a governmental unit is still a grievance,[8] but a grievance may or may not be "a claim upon which relief can be granted" in a judicial proceeding. Fed.R.Civ.P. 12(b)(6). In attempting to identify and define genuine issues for trial, court and counsel at pretrial undertook to parse the Part I Plaintiffs' allegations in search of viable legal claims. (*See* Transcript of Hearing, dated November 14, 2002 ("Tr. 11/14/02"), *passim;* Transcript of Hearing, dated November 15, 2002 ("Tr. 11/15/02"), *passim.*)

### THE PART I PLAINTIFFS

### Dr. Steven MacArthur, M.D.

Dr. Steven MacArthur, M.D. is a licensed physician specializing in obstetrics and gynecology. By 1999, he had been in practice in his specialty for about eighteen years (though not in active practice for at least the prior year[9]). On or about December 9, 1999, Dr. MacArthur requested full provisional one-year privileges to practice medicine at health care facilities operated by the SJHSD, including the Blanding Urgent Care Center, Blanding Birthing Center, Monument Valley Clinic, Monticello Clinic and San Juan Hospital, the only hospital facility located in San Juan County.[10] The SJHSD *did not grant* Dr. MacArthur full provisional one-year privileges within thirty days after his request, as contemplated by the SJHSD medical staff bylaws. Nor did it deny them.

Instead, SJHSD administrators (defendants Bradford and Dr. James Redd) granted him two-week "temporary" practice privileges allowing him to treat at least a limited number of patients at SJHSD facilities, and these "temporary" privileges were extended twice, through February 2, 2000.[11]

---

**8.** *Cf.* U.S. Const., Amend. I ("Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). "The First Amendment ... guarantees the right to petition the Government for a redress of grievances." *White v. Lee,* 227 F.3d 1214, 1227 (9th Cir.2000) (internal quotation marks omitted).

**9.** (Tr. 11/14/02, at 6:16–18 (Ms. Rose).)

**10.** The next nearest hospital facility to San Juan Hospital in Monticello, Utah is about 65 miles away to the north (Moab) or the east (Cortez, Colorado), and about 85 miles from Blanding. Shiprock Hospital in Shiprock, New Mexico, is between 65 to 85 miles from southern San Juan County. (*See* Proposed Pretrial Order at 1219 ¶ 39.)

**11.** On December 23, 1999, Dr. MacArthur was informed by Cleal Bradford of the SJHSD that he had been granted "tempo-

rary" privileges, which would last from December 23 through January 5, 2000, while his request for full provisional privileges was being considered. According to the defendants, when Dr. MacArthur first discussed his "temporary" privileges with Mr. Bradford, Bradford asked Dr. MacArthur to specify the number of patients that Dr. MacArthur thought he would treat during the temporary privilege period. When Dr. MacArthur indicated that it would be difficult to estimate exactly, Bradford told MacArthur to increase his estimate to cover any potential but unplanned patients. Defendants insist that Dr. MacArthur's "temporary privileges" did not carry any limitation on the actual number of patients that Dr. MacArthur could see during the "temporary" privileges period—but the same may not be true of the number of patients he could treat at SJHSD facilities. On January 10, 2000, Dr. MacArthur's "temporary" privileges were extended from January 5, 2000, through January 25, 2000. On January 26, 2000, Dr. Mac-

Dr. MacArthur exercised his "temporary" privileges in providing care to several patients at SJHSD facilities; he also participated with another physician in a delivery by cesarian section in November or December of 1999. In doing so, Dr. MacArthur alleges that he encountered problems involving the availability, quality and sterility of medical instruments and equipment, and some resistance—even antagonism—on the part of SJHSD nurses and support staff in treating his patients. He was further troubled by rumors that cast doubt upon his background, professional integrity and expertise, and a local newspaper report that his privileges had been "lifted" by the SJHSD, when in fact no formal determination of his request had yet been made.

On or about February 2, 2000, the SJHSD did not further extend his "temporary" privileges, and had not yet acted on his requests for full provisional privileges. At that point, the delay as to full provisional privileges was explained on the basis that required documentation was missing from his application packet (*viz.*, a copy of his medical license and DEA dispensing license), documentation which he believed had been furnished and in any event was readily available and easily verified.

By February of 2000, Dr. MacArthur had become apprehensive that his request for full provisional privileges may ultimately be denied, albeit for questionable, perhaps even pretextual reasons, and that his "temporary" privileges would soon expire and might not be further extended. He did not press the privileges issue with the SJHSD on or after February 2, 2000. Dr. MacArthur decided to move his medical practice to Ely, Nevada, and did not further pursue his request for full provisional practice privileges at the SJHSD facilities.

(*See* Proposed Pretrial Order at 1228 ¶ 199.)

Dr. MacArthur now contends that his requests for full provisional one-year privileges were deferred in violation of his constitutional right as a licensed physician to pursue his profession through use of publicly-sponsored medical facilities, and for pretextual reasons (*viz.*, "missing" documents), the real reasons being (1) discriminatory intent based upon his age (over 40), his associations with Ms. Lyman (gender), and Jewish and Mexican–American physicians (Drs. Penn and Mena), and his reporting of remarks concerning Dr. Penn; and (2) the intent to limit his competition with other SJHSD medical staff and contract physicians, none of whom are OB/GYN specialists, in serving the needs of women patients in San Juan County. He seeks an award of "damages in excess of $3.5 million dollars and attorney fees" to compensate him for the loss of income anticipated from an estimated ten years' practice in the San Juan County market, resulting from the failure of the SJHSD defendants to grant him · full provisional privileges as he requested, and the conduct of those individuals who propagated rumors spreading defamatory falsehoods concerning his background, integrity or professionalism. (Proposed Amended Complaint at 94–95.)

**Ms. Michele Lyman, P.A.**

Plaintiff Michele Lyman resides in Blanding, Utah, and has been practicing as a licensed Physician's Assistant since 1996. She initially worked for the SJHSD at Montezuma Creek in 1995, completing her preceptorship under the supervision of Dr. Lloyd Val Jones, M.D. in 1996. She then became employed by and practiced under the supervision of Dr. James Redd, M.D., who was in private practice in

---

Arthur was again granted an extension

through February 2, 2000.

Blanding; she continued to be supervised by Dr. Jones as a "back-up" as well. While working for Dr. Redd, Ms. Lyman was regularly covering Dr. Redd's clinic, and providing some coverage for the Blanding nursing home, the Blanding Birthing Center, the San Juan Hospital emergency room, and the Blanding Urgent Care Center, a SJHSD facility where she alleges she enjoyed full SJHSD medical staff privileges,[12] and was paid by the District for her "on-call" services. (See Proposed Pretrial Order at 1224 ¶ 132; Tr. 11/15/02, at 3:4–5:13 (Ms. Rose).) Ms. Lyman ceased working under Dr. Redd's supervision on or about October 7, 1998, but continued providing coverage for the SJHSD through November, 1998. She alleges that she was effectively denied her staff privileges at the Blanding Urgent Care Center within three days after leaving Dr. Redd, and thereafter experienced considerable difficulty in exercising her privileges at SJHSD facilities, even though she was working in Monticello under the supervision of two other Monticello physicians having SJHSD staff privileges, viz., Dr. Nathaniel Penn, M.D., from November 1998 until July 1999 (when Dr. Penn had

moved his practice to Moab),[13] and Dr. Robert Mena, M.D., from July to November 1999 (when Dr. Mena's SJHSD privileges expired). In early 1999, Ms. Lyman and Dr. Penn opened a Blanding Family Practice clinic; Ms. Lyman eventually purchased that clinic from Dr. Penn and operated as a "state-approved off-site independent rural clinic" for three years, until she in turn sold her practice. (Proposed Amended Complaint at 14, 96.)

In December 1999, Ms. Lyman requested a renewal of her SJHSD staff privileges (to be exercised under supervision by Dr. MacArthur), which request was delayed, purportedly because of "missing" documentation in her personnel file, e.g., CPR certification cards, that Ms. Lyman is certain had been properly issued and were current through at least December of 1999. She furnished copies of the missing cards, but alleges that the dates on those cards had been altered.

By the end of March, 2000, formal administrative action on her request for privileges was still being deferred by the SJHSD until the CPR certification card issue was resolved. According to the

---

**12.** While working under the supervision of Drs. Redd and Jones at the Blanding Urgent Care Center, plaintiffs allege that "Mrs. Lyman did the following patient procedures:
 a) Took care of acute head trauma's; and,
 b) Put in chest tubes; and,
 c) Delivered a couple of babies; and,
 d) Sutured cuts; and,
 e) Dealt with heart attacks; and,
 f) Informed families of tragedies; and,
 g) Ordered tests; and,
 h) Prescribed medications and shots; and,
 i) Prescribed tests to be run on the patients; and,
 j) Admitted and discharged patients; and,
 k) Consulted other specialists by phone; and,
 l) Treated patients with infectious diseases; and,
 m) Referred patients to the San Juan Hospital and to the other district facilities,

all without a Dr. at her side and without on site supervision, and with no Dr. even in town available for assistance."
(Proposed Amended Complaint at 55–57 ¶ 129.) However, plaintiffs then allege that "Mrs. Lyman and Dr. Key, before he left, informed Dr. Redd and Dr. Jones that this practice of leaving Mrs. Lyman without either Dr. on call was wrong, and that the practice should be changed," (id. at 57 ¶ 130), and now characterize that practice as a "Violation of Medical ByLaws and State laws and regs." (Id. at 57.)

**13.** (See Proposed Amended Complaint at 76 ¶ 203 (In "April, 1999, after working in Monticello under Dr. Penn, Ms. Lyman began a new practice in Blanding under the off-site direction of Dr. Nathaniel Penn."); Proposed Pretrial Order at 1236 ¶ 203 (same).)

pleadings, from November 1999 until sometime in 2001, Ms. Lyman may not have had a supervising physician practicing in San Juan County who had staff privileges with the SJHSD, except for the brief period between December 23, 1999 and February 2, 2000, when Dr. MacArthur exercised "temporary" SJHSD privileges.[14] At the time of pretrial, she was again being supervised by Dr. Jones. (*See* Tr. 11/15/02, at 24:9–25, 26:7–11 (Ms. Rose).)

According to the plaintiffs,

The District employees as a pattern sought to restrain competition, there was inadequate impartiality in 'peer review' or in issuing privileges since the people issuing the privileges are usually in economic competition with those they are giving privileges. Privileges for Mrs. Lyman were de facto denied by nursing personnel and medical staff without any action by the District governance board.

(Proposed Pretrial Order at 1217.) As Ms. Lyman's counsel explained at pretrial,..

She's complaining that she could not get the privileges at the hospital when she was working under physicians that had privileges. Her patients she would send over to the clinic, they would not get shots. At one point she was told she couldn't order labs or x-rays. At one point she was told she couldn't set foot in the facility.

(Tr. 11/15/02, at 14–19 (Ms. Rose).)

In addition to the alleged interference with her practice privileges at SJHSD facilities after October 1998, Ms. Lyman alleges harassment and intimidation of, and denial of health care services to her patients by Dr. Redd and other SJHSD support staff, which she contends was intended to inhibit competition by her with the SJHSD medical staff and contract providers. She also alleges a deliberate campaign of harassment conducted against her by Dr. Redd since she ceased working for him in October of 1998, intended to hinder and frustrate her professional practice, and cause her severe emotional distress. She contends that Dr. Redd created a misogynistic "hostile environment" in his own medical office in Blanding during the time that she worked under his supervision, and that her personal and professional reputation has suffered as a consequence of defamatory rumors, insinuations and accusations published to her patients and others by one or more of the defendants.

Ms. Lyman seeks an award of "damages in excess of Six (6) Million Dollars" as compensation for "unfair practices" interfering with the exercise of her practice privileges and he relationship with her patients, the harassment and intimidation of her patients, "the terrorism of her children, and herself, and the spreading of rumors that equate to nothing less than criminal defamation for both Michele Lyman and Dr. MacArthur." (Proposed Amended Complaint at 96–98.) She also seeks injunctive relief "to protect patients of Mrs. Lyman and her supervising physician, and give Mrs. Lyman's patients uniform and considerate care with District staff sensitive to the unique needs of the patient," and allowing Ms. Lyman "to minimally go into any facility to at least speak

---

**14.** At pretrial, however, counsel insisted Drs. Penn and Mena continued to supervise Ms. Lyman at a distance even after Dr. MacArthur left for Nevada—concededly doing so at that point without SJHSD privileges—and that when Drs. Penn and Mena no longer supervised her, Ms. Lyman "went to work under Dr. Jones," and therefore "there was never a time that she wasn't without a supervising physician." (Tr. 11/15/02, at 25:1–26:11 (Ms. Rose).)

and associate with her patient, regardless of whether she has privileges at the District." According to plaintiff, "ordering the [SJHSD] governance board to make physicians and chiefs of staff accountable for patient complaints and treat all medical providers and physician's equally and uniformly is not contradictory to good public policy." (*Id.* at 93–94.)

**Ms. Helen Valdez**

The claims of plaintiff Helen Valdez arise out of a single event that took·place on April 14, 1999. On that date, Ms. Valdez, accompanied by her sister-in-law, Charlene Gonzales, went to the San Juan Hospital emergency ·room at about 8:08 a.m. At that time, she was suffering from what was subsequently diagnosed as acute diverticulitis; she was experiencing symptoms including vomiting, cramping, diarrhea and pain, and felt very weak and tired. Ms. Valdez told the emergency room personnel "that she'd been sick, [and] needed to see a doctor." [15] She assisted in filling out a typed patient admittance form, furnishing identification and health insurance information to an emergency room clerk named Judy Kascheaiveaz. She signed the form, as did the clerk. At that point, Ms. Valdez had not described her symptoms to the clerk.[16] Ms. Valdez became ill and went to the lavatory, and when she returned, she observed a nurse in the emergency room, Lori Wallace, R.N., tell the clerk that "she could set both her patients up in the emergency room for the physician," referring to Ms. Valdez and Michael Bailey, another individual who had come to the emergency room with an injured foot.[17]

While Ms. Valdez went to the lavatory a second time, her sister-in-law, Ms. Gonzales, says that she overheard the nurse, Ms. Wallace, tell the clerk to "tell Helen [Ms. Valdez] to go to the doctor's office. Dr. Penn's office would open at 9:00." [18] Ms. Gonzales did not hear Ms. Wallace say anything else, and did not converse directly with Ms. Wallace about what she had overheard.[19]

Ms. Gonzalez related the overheard conversation to Ms. Valdez upon her return from the lavatory, and without any further conversation with Ms. Wallace, Ms. Kascheaiveaz, or other emergency room employees, Ms. Valdez left the emergency room, again accompanied by Ms. Gonzales. Instead of going to see her doctor at his office, Ms. Valdez went home.[20] At the time she left the emergency room, Ms. Valdez had not discussed· her symptoms with Ms. Wallace or Ms. Kascheaiveaz, whom she had seen in the emergency room,[21] and had not yet seen or been examined by a physician.

15. (Deposition of Charleen Gonzales, dated January 7, 2002, at 12:22–25.)

16. (Deposition of Helen Valdez, dated December 6, 2001, at 18:11–22.)

17. (*Id.* at 17:3–18:10.) ˙At that point, according to Ms. Valdez, she had not spoken with Ms. Wallace and did not know whether or not the nurse "knew anything about [her] symptoms or what was wrong." (*Id.* at 18:11–22.)

18. (Deposition of Charlene Gonzales, dated January 7, 2002, at 14:7–17, 20:13–24.)

19. (*Id.*)

20. Ms. Valdez testified in deposition that she believes Dr. Penn was already at the San Juan Hospital on the morning of April 14th, and that Mr. Bailey, the other emergency room patient at that time, subsequently told her he was examined by Dr. Penn in the emergency room about five minutes after Ms. Valdez had left. (Deposition of Helen Valdez, dated December 6, 2001, at 19:15–20:18.)

21. Ms. Valdez telephoned the emergency room before going there on the morning of April 14th, and briefly discussed her symptoms with a nurse, someone other than Ms. Wallace. (*Id.* at 18:14–17.)

Her symptoms subsided for a day but then intensified, and three days later, Ms. Valdez went to the Blanding Urgent Care Clinic, where she was examined by Dr. James Redd, M.D. Dr. Redd diagnosed her condition as acute diverticulitis, for which he prescribed oral antibiotics and a strict liquid diet.[22]

Ms. Valdez' condition did not improve significantly, and two days later she went to Cortez, Colorado, where she was hospitalized and placed on IV fluids and antibiotics. After receiving treatment in the Cortez hospital for several days, Ms. Valdez returned home. Within a few days, she became ill again, and this time was admitted to the University of Utah Hospital, where she was diagnosed as having an obstruction requiring immediate surgery. She underwent surgery, which apparently was successful.

To compensate for "the badge of inferiority she was made to wear as she left the facility she had sought help from, not being able to see the provider of her choice, [and] not being able to feel as though she could return to a facility in Monticello for fear of Laurie Wallace," Ms. Valdez seeks an award of "damages of $350,000 and attorneys fees." (Proposed Amended Complaint at 92–93.)

## THE PART I PLAINTIFFS' ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS

Besides the SJHSD and its parent entity, San Juan County,[23] the Part I Plaintiffs have named several individual defendants, originally and in the Proposed Amended Complaint: Commissioner Tyron Lewis, Commissioner Bill Redd, Craig Halls, Reid Wood, Cleal Bradford, Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway, Dr. James Redd, Dr. Lloyd Val Jones, Dr. Manfred Nelson, Richard Bailey, Marilee Bailey, Ora Lee Black, Gary Holliday, Laurie Schafer a/k/a "Laurie Shafer,"[24] Lori Wallace a/k/a "Laurie Walker,"[25] Carla Grimshaw, Gloria Yanito, and Julie Bronson.

22. After leaving the San Juan Hospital emergency room on April 14th, Ms. Valdez did not attempt to contact her physician, Dr. Penn, because she believed he was out of town that weekend. (*Id.* at 26:15–22.) Nor did she try to contact Dr. Penn when her symptoms worsened after seeing Dr. Redd because she did not want to be admitted to San Juan Hospital for treatment. She chose to go to Cortez, Colorado instead. (*Id.* at 35:4–21.)

23. San Juan County is organized as a political subdivision of the State of Utah under the Utah Constitution and Utah Code Ann. §§ 17–50–101 *et seq.* (2001). The SJHSD is organized as a special service district under the Utah Code Ann. § 17A–2–1301 *et seq.* (2004), and is funded in part through tax revenues. San Juan County appoints the members of the SJHSD governance board. *See* Utah Code Ann. § 17A–2–1326 (2001).

24. Ms. Schafer was omitted from the caption of the original Complaint and apparently was added by a document entitled "Amendments to the Complaint Corrections of Errors," filed August 1, 2000 (dkt. no. 3). *See* Fed.R.Civ.P. 15(a) ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . ."). She was again omitted from the captions of both the Proposed Amended Complaint and the Proposed Pretrial Order, in each instance without explanation. Nevertheless, she appears to have been included among the defendants represented by Mr. Harrison in preparation of the Proposed Pretrial Order.

25. The captions of the original Complaint, the Proposed Amended Complaint and the Proposed Pretrial Order refer to a defendant named "Laurie Walker"—in reality, Lori Wallace, R.N., a former SJHSD employee who was working in the San Juan Hospital emergency room on April 14, 1999 when plaintiff Helen Valdez was there seeking treatment. (*See* Answer to Complaint by Laurie Walker (Lori Wallace), filed September 25, 2000 (dkt. no. 46) (name correction noted on docket).)

### The County Commissioners

By the time of pretrial, two San Juan County Commissioners remained as defendants in this action in their individual capacities: Bill Redd and Ty Lewis. Both apparently were also named as defendants for their conduct as SJHSD Board members.[26] Plaintiffs allege very few specific facts concerning Commissioners Redd or Lewis individually;[27] instead, their allegations are pleaded against the *Commission* or the *County:*

> 106. The County Commission and District Board, by not policing and supervising the medical staff and leaving carte blanch[e] decisions on who gets on staff and does not get on staff, contributes directly to the private use of the staff's use of the governmental processes.

> \* \* \* \* \* \*

> 110. The lack of the District Board or County Commission in taking action to supercede medical staff and head of medical staff privilege-granting decisions, and deliberate indifference to investigating complaints, holding hearings, and exercising their government authority to foster economic competition as mandated by statutes, falls outside any 'political' action, and directly is intended to control the business processes of competitors of District employee physicians and P.A.s and those medical staff physi-

cians directly contracting with the District.

(Proposed Amended Complaint at 42–43 ¶¶ 106, 110; Proposed Pretrial Order at 1225, 1226 ¶¶ 146, 150 (same). *See* Proposed Amended Complaint at 34 ¶ 52 ("The County and District had a de facto policy of deliberate indifference to those who complained of suffering from Dr. Redd and other District staff members.").)

### County Attorney Craig Halls

As to San Juan County Attorney Craig Halls, the Part I Plaintiffs note that he "is the brother in law of Rick Bailey, District CEO and County Commission administrator." (Proposed Pretrial Order at 1220 § 51.)[28] With respect to certain administrative problems at the San Juan Hospital identified by the Utah Department of Health at or about the time of the event complained of by Ms. Valdez, plaintiffs state that "[t]he Health District and County Commissioners were informed of these problems in a Board meeting, with an executive session attended by Commissioner Bill Redd and County Attorney Craig Halls." (*Id.* at 60 ¶ 236; Proposed Amended Complaint at 87 ¶ 236 (same).) More generally, the Part I Plaintiffs allege that the County Commissioners, County Administrator and County Attorney "behaved in a deliberately indifferent manner, failed to adequately investigate the problems Mrs. Lyman and Dr. MacArthur identified in the District, did not hold hear-

---

26. Commissioner Redd was a member of the SJHSD Board for a brief period in late 1998 and early 1999, and Commissioner Lewis was a member from late 1998 to mid–1999. (Proposed Pretrial Order at 1243 ¶ 2.)

27. "County Commissioner Ty Lewis made the statement and determination in a public meeting that the County would drive out qualified private competitors," (Proposed Pretrial Order at 1224 ¶ 135); "[i]n areas of health care, Commissioner Ty Lewis is against a

private entity that would or will compete with the District." (*Id.* at 1220 ¶ 50; Proposed Amended Complaint at 34 ¶ 50 (same)).

28. Plaintiffs assert that "Cleal Bradford and James Redd had access to District board members and County Commissioners and the County Attorney as relatives and close friends, in a highly rural and isolated area," whereas plaintiffs MacArthur and Lyman did not. (Proposed Pretrial Order at 1226 ¶¶ 151–152.)

ings on the matters, did not enforce, or take any actions to rectify the situations identified by Mrs. Lyman and Dr. MacArthur." (Proposed Amended Complaint at 16–17.) "A pattern of deliberated indifference as a policy was exhibited by the County Commission, County Attorney, Health District board, administrators and medical staff." (*Id.* at 17.)

**SJHSD Board Members: Atcitty, Lewis, Housekeeper, Adams, Shumway & Holliday**

Defendants Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday are or at relevant times were members of the Board of Trustees of the San Juan Health Services District. (Proposed Pretrial Order at 1243 ¶ 3.) Defendant Cleal Bradford was also a member of the SJHSD Board from approximately February 1999 until June 1999, and from approximately June 22, 1999 until April 2001, Bradford served as executive director of the SJHSD. (*Id.*)

In the Proposed Amended Complaint, the Part I Plaintiffs plead very few factual allegations involving specific SJHSD Board members.[29] The Proposed Amended Complaint alleges nothing regarding intentionally discriminatory acts or other culpable individual conduct of defendants Atcitty, Shumway, Housekeeper,[30] John Lewis, and Adams. Other than noting his status as a SJHSD Board member, the Proposed Amended Complaint says nothing at all about defendant Gary Holliday.

Rather than addressing alleged conduct of individual Board members, the Plaintiffs appear to be complaining of alleged *inaction* by the Board *as a Board:* "The gov-

---

**29.** Plaintiffs allege that

> 223. [On] December 21, 1999 Ms. Lyman Attended San Juan Health Care Services board Meeting to discuss and attempt to resolve her problems with SJHSD staff with the SJHSD board. She requested to have a public meeting so the public could fully understand the issues involved in the health care system their tax dollars support.
>
> 224. SJHSD governance board chairman Roger Atcitty stated that he and SJHSD Patsy Shumway and SJHSD Karen Adams had discussed the situation before the official meeting and had decided that the grievance meeting with SJHSD governance board would be private. Such a decision being made before the meeting and without public input appears to be in violation of Utah's Open Meeting law. (cmplt.# 162–168).

(Proposed Amended Complaint at 83–84 ¶¶ 223–224; *see* Proposed Pretrial Order at 1238–39 ¶ 223–224 (same).)

> John Housekeeper did do some investigation for Mrs. Lyman, but labeled Dr. MacArthur a troublemaker because Dr. MacArthur was perceived by him to be associated with his current counsel in a lawyer/client relationship when Dr. MacArthur appeared at the District Board meeting in December, 1999.

(*Id.* at 22.)

> Mrs. Valdez, Dr. MacArthur, Mrs. Lyman informed the District of their problems and to no avail. Dr. MacArthur and others reporting problems to Board member Patsy Shumway and John Housekeeper were labeled either troublemakers or Dr. Redd detractors.

(Proposed Pretrial Order at 1217.)

> The Defendant community leaders Rick Bailey, Ty Lewis, John Lewis, Karen Adams, Cleal Bradford, with the power and authority over the entire district, did nothing to investigate, find and hold accountable the responsible parties, and carried out a state identified de facto policy that diminished the standard of care for the patients.

(*Id.* at 1223 ¶ 112(b).)

**30.** Concerning Mr. Housekeeper, the Proposed Amended Complaint alleges that Ms. Lyman "suffered from Dr. Redd driving by her home honking his horn," and relates that "[t]he horn honking subsided notably when John Housekeeper was notified as board member that it was going on and was asked to tell Dr. Redd to stop the honking." (Proposed Amended Complaint at 17, 22–23.) Plainly this scenario would not serve as a basis for any liability on the part of Mr. Housekeeper.

ernance board displayed a pattern of not holding doctors or others accountable for interfering in doctor /patient relations. The County was aware of the problems and did nothing to investigate, hold hearings, or resolve the provider and patients' and public's concerns as evidenced in petitions with hundreds of signatures." (Proposed Pretrial Order at 1217; *see id.* at 1226 ¶ 149 ("District Board members and CEOs stated they entrusted medical staff privileging to the medical staff or head of medical staff.").) In plaintiffs' view:

> The District has illegally operated the district by having County Commissioners as board members, by not holding doctors accountable for violations of the law, by not following their own medical by-laws, by not applying policies equally across the board to all persons, by not overriding letters or memos of doctors that set policy, without board approval, while stifling economic competition in the area.

(*Id.* at 1247.)

### The SJHSD Administrators: Wood, Bailey & Bradford

Like their allegations against the SJHSD Board members, plaintiffs' claims against SJHSD administrators Wood, Bailey and Bradford are largely footed upon allegations of *inaction* in response to plaintiffs' grievances:

> 109. Reid Wood and Rick Bailey did nothing to assist Mrs. Lyman in exercising privileges with the District that the District Board never officially and formally terminated.

> 110. Reid Wood, Cleal Bradford, and Rick Bailey as CEOs never held the medical Staff chiefs accountable for policies effecting services of P.A.s, whether written or de facto.

> 111. Reid Wood, Cleal Bradford, and Rick Bailey as CEOs never contradicted

the medical Staff chiefs for policies effecting services of Michele Lyman, whether written or de facto.

> 112. . . . .

> b. The Defendant community leaders Rick Bailey, Ty Lewis, John Lewis, Karen Adams, Cleal Bradford, with the power and authority over the entire district, did nothing to investigate, find and hold accountable the responsible parties, and carried out a state identified de facto policy that diminished the standard of care for the patients.

> \* \* \* \* \* \*

> 126. CEO's Cleal Bradford, Reid Wood, and Rick Bailey did nothing to help these doctors [MacArthur, Penn & Mena] have improved working conditions within the district, or renew their licenses or privileges. All three doctors were not employees of the District when supervising Mrs. Lyman.

> \* \* \* \* \* \*

> 188. Reid Wood and all other CEO'S in this complaint, ignored Mrs. Lyman's attempts to rectify her situation, or exacerbated it.

> \* \* \* \* \* \*

> 190. December 10,1998—Mrs. Lyman called SJHSD administrator Reid Wood twice to see if she could resolve some of the issues she was having with the nurses at the hospital since joining Dr. Penn and to resolve some of the problems with the clinic. Reid Wood did not return her calls. The third Mrs. Lyman called she was told by Carla Grimshaw that he was out of the office.

(Proposed Pretrial Order at 1223 ¶¶ 109–111, 112(b), 126; *id.* at 1234 ¶ 188, 1235 ¶ 190; *see* Proposed Amended Complaint at 71–72 ¶¶ 188, 190 (same).)

As for Mr. Bradford, the plaintiffs describe the process by which he granted temporary practice privileges to Dr. MacArthur, (Proposed Pretrial Order at 1222, 1223 ¶¶ 98–101, 104–105), and then assert that "CEO Cleal Bradford made the determination in granting Dr. MacArthur limited temporary privileges that it was best for the District if referrals to the District facilities came from District doctors. Dr. MacArthur was not employed by the District." (*Id.* at 1224 ¶ 134.) [31] Finally, plaintiffs assert:

> 151. Cleal Bradford and James Redd had access to District board members and County Commissioners and the County Attorney as relatives and close friends, in a highly rural and isolated area.
>
> 152. Dr. MacArthur and Michele Lyman did not have this familial and close friend relationship with Commissioners and District Board members.
>
> 153. Cleal Bradford who signed off on privileges as the District CEO lobbied the Board and County Commission, and medical staff, in meetings with a plurality of the decision-making body, without Mrs. Lyman or Dr. MacArthur being present.

(*Id.* at 1226 ¶¶ 151–153; *see* Proposed Amended Complaint at 44 ¶¶ 111–113 (same).)

What conceivable cause of action the latter allegations would pertain to is not readily apparent. The balance of the allegations against Wood, Bailey and Bradford assert a failure to take affirmative steps to investigate and remedy plaintiffs' grievances involving members of the SJHSD medical and support staff, similar to plaintiffs' claim against the individual SJHSD Board members.

### Laurie Schafer (a/k/a Laurie Shafer)

Laurie Schafer served at relevant times as Patient Care Director for the SJHSD. Plaintiffs allege: (1) that "Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report that he considers to be untrue." (Proposed Pretrial Order at 1222 ¶ 96); (2) that "Mrs. Shafer noticed the dates [on Ms. Lyman's CPR cards] were in error in medical staff meeting," that "[t]he Medical staff and Cleal Bradford and Laurie Shafer discussed Mrs. Lyman's CPR card problems of wrong dates without Mrs. Lyman being present," that "Mrs. Lyman's CPR cards were reviewed and found to be appropriate on more than one occasion by Carla Grimshaw and Laurie Shafer," and that "[t]he medical staff and Cleal Bradford and Laurie Shafer unanimously decided to publish the altered cards to the American Heart Association by vote of the medical staff, who was considering privileges for Mrs. Lyman, without Mrs. Lyman being present." (*Id.* at 1226 ¶ 164–165, 1227 ¶ 174); (3) "The medical staff, Cleal Bradford, Laurie Shafer, Carla Grimshaw failed to notify Dr. MacArthur of any missing documents in his application packet." (*Id.* at 1227 ¶ 182); (4) "After Dr. MacArthur missed this February 2000 meeting, Cleal Bradford, Laurie Shafer, Dr. Redd met with San Juan Record editor Bill Boyle and discussed Dr. MacArthur's privileges with Mr. Boyle. Dr. MacArthur's privileges was private information." (*Id.* at

---

**31.** Plaintiffs also allege that "Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report that he considers to be untrue." (Proposed Amended Complaint at 39 ¶ 88; Proposed Pretrial Order at 1222 ¶ 96 (same).)

1228 ¶ 195); (5) "Mrs. Lyman was told that her friendship with Laurie Shafer would be over as she knew it if Mrs. Lyman associated herself with Dr. Penn." (*Id.* at 1234 ¶ 137); and (5) on one recent occasion when Ms. Lyman was treating a patient at the Blanding Birthing Center under Dr. Jones' supervision, Ms. Shafer allegedly told "Mrs. Lyman and another nurse of Dr. Jones that they would have to leave. Mrs. Lyman and the nurse finished caring for the patient." (*Id.* at 1241 ¶ 254). Further, they allege that on December 16, 1998, Ms. Lyman was told she did not have SJHSD privileges and that SJHSD staff were not to take orders from her. "Ms. Lyman asked Ms. Yanito who gave her this order and she stated that Laurie Schafer and Dr. Redd," (*id.* at 1234 ¶ 170), and that "Laurie Schafer called later in the day and stated that Ms. Lyman could use the lab and xray *only during Dr. Penn's office hours,* otherwise Ms. Lyman did not have privileges." (*Id.* at 1234 ¶ 186 (emphasis in original). *See* Proposed Amended Complaint at 39 ¶ 88; 46–49 ¶¶ 132–133, 138, 142, 150; 51 ¶ 163; 59 ¶ 137; 69–71 ¶¶ 170, 186; 91–92 ¶ 254 (same).)

### Marilee Bailey, R.N.

At relevant times, defendant Marilee Bailey, R.N., worked as a nurse on the SJHSD support staff. Plaintiffs allege that Ms. Bailey is the wife of defendant Richard Bailey, and that like Laurie Schafer, "Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report that he considers to be untrue." (Proposed Pretrial Order at 1222 ¶ 96; *see* Proposed Amended Complaint at 39 ¶ 88 (same).)

### Ora Lee Black

Plaintiffs allege that "Ora Lee Black, as manager of Blanding clinic and birthing center, posted a paper on the walls within site of the patients stating that Mrs. Lyman had no privileges at SJHSD. Later the limited privileges of lab and exray [sic] were extended to her for her patients as required by State law," and that SJHSD "Staff had previously voted for her privileges and then the County, Board, and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied her the same. Some privileges as to labs and exrays [sic] were eventually restored." (Proposed Pretrial Order at 1234 ¶ 187, 1237 ¶ 209; *see* Proposed Amended Complaint at 71 ¶ 187 (same).) Further,

> September 16, 1999—Etta (Ms. Lyman's secretary) was told by Ora Lee Black that Ms. Lyman would not be allowed to order labs until Ms. Lyman sent a letter to Dr. Redd stating who her supervising physician was. ( Ms. Lyman had already sent a letter to administration stating that the State DOPL had approved Dr. Penn in Moab as her supervising physician and Dr. Robert Dr. Mena in Monticello as her back up supervising physician as he was closer that Dr. Penn and could back up any emergencies for admits for Ms. Lyman at the San Juan Hospital). By then, Dr. Mena had quit the San Juan Health Care Services as an employee and had started a private practice. (cmplt.# 149).

(*Id.* at 1237 ¶ 213; *see* Proposed Amended Complaint at 79–80 ¶ 213 (same).)

### Carla Grimshaw

Carla Grimshaw is a SJHSD employee. Plaintiffs allege that "[l]ess than 24 hours prior to the February 2, 2000 medical staff meeting, Carla Grimshaw called Mrs. Lyman's office to invite Mrs. Lyman and Dr.

MacArthur to that meeting";[32] that "Carla Grimshaw delivered copies of Mrs. Lyman's file to her," and that "Mrs. Lyman and Carla Grimshaw, custodian for the records, acknowledge the CPR cards were missing from Mrs. Lyman's credentialing files while in the District's custody"; that "Mrs. Lyman's CPR cards were reviewed and found to be appropriate on more than one occasion by Carla Grimshaw and Laurie Shafer"; that "Carla Grimshaw, records custodian, stated that [Dr. MacArthur's] medical license and DEA license was missing," and "allegedly wrote a note to Mr. Bradford saying Dr. MacArthur was missing only his DEA license and State of Utah Medical License," but that "[t]he medical staff, Cleal Bradford, Laurie Shafer, Carla Grimshaw failed to notify Dr. MacArthur of any missing documents in his application packet." (Proposed Pretrial Order at 1222–23 ¶ 102, 1226 ¶ 156, 1226 ¶ 161, 1227 ¶ 170, 1227 ¶ 182, 184, 1227 ¶ 191; *see also* Proposed Amended Complaint at 44–50 ¶¶ 114–159 ("Credentialing Document Problems").) Plaintiffs also recount that on May 5, 1999,

> Andrea Bianchini (Ms. Lyman's secretary) faxe[d] Ms. Lyman's ACLS, PALS and BLS heart resuscitation American Heart Association certification cards to Judy at the hospital at the administration's request. Dr. Penn and Ms. Lyman have been requesting her privileges be restored through Reid Wood. Andrea also called Carla Grimshaw to make sure that the certifications have reached her. Grimshaw state[d] that the faxed cards have arrived and that Medical staff reviewed the certifications, found them in order, and the packet has been placed in her personnel file.

(*Id.* at 1236 ¶ 207; *see* Proposed Amended Complaint at 77 ¶ 207.)

### Gloria Yanito

Plaintiffs allege that on

December 16, 1998—On this day, Ms. Lyman attempted to send a patient to the E.R. in Blanding for treatment. As soon as the patient got to Blanding, Christine Singer (who began working for Dr. Penn in December 1998) took a call from Gloria Yanito, RN at the Blanding Urgent Care. Ms. Yanito stated that Ms. Lyman did not have privileges and that Ms. Lyman "can not give orders of any kind or use any of the county facilities". Ms. Singer then told Ms. Lyman, with several witnesses sitting in the office. Ms. Lyman immediately called Ms. Yanito back and asked Yanito to repeat the Message. Yanito repeated, "you do not have privileges. We are not supposed to take any orders from you and you are not allowed to set foot in any of the county facilities". Ms. Lyman asked Ms. Yanito who gave her this order and she stated that Laurie Schafer and Dr. Redd. Ms. Lyman then attempted to call Laurie Schafer and was told she was not in. Ms. Lyman spoke with Carla Grimshaw and told her she wanted this order in writing, Grimshaw stated that she would let Laurie know. Ms. Lyman also attempted to call Reid Wood, he was not in.(Cmplt.# 130)

(Proposed Pretrial Order at 1227 ¶ 184; Proposed Amended Complaint at 69–70 ¶ 170 (same).) They further allege that Ms. Lyman had been granted SJHSD privileges, but "then the County, Board,

32. On "February 1, 2000 Carla Grimshaw calls Ms. Lyman's office to say that Ms. Lyman and Dr. MacArthur need to be at Medical staff Meeting in the a.m. at 0800. Ms. Grimshaw states nothing about their privileges being an agenda item, or that medical staff would making any decisions about those privileges." (Proposed Pretrial Order at 1239 ¶ 229.)

and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied her the same," (*id.* at 1237 ¶ 209), apparently referring to the December 16, 1998 conversation with respect to Ms. Yanito.

**Julie Bronson**

Plaintiffs allege that Julie Bronson, a nurse employed by the SJHSD, circulated a false rumor that Dr. MacArthur, *inter alia,* had previously lost practice privileges due to a felony conviction:

January 31, 2000–Louisa Lyman, of the Utah State Public Health system calls Ms. Lyman's office and states that nurse Julie Bronson has said that Dr. MacArthur lost his privileges to perform epidurals due to a felony conviction, that during a delivery the nurse came to Dr. MacArthur in the Dr's lounge and told him that the OB was ready to push and he purportedly said, "I'm going to have an orgasm", and that Dr. MacArthur spent time in prison for tax evasionAll of which is totally untrue and without any foundation whatsoever. Louisa called her office and first spoke to Christine. Ms. Lyman called back and Louisa Lyman repeated this story. Ms. Lyman stated the story was untrue.

(Proposed Amended Complaint at 84–85 ¶ 228; *see* Proposed Pretrial Order at 1239 ¶ 228 (same).) They also allege, as noted above, that "Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report that he considers to be untrue." (*Id.* at 39 ¶ 88; *see* Proposed Pretrial Order at 1222 ¶ 96 (same).)

**Lori Wallace, R.N. a/k/a Laurie Walker**

As summarized above, Plaintiffs allege that on April 14, 1999, plaintiff Helen Valdez (accompanied by her sister-in-law, Charleen Gonzales) came to the San Juan Hospital emergency room, seeking medical care for an illness later diagnosed as acute diverticulitis. At that time, SJHSD employee Lori Wallace, R.N., was working in the emergency room. While Ms. Valdez was in the hospital lavatory, she alleges that Ms. Gonzales overheard Lori Wallace tell the emergency room clerk "to go to Dr. Penn's clinic." (Proposed Amended Complaint at 23; Proposed Pretrial Order at 1216–17; *id.* at 1221 ¶ 81 ("Mrs. Valdez was told by Mrs. Gonzales that Nurse Wallace had told the receptionist that Dr. Penn's clinic was open and Mrs. Valdez should go to the clinic.").) Without any direct conversation with Lori Wallace, Ms. Valdez decided to leave the emergency room, again accompanied by Ms. Gonzales, and return home. Plaintiffs allege that Ms. Valdez "was turned away, when accompanied by her Mexican–American appearing sister-in-law, by nurse Laurie Wallace"; at the same time, plaintiffs allege that "[t]he white young male with no insurance in the ER waiting area was seen by Dr. Penn almost immediately after Mrs. Valdez left." (Proposed Amended Complaint at 86 ¶ 232–233; *see* Proposed Pretrial Order at 1221 ¶ 66 ("Mrs. Valdez' neighbor who was a white young male and had not insurance was seen immediately.").) Plaintiffs pleaded no other factual allegations against Ms. Wallace.

**Dr. Lloyd Val Jones, M.D.**

Dr. Lloyd Val Jones, M.D., is a licensed physician practicing in Blanding, Utah, who at relevant times has provided services under contract with the SJHSD. Plaintiffs allege that "For Mrs. Lyman's claims, at times the [SJHSD] medical staff consisted of Dr. Penn, Dr. Mena, Dr. Jones, Dr. Nelson, Dr. Cook, Dr. Redd." (Proposed Amended Complaint at 30–31

¶ 28; *see* Proposed Pretrial Order at 1219 ¶ 28 (same).[33]) According to plaintiffs,

32. Dr. Redd and Dr. Jones and Dr. Cook and Dr. Nelson did not approve Mrs. Lyman having privileges unless her doctor was a medical staff member and then only if the physician was in the same town as she.

33. While the policy for P.A.s appears neutral, it effected only Michele Lyman in how it was applied, monitored, and carried out.

34. Mrs. Lyman had no other place to apply for hospital privileges.

35. Mrs. Lyman's patients at times stopped going to her as they needed to use the District emergency facilities for ailments and were told they could not.

(*Id.* at 31 ¶¶ 32–35.) Plaintiff Lyman alleged that her privileges were "severely limited by Dr. Redd and Dr. Jones with no action by the board of directors," recounting a single conversation in mid–1999:

209. Dr. Penn and Ms. Lyman attended the Medical staff Meeting for June, 1999. Dr. Penn and Ms. Lyman requested full privileges be restored and Dr. Redd and Jones both stated that only if Dr. Penn was willing to sit in Blanding with Ms. Lyman while Ms. Lyman took ER call and they would not supervise me. Mr. Bryant as a P.A. working under Dr. Jones while Dr. Jones was not in Blanding, had no such restraints. Mrs. Lyman pointed out that she covered the ER (Blanding urgent care clinic) in Blanding by herself on many occasions. There was no response. (Cmplt. 137–145) Staff had previously voted for her privileges and then the County, Board, and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied

her the same. Some privileges as to labs and exrays [sic] were eventually restored.

210. Dr. Penn then suggested to medical staff that the only reason that Dr. Redd was against Ms. Lyman's privileges was because Dr. Redd was mad at Ms. Lyman for quitting Dr. Redd and Dr. Redd couldn't take it. To this Dr. Redd responded, "So what"! Dr. Jones then made the comment that Ms. Lyman had a rather large following of patients and that when he was taking ER call he didn't want Ms. Lyman to be able to see her patients at will and thus "dip into his ER money". They left with the staff's edict that Ms. Lyman could call into the ER (Blanding Urgent Care) for shots. However, Ms. Lyman tried on several occasions to call in injections to the ER (Blanding Urgent Care Clinic) and was denied every time. Ms. Lyman always had to call Dr. Penn's office and have him call the order in. (Cmplt. 146)

(*Id.* at 78–79 ¶¶ 209–210; *see* Proposed Pretrial Order ¶¶ 209–210 (same).)

Circumstances change, and by the time of pretrial, Ms. Lyman was working for Utah Navajo Health Systems, once again *under Dr. Jones' supervision,* (*see* Tr. 11/15/02, at 24:9–25 (Ms. Rose)); she points to two recent incidents involving patients in Dr. Jones' and her care:

253. Within the last 14 or so days, a patient of Dr. Jones and Michele Lyman's was told, when she called the Birthing Center in labor, that the Birthing Center was shut and she would just have to travel to Monticello. Dr. Jones' staff verified that indeed the BCC was claiming they were SHUT. The patient presented at Blanding Family Clinic,

---

**33.** According to plaintiffs, "With the exceptions of Dr. Jones and a Monument Valley clinic doctor, all other physicians and P.A.'s within San Juan District are employees of San Juan District." (Proposed Pretrial Order at 1220 ¶ 43.)

now owned by Utah Navajo Health Systems, and was found to be too far progressed to travel anywhere. Time was of the essence. Mrs. Lyman's supervising physician was denied patient care by the District he has full privileges with. The lady delivered in the Blanding Family Clinic and was then transported to Monticello for observation. The Blanding Family Clinic is taxpayer supported. There is no record of this type of patient of a Dr. Redd being told the Birthing Center was shut.

254. In another instance, a woman in labor was bleeding to death and she and the baby were in a very dangerous situation. Dr. Jones and Mrs. Lyman transported the woman to the Birthing Center and did an immediate c section on the unconcious or nearly unconcious mother. Both mom and baby were saved. As Dr. Jones was cleaning up, Dr. Fisher and Laurie Shafer were telling Mrs. Lyman and another nurse of Dr. Jones that they would have to leave. Mrs. Lyman and the nurse finished caring for the patient. This incident occurred prior to the Clinic being 'shut' when Michele's next patient was in labor and delivered in a clinic.

(Proposed Amended Complaint at 91–92 ¶¶ 253–254; see Proposed Pretrial Order at 1241 ¶¶ 253–254 (same).)

### Dr. Manfred Nelson, M.D.

Dr. Manfred Nelson, M.D., is a licensed physician practicing in San Juan County and at relevant times was a member of the SJHSD medical staff. Plaintiffs' allegations against Dr. Nelson—few as they are—essentially parallel those pleaded against Dr. Jones concerning restriction of Ms. Lyman's privileges in mid–1999, with the addition of the assertion that "Dr. Nelson sent a letter severely criticizing Mrs. Lyman and he is on Medical Staff and has never met her, spoken to her, or

worked with her. His writings are the best evidence of the types of rumors he was being told, and the damages the medical staff were seeking to inflict upon Mrs. Lyman." (Proposed Pretrial Order at 1240–41 ¶ 248.)

### Dr. James Redd, M.D.

As noted above, Dr. James Redd, M.D., a Blanding, Utah physician, maintained a private medical practice in Blanding until he became a SJHSD employee in early 1999; at relevant times thereafter, Dr. Redd served as District medical staff director. Early in her career, plaintiff Lyman worked as a Physician Assistant under Dr. Redd's and Dr. Jones' supervision. She ended that arrangement in October 1998, and sought supervision by other physicians practicing in the area.

From a review of plaintiff Lyman's allegations at the time of pretrial, it becomes plainly apparent that Dr. Redd is the primary focus of those allegations. Plaintiffs plead a litany of factual allegations against Dr. Redd, recounting a series of incidents involving the making of derogatory remarks or infliction of other verbal abuse, interference with Ms. Lyman's exercise of SJHSD staff privileges from and after the time she left his supervision in October 1998, and harassment and intimidation of patients who had some relationship with Ms. Lyman and/or her supervising physicians (Drs. Penn, Mena, MacArthur and now, Jones). (See Proposed Pretrial Order at 1230, 1231, 1232 ¶¶ 133(D)-(F), 138, 144–150, 153, 156–159; id. at 1232–33 ¶¶ 162–163, 165–166; id. at 1234, 1235 ¶¶ 167–186, 193; id. at 1241 ¶¶ 253–254 (quoted supra); see also Proposed Amended Complaint at 58–76 ¶¶ 133(D)-(F), 138, 143–150, 153, 156–195, 199–205; id. at 77–78 ¶¶ 208 (emergency room patient "was told by Dr. Redd that she must choose between Ms. Lyman/Dr. Penn and

Dr. Redd as a health care provider," and that "if the patient chose Ms. Lyman, the patient could never use the E.R. again.").) Plaintiffs assert that "[t]he District medical staff director, Dr. Redd has a long standing policy of animus toward women both as employees and as patients," (*id.* at 1220 ¶ 51), borne out in the incidents recounted in their pleadings, and that Dr. Redd demeaned and disparaged the other physicians with whom Ms. Lyman had associated. (*Id.* at 1237–38 ¶¶ 215–216.) They also allege a pattern of personal harassment and annoyance directed against Ms. Lyman by Dr. Redd:

> 196. Dr. Redd was witnessed by others as driving by Mrs. Lyman's home, frequently honking.

> 197. Mrs. Lyman reports that Dr. Redd followed Mrs. Lyman's about 10 year old daughter in his car for a period of time, frightening the daughter.

> 198. Mrs. Lyman and her nurse Christine Singer, experienced numerous flat tires over a two week or so period, with no foreign items found in the tires. These flat tires occurred at the office and at their homes.

(*Id.* at 1235 ¶¶ 196–198; *see* Proposed Amended Complaint at 73–74 ¶¶ 196–198 (same).)

## THE PART I PLAINTIFFS' THEORIES OF LIABILITY

As summarized in the Proposed Pretrial Order, Part I of the Proposed Amended Complaint asserts an array of causes of action arising under federal and Utah state law, including:

(1) Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* (2000);

(2) Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248 (2000);

(3) Health Care Quality Improvement Act, 42 U.S.C. § 11112 (2000);

(4) Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2000);

(5) "Medicare Patient Bill of Rights," 42 U.S.C. § 1395a (2000);

(6) 42 U.S.C. § 1981 (2000);

(7) 42 U.S.C. § 1985(3) (2000);

(8) 42 U.S.C. § 1983 (2000);

(9) § 4 of the Clayton Act, 15 U.S.C. § 15 (2000) and § 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1 (2000);[34]

(10) Utah Constitution, art. I, §§ 1, 7, 25, 26, 27;

(11) Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–1 *et seq.* (2001);

(12) Utah Civil Rights Act, Utah Code Ann. §§ 13–7–1 *et seq.* (2001);

(13) interference with contract and with prospective business relations;

(14) "state *common law* defamation (also a U.S. Constitutional right to reputation as guaranteed by the Ninth Amendment)";[35]

(15) "Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing. Utah Code Ann. 78–12–25(1) (1996)," in-

---

**34.** More recently, plaintiffs' counsel has invoked the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 through 76–10–926 (2003), in addition to the federal antitrust statutes. (Memorandum in Support of Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judg-

ment, filed November 23, 2004 (dkt. no. 670), at 4.)

**35.** Plaintiffs' counsel now refers to "civil and criminal defamation with malice," apparently invoking Utah Code Ann. § 76–9–404 (2003) in addition to the common law theories. (*Id.*)

cluding the implied covenant of good faith and fair dealing;[36]

(16) "privacy rights and statutory entitlements to have their credential files and patient files accurately kept by the district under Medicaid and Utah Health Department statutes and regulations";

(17) negligent and intentional infliction of emotional distress; and

(18) fraud.

(*See* Proposed Pretrial Order at 1212–13.)

Generally, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Accordingly, a pleading must 'give[ ] fair notice and state[ ] the elements of the claim plainly and succinctly.'" *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 649 (9th Cir.1984) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.13 at 8–111 (2d ed.1983)). To give such notice, a pleading must set forth specific facts as the basis for the plaintiffs' claims, not merely legal conclusions. Without specific facts, "claims are little more than conclusory allegations, which are insufficient to state a claim for relief." *Swoboda v. Dubach,* 992 F.2d 286, 289–290 (10th Cir.1993) (citing *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991)).

The parties may test the legal sufficiency of claims by motion under Fed.R.Civ.P. 12(b)(6) or 56, and as explained above, "Rule 16 empowers district courts to weed out frivolous claims." *Smith v. Gulf Oil Co.,* 995 F.2d 638, 644 (6th Cir.1993). "There is no reason to require that [the elimination of frivolous claims] await a formal motion for summary judgment," Fed. R.Civ.P. 16(c)(1), advisory committee note

to 1983 amendment, and it certainly " 'is not inconsistent with the general purpose of Rule 16' to use this rule 'to determine whether there are any issues remaining in the case that justify proceeding to a full trial on the merits.'" *Chavez v. Illinois State Police,* 251 F.3d 612, 654 (7th Cir. 2001) (quoting 6A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 1529, at 301 (2d ed.1990)).

In evaluating whether the plaintiffs' claims are maintainable or are frivolous, court and counsel must examine them within the framework of their various legal theories; the facts alleged as the basis for these claims must be considered in terms of the essential elements of each cause of action.

### ■ Plaintiffs' Civil RICO Claims (18 U.S.C. §§ 1961 *et seq.*)

■ In order to state a civil RICO claim, a plaintiff must allege that he or she suffered (1) an injury to his or her business or property because the defendant(s), (2) while involved in one or more enumerated relationships with an "enterprise," (3) engaged in a pattern of racketeering activity or collected an unlawful debt. *See* 18 U.S.C. §§ 1961–1968 (2000).

### Predicate Acts of "Racketeering Activity" (18 U.S.C. § 1961(1))

■ Among the essential elements required to establish civil liability under the RICO statute, plaintiffs must show, *inter alia,* that the defendants have conducted the affairs of an identifiable "enterprise" through a "pattern of racketeering activity," that is, that the defendants have committed a continuous series of related criminal acts in violation of one or more of the

---

**36.** Plaintiffs' counsel would now extend this theory to reach interference with a plaintiff's "right to pursue his profession and business affairs by lack of good faith and fair dealing inherent and mandated in all Utah business relations." (*Id.*)

statutes listed in 18 U.S.C. § 1961(1) ("racketeering activity" defined). 18 U.S.C. § 1962. *See, e.g., BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir.1999) ("To establish a civil RICO claim under 18 U.S.C. § 1962(c), [plaintiff] must show that the [defendants] '(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1541 (10th Cir.1993) (citing *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1273 (10th Cir.1989)).") Defendants "need not engage in the stereotypical mobster behavior to come within the bounds of civil RICO," *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 447 (5th Cir. 1992) (citing *United States v. Turkette*, 452 U.S. 576, 580–81, 591, 101 S.Ct. 2524, 69 L.Ed.2d 246(1981)), but they must nevertheless be shown to have participated in continuing criminal violations constituting an identifiable "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).[37]

The Proposed Amended Complaint points to mail fraud (18 U.S.C. § 1341), witness tampering (18 U.S.C. § 1512) and interference with commerce by threats (18 U.S.C. § 1951) as the predicate acts of racketeering activity pertinent to plaintiffs'

claims asserted in this case.[38] (Proposed Amended Complaint at 12.)

### (a) 18 U.S.C. § 1341—Mail Fraud

■ 18 U.S.C. § 1341 (2000) reads:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

**37.** The statute of limitations applicable to civil RICO actions is the four-year limitations period governing civil enforcement actions under the Clayton Act, 15 U.S.C. § 15b. *See, e.g., Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1273 n. 12 (10th Cir.1989).

**38.** "The various acts of racketeering activity described in the statute are often referred to as 'predicate acts' because they form the basis for liability under RICO." *BancOklahoma*

*Mortgage Corp.*, 194 F.3d at 1102 (citing *Bacchus Industr., Inc. v. Arvin Industr., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).

Plaintiffs' counsel also refers to "(d) illegal destruction or tampering with confidential documents in a federally contracted facility;" and "(e) intimidation of witnesses for monetary gain," (Proposed Pretrial Order at 1212 ¶ (5)), but these are not found among the offenses enumerated in the statute's definition of "racketeering activity" and thus cannot serve as RICO predicate acts. 18 U.S.C. § 1961(1) ("racketeering activity" defined).

If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

In order to prove the offense defined in § 1341 in a criminal proceeding, the government must prove the following essential elements: (1) that the defendant knowingly devised or knowingly participated in a scheme or artifice for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) that the pretenses, representations or promises were material, that is, they would reasonably influence a person to part with money or property; (3) that the defendant did so with the intent to defraud; and (4) that in advancing, or furthering, or carrying out this scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises, the defendant used the mail, or any private or commercial interstate carrier, or caused the same to be used by someone else.

■ To establish mail fraud as a predicate act of racketeering activity for the purposes of a civil RICO claim, plaintiffs must plead and prove facts establishing each of these essential elements as to each occurrence, as to each predicate act alleged as part of the requisite "pattern of racketeering activity." Rule 9(b) of the Federal Rules of Civil Procedure require that allegations of mail fraud be pleaded with particularity. *See, e.g., Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989–90 (10th Cir.1992) (predicate acts of mail fraud require heightened pleading pursuant to Rule 9(b)); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir.1989) (Rule 9(b) requires particularity in pleading the RICO predicate acts of mail fraud).

■ Plaintiff Lyman alleges that her CPR certification cards, "a necessary component of her ability to obtain privileges were altered purposefully," that "she was not notified immediately that her cards were in some way in error," that "the cards were stolen from her file at least on two if not three occasions," that "*the forged documents were mailed to the American Heart Association,*" and that "the doctors would have profited from Mrs. Lyman not being able to work ...." (Proposed Pretrial Order at 1241 ¶ 255 (emphasis added); *see id.* at 1217 ("forged documents were sent in the U.S. mail to harm her reputation with the American Heart Association who oversees the cpr classification certification programs Mrs. Lyman is obligated to pass"); *id.* at 1224 ¶¶ 129–131 ("The U.S. mail was used to mail the cards while the local doctors and medical providers could profit from limiting Mrs. Lyman's competition and reputation with the American Heart Association"); *id.* at 1227 ¶¶ 174–175.)

■ Plaintiff Lyman thus complains that her CPR cards were altered and/or forged, and alleges "the use of the mail system to send fraudulent cards" to the American Heart Association. (*Id.* at 1243.) Yet mail fraud is not committed simply by sending false statements through the mail; the mails must have been used to further a scheme to defraud or obtain money or property through false pretenses. *See BancOklahoma Mortgage Corp.*, 194 F.3d at 1102. Here, Ms. Lyman's CPR cards, even if altered or forged, and thereby becoming false or "fraudulent" representations in one sense, are not themselves alleged to be the means of obtaining money or property, and are not such as to "reasonably influence a person to part with money or property" as required to prove a violation of § 1341. Plaintiffs allege that "the local doctors and medical providers could profit from limiting Mrs. Lyman's competition and reputation with the American Heart Association,"

(Proposed Pretrial Order at 1224 ¶ 131), but do not claim that any of the defendants obtained or schemed to obtain money or property by means of the altered or forged CPR cards.

Here, the Part I Plaintiffs have failed to plead facts establishing the essential elements of mail fraud (a scheme or artifice to defraud, *viz.*, to obtain money or property by means of false or fraudulent pretenses, representations, or promises, and the use of the mails in furtherance of the scheme) as against any of the named defendants.

**(b) 18 U.S.C. § 1512—Witness Tampering**

■ Section 1512 of Title 18, United States Code prohibits specific conduct, including physical force, threats of physical force, or intimidation, threatening, "corrupt" or "misleading" persuasion or harassment, that is intended to "influence, delay or prevent" a witness from attending or testifying in an official proceeding, or intended to cause testimony, records, documents, or other objects to be withheld, concealed, altered or destroyed in order to impair their availability for use in an official proceeding. 18 U.S.C. § 1512(a), (b), (c), (d) (2000). Section 1512 prohibits only the coercive conduct specifically described in its subsections; the legislative history reflects Congress' rejection of broadly inclusive language in favor of "the specific conduct narrowly described in the final version of the statute." · *United States v. Dawlett*, 787 F.2d 771, 774–775 (1st Cir. 1986) (citing *United States v. Lester*, 749 F.2d 1288, 1295–1297 (9th Cir.1984)); *cf. McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1039–1040 (11th Cir.2000) (assertion that defendants attempted to deter plaintiff by force, intimidation, or threat from testifying before a federal grand jury about employer's activities by threatening him with job-related sanctions alleged a

violation under the federal witness tampering statute).

■ The Part I Plaintiffs assert that defendant "Dr. Redd informed the head of the local nursing home that the nursing home patients would no longer see Dr. Cook as a result of making a witness statement," that "[w]itnesses have requested that they not be used to give testimony due to fear of retaliation and loss of jobs," and that "[o]ne witness has stated she is petrified her relatives will not stay employed or her children will not be seen at District facilities if she testifies." (Proposed Pretrial Order at 1240 ¶¶ 244–246; Proposed Amended Complaint at 88–89 ¶¶ 244–246.) None of these allegations set forth facts evidencing conduct by any named defendant that falls within the scope of the statute.

Prospective fact witnesses may indeed feel fearful, anxious or apprehensive about how their testimony may be responded to by those against whom it may be offered. In some cases, potential witnesses may fear for their very lives, and with good reason. Federal law affords such witnesses some degree of protection. *See generally* 18 U.S.C. § 1513 (retaliation against witness); 18 U.S.C. §§ 3521–3528 (2000) (federal witness protection program). But fear, anxiety and apprehension on the part of a prospective witness as to a future loss of employment, denial of services, or other adverse personal consequences do not equate with the culpable criminal conduct on the part of a defendant that violates § 1512. A defendant must do *something*—use physical force, threats of physical force, or intimidation, threatening, corrupt or misleading persuasion or harassment—that is intended to "influence, delay or prevent" a witness from attending or testifying in an official proceeding, or intended to cause testimony, records, documents, or other objects to

be withheld, concealed, altered or destroyed in order to impair their availability for use in an official proceeding, in order to run afoul of the witness tampering statute. 18 U.S.C. § 1512(a)-(d).[39] The Proposed Amended Complaint alleges nothing of that kind.[40]

### (c) 18 U.S.C. § 1951—Interference with Commerce by Threats

The Anti–Racketeering Act of 1934, Act of June 18, 1934, ch. 569, 48 Stat. 979, codified at 18 U.S.C. § 1951 (2000), makes it a federal offense to commit robbery or extortion that in any way or degree obstructs commerce. To prove guilt, the government must prove that a defendant committed extortion or robbery, and that such conduct interfered with interstate commerce. Though § 1951 is often referred to as the "Hobbs Act," the Hobbs Act (Act of July 3, 1946, ch. 537, 60 Stat. 420) itself amended the 1934 Anti–Racketeering Act to include extortionate conduct by labor unions, which had been held to be exempt under the statute's original language. *See United States v. Local 807 of International Broth. of Teamsters*, 118 F.2d 684, 687–88 (2d Cir.1941), *aff'd*, 315 U.S. 521, 539, 62 S.Ct. 642, 86 L.Ed. 1004 (1942).

The courts read the legislative history of the 1934 Act to indicate that Congress enacted the 1934 legislation to eliminate racketeering by organized gangs, which was found to have a substantial effect on interstate commerce, particularly the interstate transportation industry. *See*

---

**39.** Section 1512 addresses specific affirmative coercive or misleading conduct intended to inhibit or influence *future* witness testimony or the availability of evidence yet to be offered in a pending or future federal proceeding. *See United States v. Rose*, 362 F.3d 1059, 1067–1068 (8th Cir.2004); *United States v. Davis*, 357 F.3d 726, 728–729 (8th Cir.2004), *vacated on other grounds*, 543 U.S. 1099, 125 S.Ct. 1049, 160 L.Ed.2d 993 (2005) (mem.); *United States v. Romero*, 54 F.3d 56, 62 (2d Cir.1995) ("knowing interference with a potential communication between an individual who might become a witness and federal law enforcement officials falls within the ambit of Section 1512. We have thus previously noted that the statute covers 'potential' witnesses. *United States v. Hernandez*, 730 F.2d 895, 898 (2d Cir.1984) ('[section] 1512 explicitly covers "potential" witnesses')"); *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir.1986) ("18 U.S.C. § 1512 punishes only those threats made with the intent to cause the witness to withhold future testimony").

**40.** More recently, plaintiffs' counsel has asserted that Dr. MacArthur and Ms. Lyman suffered retaliation in violation of *18 U.S.C. § 1513* for having informed the SJHSD's governance board of remarks made by SJHSD administration and staff concerning Dr. Nathaniel Penn being a "little New York Jew." (*See* Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), at 17; Memorandum in Support of Plaintiff Lyman's Motion for the Court to Reconsider its Motion to· Dismiss Plaintiff's Valdez' [sic] Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed December 28, 2004 (dkt. no. 696), at 24). Section 1513 prohibits violent retaliation (*e.g.*, killing, attempting to kill, causing bodily injury, damaging tangible property) against any person for attending or furnishing testimony or evidence in a federal proceeding or providing information to a law enforcement. officer "relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C. § 1513(a), (b). Plaintiffs have alleged no federal proceeding, no reporting of a federal offense, and no violent retaliation. Even § 1513(e), which prohibits "interference with the lawful employment or livelihood of any person for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense," simply cannot be read to reach the reporting of ethnic remarks to a local hospital's governance board.

Counsel's assertion that § 1513 was violated by conduct so plainly outside the clear language of the statute raises serious concerns under Fed.R.Civ.P. 11.

*United States v. Local 807 of International Broth. of Teamsters,* 315 U.S. 521, 528–530, 62 S.Ct. 642, 86 L.Ed. 1004 (1942) (citing H. Rep. No. 1833, 73d Cong.2d Sess. (1934)). The 1934 Act was first introduced in the Senate in response to a Senate Committee on Interstate Commerce investigation of "rackets" and "racketeering," which the Committee defined as "an organized conspiracy to commit the crimes of extortion or coercion, or attempts to commit extortion or coercion," as defined by "the penal law of the State of New York and other jurisdictions." S.Rep. No. 75–1189, 75th Cong., 1st Sess., at 3 (1935). The Committee reported that many businesses were being coerced to pay "dues" for "protection" from gangsters—most of whom were actually affiliated with those offering the "protection"— who would engage in the "hijacking" of trucks used to transport merchandise in interstate commerce, as well as price-fixing and other coercive conduct harmful to commerce. *Id.* at 9, 21–23; *Local 807 of International Broth. of Teamsters,* 315 U.S. at 529–30, 62 S.Ct. 642 (citing H.R.Rep. No. 73–1833, at 2 (1934) (the 1934 Act was intended to make unlawful racketeering "in connection with price fixing and economic extortion directed by professional gangsters.")). According to the 1934 bill's sponsor, Senator Copeland, the legislation was intended to "render more difficult the activities of predatory criminal gangs." S.Rep. No. 73–1440, at 1 (1934). The same was true of the 1946 legislation:

> In arguing for the adoption of the Hobbs Act, Congressman Hobbs, the sponsor of the Act, emphasized that the 1934 Act was being amended to address highway robbery by organized labor unions and was intended to protect individuals and goods in interstate commerce. Additional testimony during the debate in the House of Representatives clearly establishes that the Hobbs Act was passed to protect individuals "trying to deliver food into the various big cities in our nation" and those "who feel they have a right to drive down ... public highways and streets ..." According to Mr. Hobbs, the "sole and simple purpose" of the Hobbs Act is to protect interstate commerce and "free the highways and streets of this country of robbers." Thus, the Hobbs Act was originally a subject matter specific statute that applied only to actions of organized gangs, and, like other subject matter specific statutes, was passed by Congress only after findings that the specific type of crime so addressed presented a national problem. This interpretation of the Hobbs Act is further supported by the initial and long held position of the Justice Department that the robbery provision of the Act was to be utilized only in instances "involving organized crime, gang activity, or wide-ranging criminal activity."

Michael McGrail, *The Hobbs Act after Lopez,* 41 B.C.L.Rev. 949, 956–57 (2000) (footnotes omitted). Since its 1946 re-enactment in the Hobbs Act, the Court has read § 1951 to " 'manifes[t] ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.' " *United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978) (quoting *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

In *Scheidler v. National Organization for Women, Inc.,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003), however, the Court read the Hobbs Act's definition of "extortion" as "the *obtaining of property* from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official

right," 18 U.S.C. § 1951(b)(2), to require "that a person must 'obtain' property from another party to commit extortion," that is, that there must be "not only the deprivation but also the acquisition of property." 537 U.S. at 404, 123 S.Ct. 1057. The anti-abortion protestors in *Scheidler* did not violate § 1951 for purposes of civil RICO liability because in physically obstructing the operation of clinics performing abortions, they "neither pursued nor received 'something of value from' respondents that they could exercise, transfer or sell"; thus, under § 1951, "merely interfering with or depriving someone of property" was not "sufficient to constitute extortion." *Id.* at 405, 123 S.Ct. 1057.

Even if taken as true in their entirety, none of the factual allegations of Part I of the Proposed Amended Complaint identify any property 'obtained' or acquired from the plaintiffs by San Juan County, the SJHSD, or any of the named individual defendants with plaintiffs' consent "induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."[41] Nor do any of the additional factual assertions set forth more recently in the Part I Plaintiffs' combined motions for reconsideration and summary judgment identify any property or thing of value obtained and acquired by the defendants from these plaintiffs through extortionate means. (*See* Plaintiff Valdez's Motion for the Court to Reconsid-

er its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 664); Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670); Plaintiff Lyman's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed December 28, 2004 (dkt. no. 695).) These plaintiffs are not engaged in the interstate transportation of goods, or in the sale of merchandise flowing through interstate commerce. Nor, for that matter, do any of plaintiffs' allegations describe conduct of the kind of "organized crime, gang activity, or wide-ranging criminal activity" on the part of the named defendants that Congress had in mind in enacting the statute.

A private civil action under the federal RICO statute remains available as a means for those persons who have been "injured in [their] business or property" by reason of a violation of RICO's criminal provisions to seek legal and equitable remedies for their injuries from those whose ongoing criminal conduct has caused them harm. *See* 18 U.S.C. § 1964. However, civil RICO liability does not serve merely as a device to multiply the money damages available to parties embroiled in more commonplace civil litigation,[42] or as a

---

**41.** Plaintiffs assert that Ms. Lyman's patients "were told that even in an emergency they would not be seen by the District if they continued to visit Mrs. Lyman for health care. Mrs. Lyman believes threatening patients that emergency care will be denied in an emergency is extortion of the lowest kind." (Proposed Pretrial Order at 1241–42 ¶ 255.) A threat of denial of emergency medical care by a public facility may be found to be improper for a number of reasons, but such a threat does not constitute "extortion" within the meaning of the Hobbs Act.

**42.** The potential for abuse of the civil RICO remedy was recognized some years ago: " 'Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.' " *Chapman & Cole v. Itel Container Int'l*, 865 F.2d 676, 685 (5th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 155 (1989)

means to vilify civil litigants by labeling them as "racketeers," gangsters, extortionists and criminals. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (a civil RICO plaintiff only has standing if "he has been injured in his business or property by the conduct constituting the violation").

Where a plaintiff's amended complaint fails to allege specific facts stating the elements essential to her federal claim under RICO, dismissal with prejudice is warranted. *See, e.g., Martinez v. Martinez,* 207 F.Supp.2d 1303, 1305–09 (D.N.M.2002) ("[n]o reasonable or competent counsel who had read any Tenth Circuit cases concerning civil RICO complaints, and the requisites thereof, could believe that the amended complaint filed in this case stated a viable RICO claim."), *aff'd in part, vacated and remanded in part on other grounds,* 62 Fed.Appx. 309 (10th Cir.2003); *Condict v. Condict,* 826 F.2d 923, 929 (10th Cir.1987) (affirming dismissal of civil RICO claim; "this is but an unsuccessful effort to dress a garden-variety fraud and deceit case in RICO clothing").

### (2) Freedom of Access to Clinic Entrances Act of 1994 (18 U.S.C. § 248)

The Freedom of Access to Clinic Entrances Act of 1994, Pub.L. No. 103–259, 108 Stat. 694, *codified at* 18 U.S.C. §§ 241, 248 (2000), addresses the conduct of anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons

from, obtaining or providing reproductive health services," or that person is "exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship[.]" [43] Though it is primarily a criminal statute, § 248(c)(1) provides that "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action" seeking "temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses," or as an alternative to compensatory damages, "an award of statutory damages in the amount of $5,000 per violation." 18 U.S.C. § 248(c)(1)(A), (B).

▇▇▇▇ There appears little doubt that patient access to a hospital, clinic, birthing center, or physician's office in San Juan County that offers "medical, surgical, counseling or referral services relating to ... pregnancy" comes within the scope of protection afforded by this statute. 18 U.S.C. § 248(e)(1), (5). The plaintiffs in this case, however, have not alleged that the defendants engaged in the specific offense conduct prohibited by the statute, that is, the use of "force or threat of force or ... physical obstruction" to "intentionally injure[ ], intimidate[ ] or interfere[ ] with" patient access to reproductive health care facilities and services. Part I of the Proposed Amended Complaint makes no allegation of facts showing that any defendant has used physical force or obstruction to obstruct or intimidate anyone seeking to obtain or provide reproductive health services.

(quoting Black & Magenheim, *Using the RICO Act in Civil Cases,* Houston Law., Oct. 1984, at 20, 24–25 (Oct.1984)).

**43.** Section 248(a)(3) also prohibits conduct which "intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship." 18 U.S.C. § 248(a)(3).

**(3) Health Care Quality Improvement Act, 42 U.S.C. § 11112 (2000)**

Following the Pretrial Conference, the Part I Plaintiffs apparently moved to dismiss their claims under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101–11152 (2000), and the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2000), on grounds of mootness. (*See* Plaintiffs' Motion to Dismiss, filed November 25, 2002 (dkt. no. 463).) At the hearing on January 7, 2003, the court granted plaintiffs' motion. (*See* Minute Entry, dated January 7, 2003 (dkt. no. 480).) [44]

■ Apart from the question of mootness and the effect of plaintiffs' own motion, it appears in any event that the Part I Plaintiffs' claim would fail to state a legally cognizable claim. Title IV, § 412 of the HCQIA, 42 U.S.C. § 11112, the provision cited by plaintiffs, does set standards for professional review actions affecting a health practitioner's practice privileges,[45] but it does so in the context of a statutory scheme that shields the review participants from civil liability arising from the review action if that action satisfies

---

44. As the case proceeded, Ms. Valdez' EMTALA and HCQIA claims were specifically dismissed on motion by her own counsel. (*See* Plaintiffs' Motion to Dismiss, filed November 25, 2002 (dkt. no. 463).) As written, that motion moved "for an order dismissing *the defendants' motions to dismiss* EMTALA and Health Care Quality Improvement Act claims, due to mootness"—apparently making what amounted to a motion to strike the defendants' moving papers. (*Id.* (emphasis added); *see* Defendants' Motion to Dismiss Plantiffs' EMTALA Claims, filed November 13, 2002 (dkt. no. 447).) The Plaintiffs' Motion to Dismiss was not accompanied by an explanatory memorandum.

However, as docketed, calendared and heard, the Plaintiffs' Motion to Dismiss was treated as a motion to dismiss *Ms. Valdez' EMTALA and HCQIA claims* as moot:

> THE COURT: ... Many of the items that we dealt with before have heretofore been resolved. I do note that plaintiff's motion to dismiss the EMTALA and Health Care Quality Improvement Act Claims, docket number 463, filed November 25th are now moot and I take it ought to be, you don't have any problem with that determination, *your motion, that is you're dismissing those claims?*
>
> MS. ROSE: Uh, yes.
>
> THE COURT: Isn't that right, the EMTALA and Health Care Quality Improvement Act claims?
>
> MS. ROSE: That would be fine.
>
> THE COURT: It was your motion and I think we can grant that at this point without further ado....

(Transcript of Hearing, dated January 7, 2003, at 4:23–5:10 (emphasis added).) The dismissal of plaintiff's EMTALA and HCQIA claims was duly noted in the Minute Entry. (See Minute Entry, dated January 7, 2003 (dkt. no. 480) ("Grants, motion to dismiss (Dkt. # 463)).)." *See also* Transcript of Hearing, dated February 24, 2003, at 30:19–31:8 (The Court).

45. HCQIA § 412 reads in part:

> **(a) In general.** For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a) (2000).

§ 11112's procedural criteria.[46] *See* 42 U.S.C. § 11111; *Decker v. IHC Hospitals, Inc.*, 982 F.2d 433, 436 (10th Cir.1992).

The court of appeals has determined that the HCQIA does not create a private civil cause of action in favor of plaintiffs whose staff privileges at a medical facility have been adversely affected by a professional or peer review action. *See, e.g., Hancock v. Blue Cross–Blue Shield*, 21 F.3d 373, 374 (10th Cir.1994). Therefore, in the context of a grievance by a health care professional whose staff privileges have been limited or denied by a peer review process, the question posed by the HCQIA is not whether the participants in the review process are *liable under the HCQIA*, but whether the HCQIA operates to immunize those participants from private civil liability based upon other legal theories. Therefore, as a matter of law, the Part I Plaintiffs can plead no claim "for violation of the guarantees found in" the HCQIA as such.

**(4) Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2000)**

The Emergency Medical Treatment and Active Labor Act (EMTALA), as added by § 9121(b) of the Consolidated Omnibus Budget Reconciliation Act of 1985, 100 Stat. 164, and as amended, 42 U.S.C. § 1395dd, places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an "emergency medical condition."

*Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999). Among other provisions, EMTALA requires the emergency departments of hospitals participating in the federal Medicare program to provide appropriate medical screening and stabilizing treatment for all persons who present themselves at the emergency room and request care:

(a) **Medical screening requirement.** In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

---

**46.** Section 411 of HCQIA provides:

**(1) Limitation on damages for professional review actions**

If a professional review action (as defined in section 11151(9) of this title) of a professional review body *meets all the standards specified in section 11112(a) of this title,* except as provided in subsection (b) of this section—

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action,

shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C. § 11111 (2000) (emphasis added). Section 11111 makes an express exception as to liability under "any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* and the Civil Rights Acts, 42 U.S.C. 1981, *et seq.*," and for actions by the Attorney General under the federal antitrust laws. *Id.*

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(a), (b) (2000). Subsection (c) of § 1395dd sets standards governing the transfer of emergency room patients to other health care facilities, and subsection (d) provides for the enforcement of § 1395dd's requirements through civil monetary penalties collected by the Secretary of Health and Human Services and through private civil actions by "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section." 42 U.S.C. § 1395dd(d)(2) (2000).[47] The statute has been construed as imposing strict liability on hospitals for violations of its screening and stabilization requirements. *See Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 681 (10th Cir.1991); *Stevison v. Enid Health Systems, Inc.,* 920 F.2d 710, 713 (10th Cir.1990).

A hospital's duty to provide the required emergency medical screening and stabilizing treatment to persons requesting such care cannot be delayed by any inquiry as to that person's "method of payment or insurance status." 42 U.S.C. § 1395dd(h). Nor is the participating hospital's duty to provide emergency screening and treatment under § 1395dd(a) and (b) limited to those persons who are regularly in the care of physicians or health care providers having current staff privileges or practice privileges at that hospital.

 As to plaintiff Helen Valdez, counsel at the time of pretrial asserted the "violation of Mrs. Valdez' entitlement to an equal standard of care and to be examined upon her presentation to the emergency room of the hospital as mandated by 42 USC 1395dd," apparently invoking EMTALA's private civil remedy. (Proposed Amended Complaint at 14 ¶ (22); Proposed Pretrial Order at 1213 ¶ (23).)

The event in question occurred on April 14, 1999, yet plaintiff Valdez did not plead a claim under § 1395dd(d)(2) of EMTALA in the original complaint in this action filed on July 25, 2000,[48] and did not attempt to

---

**47.** Subsection (d) of § 1395dd reads:

**(2) Civil enforcement**

**(A) Personal harm** Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(B) Financial loss to other medical facility** Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this

section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

**(C) Limitations on actions** No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

**48.** Plaintiffs' counsel now points to two paragraphs out of 523 in the original Complaint as invoking the EMTALA civil remedy:

plead such a claim until the Proposed Amended Complaint, submitted on November 6, 2002—one week before pretrial and "more than two years after the date of the violation with respect to which the action is brought," 42 U.S.C. § 1395dd(d)(2)(C)—as an attachment to the "Plaintiffs' Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," (dkt. no. 438).

On the eve of pretrial, the SJHSD defendants filed a Rule 12(b)(6) motion to dismiss plaintiff's EMTALA claim as asserted in the Proposed Pretrial Order on the ground of the two-year statute of limitations. (*See* Defendants' Motion to Dismiss Plaintiffs' EMTALA Claims, filed November 13, 2002 (dkt. no. 447); Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's EMTALA Claim, filed November 13, 2002 (dkt. no. 448).)

Absent leave to amend her pleadings under Fed.R.Civ.P. 15(a) & (b), or incorporation of the claim as a triable issue in a pretrial order pursuant to Fed.R.Civ.P. 16(c), even taking all of Ms. Valdez' alleged facts as true, the conclusion would necessarily follow that her claim under EMTALA is time-barred.[49]

**(5) "Medicare Patient Bill of Rights" (42 U.S.C. § 1395a)**

■ Plaintiffs' counsel points to § 1802 of Title XVIII of the Social Security Act, 42 U.S.C. § 1395a, as an additional footing for plaintiff Helen Valdez' claims, alleging a "violation of Mrs. Valdez' Medicare Patient Bill of Rights to see the medicare provider of her choice," and a violation of her right "to freely contract and associate with the provider of her choice as found in 42 USC 1395a." (Proposed Amended Complaint at 13, 14 ¶¶ (19), (24); Proposed Pretrial Order at 1213 ¶¶ (20), (25).)

Concerning Medicare beneficiaries, § 1395a provides in part:

**§ 1395a. Free choice by patient guaranteed**

**(a) Basic freedom of choice** Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.

This statute, the so-called Medicare "freedom of choice provision," reflects one of the fundamental principles upon which the Medicare program was founded, and guarantees Medicare beneficiaries the freedom to choose health care providers, who would then be paid by Medicare at the program's prescribed rates. Section 1395a(a) bars interference by the Secretary of Health and Human Services (or his subordinates

---

365. In violation of EMPTALA [sic] and COBRA violations Mrs. Valdez was not examined, checked, asked what her problem was, nor had her temperature and blood pressure checked while Mrs. Valdez was in such a condition.

\*　　\*　　\*　　\*　　\*　　\*

377. Mrs. Valdez had a right to expect an examination by a Dr. Of her choice at San Juan Hospital at the time of presentment with her malady pursuant to her insurance contracts and EMPTALA [sic] and COBRA statutes and regulations.

(Complaint (Verified), filed July 25, 2000 (dkt. no. 1), at 108–109 ¶¶ 365, 377.) Besides the fact that neither paragraph accurately states an EMTALA requirement, the original Complaint makes *no* reference to EMTALA or COBRA in its extended statement of the plaintiffs' "Causes of Action," (*id.* at 118–154 ¶¶ 443–523).

Clearly, the original Complaint did not give fair notice to the SJHSD of any claim of liability under EMTALA, even if one had been intended.

**49.** Her EMTALA claim fails on its merits as well. ·(*See infra* at 1168 & n. 81.)

in the administration of the Medicare program) with a beneficiary's selection of a physician.[50]

Nothing in the Proposed Amended Complaint or in counsel's proffers at the Pretrial Conference suggests that the Secretary, Medicare program officials—or anyone else involved in HHS administration of Medicare benefits—attempted to interfere with Ms. Valdez' choice of health care providers from among those qualified to participate in the Medicare program. No claim whatsoever is made that Dr. Penn or any other qualified provider was denied Medicare payment or reimbursement for medical care provided to Ms. Valdez as an eligible Medicare recipient.

### (6) 42 U.S.C. § 1981

 Section 1981 of Title 42, United States Code reads:

(a) **Statement of equal rights.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) **"Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) **Protection against impairment.** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (2000).[51] Section 1981 addresses intentional racial discrimination in the making and enforcement of contracts: "A § 1981 ... plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him or her on the basis of race." *Guides, Ltd. v. Yarmouth Group Property Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir.2002) (citing *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir.2000)). As to the scope of the protection afforded by § 1981:

> The Supreme Court has construed the language that secures to all the same contracting rights as "white citizens" to refer only to the racial (as opposed to, say, gender-based or religious) character of the prohibited discrimination .... [W]hites as well as blacks may assert contract denial claims under § 1981 on the basis of race.

See Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144. It was amended more recently by the Civil Rights Act of 1991, Pub.L. No. 102–166, title I, § 101, 105 Stat. 1071 (1991) (designated then-existing provisions as subsection (a) and added subsections (b) and (c)). *See also Guides, Ltd. v. Yarmouth Group Property Mgmt., Inc.*, 295 F.3d 1065, 1080 (10th Cir. 2002) (dissenting opinion) ("The protection afforded by these statutes finds its roots in the Thirteenth and Fourteenth Amendments...." (citations omitted).)

---

**50.** The remaining language of this section gives limited statutory authority for beneficiaries to contract for health care services, *e.g.*, with managed care networks. 42 U.S.C § 1395a(b).

**51.** 42 U.S.C. § 1981 (2000) was originally enacted as part of the Civil Rights Act of 1866, Act of April 9, 1866, ch. 31, 14 Stat. 27, the first of the Reconstruction Era civil rights acts, and was grounded upon the Thirteenth Amendment, ratified a year earlier. The provision was re-enacted in 1870, two years after the ratification of the Fourteenth Amendment.

Harold S. Lewis, Jr., *Civil Rights and Employment Discrimination Law* § 1.2, at 3 (1997) (footnote omitted) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)); *see also Guides, Ltd. v. Yarmouth Group Property Mgmt., Inc.*, 295 F.3d at 1081 n. 3 (dissenting opinion) ("In this Circuit, a racial identity is the cornerstone of a section 1981 and 1982 cause of action and a necessary element of a plaintiff's prima facie case. *See Shawl v. Dillards, Inc.*, 17 Fed.Appx. 908, 911 (10th Cir.2001) (To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a protected class .... (citing *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101 (10th Cir.2001)))."). The Supreme Court understands "race" to include "ancestry," defined as genetic membership in an " 'ethnically and physiognomically distinctive subgrouping of *homo sapiens*.' " *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (quoting *Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 517 (3d Cir.1986)).

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

*Id.* (footnote omitted). However, "ancestry" as "race"—as a prohibited basis for discrimination for purposes of § 1981—does not embrace national origin, religion or status as an alien. *Id.* at 613, 107 S.Ct. 2022 ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was

born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981."); *King v. Township of East Lampeter*, 17 F.Supp.2d 394, 417 (E.D.Pa.1998) ("The scope of § 1981 is not so broad as to include disparity in treatment on the basis of religion, sex, or national origin."), *affirmed*, 182 F.3d 903 (3d Cir.) (mem.), *cert. denied*, 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999); *Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276, 1281 (E.D.Pa.1982), *affirmed*, 707 F.2d 1405, *cert. denied*, 464 U.S. 835, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983).

 Thus, to state a claim under § 1981, the plaintiffs must show that (1) they are members of an identifiable racial or ancestral group; (2) the defendant had an intent to discriminate on the basis of their race or ancestry; and (3) the discrimination concerned one or more of the activities enumerated in the statute, *viz.*, the making and enforcing of a contract. *See Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir.1994); *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). A § 1981 claim for "interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Morris v. Office Max, Inc.*, 89 F.3d 411, 414–15 (7th Cir.1996) (citing *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262 (10th Cir.1989)). Moreover, "It has been held that '[p]rudential limitations on standing ordinarily require that an action under section[ ] 1981 ... be brought by the direct victims of the alleged discrimination because they are best situated to assert the individual rights in question.' " *Guides, Ltd.*, 295 F.3d at 1072 (quoting *Clifton Terrace Assocs., Ltd. v. United Technologies Corp.*, 929 F.2d 714, 721 (D.C.Cir.1991)).

None of the allegations of the Proposed Amended Complaint plead facts that would serve as direct evidence of intentional discrimination against the Part I Plaintiffs in the making or enforcement of contracts based upon these plaintiffs' race or ancestry. *See Durham v. Xerox Corp.,* 18 F.3d 836, 841 (10th Cir.) ("Without proof of pretext or direct evidence of discriminatory intent, Durham cannot meet her ultimate burden of proving intentional discrimination."), *cert. denied,* 513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994). Several paragraphs repeat comments allegedly made by one defendant, Dr. Redd, in which he referred to Dr. Nathaniel Penn as a "little New York Jew," or words to that effect. (Proposed Amended Complaint at 53 ¶ 168(B); 58 ¶ 133(F); 59 ¶ 138; 68–69 ¶ 166.) Such comments may or may not address Dr. Penn's "ancestry" for purposes of § 1981, *cf. Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987) (42 U.S.C. § 1982 protects property rights of Jewish congregation in synagogue); *Singer v. Denver Sch. Dist. No. 1,* 959 F.Supp. 1325, 1331 (D.Colo.1997), but that question is not now before this court because Dr. Penn is no longer a plaintiff in this action. (*See* Minute Entry, dated March 1, 2002 (dkt. no. 296).)

**(7) 42 U.S.C. § 1985(3)**

Section 1985(3) of Title 42, United States Code reads:

> **(3) Depriving persons of rights or privileges.** If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privi-

leges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (2000).[52]

 To state a claim under § 1985, there "must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). A plaintiff who fails to allege racial or class-based discrimination cannot state a claim under § 1985(3). *See Burns v. County of King,* 883 F.2d 819, 821 (9th

**52.** Section 1985 was enacted as part of the Ku Klux Klan Act of 1871, Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13.

Cir.1989) (citing *Bretz v. Kelman,* 773 F.2d 1026, 1028 (9th Cir.1985) (en banc)).

▇ In this case, the Part I Plaintiffs allege "civil rights violations regarding freedom to contract, free speech, free association, including 1985 conspiracy," and a "conspiracy to deprive the Plaintiffs of their legal entitlements of due process, equal protection, privacy, rights of association, rights to contract," as well as "state license entitlements," "Medicaid entitlements," and even an "entitlement to a contract with the District that is based upon principles of good faith and fair dealing, with adequate consideration," (Proposed Pretrial Order at 1212 ¶ (1), 1212 ¶¶ (9), (10), (12), (13) & (14)), but they do not allege discrimination against any remaining Part I Plaintiff based upon that plaintiff's race.

### (8) 42 U.S.C. § 1983

Section 1983 of Title 42, United States Code, provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ....

42 U.S.C. § 1983 (2000).[53] "Section 1983 provides an enforcement remedy for one who is deprived under color of state law of 'any rights, privileges, or immunities secured by the Constitution.'" *Trujillo v. Board of County Comm'rs of Santa Fe,* 768 F.2d 1186, 1189 (10th Cir.1985).

"There are two elements to a section 1983 claim: (1) the conduct complained of must have been under color of state law, and (2) the conduct must have subjected the plaintiff to a deprivation of constitutional rights," or rights protected by federal law. *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 649 (9th Cir.1984) (citing *Williams v. Gorton,* 529 F.2d 668, 670 (9th Cir.1976)).

Section 1983 does not specify the state of mind on the part of someone who "subjects, or causes to be subjected" a person to a deprivation of civil rights which a plaintiff must allege and prove to establish liability under the statute; the question is "did the defendant violate the plaintiff's Fourteenth Amendment rights? The defendant's state of mind is relevant only to the existence of the claimed Fourteenth Amendment violation." 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3:2 (4th ed. Rev.2004) (footnote omitted).

> Although this section does not require a specific state of mind for actionability, *see Parratt v. Taylor,* 451 U.S. 527, 534, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), a court must examine closely the nature of the constitutional right asserted to determine whether a deprivation of that right requires any particular state of mind, *McKay v. Hammock,* 730 F.2d 1367, 1373 (10th Cir.1984) (en banc). For instance, it is well established that deprivations of equal protection require proof of discriminatory intent on the part of the state actor, *see, e.g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), while deprivations under the Eighth Amendment require a showing of deliberate indifference, *see, e.g., Estelle v.*

---

**53.** Like § 1985, § 1983 was originally enacted as part of the Ku Klux Klan Act of 1871, Act of April 20, 1871, ch. 22, 17 Stat. 13.

*Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Moreover, some deprivations of First Amendment rights require proof that the state's action was intended to repress an individual's protected speech or association. *See, e.g., Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); ....

*Trujillo,* 768 F.2d at 1189 (some citations omitted).[54]

■■■ In order to state a claim under 42 U.S.C. § 1983, a complaint must assert a right to recover under the Constitution or other federal laws and not be wholly insubstantial and frivolous. *See, e.g., Keniston v. Roberts,* 717 F.2d 1295, 1298 (9th Cir. 1983).

"Conclusionary allegations, unsupported by facts, [will be] rejected as insufficient to state a claim under the Civil Rights Act." *Sherman v. Yakahi,* 549 F.2d 1287, 1290 (9th Cir.1977). The plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in" that support the plaintiff's claim. *Id.,* quoting *Powell v. Workmen's Compensation Board,* 327 F.2d 131, 137 (2d Cir.1964).

*Jones,* 733 F.2d at 649.

Here, the Part I Plaintiffs assert civil rights "violations regarding freedom to contract, free speech, free association," and "retaliation for speaking and associa-

tion," as well as the denial of due process guaranteed by the Fourteenth Amendment. (Proposed Pretrial Order at 1212 ¶¶ (1), (2), (3).[55]) They allege "interference with the patients' and [plaintiffs'] ability to freely contract for services with the District, with each other, with patients as guaranteed by the Fourteenth Amendment, Utah [U]nfair Practices Act, and federal common law," (*id.* at 1212 ¶ (8)), and as to plaintiff Helen Valdez, a denial of equal protection of the laws. (*Id.* at 1213 ¶ (21).)

Whether these allegations are wholly insubstantial and frivolous, or whether they raise genuine issues requiring a trial was examined in detail by court and counsel during the Pretrial Conference. *See* Fed. R.Civ.P. 16(c)(1).

### § 1983 Conspiracy

■■■ The Part I Plaintiffs also allege a "conspiracy to deprive the Plaintiffs of their legal entitlements of due process, equal protection, privacy, rights of association, rights to contract," (Proposed Pretrial Order at 1212 ¶ (13)), but they do not plead specific facts showing both conspiratorial agreement and concerted action by the named defendants.

In order to prevail on such a claim, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."

---

**54.** *See* 1 Nahmod, *supra,* at § 3:2:

Different Fourteenth Amendment violations (and hence Bill of Rights violations) require different states of mind, apparently because of the language and history of the applicable constitutional provisions. For example, equal protection violations require purposeful discrimination, Eighth Amendment violations require deliberate indifference, and due process violations require more than mere negligence. The Supreme Court finally made clear the distinction between § 1983 and the underlying constitu-

tional violation in *Parratt v. Taylor* when it held that, as a matter of statutory interpretation, § 1983 imposed no independent state-of-mind requirement for the prima facie case, in contrast to state-of-mind requirements for the violation of particular constitutional provisions themselves. [Footnotes omitted.]

**55.** Plaintiffs also assert their reliance upon a due process guarantee in the provisions of the Health Care Quality Improvement Act, 42 U.S.C. § 11112 (2000), discussed *infra.* at 1157 n. 66.

[*Dixon v. Lawton,* 898 F.2d 1443, 1449 (10th Cir.1990) ]; *Snell v. Tunnell,* 920 F.2d 673, 701 (10th Cir.1990). In pleading conspiracy, a plaintiff must allege "specific facts showing agreement and concerted action among [the alleged co-conspirators]." *Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir.1994). "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Durre v. Dempsey,* 869 F.2d 543, 545 (10th Cir.1989). Thus, a plaintiff fails to state a claim for conspiracy absent specific facts showing a "meeting of the minds" among the alleged co-conspirators. *See Hunt,* 17 F.3d at 1268.

*Marino v. Mayger,* 118 Fed.Appx. 393, 404–405 (10th Cir.2004) (unpublished disposition). The Part I Plaintiffs' conclusory assertion of a conspiracy, without more, fails to state a viable claim under § 1983.

### Liability of the SJHSD & San Juan County

▉▉▉▉ To state a colorable claim against San Juan County or the SJHSD under § 1983, the Part I Plaintiffs each must allege that a policy or custom of the County or the SJHSD was the proximate cause of the plaintiffs' constitutional injury. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (local government may be liable under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."). Causation presents a threshold question: "our first inquiry in any case alleging [local governmental] liability under § 1983 is the question whether there is a direct causal link between a [local governmental] policy or custom and the alleged constitutional deprivation," because "[i]t is only when the 'execution of the government's policy or custom ... inflicts the injury' " that a local

government entity may be held liable under § 1983. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (internal citation omitted). Assuming that causation may be shown,

> To subject a governmental entity to liability, "a municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.' " *See Lankford v. City of Hobart,* 73 F.3d 283, 286 (10th Cir.1996) (quoting *Starrett,* 876 F.2d at 818); *see also Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Absent such an official policy, a municipality may also be held liable if the discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Lankford,* 73 F.3d at 286 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

*Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1249 (10th Cir.1999). Thus, acts that do not rise to the level of official policy may nonetheless create liability if they are "sufficiently widespread and pervasive so as to constitute a 'custom.' " *Id.* at 1250. However, conduct directed solely at a plaintiff may not "demonstrate a custom or policy" of the entity "to be deliberately indifferent" to that conduct as a general matter. *Id.* (citing *Monell,* 436 U.S. at 691 & n. 56, 98 S.Ct. 2018).

> [T]his deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th

Cir.1998). Although a single incident generally will not give rise to liability, *Okla. City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." *Barney,* 143 F.3d at 1307 (internal citations omitted). The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 399, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, (10th Cir.2002).

Plaintiffs contend that "[t]he County and District had a de facto policy of deliberate indifference to those who complained of suffering from Dr. Redd and other District staff members," and that "[t]he County and District had a policy of harming the reputations of persons in retaliation for challenging their authority." (Proposed Pretrial Order at 1220 ¶ 52–53; *see* Proposed Amended Complaint at 34 ¶¶ 52–53 (same)). In the Proposed Amended Complaint, they allege that the SJHSD administrators and Board members, as well as the County Commissioners, County Administrator and County Attorney "behaved in a deliberately indifferent manner, failed to adequately investigate the problems

Mrs. Lyman and Dr. MacArthur identified in the District, did not hold hearings on the matters, did not enforce, or take any actions to rectify the situations identified by Mrs. Lyman and Dr. MacArthur." (Proposed Amended Complaint at 16–17.) "A pattern of deliberated indifference as a policy was exhibited by the County Commission, County Attorney, Health District board, administrators and medical staff." (*Id.* at 17.) [56]

Of course, the policy "causation" question presupposes that a deprivation of constitutional rights has occurred; if there was no deprivation, the policy or custom is immaterial. Before the Part I Plaintiffs can plead and prove an arguable legal claim against San Juan County or the SJHSD for liability under § 1983, they first must allege "the deprivation of [a] right[ ], privilege[ ], or immunit[y] secured by the Constitution and laws." 42 U.S.C. § 1983.

For the reasons explained hereafter, on the factual allegations now before the court, Dr. MacArthur suffered no arguable deprivation of a constitutional "liberty" or "property" interest, or other federally protected right. *See infra* at 1154–60. Likewise, for reasons explained hereafter, Ms. Lyman has not alleged facts showing such a deprivation. *See infra* at 1160–66. Finally, Ms Valdez asserts that—as a woman of advancing years, married to a Mexican–American husband—being refused exami-

---

**56.** More recently, counsel argued that "[a] repeated pattern of a government entity's conduct is a *de facto* 'silent' policy enabling [individual defendants] to *ultra vires* arbitrarily deny a plaintiff of his liberty and property rights," that "[c]areful or heightened scrutiny attaches when these liberty and property rights are compromised by government," and that the federal civil rights acts are "designed · to specifically cure a situation wherein the officials refuse to enforce provisions of the

law." (Memorandum in Support of Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), at 5 (citing *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).)

nation and treatment at an emergency room denies her the equal protection of the laws guaranteed by the Fourteenth Amendment; yet, as examined in greater detail below, the specific facts pleaded and proffered in support of her claim show *no* actual refusal or denial of examination or treatment on the date in question, and therefore prove insufficient to raise a genuine issue as to constitutional deprivation that would require a trial. *See infra* at 1166–69.

### Plaintiffs' § 1983 Claims Against the County Commissioners & SJHSD Board Members

In the Proposed Amended Complaint, the plaintiffs alleged that the SJHSD "Board members and County Commissioners ... behaved in a deliberately indifferent manner, failed to adequately investigate the problems Mrs. Lyman and Dr. MacArthur identified in the District, did not hold hearings on the matters, did not enforce, or take any actions to rectify the situations identified by Mrs. Lyman and Dr. MacArthur." (Proposed Amended Complaint at 16–17.) The plaintiffs characterize the SJHSD Board's inaction on their grievances as "[a] pattern of deliberated indifference as a policy" that "was exhibited by the County Commission, County Attorney, Health District board, administrators and medical staff." (*Id.* at 17; *see also id.* at 21 ("The County and District ... evidenced a pattern of deliberate indifference to [plaintiffs'] plight."); *id.* at 87 ¶ 237 ("The Health District and the County did not did not reprimand Dr. Redd or any other medical staff member for their treatment of Mrs. Lyman or Dr. MacArthur, or Helen Valdez.").) As noted above, plaintiffs also asserted at pretrial that "[t]he County and District had a de facto policy of deliberate indifference to those who complained of suffering from Dr. Redd and other District staff members." (Proposed Pretrial Order at 1220 ¶ 52.)

### Vicarious Liability, Respondeat Superior & § 1983

The defendants respond that "[w]ith respect to each of the plaintiffs' discrimination and due process claims, San Juan County, the Health District, Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday are not liable because respondeat superior liability does not attach for purposes of 42 U.S.C. § 1983 unless the adverse treatment resulted from a policy or custom of the Health District, of which there is no evidence in this case." (Proposed Pretrial Order at 1213–14 ¶ vii.)

It has long been understood that "the doctrine of respondeat superior was not applicable to render a supervisor or other superior liable under § 1983 for the unconstitutional conduct of his subordinates." 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3:90, at 3–330 (4th ed. rev. 2004) (footnotes omitted); *see Draeger v. Grand Central, Inc.*, 504 F.2d 142, 145 (10th Cir.1974) ("Generally speaking, the doctrine of vicarious liability or respondeat superior has been ruled out in cases arising under the Federal Civil Rights statutes."). *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), clearly holds that vicarious liability under the doctrine of respondeat superior "cannot be applied *either* to superiors *or* to local government entities" under § 1983, under any circumstances. 1 Nahmod, *supra*, at § 3:91, at 3–332 (emphasis in original; footnote omitted). Instead, *Monell* held that local governmental entities "are suable persons under § 1983 and can be held liable for *their* unconstitutional policies, practices and customs." *Id.* (emphasis in original).

Consequently, in light of *Monell*, ... the superior does not and should not invariably have a § 1983 duty, solely by reason of position, to compensate a person whose constitutional rights have been violated by subordinates. What is currently required in order for the superior to have such a duty is that the superior personally either acted unconstitutionally or with deliberate indifference. That is, the superior must have possessed either the state of mind for the particular constitutional violation or deliberate indifference, and *must also have played a causal role in plaintiff's constitutional deprivation.*

*Id.* (emphasis added & footnote omitted). Section 1983 addresses conduct which "subjects, or causes to be subjected" the plaintiff to a deprivation of civil rights, requiring pleading and proof of a causal connection between a defendant's conduct and the constitutional deprivation suffered by the plaintiff. *See Rizzo v. Goode*, 423 U.S. 362, 376–377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("the responsible authorities had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights").

■■■ Thus, theories of vicarious liability are not available to § 1983 plaintiffs. "Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir.1997). Where an official becomes aware of a constitutional violation only after the fact, he or she cannot be held liable for the violation under § 1983 because the violation has already occurred and the official played no causal role in it. *See Schultz v. Baumgart*, 738 F.2d 231, 238–239 (7th Cir.1984). Thus, "some *personal involvement* of the supervisory official in the subordinate's unconstitutional con-

duct—analogous to *Monell*'s official policy or custom requirement for local government liability—must be shown for § 1983 liability." 1 Nahmod, *supra*, § 6.6, at 6–24 (emphasis in original). *See* Annotation, *Vicarious liability of superior under 42 U.S.C.S. § 1983 for subordinate's acts in deprivation of civil rights,* 51 A.L.R. Fed. 285, 1981 WL 167326 (1981 & Supp.2004), and cases cited therein.

■■■ The Part I Plaintiffs plead the language of "deliberate indifference," "pattern," and "policy," but allege no specific facts showing that the individual SJHSD Board members knew of or directly instigated any denial of constitutional due process or other actionable deprivation by SJHSD medical and support staff members; nor do they assert that the alleged violations were directly effected pursuant to an *existing* policy or custom instituted by each Board member named as a defendant. Instead, plaintiffs contend that the SJHSD Board members owed an affirmative duty to provide the plaintiffs with *post*-deprivation relief—that is, a duty after the fact to investigate matters that the plaintiffs complained of, to "find and hold accountable the responsible parties," and to thereby "resolve the provider and patients' and public's concerns." *Cf.* 1 Nahmod, *supra*, § 6:6 at 6–24 ("Plaintiffs may be expected to try to fit local government failure to act cases into *Monell*'s category of official policy or custom.")

Plaintiffs have not cited to pertinent authority establishing such an affirmative duty on the part of senior public officials to vindicate plaintiffs' interests in that fashion—the breach of which would render the County Commissioners or SJHSD Board members individually liable to plaintiffs under § 1983. Absent such authority, the court has discerned no basis in the law or policy of § 1983 for finding the existence of such an affirmative duty. *See generally*

*Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (sheriff has no affirmative duty under § 1983 to investigate arrestee's claims of innocence and mistaken identity).

Even assuming that plaintiffs' claims of due process violations or discrimination by SJHSD medical or support staff could be proven, holding the County Commissioners and SJHSD Board members individually liable for failing to vindicate the plaintiffs' interests *after the fact*—failing to investigate their complaints, "not hold[ing] hearings on the matters," and not "tak[ing] any actions to rectify the situations identified by Mrs. Lyman and Dr. MacArthur"— would attach § 1983 liability to *post hoc* conduct that can bear no causal relationship to the alleged constitutional deprivations themselves. Remembering that § 1983 imposes liability only upon one who "subjects, or causes to be subjected" a person to a constitutional deprivation, the requirement that a plaintiff must demonstrate a "direct causal link" between the defendant's conduct and the civil rights violation, *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 399, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), would appear to preclude the imposition of § 1983 liability upon the County Commissioners and the SJHSD Board members based upon the "failure to vindicate" theory urged by the Part I Plaintiffs.

### The SJHSD Board & the SJHSD Medical Staff's "Policy" re: Physician Assistants

Referring to the SJHSD medical staff's alleged adoption in 1999 of a staff "policy" requiring Physician Assistants exercising SJHSD staff privileges to be supervised by a local physician having SJHSD staff privileges,[57] plaintiffs complain that "[w]hile the [Physician Assistant] policies in question appear to be facially neutral, in application they applied only to Mrs. Lyman and were not approved by the District Board. How-

---

57. Plaintiff Lyman alleges:

> 31. Though Dr. Penn and Dr. Mena were staff members, Michele Lyman did not enjoy full privileges while supervised by them.
> 32. Dr. Redd and Dr. Jones and Dr. Cook and Dr. Nelson did not approve Mrs. Lyman having privileges unless her doctor was a medical staff member and then only if the physician was in the same town as she.
> 33. While the policy for P.A.s appears neutral, it effected only Michele Lyman in how it was applied, monitored, and carried out.

> \* \* \* \* \* \*

> 209. Dr. Penn and Ms. Lyman attended the Medical staff Meeting for June, 1999. Dr. Penn and Ms. Lyman requested full privileges be restored and Dr. Redd and Jones both stated that only if Dr. Penn was willing to sit in Blanding with Ms. Lyman while Ms. Lyman took ER call and they would not supervise me. Mr. Bryant as a P.A. working under Dr. Jones while Dr. Jones was not in Blanding, had no such

restraints. Mrs. Lyman pointed out that she covered the ER (Blanding urgent care clinic) in Blanding by herself on many occasions. There was no response. (Cmplt. 137–145) Staff had previously voted for her privileges and then the County, Board, and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied her the same. Some privileges as to labs and exrays were eventually restored. (Proposed Amended Complaint at 31 ¶¶ 31–33; 78 ¶ 209; *see* Proposed Pretrial Order at 1219 ¶¶ 31–33; 1237 ¶ 209 (same).)

Recounting that the medical staff "pass[ed] a policy saying 'in order to have privileges your supervising physician has to be in the same town,'" Ms. Lyman's counsel asserted that she did not see "where the governing board adopted that policy so it was an action taken by medical staff but under the bylaws the governing board is the body that sets the policy." (Tr. 11/15/02, at 15:7–24 (Ms. Rose).) Apparently the argument is that the SJHSD Board adopted a "policy" of letting the medical staff make "policy" concerning Physician Assistants' staff privileges, but that it did so without any formal Board action.

ever, *the District Board knew of them and did nothing to stop them from being used to prevent Mrs. Lyman's practice.*" (Proposed Amended Complaint at 22 (emphasis added).)[58]

Ms. Lyman's contention that the 1999 staff "policy" re: local supervision (or the other alleged "denials" of privileges of which she complains) resulted in a constitutional deprivation under § 1983 presupposes that she had a constitutional right to exercise practice privileges at SJHSD facilities free of any such limitation or restraint imposed by the SJHSD medical staff.

**Qualified Immunity & Plaintiffs' § 1983 Claims**

In the Proposed Pretrial Order, the defendants asserted that

[b]ecause San Juan County and the Health District are political subdivisions of the State of Utah and the alleged acts and/or omissions by County commissioners, officials or employees or Health District trustees, employees or staff members, about which plaintiffs complain, were carried out within the scope of and pursuant to their official duties as trustees, employees or staff members of the Health District, plaintiffs' claims are barred by the doctrine of qualified immunity,

as well as "the provisions of the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–1 *et seq,* including but not limited to § 63–30–3 and § 63–30–10." (Proposed Pretrial Order at 1215 ¶ xxxvi.)

▮▮▮ The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly es-

tablished statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This grant of immunity is intended to balance two competing interests. On the one hand, when an official abuses his office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Id.,* 457 U.S. at 814, 102 S.Ct. 2727. On the other hand, exposing government officials to damages suits "entail[s] substantial social costs," *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), such as "the expenses of litigation, the diversion of official energy from pressing public issues, ... the deterrence of able citizens from acceptance of public office ... [and the deterrence of public officials from] 'the unflinching discharge of their duties.'" *Harlow,* 457 U.S. at 814, 102 S.Ct. 2727. "The Supreme Court has attempted to strike the balance between these two concerns by shielding government officials from suits for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lawrence v. Reed,* 406 F.3d 1224, 1230 (10th Cir.2005) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). "Although courts have derived from this statement a variety of multi-part tests, the essential inquiry is: would an objectively reasonable official have known that his conduct was unlawful?" *Id.* (citing *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034).

In the Tenth Circuit, we employ a three-step inquiry. *See Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1239–40, 1247, 1251 (10th Cir.2003). First, we ask "whether the plaintiff's allegations, if

---

**58.** Plaintiffs also allege that "[a]s a policy and pattern of practice, those who inform those in power of problems are subjected to reputation assassination within the area." (*Id.* at 17.)

true, establish a constitutional violation." *Id.* at 1239–40. If not, the suit is dismissed; if so, we move to the second step: "whether the law was clearly established at the time the alleged violations occurred." *Id.* at 1247. This step gives the official an opportunity to show that he "neither knew nor should have known of the relevant legal standard" because the law was not clearly established at the time he acted. *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727, 73 L.Ed.2d 396. Where the law is not clearly established, courts do not require officials to anticipate its future developments, and qualified immunity is therefore appropriate.

If the law was clearly established, we reach the third step of the inquiry: whether, in spite of the fact that the law was clearly established, "extraordinary circumstances"—such as reliance on the advice of counsel or on a statute—"so 'prevented' [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Roska,* 328 F.3d at 1251. This occurs only "rarely." *Id.*

*Id.*[59] Whether an official is protected by qualified immunity thus turns upon the objective legal reasonableness of the action, in light of legal rules clearly established at the time the action was taken.[60] The contours of the right allegedly violated must be sufficiently clear so that a reasonable official would understand that what he or she is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). " 'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in light of pre-existing law that unlawfulness must be apparent.' " *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034) (internal citation omitted). Thus, if prior case law provides "fair warning" that an officer's conduct would violate the plaintiff's constitutional rights, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 739–740, 741, 122 S.Ct. 2508.[61]

■ It is important to note that qualified immunity "establishes a right not to be tried." *Elliott v. Thomas,* 937 F.2d 338, 341 (7th Cir.1991). Accordingly, the

---

**59.** Once a defendant raises a the defense of qualified immunity, "the burden shifts to the plaintiff [to] satisf[y] a heavy two-part burden" to "demonstrate that the defendant violated a constitutional or statutory right[,]" and " 'that the right at issue was clearly established at the time of the defendant's unlawful conduct.' " *Gross v. Pirtle,* 245 F.3d 1151, 1155, 1156 (10th Cir.2001). If the plaintiff cannot make both showings, the defendant is entitled to qualified immunity; if he can, the burden shifts to the defendant "to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* at 1156.

**60.** The Supreme Court has expressly held that qualified immunity is governed by an objec-

tive reasonableness standard, and that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford–El v. Britton,* 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

**61.** According to the court of appeals, "In order for the law to be clearly established there must have been a Supreme Court or other Tenth Circuit decision on point so that 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' *Finn* [*v. New Mexico,* 249 F.3d 1241 (10th Cir.2001)] at 1250 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))." *McFall v. Bednar,* 407 F.3d 1081, 1087 (10th Cir.2005).

courts often find it appropriate to make a determination on this issue prior to commencement of trial.

> "[T]he 'entitlement [to qualified immunity] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *National Commodity and Barter Association v. Archer*, 31 F.3d 1521, 1532 n. 8 (10th Cir.1994) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

*Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir.2005).

### Dr. MacArthur's § 1983 Claim

### Dr. MacArthur's "Right" to Practice at SJHSD Facilities

Counsel asserts that "Dr. MacArthur's ability to practice medicine entering into patient contracts which are property constitutes a liberty and property right," relying on an oft-quoted passage from the Declaration of Independence and an excerpt from Justice Bradley's dissenting opinion in *The Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), referring to the right to pursue a common calling.[62] (Memorandum in Support of Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), at 4–5.) In counsel's view, this "liberty and property right" to practice medicine amounts to a *carte blanche* entitlement to full practice privileges at county-sponsored hospital and clinical facilities. Counsel elaborated on this view at the Pretrial Conference:

> THE COURT: Okay. Now what's, what's Dr. MacArthur complaining about?
>
> MS. ROSE: He's complaining about one, he had, he had a medical license that allowed him privileges.
>
> THE COURT: Well you don't get privileges as a matter [of] course do you?
>
> MS. ROSE: I think that when you're, I think that when there is a Congressional policy for encouraging people, providers to go to rural areas to increase competition in those areas and so forth.
>
> THE COURT: But the hospital as a hospital grants privileges and denies privileges or revokes privileges?
>
> MS. ROSE: And that's, that's the key question here Your Honor. He has, I mean they're not claiming that I'm aware of that he was unqualified to work there, they're claiming that those 2 documents weren't in his file. Dr. Redd said he saw the documents.
>
> \* \* \* \* \* \*
>
> THE COURT: Well no one says that you're entitled to have hospital privileges. Show me a provision that says that you're entitled as a matter of right to have hospital privileges?
>
> MS. ROSE: Well here's another way of rephrasing that. Where is the provision that allows a tax supported publicly funded district to prohibit an otherwise

---

**62.**

> This right to choose one's calling is an essential part of that liberty which it is the object of government to protect; and a calling, when chosen, is a man's property right.... A law which prohibits citizens ... from adopting a lawful employment, or from following a lawful employment previously adopted, does deprive them of liberty as well as property, without due process of law.

83 U.S. (16 Wall.), at 116, 122, 21 L.Ed. 394 (Bradley, J., dissenting); *see* Tr. 11/14/02 at 28:11–23 (Ms. Rose) (quoting Justice Bradley's dissenting opinion, 83 U.S. (16 Wall.) at 120).

qualified physician from using the facilities for these patients and I think that's more of the crux of it.

We've got, we've, you know, the district's powers are limited by statute. Where's the statute that allows this district to deny and limit the powers and rights and privileges that Dr. MacArthur gets from having that medical license[?].

\* \* \* \* \* \*

THE COURT: Yes. The fact that you have a medical license doesn't give you automatically hospital privileges. You've got to have a different kind of relationship established.

MS. ROSE: And what right, what statutory source allows the hospital to maintain a monopoly or attempt to maintain a monopoly and reserve its privileges to those they arbitrarily and capriciously choose to bestow them upon[?]

Nothing, there is no source for a publicly funded tax supported hospital accepting Medicare and Medicaid to do so because to do so deprives the Medicare patients in the area of the right to choose who their providers are.

(Tr. 11/14/02, at 19:7–23, 24:13–25:1, 28:24–29:10.)

As counsel suggests, the Fourteenth Amendment's "liberty" guarantee includes an individual's right " 'to engage in any of the common occupations of life' ":

"While this court has not attempted to define with exactness the liberty ... guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, e.g., *Bolling v. Sharpe,* 347 U.S. 497, 499—500, 74 S.Ct. 693, 694, 98 L.Ed. 884; *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).[63] As the Fifth Circuit more recently elaborated in *Martin v. Memorial Hosp. at Gulfport,* 130 F.3d 1143 (5th Cir.1997):

"The Due Process Clause ... protects an individual's liberty interest which is viewed as including an individual's freedom to work and earn a living and to establish a home and position in one's community." *Cabrol v. Town of Youngsville,* 106 F.3d 101 (5th Cir.1997),

---

**63.** 2 Thomas M. Cooley, *A Treatise on the Constitutional Limitations which rest upon the Legislative Power of the States of the American Union* 824 (8th ed.1927):

 "Liberty" as used in [the Due Process] clause denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. [Footnote omitted.]

citing *Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706–07. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure." *Phillips v. Vandygriff,* 711 F.2d 1217, 1222 (5th Cir.1983), quoting *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). *See also: Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) ("Without doubt, ['liberty' in the fourteenth amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life …"); and *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A state cannot exclude a person from the practice of law or from any other occupation … for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.").

*Id.* at 1148.

█ Nonetheless, a physician's "liberty" interest in pursuing his or her professional practice and "establish[ing] a home and position in" a particular community does not *per se* entitle the physician to exercise plenary staff privileges at public hospitals or medical facilities. To the contrary, "Suits by physicians who have been denied hospital staff privileges are not new. It has been clearly established for years that a doctor has no constitutional right to the staff privileges of a hospital merely because he is licensed to practice medicine. *Hayman v. Galveston,* 1927, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714." *Sosa v. Board of Managers of Val Verde Mem. Hosp.,* 437 F.2d 173, 175 (5th Cir. 1971).[64] Generally, a physician is limited to assertion of a substantive due process right not to be excluded from staff privileges except for reasons related to the operation of the hospital which are not arbitrary or capricious, and a right to procedural due process sufficient to ensure that the physician has an opportunity to demonstrate that the exclusion is not justified. *See Woodbury v. McKinnon,* 447 F.2d 839, 842 (5th Cir.1971); *Sosa v. Board of Managers of Val Verde Mem. Hosp.,* 437 F.2d at 176–177; *Sarasota Cty. Pub. Hosp. Bd. v. Shahawy,* 408 So.2d 644, 646–647 (Fla.App.1981).

█ Absent the recognition of a *per se* right to pursue medical practice through the exercise of full staff privileges at government-sponsored medical facilities, the SJHSD's exercise of supervisory power to grant, limit or deny practice privileges at those facilities—by requiring physicians to apply for and obtain privileges under the medical staff bylaws—did not deny a substantive constitutional "liberty and property right" to practice medicine or to make contracts with patients for his professional services.[65]

---

**64.** In *Hayman,* the Court stated that

the only protection claimed here is that of appellant's privilege to practice his calling. However extensive that protection may be in other situations, it cannot, we think, be said that all licensed physicians have a constitutional right to practice their profession in a hospital maintained by a state or a political subdivision, the use of which is reserved for purposes of medical instruction. It is not incumbent on the state to maintain a hospital for the private practice of medicine.

*Hayman v. City of Galveston,* 273 U.S. 414, 416–417, 47 S.Ct. 363, 71 L.Ed. 714 (1927).

**65.** Justice Sutherland's opinion in *Adkins v. Children's Hospital,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), cited by plaintiffs, extolls the virtue of freedom of contract, but does so in the context of state legislation prescribing minimum wages for women and

A physician's liberty interest in pursuing a professional practice raises *procedural* due process concerns with respect to the grant or denial of staff privileges at a public hospital or medical facility once a request for such privileges has been made.

**Dr. MacArthur's Request for Privileges & Procedural Due Process**

■ Dr. MacArthur's § 1983 claim also attempts to raise an issue of *procedural* due process concerning a right to notice and hearing concerning his December 1999 request for full provisional privileges at SJHSD facilities:

> MS. ROSE: All right. This is what the crux of it is. There was no due process, there was no notice. He was never told there was a problem. He was never given an opportunity to rectify the problem. There's no, by the bylaws there's no hearing process available for physicians that have temporary privileges. He was given no hearing basis

children in private employment, without reference to the pursuit of a particular line of employment. *See id.* at 545–546, 43 S.Ct. 394 ("the right to contract about one's affairs is a part of the liberty of the individual protected by this [Due Process] clause," and although "[t]here is, of course, no such thing as absolute freedom of contract[,] ... freedom of contract is, nevertheless, the general rule, and restraint the exception, and the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances"), *overruled by West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). The Court has long since abandoned *Adkins'* expansive view of freedom of contract. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 860, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

66. In arguing the denial of procedural due process, Dr. MacArthur's counsel retreated somewhat from her substantive due process theory:

> THE COURT: Okay. Well your idea is that in rural areas a doctor with a medical

except that, you know, he was not told any time in advance that this February 2nd hearing was going to be held to discuss his staff privileges.

(Tr. 11/14/02, at 20:25–21:8 (Ms. Rose).) [66] Counsel referred to a February 2, 2000 SJHSD staff meeting at which it is alleged that Dr. MacArthur's December 1999 request for privileges was discussed, but no formal action was taken. Dr. MacArthur was not present for the February 2 meeting; he had accompanied his wife out of town for a medical procedure. (*See* Tr. 11/14/02, at 11:13–19 (Ms. Rose).) SJHSD's executive director, Cleal Bradford, also was not in attendance. Mr. Bradford's signature would have been required for any grant of provisional privileges or any further extension of Dr. MacArthur's "temporary" privileges beyond their February 2 expiration date. (*See* Tr. 11/14/02, at 16:1–21, 17:25–18:16 (Ms. Rose).)

degree and a medical license has unrestricted power to practice in a local hospital?
> MS. ROSE: No, Your Honor, it is subject to what is called peer review. It is subject to notice and due process and that's verified in 42 U.S.C. 11112 ....

(Tr. 11/14/02, at 31:25–32:5.) In counsel's view, the Health Care Quality Improvement Act, 42 U.S.C. § 11112, discussed *supra*, "requires that if you're going to limit or deny privileges to a doctor you do it with adequate and fair notice and due process." (Tr. 11/14/02, at 33:7–9 (Ms. Rose).) As noted above, § 411 of the HCQIA, 42 U.S.C. § 11111, encourages the use of peer review procedures in supervising physicians' practice privileges by immunizing the review participants from civil liability arising from a review action (with specific exceptions) if that action meets § 11112's procedural criteria. The HCQIA does not impose due process *requirements* on hospitals and health care facilities; it provides an incentive for the adoption of notice-and-hearing procedures by the facilities themselves. Section 11111(a)(1) does not immunize peer review participants from liability under the federal civil rights acts, including 42 U.S.C. § 1983.

According to the facts alleged by the plaintiffs, the SJHSD had neither granted nor denied Dr. MacArthur's request for full provisional privileges as of February 2, 2000, when his "temporary" privileges expired; the matter was tabled pending the receipt of further documentation. At that point, as counsel explained, Dr. MacArthur moved his practice to Ely, Nevada. (Tr. 11/14/02, at 18:17–19:6 (Ms. Rose).)

> THE COURT: After his temporary hospital privileges expired what did he do in reference to having that issue be examined?
>
> MS. ROSE: At that point he left.
>
> THE COURT: He went to Ely?
>
> MS. ROSE: Starting May 1st I believe.

(*Id.* at 25:22–26:2.) According to counsel, Dr. MacArthur chose to go to Ely, Nevada, because the situation in San Juan County "was so inhospitable." (*Id.* at 26:12–21 (Ms. Rose); *see id.* at 37:8–38:8 (Ms. Cox).) "The working conditions in the area were so hostile, not only to him but to his patients that he felt he had no alternative but to leave . . . ." (*Id.* at 42:20–23 (Ms. Rose).)

Whether an environment is hospitable or hostile is a matter of perception, based upon an aggregation of circumstances and events. Taking plaintiffs' factual allegations as true, it appears that in providing medical care to his patients at SJHSD facilities, Dr. MacArthur experienced several unpleasant and frustrating instances involving a lack of sterile and functional medical instruments; conduct on the part of SJHSD nurses or staff that was disrespectful, ill-mannered, rude, and at times, unprofessional; and he became the subject of disparaging rumors circulated among the SJHSD support staff by a few antagonists, rumors that threatened to injure his personal reputation and his professional practice. All of these factors contributed to his perception that the SJHSD environment was inhospitable, and led ultimately to his decision in February of 2000 to forsake his request for privileges at SJHSD and move his practice to Nevada.

The essence of Fourteenth Amendment due process analysis is the implication of a liberty or property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Under the Fourteenth Amendment, procedural due process requires notice and a pre-deprivation hearing before property interests are negatively affected by governmental actors." *Marcus v. McCollum,* 394 F.3d 813, 820 (10th Cir.2004). Health care professionals have been held to have a property interest in their professional licenses. *See, e.g., Seay v. Campbell,* 130 Fed.Appx. 268 (10th Cir.2005) ("property" interest in license to practice dentistry); Annotation, *Rights as to notice and hearing in proceeding to revoke or suspend license to practice medicine,* 10 A.L.R. 5th 1 (1993).

Some courts have expressed the view that "[h]ospital staff privileges are generally considered to be a property or liberty interest of the physician," at least where they have already been granted by a government-sponsored facility. *Beyer v. Lakeview Community Hospital,* 187 F.3d 634 (Table), 1999 WL 552606, *3 (6th Cir. 1999) (citing *Foster v. Mobile County Hosp. Bd.,* 398 F.2d 227, 229 (5th Cir. 1968)). A limitation, revocation or termination of existing hospital staff privileges would thus have due process implications.

At least two circuits have held that "[s]eeking staff privileges, which entitle a physician to admit patients to a particular hospital, has been held to be a protected liberty interest . . . ." *Silverstein v. Gwinnett Hosp. Authority,* 861 F.2d 1560, 1566 (11th Cir.1988) (citations omitted). *See Burkette v. Lutheran General Hospital,*

595 F.2d 255, 255–256 (5th Cir.1979) ("We have held that a physician in private practice denied staff privileges in a hospital that is subject to the fourteenth amendment possesses a protectible 'liberty' interest that can ground a complaint on such a denial. *Shaw v. Hospital Authority*, 507 F.2d 625 (5th Cir.1975).").[67]

To pursue a due process claim in the courts based upon a denial of hospital staff privileges, however, those privileges must in fact be *denied* before the claim may be pursued in the courts. *See Unnamed Physician v. Board of Trustees of Saint Agnes Medical Center*, 93 Cal.App.4th 607, 113 Cal.Rptr.2d 309 (2001) (physician challenging hospital's denial or withdrawal of staff privileges must pursue the internal remedies afforded by that hospital to a final decision on the merits before resorting to the courts for relief); *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95 (Alaska 1992) (exhaustion of administrative remedies required); *Eidelson v. Archer*, 645 P.2d 171 (Alaska 1982). The reported cases involving due process claims and hospital staff privileges arise from the actual denial, restriction, non-renewal or revocation of staff privileges. *See generally* Annotation, *Exclusion of, or discrimination against, physician or surgeon by hospital*, 28 A.L.R. 5th 107, 1995 WL 900213 (1995 & Supp.2004), and cases cited therein.

In this instance, the SJHSD had neither granted nor denied Dr. MacArthur's request for full one-year provisional privileges at the time that he decided to move his practice to Nevada in February or March of 2000. For his part, Dr. MacAr-thur did not press the issue after his "temporary" privileges expired by their own terms on February 2, 2000—temporary privileges that in fact had afforded Dr. MacArthur the use of the SJHSD hospital and Blanding birthing center to treat his patients and deliver babies during most of the time that his request for full provisional privileges was pending. Close examination of plaintiffs' allegations turns up no instance in which Dr. MacArthur was denied access to SJHSD facilities to provide care to a patient during the time that his request for full privileges was pending and his temporary privileges—twice extended—remained in effect.

Taking Dr. MacArthur's factual allegations as true, the court concludes that Dr. MacArthur had not in fact been *denied* access to SJHSD facilities by any final action or determination by the SJHSD before Dr. MacArthur deliberately chose to forsake his request for full one-year SJHSD provisional staff privileges in favor of pursuing his medical practice elsewhere. Dr. MacArthur's election to move his practice out of state waived his request for staff privileges at SJHSD facilities, and mooted any § 1983 claim based upon a denial of such privileges on due process grounds. His claim of denial or exclusion never became ripe for judicial review prior to February 2, 2000, the point at which Dr. MacArthur effectively abandoned his request for SJHSD privileges. *See, e.g., Unity Ventures v. Lake County*, 841 F.2d 770, 775–776 (7th Cir.1988) (absent final governmental action denying intended use of property, § 1983 due process challenge to local land use regulation was not ripe

---

**67.** The Utah courts have also entertained contractual "due process" claims involving the limitation or revocation of practice privileges at private hospitals based upon notice-and-hearing requirements found in hospital by-laws. *See, e.g., Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069 (Utah 1991); *Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.*, 933 P.2d 403, 408 (Utah Ct.App. 1997). In this case, Dr. MacArthur and Ms. Lyman have not pleaded such claims based upon the SJHSD medical staff bylaws, instead choosing to attack the validity of the bylaws themselves. *See infra* note 104.

for judicial review); *Unnamed Physician v. Board of Trustees of Saint Agnes Medical Center,* 93 Cal.App.4th 607, 113 Cal. Rptr.2d 309 (2001).

His § 1983 claim cannot raise a triable issue, and must therefore be dismissed as against all of the defendants. Fed. R.Civ.P. 16(c)(1).

**Ms. Lyman's § 1983 Claim**

**Substantive Due Process**

 From the colloquy at the Final Pretrial Conference, it became ever more apparent that even though plaintiffs MacArthur and Lyman have pleaded many parallel allegations concerning the question of staff privileges, their positions differ in fundamental ways. For one thing, Dr. MacArthur as a licensed physician was free to compete for patient business with other licensed physicians; Ms. Lyman, as a licensed Physician's Assistant, is required by Utah law to work under the direct supervision of a physician. Under Utah law, the scope of practice for a Physician Assistant is defined in pertinent part as follows:

**58–70a–501. Scope of practice.**

(1) A physician assistant may provide any medical services that are not specifically prohibited under this chapter or rules adopted under this chapter, and that are:

 (a) within the physician assistant's skills and scope of competence;

 (b) within the usual scope of practice of the physician assistant's supervising physician; and

 (c) *provided under the supervision of a supervising physician* and in accordance with a delegation of services agreement.

---

**68.** This statutory definition has been in effect since its enactment in 1997. *See* 1997 Utah

Utah Code Ann. § 58–70a–501 (2002) (emphasis added).[68] State Administrative Rule R156–70a, the Physician Assistant Practice Act Rules, provides:

**R156–70a–501. Working Relationship and Delegation of Duties.**

In accordance with Section 58–70a–501, the working relationship and delegation of duties between the supervising physician and the physician assistant are specified as follows:

(1) The supervising physician shall provide supervision to the physician assistant to adequately serve the health care needs of the practice population and ensure that the patient's health, safety and welfare will not be adversely compromised. The degree of on-site supervision shall be outlined in the Delegation of Services Agreement maintained at the site of practice. Physician assistants may authenticate with their signature any form that may be authenticated by a physician's signature.

(2) There shall be a method of immediate consultation by electronic means whenever the physician assistant is not under the direct supervision of the supervising physician.

(3) The supervising physician shall review and co-sign sufficient numbers of patient charts and medical records to ensure that the patient's health, safety, and welfare will not be adversely compromised. The Delegation of Services Agreement, maintained at the site of practice, shall outline specific parameters for review that are appropriate for the working relationship.

(4) A supervising physician shall not supervise more than two full time equivalent (FTE) physician assistants without the prior approval of the division and

---

Laws ch. 229, § 11.

the board, and if patient health, safety, and welfare will not be adversely compromised.

Utah Admin. Code § R156–70a–501 (2004).

While it is true that under these provisions, a Physician Assistant may provide "any medical services" not specifically prohibited that are within the range of her skills and scope of competence and the skills and scope of practice of her supervising physician, she cannot lawfully exercise the identical degree of independent professional judgment and discretion that a physician could exercise, and logically she could not be entitled as a matter of constitutional right to exercise practice privileges at hospitals, clinics and similar facilities identical to those that physicians may enjoy. (*Cf.* Tr. 11/15/02, at 34:21–39:5 (Ms. Rose).)

Limiting a Physician Assistant's practice privileges to take into account the statutory and regulatory requirement of direct supervision and review by a physician cannot operate to deprive the Physician Assistant of "liberty" or "property" otherwise guaranteed by the Fourteenth Amendment. Nor is it arbitrary or unreasonable for a health care facility to require that Physician Assistants exercise staff privileges under the supervision of a physician who currently has staff privileges at the same facility.

The restrictions on plaintiff Lyman's practice privileges at SJHSD facilities described in the Proposed Amended Complaint and at pretrial,[69] fall short of a constitutional deprivation,[70] and thus cannot serve as the factual footing for Ms.

**69.** Starting from the premise that "[w]hile working for Dr. Redd, Mrs. Lyman applied for and received privileges with the District, with the same scope of privileges as Dr. Redd," (Proposed Pretrial Order at 1223 ¶ 117); *see id.* at 1229 ¶ 127 ("Mrs. Lyman's scope of privileges was originally for duties equal to Dr. Redd's."), Ms. Lyman alleges that after leaving Dr. Redd's supervision in October, 1998, her privileges were restricted in several respects: "Mrs. Lyman could not admit or discharge patients without first her supervising doctor initially and officially and physically signing off on the patient's admit or discharge," (*id.* at 1234 ¶ 169); she was told on one occasion in December 1998 that she could not give orders to SJHSD staff, (*id.* at 1234 ¶ 170); later that same day, she was told she "could use the lab and xray *only during Dr. Penn's office hours,* [and that] otherwise Ms. Lyman did not have privileges," (*id.* at 1234 ¶ 186 (emphasis in original)); "[l]ater the limited privileges of lab and exray [sic] were extended to her for her patients as required by State law," (*id.* at 1234 ¶ 187), but in September 1999, her secretary was told "that Ms. Lyman would not be allowed to order labs until Ms. Lyman sent a letter to Dr. Redd stating who her supervising physician was." (*Id.* at 1237 ¶ 213). (*See* Proposed Amended Complaint at 55 ¶ 127; 69–70 ¶¶ 169–170; 70–71 ¶¶ 186–187; 79–80 ¶ 213

(same); Tr. 11/15/02, at 8:20–10:25, 17:6–11, 19:2–20:19, 22:15–20, 28:8–19, 30:4–20, 31:9–32:17, 40:22–42:3, 44:22–45:5, 46:7–20, 54:9–20.)

Ms. Lyman also alleges interference with her care for individual patients: in one instance, her request for a Holter monitor for a patient was denied (*id.* at 1234 ¶ 185); on at least two occasions, her request for patient medical records was refused by Dr. Redd, (*id.* at 1234, 1235 ¶¶ 189, 193–194); despite an understanding with the SJHSD medical staff concerning injections, "Ms. Lyman tried on several occasions to call in injections to the ... ER (Blanding Urgent Care Clinic) and was denied every time. Ms. Lyman always had to call Dr. Penn's office and have him call the order in. requests to the Blanding Urgent Care Center for injections for patients were denied by SJHSD staff," (*id.* at 1237 ¶ 210). (*See* Proposed Amended Complaint at 70–73 ¶¶ 185, 189, 193–194, 210 (same); Tr. 11/15/02, at 16:10–17:5, 21:19–21, 22:5–14, 26:12–25, 30:4–31:6, 39:3–40:12; *compare supra* n. 12.)

**70.** Substantive due process requires that a termination, suspension, denial or restriction of a plaintiff's practice privileges not be " 'arbitrary, capricious, or without a rational basis.' " *Tonkovich v. Kansas Bd. of Regents,*

Lyman's § 1983 claim against any of the individual defendants, including the SJHSD Board and San Juan County Commissioners. (*See* Tr. 11/15/02, at 26:14–32:17, 34:20–44:7 (Ms. Rose).) Or, looking at it another way, plaintiffs' allegations, taken as true, fail to establish a violation of a clearly established constitutional right to unrestricted practice privileges as a state-licensed Physician Assistant at publicly-sponsored medical facilities, and as a result, plaintiff's § 1983 claim against the individual defendants is barred by the doctrine of qualified immunity. Plaintiff Lyman likewise fails to allege an arguable claim of constitutional deprivation resulting from a "policy" or "custom" of the SJHSD or San Juan County, and cannot hold either entity liable under § 1983.

159 F.3d 504, 528 (10th Cir.1998) (quoting *Brenna v. Southern Colo. State College*, 589 F.2d 475, 477 (10th Cir.1978)).

> The Tenth Circuit recently reiterated the standards for evaluating substantive due process claims:
>> In analyzing plaintiff's substantive due process claim, the court assumes plaintiff's employment was an interest entitled to protection. In *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir.1995), we stated that "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.' " *Id.* at 573 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)) (further quotations omitted). To "satisfy the 'shock the conscience' standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Id.* at 574. Rather, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.*
>
> *Babbar v. Ebadi*, 2000 WL 702428, at \*10 (10th Cir.2000).

*Ferraro v. Board of Trustees of Labette County Medical Center*, 106 F.Supp.2d 1195, 1202 (D.Kan.2000).

## Procedural Due Process

Plaintiffs plead a "Lack of Notice and Due Process," (Proposed Amended Complaint at 46–52 ¶¶ 129–167; *see* Proposed Pretrial Order at 1226–28 ¶¶ 161–199 (same)), but relatively few of the factual allegations pleaded under that heading pertain to Ms. Lyman, and they address the alleged alteration of dates on her CPR certification cards—cards curiously discovered to be "missing" from her SJHSD file at the time that she requested staff privileges to practice under Dr. MacArthur's supervision in December, 1999. (*See id.* at 46–48 ¶¶ 129–140, 142–146.) [71] Other than alleging that "[t]he Medical staff and Cleal Bradford and Laurie Shafer discussed Mrs. Lyman's CPR card problems of

71. Ms. Lyman also asserts that she "had sought privileges ever since they were de facto terminated by district policy after she began working for Dr. Penn, having left the practice of Dr. Redd,"in October 1998, (Proposed Amended Complaint at 40 ¶ 91), but her specific factual allegations reflect that she continued to exercise her privileges through 1999. The scope of her privileges was the subject of discussion involving Ms. Lyman, Dr. Penn and the SJHSD medical staff in which it was acknowledged by the medical staff that Ms. Lyman could, *inter alia*, request x-rays, lab work and injections for patients, and could continue to exercise privileges under local physician supervision. *See supra* at n. 69. In December of 1999, she requested *renewal* of her existing privileges, which had a renewal date of December 22, 1999. (*See* Tr. 11/15/02, at 49:6–52:6 (Ms. Rose).)

Whether certain SJHSD nurses or other employees interfered with the exercise of her existing privileges is another matter, (*see* Proposed Pretrial Order at 1217 ("Privileges for Mrs. Lyman were de facto denied by nursing personnel and medical staff without any action by the District governance board.")), raising potential claims of breach of contract or the implied covenant of good faith and fair dealing, or interference with contract.

wrong dates without Mrs. Lyman being present," (*id.* at 46–47 ¶ 133), and "[t]he medical staff and Cleal Bradford and Laurie Shafer unanimously decided to publish the altered cards to the American Heart Association by vote of the medical staff, who was considering privileges for Mrs. Lyman, without Mrs. Lyman being present," (*id.* at 48 ¶ 142), Ms. Lyman does not plead specific facts showing a denial of fair notice and an opportunity to be heard on the CPR card issue. (*Cf.* Proposed Pretrial Order at 1241–42 ¶ 255 ("she was not notified immediately that her cards were in some way in error").) In fact, she alleges that the CPR card problem was brought to her attention, that she furnished accurate CPR certification information to the SJHSD, but that her SJHSD privileges ultimately were not renewed. She did not pursue the request any further. (*See* Tr. 11/15/02, at 52:3–53:17 (Ms. Rose).)

While the specific instances of interference with her exercise of her SJHSD privileges may raise contract-based claims under Utah law, *see infra,* Ms. Lyman has not alleged specific facts showing a denial of procedural due process guaranteed by the Fourteenth Amendment.

**Misogyny & "Hostile Environment" under § 1983**

Ms. Lyman complains that Dr. Redd, the "Chief of Medical Staff has a long standing animus toward women," that during the time she was employed by Dr. Redd in his private practice from June 1996 until October 1998, she observed Dr. Redd being angry and verbally abusive in dealing with his female employees, *e.g.,* referring to Ms. Lyman as an "idiot" and another employee as an "incompetent bitch," and that

149. Mrs. Lyman observed that each nurse, in order to avoid Dr. Redd's tirades would turn on each other or disas-sociate with the person who Dr. Redd targeted that day.

150. Thus, an atmosphere of distrust and hostility permeated the office creating a hostile work and patient environment.

(Proposed Amended Complaint at 60–61 ¶¶ 143, 149–150.)

■ Generally, to plead a viable "hostile environment" claim, a plaintiff must show "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus," or other forbidden class-based discriminatory animus, such as gender. *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (citation omitted). In a case involving discrimination on account of race, "[a] plaintiff cannot meet this burden by demonstrating "a few isolated incidents of racial enmity" or "sporadic racial slurs," or the like." *Id.* (quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412–13 (10th Cir.1987)). Instead, " 'there must be a steady barrage of opprobrious racial comments.' " *Chavez v. New Mexico,* 397 F.3d 826, 832 (10th Cir.2005). Where the enmity is based upon gender, a plaintiff must likewise allege a "steady barrage" or "steady stream" of misogynistic abuse in order to sustain a "hostile environment" claim. *See, e.g., Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1539 (10th Cir.1995) ("It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII"); *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000–1001 (10th Cir.1996) ("Over the course of her employment, plaintiff was called a 'whore,' 'floor whore,' 'curb whore,' 'curb side cunt,' and 'bitch,' on a consistent basis. These sexual epithets have been iden-

tified as 'intensely degrading' to women." (internal quotation & citation omitted)).

██ "Hostile work environment harassment occurs when unwelcome sexual conduct ' "unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment." ' " *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a)(3)). According to the court of appeals,

> *Meritor* states that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* at 67, 106 S.Ct. at 2405 (citation omitted). The mere utterance of a statement which " 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* (quoting *Rogers v.*

*EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).
*Smith v. Northwest Financial Acceptance, Inc.,* 129 F.3d 1408, 1412 (10th Cir.1997).[72] In the context of a hostile environment claim, courts must "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and citation omitted).

██ Plaintiff Lyman did not plead and does not assert a "hostile environment" claim under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–1 *et seq.*

The court of appeals has held that, apart from Title VII, gender discrimination and sexual harassment can result in a violation of the Fourteenth Amendment right to equal protection of the law that is actionable under § 1983.[73] However, a plaintiff

---

**72.** *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), clarified the elements of a claim for gender discrimination resulting from a hostile work environment. The Supreme Court held that conduct within the purview of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–1 *et seq.,* must be severe or pervasive enough to create both "an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile"-and an environment the victim-employee subjectively perceives as abusive or hostile. *Id.* at 21–22, 114 S.Ct. 367. Whether an environment is "hostile" or "abusive" is determined by looking at the totality of circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; ... whether it unreasonably interferes with an employee's work performance"; and the context in which the conduct occurred. *Id.* at 23, 114 S.Ct. 367. Additionally, the *Harris* Court specifically noted that any relevant factor "may be taken into account, [but] no single factor is required." *Id.*

**73.**
> If a plaintiff can show a constitutional violation by someone acting under color of state law, then the plaintiff has a cause of action under Section 1983, regardless of Title VII's concurrent application. *See Owens v. Rush,* 654 F.2d 1370, 1380 (10th Cir.1981) ("Title VII did not impair in any way [plaintiff's] independent, substantive rights created by the First and Fourteenth Amendments .... '[S]ubstantive rights conferred in the 19th Century were not withdrawn, sub silentio, by the subsequent passage of the modern statutes.' ") (quoting *Novotny,* 442 U.S. at 377, 99 S.Ct. at 2351); *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1205 (6th Cir.1984) ("Where an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute ... the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII."); *cf. Meade v. Merchants Fast Motorline, Inc.,*

must allege "the state action necessary to support a § 1983 claim," [74] and each individual defendant must act under color of state law; a "state actor" must serve as the plaintiff's "supervisor or in some other way exercise state authority over her." *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir.1994); *see also David v. City & County of Denver*, 101 F.3d 1344, 1354 (10th Cir. 1996) (public co-employees may act under color of law if they exercise de facto authority over victim), *cert. denied*, 522 U.S. 858, 118 S.Ct. 157, 139 L.Ed.2d 102 (1997).[75]

■ Here, the "state action" requirement proves somewhat problematic. During the time Ms. Lyman worked for Dr. Redd, Dr. Redd was engaged in private

medical practice, and was not a SJHSD employee. His conduct in that context would lack the requisite "state action" needed to sustain a § 1983 claim. The plaintiffs' factual allegations suggest that Dr. Redd was speaking to Ms. Lyman and his other employees as a private employer, and not in any official capacity.[76] Though Dr. Redd became employed by the SJHSD in March of 1999 and would likely be held to be a "state actor" as to his conduct as SJHSD medical director or "Chief of Medical Staff," [77] the plaintiffs' pleadings speak of the "atmosphere of distrust and hostility" that "permeated" Dr. Redd's office in Blanding at the time Ms. Lyman worked there. (Proposed Amended Complaint at 61 ¶ 150.) [78]

820 F.2d 1124, 1127 (10th Cir.1987) ("plaintiff may properly pursue his cause of action under § 1981 for private employment discrimination despite the applicability of Title VII to the same conduct").
*Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir.1989).

74. "To be successful, section 1983 claimants must make two showings to establish that the conduct at issue constituted state action. 'First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.' *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). 'Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.' *Id.*" *Nieto v. Kapoor*, 268 F.3d 1208, 1215 (10th Cir. 2001).

75. State action under § 1983 can occur when a supervisor "participates in or consciously acquiesces in sexual harassment ... by co-workers." *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1250 (10th Cir.1999) (quotation marks and citation omitted).

76. At that time, Dr. Redd was also a member of the SJHSD medical staff, and at different times in 1996 may have served as chief of staff. (*See* Tr. 11/15/02, at 3:20–22 (Ms. Rose)). Dr. Redd's conduct *as the*

SJHSD chief of staff may be state action under § 1983. *See, e.g., Nieto v. Kapoor*, 268 F.3d 1208, 1215–1217 (10th Cir.2001) (nonemployee medical director of hospital department acted under color of state law for purposes of § 1983 "when undertaking his supervisory duties over plaintiffs' work" in that department and was "a state actor for purposes of section 1983."). Yet plaintiffs do not allege that Dr. Redd was acting as the SJHSD chief of staff—not as a private employer engaged in a private medical practice—in making the alleged derogatory remarks to Ms. Lyman and others who worked for him. (*See* Proposed Amended Complaint at 60–68 ¶¶ 145–166.)

77. (Proposed Amended Complaint at 60 ¶ 143.)

78. Ms. Lyman would not have standing to bring a "hostile environment" claim under either Title VII or § 1983 for verbal abuse occurring after October or November of 1998 because at that point she was no longer employed by Dr. Redd. She was working with and being supervised by Dr. Penn; after she left Dr. Redd's supervision in 1998, Dr. Redd's derogatory remarks—rude, offensive, antagonistic and unprofessional as they may have been—could not alter the terms, conditions, or privileges of Ms. Lyman's subsequent employment.

### Qualified Immunity & Ms. Lyman's § 1983 Claim

Further, as noted above, the defendants contend that because "the alleged acts and/or omissions by County commissioners, officials or employees or Health District trustees, employees or staff members, about which plaintiffs complain, were carried out within the scope of and pursuant to their official duties as trustees, employees or staff members of the Health District, plaintiffs' claims are barred by the doctrine of qualified immunity," (Proposed Pretrial Order at 1215 ¶ xxxvi), at least to the extent those claims are asserted pursuant to 42 U.S.C. § 1983. Concerning individual defendants who have raised a claim of qualified immunity,

> The threshold inquiry is whether the alleged facts (or, on summary judgment, the evidenced facts) taken in the light most favorable to the plaintiff show a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

*Simkins v. Bruce,* 406 F.3d 1239, 1241 (10th Cir.2005).

■■■ From the foregoing summary, it readily becomes apparent that the plaintiffs' allegations as of the eve of pretrial, taken as true and in the light most favorable to the plaintiffs, failed on their face to show a constitutional violation by the individual defendants. "[A] defamatory statement published by state officials is not for that reason alone a Fourteenth Amendment violation," 1 Nahmod, *supra,* § 3:40, at 3–117 (citing *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)), and the making of derogatory remarks,

the infliction of verbal abuse, the honking of car horns and other potentially tortious conduct does not automatically implicate the Due Process Clause simply because the actor is employed by a local health services district or is a member of its medical staff. Nor does interference with, or even the breach of a district contract with a health services provider, caused by a district official or staff acting under his direction, necessarily result in a constitutional deprivation of "liberty" or "property" that is actionable under § 1983. Absent a constitutional deprivation, qualified immunity entitles the individual defendants to a dismissal of plaintiff Lyman's § 1983 claims.

### Ms. Helen Valdez' § 1983 Claim

The facts underlying the claim of plaintiff Helen Valdez have already been summarized herein. (*See supra* at 1118–19, 1126–27.) Her potential civil claim under EMTALA being time-barred, at least absent leave to amend,[79] the only claim that remained pending for consideration at the time of pretrial was her § 1983 claim of purposeful national origin, gender and age discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

In order to state a viable equal protection claim under § 1983, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles,* 250 F.3d 668, 686 (9th Cir.2001) (citations omitted); *see also Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). To support her § 1983 claim, then, Ms. Valdez must come forward with facts indicating a discriminatory intent on the part of the defendants.

---

79. (*See supra* at 1141–42.)

*See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (§§ 1981 & 1983); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (equal protection). She must also allege facts showing that a defendant "engaged in specific conduct that denied her equal protection of the laws." *Williams v. Bramer,* 180 F.3d 699, 701 (5th Cir.1999).

■ Ms. Valdez is a white female over the age of 60, married to a Mexican–American husband. (Proposed Pretrial Order at 1244 ¶¶ 14–15.) Counsel asserts that on April 14, 1999, she was "turned away" from the San Juan Hospital emergency room because of her age, her gender, her association with her Mexican–American husband and sister-in-law, and with her then-primary care physician, Dr. Penn, who was identified as being Jewish. (*See* Tr. 11/15/02, at 59:1–15 (Ms. Rose); Memorandum of Points and Authorities Supporting Plaintiff Valdez's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 665), at 6–20.)[80] Counsel relies upon a "disparate treatment analysis," citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), based upon allegations that Ms. Valdez "was turned away, when accompanied by her Mexican–American appearing sister-in-law, by nurse Laurie Wallace," while at the same time, "[t]he white young male with no insurance in the ER waiting area was seen by Dr. Penn almost immediately after Mrs. Valdez left." (Proposed Amended Complaint at 86 ¶ 232–233; *see* Proposed Pretrial Order at 1221 ¶ 66 ("Mrs. Valdez' neighbor who was a white young male and had not insurance was seen immediately.").)

Counsel's proffered inference of discriminatory treatment and discriminatory purpose from the fact that another patient waiting in the emergency room was examined by a physician and Ms. Valdez was not collides with a key fact: Ms. Valdez was not refused screening, examination, or treatment; nor was she instructed or ordered by any emergency room personnel to leave the facility. (*See supra* at 1118–19.) At pretrial, counsel argued that Ms. Valdez "was told to go"—an assertion belied by the plaintiffs' own pleadings and Ms. Valdez' own deposition testimony. (Tr. 11/15/02, at 60:7 (Ms. Rose).) Ms. Valdez explained that she decided to leave the emergency room and return home after her sister-in-law told her that she had overheard a nurse, Lori Wallace, tell the emergency room clerk who had assisted Ms. Valdez in filling out her patient admittance form to tell Ms. Valdez to go to her physician's clinic. (*See supra* at 1118 & nn. 18–19; Tr. 11/15/02, at 57:1–4 (Ms. Rose) ("Laurie [sic] Wallace had told the receptionist, tell them to go to the clinic, it's open, something to that effect. The exact words were tell them to go to the

---

**80.** Claims of class-based discrimination against a non-minority plaintiff based upon association with the plaintiff's minority spouse have met with mixed results. *Compare, e.g., Davis v. Southeastern Pennsylvania Transp. Authority,* 924 F.2d 51 (3d Cir.1991) (plaintiff white police officer married to African–American spouse prevailed on § 1983 anti-discrimination claim arising out of offi- cer's discharge from employment), *with University Village Music Center v. Seattle School Dist.,* 844 F.2d 793 (Table), 1988 WL 33365 (9th Cir.1988) (unpublished disposition) (conclusory allegations that the defendants discriminated against plaintiff's business because his former wife is of Japanese descent insufficient to state a § 1983 claim).

clinic.").) Shortly before that, however, Ms. Valdez had observed Lori Wallace tell the same clerk that "she could set both her patients up in the emergency room for the physician," apparently referring to Ms. Valdez and Michael Bailey, the other individual then waiting in the emergency room. (*Id.*)

Yet Ms. Valdez did not speak directly to either the nurse or the clerk about her symptoms or ask whether or when she would be seen by a doctor at the emergency room. She left the facility, apparently assuming that she would not be examined. She explained her reticence in her deposition:

A Well, living in San Juan County for many years and living in a Mexican–American community, you kind of learn to keep your place. You don't just voluntarily speak out. You just kind of wait until spoken to.

Q How does that apply to being a woman in San Juan County?

A I believe probably about the same.

(Deposition of Helen Valdez, dated December 6, 2001, at 52:17–24.) In this instance, she did not wait to be spoken to; assuming that she would not be examined at the emergency room, Ms. Valdez simply left. Taking the plaintiff's factual averments as true—in particular, the portions of the deposition testimony of Ms. Valdez and Ms. Gonzales submitted to the court by plaintiffs' counsel—it cannot fairly be said that Ms. Valdez was "turned away" from examination and treatment at the San Juan Hospital emergency room on April 14, 1999. No one on the SJHSD staff told Ms. Valdez that she would not be examined by a physician if she remained there, and both Ms. Valdez and Ms. Gonzales acknowledged that no one on the SJHSD staff expressly instructed Ms. Valdez to leave.[81]

Before Lori Wallace may be held liable under § 1983 for a constitutional deprivation purposefully inflicted upon Ms. Valdez,[82] there needs to be at least one sworn averment of specific facts in the record showing that Ms. Wallace acted that "with an intent or purpose to discriminate against the plaintiff" based upon the plaintiff's membership in a protected class (or at least her identification with a protected class),[83] and that Ms. Wallace "engaged in specific conduct that denied her equal protection of the laws." None was cited or proffered at pretrial, and none was submitted in connection with either the Proposed Amended Complaint or the Proposed Pretrial Order.

At the conclusion of the pretrial colloquy concerning Ms. Valdez' claim, this court concluded:

Looking at the statutes referred to and particularly the suggestion that implicit[ly] the complaint ought to conform with what is said to be the evidence,

---

81. This being so, Ms. Valdez was not denied or refused the screening, examination or stabilizing treatment for an "emergency medical condition" required by EMTALA, 42 U.S.C. § 1395dd(a), and has no arguable legal claim arising from a violation of that statute. 42 U.S.C. § 1395dd(d). (*See supra* at 1139–40.)

82. Counsel now argues the existence of a County "policy or custom" of disparate treatment of "people of color," relying largely on hearsay assertions of anecdotal evidence. (*See* Memorandum of Points and Authorities Supporting Plaintiff Valdez's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 665), at xii, 18–19.) This claim was neither pleaded through specific allegations in the Proposed Amended Complaint nor raised as an issue in the Proposed Pretrial Order.

83. *Muzquiz v. W.A. Foote Memorial Hosp., Inc.*, 70 F.3d 422, 429 (6th Cir.1995) (witness' "subjective belief that minorities would be treated differently at the hospital was simply not probative of a discriminatory animus").

namely that she went to an emergency room and wasn't treated, I think under the factual scenario presented that it is insufficient to justify referring the matter to a fact-finder and under the circumstances that cause of action as alleged and as proffered should also be dismissed and I will so order.

(Tr. 11/15/02, at 117:10–18 (the Court).)

"The pretrial conference is never to be used as a substitute for trial .... Nevertheless, just as the Court may render judgment on immaterial issues for which there is no dispute of material fact, 'judgment may be ordered ... if there is no triable issue left at the end of the discussion.'" *Pifcho v. Brewer,* 77 F.R.D. 356, 357 (M.D.Pa.1977) (quoting 6 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1525 (1971).)

**(9) Federal Antitrust Laws (15 U.S.C. §§ 1 *et seq.*)**

Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (1997), cited by the Part I Plaintiffs, provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" in an appropriate federal district court "and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee," expressly providing injured parties with a private civil treble damages remedy for violations of the federal antitrust laws. As a remedial provision, § 4 itself does not proscribe any specific anti-competitive conduct. Conduct "forbidden in the antitrust laws" is defined elsewhere, as in the first two sections of the Sherman Anti–Trust Act. Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (1997), states in part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal ....

Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (1997), states in part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, ....

 Section 4 of the Clayton Act "requires a plaintiff to show actual injury," *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), and "the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Id.* (footnote omitted). Indeed, "[s]tanding and antitrust injury are essential elements in a private antitrust damages action brought under section 4 of the Clayton Act." *Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 960 (10th Cir.1990) (citing *Cargill,* 479 U.S. at 110, 107 S.Ct. 484; *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). According to the court of appeals, the following factors are "to be considered in determining antitrust standing:"

> the causal connection between the antitrust violations and plaintiff's injury; the defendant's intent; the nature of the plaintiff's injury; the directness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint; the speculativeness of the plaintiff's damages; and the "risk of duplicative recoveries ... or the danger of complex apportionment of damages." *Associated Gen. Contractors,* 459 U.S. at 544, 103 S.Ct. at 912.

*Id.* at 962 n. 15.

 The "nature of the plaintiff's injury factor" is "designed to implement

the requirement that only *antitrust* injuries are redressable under section 4." *Id.* (emphasis in original). "Antitrust injury" is demonstrated " 'by a causal relationship between the harm and the challenged aspect of the alleged violation' of the federal antitrust laws." *Id.* at 961 (quoting *Alberta Gas Chems., Ltd. v. E.I. Du Pont De Nemours & Co.,* 826 F.2d 1235, 1240 (3d Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988).).

> An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." ... It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (citation omitted). In evaluating a private plaintiff's standing under § 4, "we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff," and "(2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 478, 102 S.Ct. 2540.[84] The "injury suffered by the plaintiff must be of the type the antitrust laws were intended to forestall." *Id.* at 484 n. 21, 486, 102 S.Ct. 2540; *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful").

Thus, to "prevail, a private plaintiff must establish both (1) that it has standing *and* (2) the defendant has violated the antitrust laws.... [T]he antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation." 2 Phillip E. Areeda, Herbert Hovencamp & Roger D. Blair, *Antitrust Law* ¶ 335, at 297 (2d ed.2000) (footnote omitted). "Once it appears, whether early or late in the litigation, that either requirement [of standing or antitrust violation] is lacking, the suit must be dismissed." *Id.*

At the time of the Pretrial Conference, the Part I Plaintiffs asserted that the "District employees as a pattern sought to restrain competition[;] there was inadequate impartiality in 'peer review' or in issuing privileges since the people issuing the privileges are usually in economic competition with those they are giving privileges." (Proposed Pretrial Order at 1217–18.) The Proposed Amended Complaint alleged that "District employee doctors and Dr. Jones who was contracted with the District constituted about 80% or greater

---

**84.** Ms. McCready, a subscriber to a group health care plan who had been denied reimbursement by the plan for the cost of services of a clinical psychologist, brought her suit under § 4, alleging that the plan had conspired with a professional association of physicians and psychiatrists to exclude psychologists from receiving payment under the plan for outpatient treatment of mental disorders, including psychotherapy in violation of § 1 of the Sherman Act. 457 U.S. at 467–70, 102 S.Ct. 2540. The Court concluded that "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market. In light of the conspiracy here alleged we think that McCready's injury 'flows from that which makes defendants' acts unlawful ... and falls squarely within the area of congressional concern." *Id.* at 484, 102 S.Ct. 2540 (footnote omitted).

of the competing doctors in the area," (Proposed Amended Complaint at 30 ¶ 26), and that "[a]t all times, Dr. MacArthur and Michele Lyman were subject to District policies regarding their privileges as written and accepted by medical providers and physicians who economically competed with them." (*Id.* at 30 ¶ 27.)

In this case, then, the alleged "conduct forbidden by the antitrust laws" arises in the context of the grant, limitation, or denial of medical practice privileges at a hospital, clinic or birthing center. (*See generally id.* at 26–34 ¶¶ 1–49 ("Specific Statements of Facts—Anti–Trust Claims"); *id.* at 34–58 ¶¶ 50–168 ("Facts for 42 USC 1983, and antitrust and RICO claims"); *id.* at 58–86 ¶¶ 125–230 (same).)

Plaintiffs assert that the geographic market in which plaintiffs and the "District" health care services providers compete is San Juan County, Utah, with a "rural" or "frontier" population of over 13,000 people; the boundaries of the SJHSD are co-extensive with those of the county. (*Id.* at 29–30 ¶¶ 19–25.) Within that geography, plaintiffs assert that the SJHSD is the sole provider of hospital and birthing center services to that population:

37. San Juan Hospital and Blanding Birthing Center are the only facilities in San Juan County for births and are operated solely by San Juan Health Services District.

38. Nearly all emergency ambulance deliveries are made to San Juan Hospital.

39. The next nearest hospital facility to San Juan Hospital in Monticello, Utah is about 65 miles away in either a north (Moab) or east (Cortez, Co.) direction, and about 85 miles from Blanding. Shiprock hospital is between 65 to 85 miles from southern areas of San Juan County in Shiprock, New Mexico.

40. San Juan Hospital is the sole provider for those persons with insurance but without transportation to go outside the county or with physical conditions requiring ambulance transportation.

41. Any physician delivering babies in San Juan County would need to use the closest San Juan District facilities for patients in active labor.

(*Id.* at 32–33 ¶¶ 37–41.) Further, according to plaintiffs, "With the exceptions of Dr. Jones and a Monument Valley clinic doctor, all other physicians and P.A.'s within San Juan District are employees of San Juan District," and none of these providers specialized in obstetrics and gynecology during the period that Dr. MacArthur—an obstetrician/gynecologist— sought staff privileges at SJHSD facilities. (*Id.* at 33 ¶¶ 43, 44.) The Part I Plaintiffs assert that "Dr. MacArthur's practice was in direct competition with District and District associated General Pract[it]ioners who delivered babies," and received additional compensation for doing so. (*Id.* at 34 ¶ 48; *see id.* at 33 ¶¶ 45–47.) According to these plaintiffs, the grant or denial of privileges to Dr. MacArthur and Ms. Lyman was driven by considerations of competitive economics rather than professional practice concerns:

45. Without Dr. MacArthur and Michele Lyman to treated obstetric patients, the patients if they wished a local delivery when they went into labor, had to go to a doctor not specialized in the area of obstetrics.

\*　　\*　　\*　　\*　　\*　　\*

49. In making the determination of granting privileges, the medical staff and CEOs would analyze the effect of the independent practices of Dr. MacArthur and Michele Lyman upon their income outside any formal 'peer review'

context and in regards to them obtaining privileges.

(*Id.* at 33–34 ¶¶ 45, 49.)

The Proposed Amended Complaint speaks of the "anti-competitive effect" of limiting the privileges of Dr. MacArthur and Ms. Lyman:

> 42. Dr. MacArthur's limited temporary privileges preventing him from fully using the District facilities provided his patients with limited options in where they could receive their care, and prevented some from becoming his patient.

> \* \* \* \* \* \*

> 98. The likely and logical *per se* effect of not granting District privileges to Michele Lyman and Dr. MacArthur is that patients would not be able to choose Michele Lyman or Dr. MacArthur as providers if they wished to receive to receive their care at the hospital.

(Proposed Amended Complaint at 33 ¶ 42, 40–41 ¶ 98.)

The restriction or denial of hospital staff privileges as a result of peer review procedures may indeed raise antitrust concerns:

> Peer review of physicians holding or applying for hospital or medical staff privileges has given rise to numerous antitrust claims. The courts have recognized that peer review has the potential to be procompetitive by ensuring that only competent, professional, and otherwise qualified practitioners are permitted to practice at health care institutions. On the other hand, staff privilege decisions can raise a risk of anti-competitive abuse insofar as they are typically made upon the recommendations of members of the medical staff who may be direct or indirect competitors of the physician under review. The courts have recognized that a denial or termination of staff privileges arguably can

insulate the other medical staff members from competition by the physician under review . . . .

2 American Bar Association Section of Antitrust Law, *Antitrust Law Developments (Fifth)* 1326–1327 (5th ed.2002) (footnote omitted).

However, civil liability under the federal antitrust laws for "anticompetitive" conduct is not without limit.

At the outset of the Final Pretrial Conference, the defendants moved to dismiss the Part I Plaintiffs' antitrust claims on the grounds that (1) the claims are barred by the "state action" doctrine announced in *Parker v. Brown,* 317 U.S. 341, 351–353, 63 S.Ct. 307, 87 L.Ed. 315 (1943); (2) the claims are barred by the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750, codified at 15 U.S.C. §§ 34–36 (2000); (3) the plaintiffs have failed to identify a specific antitrust law violation or plead the essential elements of such a violation; and (4) the plaintiffs have failed to plead an effect on interstate commerce. (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims, filed November 14, 2002 (dkt. no. 455), at 3–8.)

**The Local Government Antitrust Act (15 U.S.C. §§ 34–36)**

██ . The Local Government Antitrust Act provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. §§ 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity," 15 U.S.C. § 35(a), or "based on any official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a). Federal courts are thus precluded "from awarding monetary relief on antitrust claims brought against local govern-

ment entities." *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, (10th Cir.1990).

> All that the Defendants need show in order to assert a valid claim of immunity from antitrust liability is that they acted in an official capacity or were directed by government officials or employees who were themselves acting in their official capacities. As previously discussed, these standards do not include a consideration of the defendant's intentions. The court considers only the objective questions: (i) whether, in light of the authority invested in a local government, its officials or employees, the actions complained of were lawful and taken within the scope of their authority, ... or (ii) whether, if the defendant is not a local government official or employee, the actions were directed by a local government or one of its officials or employees acting within the scope of his authority.

*Sandcrest, supra,* at 1148 (citations omitted).

*Cohn v. Wilkes General Hosp.*, 767 F.Supp. 111, 113 (W.D.N.C.1991) (quoting *Sandcrest Outpatient Services, P.A. v. Cumberland County Hospital*, 853 F.2d 1139, 1148 (4th Cir.1988)), *affirmed,* 953 F.2d 154 (4th Cir.1991), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992). In *Cohn,* the court held that the statute applied to bar a chiropractor's antitrust claim against a municipal hospital, its board of trustees and medical staff arising from the hospital's denial of his request for hospital staff privileges for allegedly anti-competitive reasons.

Applying the Local Government Antitrust Act in the context of this action, it appears to bar the damages claims of plaintiffs MacArthur and Lyman as against the SJHSD, San Juan County, the defendant members of the SJHSD Board, SJHSD's administrators and medical staff, and subordinate employees. Both plaintiffs allege that the members of the SJHSD medical staff—Drs. Redd, Jones and Nelson—acted upon plaintiffs' requests for full staff privileges for anti-competitive purposes, *viz.,* to limit competition by Dr. MacArthur and Ms. Lyman with the SJHSD medical staff for patients in the San Juan County area, and that other defendants at least acquiesced in their doing so, in their capacity as SJHSD Board members, administrators or County Commissioners. (*See* Proposed Amended Complaint at 26–34 ¶¶ 1–49 ("Specific Statements of Facts—Anti–Trust Claims"); *id.* at 34–58 ¶¶ 50–168 ("Facts for 42 USC 1983, and antitrust and RICO claims"); *id.* at 58–86 ¶¶ 125–230 (same).)

**Dr. MacArthur's Federal Antitrust Law Claim**

By the time of pretrial, Dr. MacArthur's federal antitrust claim against the defendants sought only an award of treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15. Applying the Local Government Antitrust Act to that claim leaves no viable federal antitrust claim remaining.

Apart from this statutory preclusion, Dr. MacArthur's federal antitrust claim fails on its own facts.

Plaintiffs insist that a denial of the full provisional SJHSD staff privileges requested by Dr. MacArthur in December of 1999 would be anti-competitive in both purpose and effect. Whatever force that argument may have, the fact remains uncontroverted that the SJHSD did not deny privileges to Dr. MacArthur before he elected to move his practice out of state. The SJHSD, under the authorizing signatures of Mr. Bradford and Dr. Redd, granted Dr. MacArthur "temporary" staff privileges two weeks after he made his

request for full one-year provisional privileges, and extended those privileges twice through February 2, 2000. During that interim period, Dr. MacArthur exercised his temporary privileges in providing care for his patients, and he does not allege specific facts showing that he was unable to provide care for any particular patient because of any limitation of those privileges by number or duration.

Even taking as true Dr. MacArthur's allegation that his request for full privileges was placed in the hands of other SJHSD staff physicians with whom he was competing for patients—competitors who would put their own economic interests first in making such a determination—he has failed to allege any actionable "antitrust injury" to his practice during the brief period of time in which he was exploring the San Juan County market for obstetrics and gynecological care. As explained above, § 4 of the Clayton Act "requires a plaintiff to show actual injury," *Cargill, Inc.*, 479 U.S. at 111, 107 S.Ct. 484, and "the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Id.* (footnote omitted).

Moreover, because there no final determination by the SJHSD to deny Dr. MacArthur the privileges he sought, his federal antitrust claim, like his § 1983 claim, was not ripe at the time he elected to move his practice out of the area, and, thereafter was rendered moot by his absence from the San Juan County health care services market after March of 2000. *See Unity Ventures v. Lake County*, 841 F.2d at 776–777 (absent final governmental action denying intended use of property, federal antitrust claim based on local land use regulation was not ripe).

Consequently, Dr. MacArthur's federal antitrust law claims must be dismissed as against all defendants. Fed.R.Civ.P. 16(c)(1).

### Ms. Lyman's Federal Antitrust Law Claim

As explained above, the effect of the Local Government Antitrust Act, 15 U.S.C. § 35(a), is to bar plaintiff Lyman's federal antitrust claim for treble damages against the defendants, limiting that claim to a request for declaratory and injunctive relief.

As explained above, to prevail on a private civil claim under § 4 of the Clayton Act, 15 U.S.C. § 15, "a private plaintiff must establish both (1) that it has standing *and* (2) the defendant has violated the antitrust laws...." 2 Phillip E. Areeda, Herbert Hovencamp & Roger D. Blair, *Antitrust Law* ¶ 335, at 297. "Once it appears, whether early or late in the litigation, that either requirement [of standing or antitrust violation] is lacking, the suit must be dismissed." *Id.* Likewise, § 16 of the Clayton Act permits injunctive relief "against threatened loss or damage by *a violation of the antitrust laws*." 15 U.S.C. § 26 (emphasis added).

Plaintiff Lyman claims that one or more of the defendants have violated the antitrust laws, but does not allege the specific nature of that violation. (*See* Proposed Amended Complaint at 26–34 ¶¶ 1–49; *id.* at 34–58 ¶¶ 50–168; *id.* at 58–86 ¶¶ 125–230.) Gleaning the elements of a particular antitrust law violation from the dense thicket of the plaintiffs' pleadings, original or amended, proves a daunting and largely fruitless task.

■ Taking action that is intended to disadvantage a competitor, or that has that effect, intended or not, by itself does not violate the antitrust laws. Yet plaintiff Lyman has alleged little more than that one or more SJHSD medical staff defendants—Drs. Redd, Jones and Nelson—

took their own economic interests into consideration when addressing matters involving the plaintiff's practice privileges at SJHSD facilities in 1999, or that the effect of one or another limitation upon Ms. Lyman's privileges as a Physician Assistant operated to limit her ability to compete directly with physicians in the market for medical care in the San Juan County area.

■ Moreover, according to Ms. Lyman's counsel, Ms. Lyman did not have SJHSD privileges after December 22, 1999, the date her existing privileges expired, her request for renewal of her privileges in December 1999 ultimately was denied, and she made no further application for SJHSD privileges after that date:

> THE COURT: Did she subsequently apply again for privileges at the hospital?
>
> MS. ROSE: No, sir.
>
> THE COURT: The district, she never applied again?
>
> MS. ROSE: No, Sir.

(Tr. 11/15/02, at 53:13–17.) Thus, there exists no currently existing controversy between Ms. Lyman and the defendants concerning her entitlement to exercise of staff privileges at SJHSD facilities or the potential for denial of those privileges in violation of the federal antitrust laws. In this context, any claim for declaratory relief under 28 U.S.C. §§ 2201–2202 has "become moot because a declaratory judgment would no longer have any effect on defendants' behavior. *See Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1256–57 (10th Cir.2004) (holding that an action for declaratory relief was moot when the requested declaration involved past conduct not likely to recur)." *GF Gaming Corp. v. City of Black Hawk, Colo.,* 405 F.3d 876, 883 (10th Cir.2005); *see Cox v. Phelps Dodge Corp.,* 43 F.3d 1345, 1348 (10th Cir.1994) ("[W]hat makes a declaratory judgment action 'a proper judicial resolution of a 'case or controversy' rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.'") (quoting *Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)).[85]

Similar mootness problems afflict Ms. Lyman's request for injunctive relief. *See, e.g., Facio v. Jones,* 929 F.2d 541, 544 (10th Cir.1991) ("plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future"); Moreover, if, as the Proposed Amended Complaint indicates, Ms. Lyman seeks injunctive relief "to protect patients of Mrs. Lyman and her supervising physician, and

---

**85.** As the court of appeals recently elaborated:

> It is not enough that a plaintiff wishes to have the moral satisfaction of a judicial ruling that he was right and his adversary was wrong; the relief sought must have legal effect in determining the present and future rights and obligations of the parties. "The crucial question is whether 'granting a present determination of the issues offered … will have some effect in the real world.'" *Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1182 (10th Cir.2000), quoting *Kennecott Utah Copper Corp. v. Becker,* 186 F.3d 1261, 1266 (10th Cir.1999); *see*

*also Colorado Off–Highway Vehicle Coalition v. United States Forest Serv.,* 357 F.3d 1130, 1133 (10th Cir.2004) ("A 'case or controversy' no longer exists when it is impossible for the court to grant any effectual relief whatsoever to a prevailing party."); *Air Line Pilots Ass'n v. UAL Corp.,* 897 F.2d 1394, 1396–97 (7th Cir.1990) (the test is whether the relief sought would "make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)"). *Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1263 (10th Cir.2004).

give Mrs. Lyman's patients uniform and considerate care with District staff sensitive to the unique needs of the patient," and allowing Ms. Lyman "to minimally go into any facility to at least speak and associate with her patient, regardless of whether she has privileges at the District," (Proposed Amended Complaint at 93), that relief would not be granted as "against threatened loss or damage by a violation of the antitrust laws" as provided by § 16 of the Clayton Act, 15 U.S.C. § 26. Nor would "ordering the [SJHSD] governance board to make physicians and chiefs of staff accountable for patient complaints and treat all medical providers and physician's equally and uniformly," (Proposed Amended Complaint at 94), be tailored to redress a specific antitrust violation.

As framed in plaintiffs' pleadings, Ms. Lyman's claim under the federal antitrust laws did not assert an arguable legal theory at the time of pretrial.

(10) **Utah Constitution, art. I, §§ 1, 7, 25, 26, 27**

The Part I Plaintiffs point to several provisions of the Utah Constitution as a footing for their allegations of "due process violations" or "violation of Mrs. Valdez' Utah Constitutional rights" by the defendants, (Proposed Amended Complaint at 11 ¶ (3), 14 ¶ (23)):

**Article I, Section 1. [Inherent and inalienable rights.]**

All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

\* \* \* \* \* \*

**Article I, Section 7. [Due process of law.]**

No person shall be deprived of life, liberty or property, without due process of law.

\* \* \* \* \* \*

**Article I, Section 25. [Rights retained by people.]**

This enumeration of rights shall not be construed to impair or deny others retained by the people.

**Article I, Section 26. [Provisions mandatory and prohibitory.]**

The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.

**Article I, Section 27. [Fundamental rights.]**

Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government.

Utah Const., art. I, §§ 1, 7, 25–27. The Utah Constitution's Due Process Clause, Article I, § 7, provides a footing for a direct private right of action seeking a remedy for an alleged deprivation of life, liberty or property, but only in "appropriate"—that is, extraordinary—circumstances:[86]

---

86. The source of judicial authority to grant relief in "appropriate circumstances" in Utah is the common law:

20. We begin by identifying the source of our authority to award damages for constitutional violations. Except for the Takings Clause, the Utah Constitution does not expressly provide damage remedies for constitutional violations. Thus, aside from the Takings Clause, there is no textual constitutional right to damages for one who suffers a constitutional tort. Nor has the legislature enacted any laws authorizing damage claims for constitutional violations in gen-

22. To ensure that damage actions are permitted only "under appropriate circumstances," we therefore hold that a plaintiff must establish the following three elements before he or she may proceed with a private suit for damages.

23. First, a plaintiff must establish that he or she suffered a "flagrant" violation of his or her constitutional rights. *See Dick Fischer Dev. v. Department of Admin.*, 838 P.2d 263, 268 (Alaska 1992); *see also Bott*, 922 P.2d at 734–35, 739–40 (describing the level of defendants' culpability necessary to create damages liability). In essence, this means that a defendant must have violated "clearly established" constitutional rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To be considered clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107

S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted). The requirement that the unconstitutional conduct be "flagrant" ensures that a government employee is allowed the ordinary "human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation." *Bott*, 922 P.2d at 739–40.

24. Second, a plaintiff must establish that existing remedies do not redress his or her injuries. *See Schweiker v. Chilicky*, 487 U.S. 412, 425, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (refusing to create a damages remedy for an alleged due process violation where Congress had provided meaningful safeguards or remedies); *Bush v. Lucas*, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (same with respect to alleged First Amendment violation); *Dick Fischer Dev.*, 838 P.2d at 268; *Bonner v. City of Santa Ana*, 45 Cal.App.4th 1465, 53 Cal.Rptr.2d 671, 673, 676–78 (1996) (refusing to create damages remedy for

---

eral, or the violation of the Due Process Clause or the Open Education Clause in particular. Thus, there is no express statutory right to damages for one who suffers a constitutional tort. In the absence of applicable constitutional or statutory authority, Utah courts employ the common law. See Utah Code Ann. § 68–3–1 (1996). Under the common law, "individuals had access to remedies of money damages for violations of their individual rights, and these rights, enumerated in fundamental documents, were the forerunners of many of the provisions adopted in federal and state bills of rights." *Bott*, 922 P.2d at 739 (citations omitted). Hence, a Utah court's ability to award damages for violation of a self-executing constitutional provision rests on the common law. The *Restatement (Second) of Torts* supports this view. *Restatement* section 874A states that when no specific remedy is mentioned, a court may accord an appropriate remedy to one injured from the violation of a constitutional provision. *See Restatement (Second) of Torts* § 874A &

cmt. a (1979). Comment (g) to section 874A suggests that a court's authority to do so arises from the common law. *See id.* cmt. g, at 306–07; *see also* Jennifer Friesen, *State Constitutional Law* § 7–5(c) (2d ed.1996) (stating that section 874A espouses a common law doctrine).

21. This common law ability to award damages for constitutional violations requires policy decisions by the court, and it should be aware of them and face them candidly.... The court is not required to provide the civil remedy, and yet judicial tradition gives it the authority to do this under appropriate circumstances. The court has discretion and it must be careful to exercise that discretion cautiously and soundly.

*Restatement* § 874A cmt. d, at 303.

*Spackman ex rel. Spackman v. Board of Educ. of Box Elder County School Dist.*, 2000 UT 87, ¶¶ 20–21, 16 P.3d 533, 537–538 (quoting *Bott v. DeLand*, 922 P.2d 732, 739 (Utah 1996)) (footnotes omitted).

alleged due process violation where alternative common law tort cause of action existed); *Restatement (Second) of Torts* § 874A cmt. h, at 309 (suggesting courts should consider the adequacy of existing remedies when deciding whether to provide a tort remedy). This second requirement is meant to ensure that courts use their common law remedial power cautiously and in favor of existing remedies. *See Lynch v. Jacobsen,* 55 Utah 129, 138–39, 184 P. 929, 933 (1919). We urge caution in light of the myriad policy considerations involved in a decision to award damages against a governmental agency and/or its employees for a constitutional violation. Moreover, we urge deference to existing remedies out of respect for separation of powers' principles. In general, the legislative branch has the authority, and in many cases is better suited, to establish appropriate remedies for individual injuries. By requiring courts to defer to relevant legislative determinations of appropriate remedies, we respect the legislature's important role in our constitutional system of government.

25. Third, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries. *See, e.g., Bott,* 922 P.2d at 739 (stating that "if prisoners' rights under article I, section 9 are violated, injunctive relief may not be adequate to remedy prisoners' injuries"); *see also, e.g., Davis v. Passman,* 442 U.S. 228, 245, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (stating that damages are an appropriate remedy where plaintiff was unconstitutionally terminated from her job on a congressional staff because, in part, "equitable relief in the form of reinstatement would be unavailing" in light of the fact that her former employer was no longer a congressman); *cf.*

*Rockhouse Mountain Property Owners Ass'n, Inc. v. Town of Conway,* 127 N.H. 593, 503 A.2d 1385, 1388 (1986) (stating that damages are an inappropriate remedy for a constitutional violation where the alleged injury "can be undone" by the judiciary). This final requirement is meant to take advantage of the meaningful role equitable relief can play in redressing constitutional injuries, while not implicating so many of the difficult policy considerations raised by a decision to award damages.

*Spackman ex rel. Spackman v. Board of Educ. of Box Elder County School Dist.,* 2000 UT 87, ¶¶ 22–25, 16 P.3d 533, 538–539 (footnotes omitted).

■ The Part I Plaintiffs have not even attempted to plead these three essential elements of a direct civil action under the Utah Constitution in either the Proposed Amended Complaint and the Proposed Pretrial Order. They did not raise them as issues at the Final Pretrial Conference. Nor have they addressed them in the legal memoranda submitted either prior to the Final Pretrial Conference, or since. "Failure of counsel to identify an issue for the court can result in waiver: 'If counsel fail to identify an issue for the court, the right to have the issue tried is waived.' Fed.R.Civ.P. 16 advisory committee's note." *Smith v. Gulf Oil Co.,* 995 F.2d 638, 644 (6th Cir.1993).

Besides failing to address the essential elements of a direct civil action under the Utah Constitution, the Part I Plaintiffs have not identified the specific constitutional right(s) that come within the scope of Article I, §§ 1, 25, 26, and 27, that purportedly have been violated by the conduct of one or more of the defendants.

To date, the reported case law construing the Article I, § 25 "retained rights" provision has involved parental rights is-

sues. *See, e.g., In re J.P.,* 648 P.2d 1364 (Utah 1982); *In re K.B.E.,* 740 P.2d 292 (Utah Ct.App.1987); *T.R.F. v. Felan,* 760 P.2d 906 (Utah Ct.App.1988); *P.O. v. S.G.,* 927 P.2d 202 (Utah Ct.App.1996); *J.R. v. State of Utah,* 261 F.Supp.2d 1268 (D.Utah 2002). Article I, §§ 26 and 27 appear to be declaratory of general constitutional principles rather than an enumeration of individual constitutional rights as such. *See Ritchie v. Richards,* 14 Utah 345, 361–363, 47 P. 670 (1896) (Bartch & Miner, JJ.) (constitutional provisions prescribing formalities to be observed in the enactment of laws are mandatory and binding on the legislature); *see generally* Comment, *Fundamental Principles, Individual Rights, and Free Government: Do Utahns Remember How to Be Free?,* 1996 Utah L.Rev. 661 ("exploring the meaning of [art. I] Section 27 of the Utah Constitution").

Having considered the pleadings, proffers, arguments and memoranda submitted by counsel, the court cannot "identify the litigable issues" that plaintiffs believed would arise under these provisions. *See* Fed.R.Civ.P. 16(c)(1); *see also* Fed. R.Civ.P. 8(a)(2); Fed.R.Civ.P. 11(b); *Chavez v. New Mexico,* 397 F.3d 826, 839 (10th Cir.2005) (" 'the Court refuses to go on a fishing expedition in search of legal analysis and facts to support these claims' ").

**(11) Utah Unfair Practices Act (Utah Code Ann. §§ 13–5–1 *et seq.* (2001))**

 The Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–1 through 13–5–18 (2001), disallows the use of a list of specific unfair trade practices by persons "engaged in commerce," including anticompetitive price discrimination,[87] advertising or sale of goods at a price less than cost,[88] and advertising goods, wares, or merchandise that the advertiser is not prepared to supply.[89] These forbidden practices involve trade in "goods," "merchandise," "articles," "products" and "commodities," and services or facilities furnished in connection with such trade, as well as the services of someone "who performs work upon, renovates, alters or improves any personal property belonging to another person, except necessary repairs due to damage in transit . . . ." Utah Code Ann. § 13–5–12(2) (2001). As the Utah Supreme Court explains, "The immediate stimuli for the enactment of such acts were in part the rapid rise of chain stores, and in part the general sharpening of

87. Utah Code Ann. § 13–5–3 (2001). Section 13–5–3(1)(a) provides:
 (1) (a) It is unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchasers involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the state and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

88. Utah Code Ann. § 13–5–7(1) (2001):

 (1) It is hereby declared that any advertising, offer to sell, or sale of any merchandise, either by retailers or wholesalers, at less than cost as defined in this act with the intent and purpose of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor or otherwise injuring a competitor, impairs and prevents fair competition, injures public welfare, is unfair competition contrary to public policy and the policy of this act and is declared to be a violation of this act. *See also* Utah Code Ann. § 13–5–9 (2001) (selling goods in quantity below cost); Utah Code Ann. § 13–5–10 (2001) (advertising and segregation of below-cost goods at forced liquidation or close-out sales).

89. Utah Code Ann. § 13–5–8 (2001).

competitive practices under pressure of the depression." *Burt v. Woolsulate, Inc.,* 106 Utah 156, 160, 146 P.2d 203 (1944).

One of the practices aimed at by these [Unfair Practices Acts] statutes is that, common in chain stores, of selling at lower prices in one locality than in another and making up losses incurred by profits in other stores. Even more important in the application of anti-discrimination statutes today is the prevention of discrimination sales by manufacturers to customers with unusually strong bargaining power who can force large price concessions. . . .

On the whole the anti-discrimination provisions of the Unfair Practices Acts seem best fitted to reach manufacturers and producers who, in the past have placed certain retail buyers in preferred competitive positions by giving them special rebates or other price favors. . . .

*Id.* (quoting Comment, *Prohibiting Price Discrimination and Sales Below Cost:* *The State Unfair Practices Acts,* 32 Ill. L.Rev. 816 (1938)); *see also* 54A Am. Jur.2d *Monopolies, etc.* §§ 1077–1106 (1997); Annot., *Validity, construction and application of state statutory provision prohibiting sales of commodities below cost—modern cases,* 41 A.L.R.4th 612, 1985 WL 287621 (1985).[90]

Plaintiffs allege "interference with the patients' and [plaintiffs MacArthur and Lyman]'s ability to freely contract for services with the District, with each other, with patients as guaranteed by the . . . Utah [U]nfair Practices Act," among other laws, (Proposed Pretrial Order at 1212 ¶ (8)), and the "violation of the Utah Unfair Practices Act," (*id.* at 1212 ¶ (15); Proposed Amended Complaint at 12 ¶ 14), but nowhere in their pleadings do they detail the nature of that alleged violation. Instead, plaintiffs appear to cite the Act for its general policy statement "fostering economic competition,"[91] and as a footing for an award of treble damages. (Pro-

**90.** In *Trade Comm. v. Skaggs Drug Centers, Inc.,* 21 Utah 2d 431, 446 P.2d 958 (Utah 1968), the Utah Supreme Court upheld the constitutionality of the Utah Unfair Practices Act, and elaborated upon its purpose:

It has been argued that the purpose of statutes such as the Utah Unfair Practices Act is to preserve a competitive climate by preventing large business concerns through the unrestrained use of size and resources alone, from overwhelming and destroying their smaller competitors. These statutes it is claimed seek to preserve the right of a competitor to enter a market and compete with those already operating.

It has been further argued that unrestrained price cutting on a massive scale has had disastrous effect on the small independent retailer with limited resources. That the below cost selling has become a weapon in the fight for markets and customers, characterized by the deliberate use of below cost selling to undercut, overwhelm and destroy competition, all to the benefit and further enrichment of the big interests. It is further claimed that to cor-

rect the unscrupulous conduct of these vested groups it became necessary for government to adopt such unfair trade practices acts as the one here in question.

\* \* \* \* \* \*

We do not suggest that a purpose to divert or capture a competitor's business is wrong or unethical. It is perfectly legitimate so long as it is not carried out unfairly. The legislature simply has declared it unfair to accomplish it through giving away goods or services or selling them for less than cost. *Id.,* 21 Utah 2d at 438, 441, 446 P.2d at 962–963, 965 (footnote omitted).

**91.** Utah Code Ann. § 13–5–17 (2001) reads:

**Policy of act.**

The Legislature declared that the purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be liberally construed that its beneficial purposes may be subserved.

posed Amended Complaint at 26 ¶ 2; *id.* at 97 (Prayer for Relief) ("Mrs. Lyman is praying for damages in excess of Six (6) Million Dollars, some of which is treble damages, due to unfair practices ....").)

The Utah Unfair Practices Act does provide for an award of treble damages in favor of a private plaintiff who has been injured by "any act in violation of this chapter" and has sustained actual damages,[92] but such acts would be those expressly defined by the Act as "a violation of this act" or as "unlawful." Neither the Act's general purpose "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition" nor the "liberal construction" of its terms can extend civil liability—or the Act's criminal sanctions—beyond the "unfair and discriminatory practices" expressly "prohibit[ed]" by the Act itself. Utah Code Ann. § 13–5–17 (2001).

Where, as here, the plaintiffs fail to plead or otherwise identify acts by one or more defendants that violate the Utah Unfair Practices Act's specific provisions, neither the conclusory allegation of a violation nor the generalized assertion of interference with freedom of contract can sustain their treble damages claims under that Act.

**(12) Utah Civil Rights Act (Utah Code Ann. §§ 13–7–1 *et seq.* (2001))**

Utah Code Ann. § 13–7–3 (2001) reads:

**13–7–3. Equal right in business establishments, places of public accommodation, and enterprises regulated by the state.**

All persons within the jurisdiction of this state are free and equal and are entitled to full and equal accommodations, advantages, facilities, privileges, goods and services in all business establishments and in all places of public accommodation, and by all enterprises regulated by the state of every kind whatsoever, without discrimination on the basis of race, color, sex, religion, ancestry or national origin. Nothing in this act shall be construed to deny any person the right to regulate the operation of a business establishment or place of public accommodation or an enterprise regulated by the state in a manner which applies uniformly to all persons without regard to race, color, sex, religion, ancestry, or national origin; or to deny any religious organization the right to regulate the operation and procedures of its establishments.

This explicit guarantee of equal treatment reflects Utah's public policy "to assure all citizens full and equal availability of all goods services and facilities offered by" business establishments, places of public accommodation and state-regulated enterprises "without discrimination because of race, color, sex, religion, ancestry, or national origin," and the State's recognition since 1965 that "the practice of discrimination on the basis of race, color, sex, religion, ancestry, or national origin ... endangers the health, safety, and general welfare of this state and its inhabitants." Utah Code Ann. § 13–7–1 (2001).[93] Sec-

---

**92.** Under Utah Code Ann. § 13–5–14 (2001):

> Any person or the state of Utah may maintain an action to enjoin a continuance of any act in violation of this chapter, and, if injured by the act, for the recovery of damages. If, in such action, the court finds that the defendant is violating or has violated any of the provisions of this chapter, it shall enjoin the defendant from a continuance of

> the violation. It is not necessary that actual damages to the plaintiff be alleged or proved. In addition to such injunctive relief, the plaintiff is entitled to recover from the defendant three times the amount of the actual damages sustained or $2,000, whichever is greater, plus court costs.

**93.** This statute was first enacted by the Utah Legislature in 1965, (1965 Utah Laws ch.

tion 13–7–4(3) provides that "[a]ny person who is denied the rights provided for in Section 13–7–3 shall have a civil action for damages and any other remedy available in law or equity against any person who denies him the rights provided for in Section 13–7–3 or who aids, incites or conspires to bring about such denial."

■ Plaintiffs' pleading alleges the "violation of Mrs. Valdez' state right to receive services equally with all other patients as found in Utah Code Ann. 13–7–2," (Proposed Amended Complaint at 13 ¶ (21)), but she does not allege specific facts showing discrimination against her on the basis of *her* race, color, sex, religion, ancestry or national origin, or plead specific facts from which such discrimination may reasonably be inferred. Nor does she allege specific facts showing that she was denied "full and equal accommodations, advantages, facilities, privileges, goods and services" in a "place[ ] of public accommodation," as guaranteed by the Utah statute.

## (13) Interference with Contract and with Prospective Business Relations

The tort of "interference with contract" addresses "conduct which 'intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract.' *Restatement (Second) of Torts* § 766 (1979). *See also Bunnell v. Bills*, 13 Utah 2d 83, 90, 368 P.2d 597, 602 (1962); W. Prosser, *Handbook of the Law of Torts* § 129 at 929–30 (4th ed.1971); *Annot., Liability for procuring breach of contract*, 26 A.L.R.2d 1227, 1952 WL 7867 (1952)." *Leigh Furniture and*

*Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982).

■ "The tort of intentional interference with prospective economic relations reaches beyond protection of an interest in an existing contract and protects a party's interest in prospective relationships of economic advantage not yet reduced to a formal contract (and perhaps not expected to be)." *Leigh*, 657 P.2d at 302 (citing *Buckaloo v. Johnson*, 14 Cal.3d 815, 537 P.2d 865, 868–69, 122 Cal.Rptr. 745, 748–49 (1975); *Restatement (Second) of Torts* § 766B comment c; Prosser, *supra*, at § 130). In the *Leigh* case, the Utah Supreme Court recognized "a common-law cause of action for intentional interference with prospective economic relations," and adopted the Oregon definition of this tort. *Id.* at 304 (citing *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371, 374 (1979); *Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Or. 201, 205, 209, 582 P.2d 1365, 1368, 1371 (1978)). "Under this definition, in order to recover damages, the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Id.*

The "economic relations" protected by this theory are diverse. "Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy. *E.g.*, *Guillory v. Godfrey*, 134 Cal.App.2d 628, 286 P.2d 474 (1955); *Tuttle v. Buck*, 107 Minn. 145, 119 N.W. 946 (1909); W. Prosser, *Handbook of the Law of Torts* § 130 (4th ed.1971); *Restatement (Second) of Torts* § 766B(a)," *Leigh*, 657 P.2d at 306, but protection extends to "any prospective con-

174), a watershed year for civil rights, government reform and other significant Utah legislation. A 1973 amendment added dis-

crimination on the basis of sex to the conduct prohibited by the statute. *See* 1973 Utah Laws ch. 18, § 3.

tractual relations ... if the potential contract would be of pecuniary value to the plaintiff" (excluding contracts to marry), as well as "a continuing business or other customary relationship not amounting to a formal contract." *Restatement (Second) of Torts* § 766B comment c (1979).

The question of interference for an "improper purpose" or by an "improper means" requires the weighing of several relevant factors:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

*Restatement (Second) of Torts* § 767(a)-(g) (1979). As the *Leigh* court observed:

> In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage. The law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition. Problems inherent in proving motivation or purpose make it prudent for commercial conduct to be regulated for the most part by the improper means alternative, which typically requires only a showing of particular conduct.

> The alternative of improper purpose will be satisfied where it can be shown that the actor's predominant purpose was to injure the plaintiff. . . .

657 P.2d at 307 (footnote & citations omitted). As the *Restatement* explains, a competitor's interference with a prospective contractual relation is not improper if, among other things, "his purpose is at least in part to advance his interest in competing with the other." *Restatement (Second) of Torts* § 768(d) (1979).

> g. *The actor's purpose.* The rule stated in this Section developed to advance the actor's competitive interest and the supposed social benefits arising from it. If his conduct is directed, at least in part, to that end, the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper. But if his conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper.

*Id.* § 768 comment g.

The factual allegations underpinning Dr. MacArthur's and Ms. Lyman's interference claims were considered in some detail at the Final Pretrial Conference.

**(14) "state *common law* defamation (also a U.S. Constitutional right to reputation as guaranteed by the Ninth Amendment)"**

**(a) Utah Law of Defamation**

 "At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation." *West v. Thomson Newspapers,* 872 P.2d 999, 1008 (Utah 1994); *see Seegmiller v. KSL, Inc.,* 626 P.2d 968, 973 (Utah 1981) (recognizing that "the integrity of an individual's reputation is essential to his stand-

ing in society, in his vocation, and even in his family").

In order to state a claim for defamation under Utah law, a plaintiff must show "that defendants published the statements concerning him [either in print or by spoken words], that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West,* 872 P.2d at 1007–08 (footnotes omitted).

*Wayment v. Clear Channel Broadcasting, Inc.,* 2005 UT 25, ¶ 18 n. 2, 116 P.3d 271, 278 n. 2; *see DeBry v. Godbe,* 1999 UT 111, ¶ 8, 992 P.2d 979, 982;[94] *Cox v. Hatch,* 761 P.2d 556, 561 (Utah 1988); *Seegmiller v. KSL, Inc.,* 626 P.2d 968, 974, 976 (Utah 1981); *Berry v. Moench,* 8 Utah 2d 191, 331 P.2d 814, 818–19, 820–21 (1958); Utah Code Ann. § 45–2–2 (1998); Tracy H. Fowler, Note, *Modernizing Defamation Law in Utah,* 1980 Utah L.Rev. 535; *see also Restatement (Second) of Torts* § 558 (1972).[95] Under Utah law, "a statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West,* 872 P.2d at 1008 (citing *Cox,* 761 P.2d at 561 (citing Utah Code Ann. § 45–2–2(1))). "A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it

must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning." *Id.* at 1009 (citations omitted).

As detailed most recently in the *Wayment* opinion, the question of "requisite degree of fault" that must be shown largely turns upon whether the plaintiff is in some sense a "public figure." 2005 UT 25, ¶¶ 17–36, 116 P.3d 271, 279–84. If a plaintiff is a non-"public" private individual, "the necessary degree of fault which must be shown in a defamation action ... is negligence." *Seegmiller,* 626 P.2d at 973; *accord, In re I.M.L. v. State of Utah,* 2002 UT 110, ¶ 25, 61 P.3d 1038, 1045 ("in a civil action for libel 'actual malice' is required if the statement concerns a public official, whereas only negligence is required if the statement concerns a private citizen"); *see* 50 Am.Jur.2d *Libel and Slander* § 21 (1995).

**(b) Defamation & the Ninth Amendment**

Plaintiffs have not cited and this court has not found Supreme Court or Tenth Circuit case authority recognizing "a U.S. Constitutional right to reputation as guaranteed by the Ninth Amendment," (Proposed Amended Complaint at 12 ¶ (6)), at least as a theory of legal liability for injury to reputation independent of state defamation law.

Given that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect," *Marbury v. Madi-*

---

**94.** According to *DeBry v. Godbe,*

> To establish her claim for defamation, the plaintiff must demonstrate that (1) the defendant published the statements in the letter concerning Ms. DeBry; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages. See *West v. Thomson Newspapers,* 872 P.2d 999, 1007–08 (Utah 1994).

**95.** The *Restatement (Second) of Torts* § 558 identifies four elements necessary in order to establish a cause of action in defamation: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*son*, 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803), the Ninth Amendment must be afforded a stature greater than that of a mere "inkblot," [96] and recent scholarship argues various approaches to its interpretation.[97] At a minimum, the Ninth Amendment serves as a "constitutional 'saving clause' " [98] avoiding an overly narrow construction of the Bill of Rights. While it may or may not "constitute[ ] an independent source of rights protected from infringement by either the States or the Federal Government," the Ninth Amendment "shows a belief of the Constitution's authors that fundamental rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive." *Griswold v. Connecticut*, 381 U.S. 479, 492, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

[T]he Fifth and Fourteenth Amendments protect certain fundamental personal liberties from abridgment by the Federal Government or the States. . . . The Ninth Amendment simply shows the intent of the Constitution's authors that other fundamental personal rights should not be denied such protection or disparaged in any other way simply because they are not specifically listed in the first eight constitutional amendments.

*Id.* (citations omitted).

One recent commentary asserts that reading the Ninth Amendment in light of the original intent of the Framers (and in particular, James Madison) requires the courts to strike a balance between the competing constitutional right to free speech and non-constitutional legal rights to reputation, but rejects the view that the Ninth Amendment elevates the right to

**96.** (in the words of Judge Robert Bork, *The Bork Disinformers*, Wall St. J., Oct. 5, 1987, at 22.)

**97.** *See, e.g., The Rights Retained by the People: The History and Meaning of the Ninth Amendment* (Randy E. Barnett ed.1989); *The Rights Retained by the People: The Ninth Amendment and Constitutional Interpretation, Volume II* (Randy E. Barnett ed.1993); *The Bill of Rights: Original Meaning and Current Understanding* 419–451 (Eugene W. Hickok, Jr., ed.1991); Congressional Research Service, Library of Congress, *The Constitution of the United States of America: Analysis and Interpretation* 1503–1505 (1992 ed.); Kurt T. Lash, *The Lost Jurisprudence of the Ninth Amendment*, 83 Tex. L.Rev. 597 (February 2005); Kurt T. Lash, *The Lost Original Meaning of the Ninth Amendment*, 83 Tex. L.Rev. 331 (2004); Christopher J. Schmidt, *Revitalizing the Quiet Ninth Amendment: Determining Unenumerated Rights and Eliminating Substantive Due Process*, 32 U. Balt. L.Rev. 169 (2003); Akhil Reed Amar, *The Bill of Rights* 119–133 (1998); John Hart Ely, *Democracy and Distrust—a Theory of Judicial Review* 34–41 (1980); Charles A. Black, Jr., *Decision According to Law* (1981); Raoul Berger, *The*

*Ninth Amendment, as Perceived by Randy Barnett*, 88 Nw. U.L.Rev. 1508 (1994); Raoul Berger, *Suzanna And—the Ninth Amendment*, 1994 B.Y.U. L.Rev. 51; William Van Alstyne, *Slouching Toward Bethlehem with the Ninth Amendment*, 91 Yale L.J. 207 (1981).

**98.** At the time of the adoption of the Bill of Rights,

> Madison's comments in Congress also reveal the perceived need for some sort of constitutional "saving clause," which, among other things, would serve to foreclose application to the Bill of Rights of the maxim that the affirmation of particular rights implies a negation of those not expressly defined. See 1 Annals of Cong. 438–440 (1789). See also, *e.g.*, 2 J. Story, Commentaries on the Constitution of the United States 651 (5th ed. 1891). Madison's efforts, culminating in the Ninth Amendment, served to allay the fears of those who were concerned that expressing certain guarantees could be read as excluding others.

*Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 & n. 15, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (Burger, C.J.) (plurality opinion).

reputation to constitutional status. Laurence Claus, *Protecting Rights from Rights: Enumeration, Disparagement, and the Ninth Amendment*, 79 Notre Dame L.Rev. 585, 587 (2004) (the "right to reputation is not relevantly denied or disparaged unless listing certain rights in the Constitution is construed to leave reputation less protected than it would otherwise have been" under state laws, at least as they existed in 1789 or 1791.) This raises the question whether, *e.g.*, the vindication of First Amendment interests in free expression at the expense of state defamation laws protecting the reputation of "public figures" serves "to deny or disparage" unenumerated rights "retained by the people" contrary to the Ninth Amendment. *See id.* at 586, 616–621. However, that

issue does not arise here, where no one has asserted that either Dr. MacArthur or Ms. Lyman are "public figures" subject to more limited protection under Utah defamation law. *See Wayment v. Clear Channel Broadcasting, Inc.*, 2005 UT 25, ¶¶ 17–36, 116 P.3d 271, 279–84.

Unless the Part I Plaintiffs are attempting to extend their claims under 42 U.S.C. § 1983 to include defamatory injury to reputation (as one among the "rights, privileges, or immunities secured by the Constitution and laws" of the United States),[99] invoking the Ninth Amendment in the context of their defamation claims does not appear to make any substantive difference to the legal standards to be applied or the judicial remedies that may be available to them.[100]

99. The Supreme Court has rejected the assertion of reputation as a discrete interest protected by the Due Process Clause of the Fourteenth Amendment. Reputation alone—apart from some more tangible interests such as employment—does not implicate any "liberty" or "property" interests sufficient to invoke the procedural protection of the Due Process Clause; hence, to establish a claim under § 1983 and the Fourteenth Amendment, more must be involved than simply defamation by a state official. *Paul v. Davis*, 424 U.S. 693, 701–712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

> [A plaintiff's] interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where, as here, inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons, we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

> *Id.* at 712, 96 S.Ct. 1155.

100. Under Utah law, private civil damages action for common-law defamation are subject to a one-year statute of limitations: "An action may be brought within one year: ... (4) for libel, slander, assault, battery, false imprisonment, or seduction; ...." Utah Code Ann. § 78–12–29(4) (2002).

> "Under Utah law, the statute of limitations begins to run when the cause of action accrues." *Retherford v. AT & T Communications of Mt. States, Inc.*, 844 P.2d 949, 975 (Utah 1992); *see also* Utah Code Ann. § 78–12–1 (2002). "A tort cause of action accrues when all of its elements come into being and the claim is actionable." *Retherford*, 844 P.2d at 975. Pursuant to Utah Code section 78–12–29(4), "an action may be brought within one year ... for libel ... [or] slander." Utah Code Ann. § 78–12–29(4) (2002). "[I]n libel cases, the one-year period of section 78–12–29(4) does not run until the libel is known or is reasonably discoverable by the plaintiff." *Allen v. Ortez*, 802 P.2d 1307, 1314 (Utah 1990).
> *Christensen v. Drossos*, 2005 UT App 170, 2005 WL 851700, *1.

> It appears to be uncontroverted that in this case, both Dr. MacArthur and Ms. Lyman became aware of the false and malicious rumors allegedly being circulated about them by one or more of the individual defendants contemporaneously with the rumors' circulation.

**(15) "Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing. Utah Code Ann. 78–12–25(1) (1996)," including the Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs MacArthur and Lyman allege "bad faith void contracts that lack fair dealing," the "denial of their entitlement to a contract with the District that is based upon principles of good faith and fair dealing, with adequate consideration," and "violations of Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing. Utah Code Ann. §§ 78–12–25(1) (1996)."[101] (Proposed Pretrial Order at 1212 ¶¶ (11), (12) & (18).)

**(a) Contracts of Adhesion**

■ "A contract of adhesion is an agreement forced on one party by another who has superior bargaining strength." *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 906 n. 1 (Utah Ct.App.1995) (citing *Wagner v. Farmers Ins. Exch.*, 786 P.2d 763, 766 n. 2 (Utah Ct.App.1990),[102] *overruled on other grounds, Allen v. Prudential Property and Cas. Ins. Co.*, 839 P.2d 798 (Utah 1992)). "In other words, an adhesion contract is one in which the party has no alternative." (*Id.*)

■ Under Utah law, "adhesion contracts" are not prohibited *per se*. Instead, the Utah Supreme Court has enumerated several equitable doctrines that may be applied to remedy over-reaching in the making of adhesion contracts, including the doctrines of estoppel, waiver, unconscionability, breach of the implied duty of good faith and fair dealing, and the rule that ambiguous language is to be resolved against the drafter. *Allen v. Prudential Property and Cas. Ins. Co.*, 839 P.2d 798, 805–807 & nn. 11–16 (Utah 1992) (rejecting proposed rule that ambiguous insurance contract provisions must be interpreted to effectuate the "reasonable expectations" of the insured). "[T]he existing equitable doctrines, such as waiver, estoppel, and unconscionability, apply to any contractual relationship regardless of context so long as warranted by the facts." *Id.* at 806 n. 17.

**(b) Implied Covenant of Good Faith and Fair Dealing**

■ Utah has recognized that all contracts contain a covenant of good faith and fair dealing. *Beck v. Farmers Ins. Exchange*, 701 P.2d 795, 798 (Utah 1985).

---

For Dr. MacArthur, the pertinent events transpired between October 1999 and March 2000, at which time he relocated to Nevada. Ms. Lyman may have a timely claim for defamatory falsehoods that were known or reasonably discoverable after July 25, 1999, but some of the events of which she complains may have taken place before that date.

101. Utah Code Ann. § 78–12–25(1) (2002) provides that "[a]n action may be brought within four years:"

(1) upon a contract, obligation, or liability not founded upon an instrument in writing; also on an open account for goods, wares, and merchandise, and for any article charged on a store account; also on an open account for work, labor or services rendered, or materials furnished; provided, that action in all of the foregoing cases may be commenced at any time within four years after the last charge is made or the last payment is received; ....

102. *Wagner* defined an "adhesion contract" as " 'a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a "take it or leave it basis...." ' " 786 P.2d at 766 n. 2 (quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 107, 419 P.2d 168, 171 (1966)).

As the Utah Supreme Court explained in *Christiansen v. Farmers Ins. Exchange,* 2005 UT 21, 116 P.3d 259:

> A breach of express contract claim arises out of the express terms of the contract, and the breach is proven in relation to those terms. *See Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.,* 2004 UT 54, ¶ 11, 94 P.3d 292 (relying on a contract's express terms to determine the intent of the parties). A claim for breach of the implied covenant of good faith and fair dealing, by contrast, is based on judicially recognized duties not found within the four corners of the contract. *See Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 798 (Utah 1985). These duties, unlike the duties expressly stated in the contract, are not subject to alteration by the parties. They exist whenever a contract is entered, *see id.,* and are imposed on the parties "consistent with the agreed common purpose" of the contract, *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 200 (Utah 1991).

116 P.3d at 261–62. Under Utah law, "the covenant of good faith and fair dealing inheres in all contracts," *id.* at 262, and

> Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 199 (Utah 1991). A violation of the covenant is a breach of the contract. *Id.* at 200 (citing *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 798 (Utah 1985)).

*Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶14, 94 P.3d 193, 197

> To determine the legal duty a contractual party has under this covenant, a court will assess whether a "party's actions [are] consistent with the agreed common purpose and the justified expectations of the other party." *Id.* at 200. This court determines the "purpose, intentions, and expectations" by considering "the contract language and the course of dealings between and conduct of the parties." *Id.*

*Oakwood Village LLC v. Albertsons, Inc.,* 2004 UT 101, ¶43, 104 P.3d 1226, 1239–40.

> Under Utah law, "some general principles limit the scope of the covenant," including the following:

> First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree *ex ante.* *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991). Second, this covenant cannot create rights and duties inconsistent with express contractual terms. *See id.; Rio Algom Corp. v. Jimco, Ltd.,* 618 P.2d 497, 505 (Utah 1980). Third, this covenant cannot compel a contractual party to exercise a contractual right "to its own detriment for the purpose of benefitting another party to the contract." *Olympus Hills Shopping Ctr. v. Smith's Food & Drug Ctrs.,* 889 P.2d 445, 457 n. 13 (Utah Ct.App.1994). Finally, we will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract. *See Dalton v. Jerico Constr. Co.,* 642 P.2d 748, 750 (Utah 1982).

*Oakwood Village LLC,* 104 P.3d at 1240; *see Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991) (the implied covenant of good faith and fair dealing "cannot be construed . . . to establish new, independent rights or duties not agreed upon by the parties."). Generally, "the degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and im-

posed limitations on the exercise of discretion through express contract terms." *Smith v. Grand Canyon Expeditions*, 2003 UT 57, ¶ 20, 84 P.3d 1154, 1160.[103] In all instances, however, "[t]he reach of the implied covenant of good faith and fair dealing extends no further than the purposes and express terms of the contract." *Id.*, at ¶ 22, 84 P.3d at 1160.

The "federal common law" reading of this implied covenant finds reflection in *United States ex rel. Norbeck v. Basin Elec. Power Coop.*, 248 F.3d 781 (8th Cir. 2001), in which the Eighth Circuit, applying federal common law, was confronted with the application of the implied covenant of good faith and fair dealing to a contract term involving amortization of certain costs. *Id.* at 794–97. *Basin Electric* reversed a portion of the district court's judgment granted for a breach of the implied covenant of good faith and fair dealing, noting that the covenant "does not imply 'an everflowing cornucopia of wished-for legal duties,'" and "does not impose a general requirement that a party

act reasonably[;][r]ather, the covenant acts as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting." *Id.* at 796 (internal citations omitted). The implied covenant would not be applied in a fashion that necessitates rewriting the contract to give one party "benefits for which it did not bargain." *Id.* at 797–98.

■ Plaintiffs assert the "denial of their entitlement to a contract with the District that is based upon principles of good faith and fair dealing, with adequate consideration," (Proposed Pretrial Order at 1212 ¶ (12)); "injuries from the defendants' by way of . . . (12) bad faith void contracts that lack fair dealing," (Proposed Amended Complaint at 11–12 ¶ (12)); and that as to Dr. MacArthur, "[e]very time he was given a contract in bad faith with amibuities [sic] upon which he relied, he has a claim." (*Id.* at 95; Proposed Pretrial Order at 1242.) Yet nowhere in the Proposed Amended Complaint, the Pro-

---

103. According to Justice Nehring, author of the *Smith v. Grand Canyon Expeditions* opinion:

> [T]he implied covenant is by its very nature a pliable doctrine. It is inherently amorphous and evades definitional precision. These traits place the implied covenant directly at odds with predictability of conduct, the most basic and cherished characteristic of the contracts which the implied covenant was created to serve. As one commentator observed, "While the varieties of good faith are not quite as infinite as those of religious faith, it would be quite extraordinary if this protean concept were used in the same sense in all . . . assorted instances." Farnsworth, E. Allan, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U. Chi. L.Rev. 666, 668 (1968).
>
> However, this answer is unsatisfactory to many who share the view made evident in the dissent that the implied covenant can too easily turn away from being an ally of contract law and become its antagonist.

> This happens when courts mishandle the subtle but important distinction between invoking the implied covenant to compel a contracting party to honor the "agreed common purpose" and "justified expectations" of another party to the contract, *Restatement Second of Contracts* § 205 cmt. a (1979), and injecting it to "establish new, independent rights or duties not agreed upon by the parties" or to "nullify a right granted by a contract to one of the parties." *Brehany v. Nordstrom*, 812 P.2d 49, 55 (Utah 1991).
>
> The parties can reduce the risk that a court will remake their contract and award one party "benefits for which it did not bargain," . . . by bargaining for terms that limit the exercise of unfettered discretion by one party or that otherwise clearly articulate the purposes and expectations of the parties. In short, the parties to a contract are best served when they fill their own gaps.

*Eggett v. Wasatch Energy Corp.*, 94 P.3d at 204 (Nehring, J., concurring).

posed Pretrial Order, or plaintiffs' more recent written submissions do they plead specific facts identifying the "bad faith void contracts" in question, or detailing the bad faith or over-reaching involved in making those contracts.[104]

Instead, it appears that plaintiffs' counsel is attempting to weave the equitable doctrines enumerated in *Allen* into an affirmative legal duty of "fair dealing" affecting "all Utah business relations," independent of the terms of a specific contract—a duty to make all contracts on terms that accommodate the economic expectations of the plaintiffs. Indeed, plaintiffs' counsel asserts an "interference with" Dr. MacArthur's "right to pursue his profession and business affairs by lack of good faith and fair dealing inherent and mandated in all Utah business relations." (Memorandum in Support of Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), at 4.)

 The Utah Supreme Court has taken the position "that the ability of a plaintiff to recover in tort for breach of the implied covenant of good faith and fair dealing in a contract 'has the potential for distorting well-established principles of contract law and will not be permitted.'" *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1046 (Utah 1989) (Durham, J.) (quoting *Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 799 (Utah 1985)). Utah law thus does not recognize an independent tort cause of action based upon "good faith and fair dealing" apart from the purposes and terms of an existing contract, and in contrast to equitable doctrines such as unconscionability, the implied covenant cannot serve as a basis for invalidating a contract.

## (16) "privacy rights and statutory entitlements to have their credential files and patient files accurately kept by the district under Medicaid and Utah Health Department statutes and regulations"

The confidentiality of individual patients' medical information has been a matter of long-standing concern, acknowledged in the Hippocratic Oath (ca. 400 B.C.E.).[105]

---

104. If these allegations were intended to refer to the SJHSD medical staff *bylaws* that govern medical practice at District facilities, the reference is well-hidden. Under Utah law, it is understood that "[h]ospital bylaws constitute 'a contract between the hospital and the physician,'" and that "the Hospital must comply with those bylaws when taking actions which effect its staff." *Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.*, 933 P.2d 403, 408 (Utah Ct.App.1997) (quoting *Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069, 1076 (Utah 1991)).

In contrast to *Rees* and *Houston*, the plaintiffs in this action do not seek to enforce the provisions of the SJHSD bylaws, or even to enforce the implied covenant of good faith and fair dealing as an implied term of the bylaws "contract." They list no claim for breach of contract. Instead, they apparently contend that the SJHSD "medical staff by-laws in and of themselves are unconstitutional [unconscionable?], violative of covenants of good faith and fair dealing." (Tr. 11/14/02, at 43:5–9 (Ms. Rose).) Yet this view of the medical staff bylaws would necessarily hold them to be unenforceable and of no legal effect— leaving plaintiffs MacArthur and Lyman with no procedural mechanism by which they could have obtained or maintained practice privileges at SJHSD facilities.

105. The Oath of Hippocrates, 4th Century, B.C.E., reads in part:

What I may see or hear in the course of the treatment or even outside of the treatment in regard to the life of men, which on no account one must spread abroad, I will keep to myself, holding such things shameful to be spoken about.

Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* (1943).

Drawing from its rich history, confidentiality remains widely acknowledged as a fundamental ethical tenet of medicine, as patients must be willing to confide sensitive and personal information to health care professionals. Therefore, its value in the context of the patient-physician relationship stems partly from the need for patients to trust their physicians, and for physicians to express their loyalty to patients.

Council on Ethical and Judicial Affairs, American Medical Association, *Privacy in the Context of Health Care* (CEJA Report 2–I–01), at 2 (December 2001), *available at* <http://www.ama-assn.org/amal/pub/upload/mm/369/ceja_2i01.pdf>. Concern for the protection of patient confidentiality and privacy finds current expression in the American Medical Association's Principles of Medical Ethics: "A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law." American Medical Association, *Principles of Medical Ethics* ¶ IV (2001), *available at* <http://www.ama-assn.org/ama/pub/category/2512.html>.[106]

In Utah, the maintenance and protection of the confidentiality of medical records involves the application of both legal and ethical standards. The Utah Medical Practice Act Rules (Rule R156–67) currently provide:

**R156–67–602. Medical Records.**

In accordance with Subsection 58–67–803(1), medical records shall be maintained to be consistent with the following:

(1) all applicable laws, regulations, and rules; and .

(2) the Code of Medical Ethics of the Council on Ethical and Judicial Affairs as published in the AMA Policy Compendium, 2001 edition, which is hereby incorporated by reference.

Utah Admin. Code § R156–67–602 (2005); *see* Utah Code Ann. § 58–67–803(1) (2002) ("Medical records maintained by a licensee shall: (a) meet the standards and ethics of the profession; and (b) be maintained in accordance with division rules made in collaboration with the board.").

The advent of electronic storage and computer access to patient medical records and health information has increased patient privacy and confidentiality concerns, as one recent commentary explains:

[As] access to medical information of a sensitive nature has grown, those in the medical community and privacy advocates began to recognize the need for broad privacy protections to medical data. The result of this campaign is the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rule"), a set of regulations promulgated by the Secretary of Health and Human Services ("HHS"). The Privacy Rule was required by the Health Insurance Portability & Accountability Act of 1996 ("HIPAA"); then popularly known as the Kennedy–Kassenbaum Act. At the time, HIPAA received significant attention, because it made it easier for an employee to maintain health insurance after leaving a job. HIPAA also provided that if Congress did not pass legislation pertaining to medical

---

**106.** The terms "confidentiality" and "privacy" address distinct, yet overlapping concerns: "In the context of health care, emphasis has been given to confidentiality, which is defined as information told in confidence or imparted in secret. However, physicians also should be mindful of patient privacy, which encompasses information that is concealed from others outside of the patient-physician relationship." *Privacy in the Context of Health Care, supra*, at 3.

privacy within a specified time, HHS would promulgate regulations to that affect. HHS issued a proposed rule in October 1999, and after an unusually long and contentious comment period and a clerical error that nearly derailed the regulations at the last second, the Privacy Rule was implemented in early 2001.

Kevin B. Davis, *Privacy Rights in Personal Information: HIPAA and the Privacy Gap Between Fundamental Privacy Rights and Medical Information*, 19 J. Marshall J. Computer & Info. L. 535, 536 (2001) (footnotes omitted).

In enacting the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. No. 104–191, 110 Stat. 1936 (1996), Congress mandated the establishment of national standards for protection of the privacy of individually identifiable health and medical information. As indicated, the U.S. Department of Health and Human Services promulgated such standards in 2001, and most health plans and health care providers that are covered by the new rule were required to comply with the new standards by April of 2003. *See Standards for Privacy of Individually Identifiable Health Information*, 65 Fed. Reg. 82462 (Dec. 28, 2000), *codified at* 45 C.F.R. Parts 160, 164 (2004).[107]

 Prior to the enactment of HIPAA, Utah law already afforded some degree of legal protection for the privacy and confidentiality of patient medical records. *See, e.g., Hoopiiaina v. Intermountain Health Care*, 740 P.2d 270, 272 (Utah Ct.App.1987) ("Confidentiality of patient information is required by Utah Code Ann. § 78–25–25 (1987) and Chapter 7.404 of the Utah State Department of Health, Hospital and Psychiatric Hospital Rules and Regulations, Medical Records Department (1984 Revision).").[108] Utah law may afford some common-law privacy protection for medical records as well.[109]

---

**107.** In mid–2001, HHS released an FAQ-style "Guidance" commentary explaining the new "Privacy Rule" standards and requirements. HHS Office for Civil Rights, *Standards for Privacy of Individually Identifiable Health Information* (2001), at <http://www.hhs.gov/ocr/hipaa/finalmaster.html> (July 6, 2001; last revised January 14, 2002).

**108.** Originally adopted in 1971 (1971 Utah Laws ch. 213, § 1), Utah Code Ann. § 78–25–25 (2002) addressed attorney access to patient medical records, and was repealed and re-enacted in 2003 in light of HIPAA and the HHS Privacy Rule. *See* Utah Code Ann. § 78–25–25 (Supp.2004); 2003 Utah Laws ch. 64, § 2.

**109.** Under Utah law, to prevail on a claim of public disclosure of embarrassing private facts, a plaintiff must establish the following essential elements:

(1) the disclosure of the private facts must be a public disclosure and not a private one;

(2) the facts disclosed to the public must be private facts, and not public ones; [and] (3) the matter made public must be one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

*Shattuck–Owen v. Snowbird Corp.*, 2000 UT 94, ¶ 11, 16 P.3d 555, 558 (quoting *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct.App.1997) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 117, at 856–857 (5th ed.1984) (footnote omitted))). *See also Restatement (Second) of Torts* § 652D (1977) ("One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."). *Shattuck–Owen* notes that the *Restatement (Second) of Torts* § 652D (1977) "contains another element requiring that the matter made public not be 'of legitimate concern to the public,' " but did not "decide whether to adopt this requirement as an element of the invasion of privacy tort we ad-

At this point, however, this court need not reconstruct the pre-HIPAA Utah law of confidentiality of patient medical records; plaintiffs assert the breach of such confidentiality, but plead no specific facts by which such a breach could be established. Plaintiffs asserted at the time of the Pretrial Conference that "Mrs. Lyman had patient files disappear, and patients['] confidentiality breached," (Proposed Pretrial Order at 1216), that "[p]atients of Michele Lyman were subjected to ... (3) breach of confidentiality of any medical treatment they did receive in the District facilities," (*id.* at 1225 ¶ 139), that "[c]onfidentiality of her patients was broken on more than one occasion by medical staff and other SJHSD personnel," (*id.* at 1235 ¶ 195), but with no specific factual allegations as to particular instances in which such a breach of confidentiality has occurred, or in which it is alleged there was a public disclosure of a patient's embarrassing private medical information.[110] Moreover, absent such specific factual allegations, the court need not decide the threshold question whether the remaining Part I Plaintiffs have the requisite standing to assert claims for a breach of confidentiality or invasion of privacy affecting third persons, *viz.,* their patients. *Cf. Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct.

1029, 31 L.Ed.2d 349 (1972); *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943); Henry P. Monaghan, *Third Party Standing,* 84 Colum. L.Rev. 277 (1984).[111]

### (17) Negligent and Intentional Infliction of Emotional Distress

#### (a) Intentional Infliction of Emotional Distress

In *DeBry v. Godbe,* 1999 UT 111, 992 P.2d 979, the Utah Supreme Court reiterated the essential elements of a claim of intentional infliction of emotional distress:

> In *Samms v. Eccles,* we stated the elements of such a claim:
>
> > [A]n action for severe emotional distress, though not accompanied by bodily impact or physical injury, [may lie] where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.
>
> 11 Utah 2d 289, 293, 358 P.2d 344, 346–47 (1961).

---

dress today." 2000 UT 94, ¶ 11 n. 1, 16 P.3d at 558 n. 1.

**110.** The Proposed Amended Complaint asserts that "some of Mrs. Lyman's patients[ ] were subjected to community gossip for conditions that were supposed to be private," (Proposed Amended Complaint at 17–18), at least implying some breach of confidentiality. That assertion is omitted from the recitation of contested issues of fact in the Proposed Pretrial Order, replaced by the equally conclusory assertions that "Patients of Michele Lyman were subjected to ... (3) breach of

confidentiality of any medical treatment they *did receive in the District facilities,* ... (6) false rumors as to their medical conditions," still without any reference to particular instances. (Proposed Pretrial Order at 1225 ¶ 139.)

**111.** Ordinarily, a litigant " 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting

992 P.2d at 986.[112] "To prevail on her claim of intentional infliction of emotional distress," a plaintiff "must prove that the defendants either intentionally or recklessly engaged in intolerable and outrageous conduct that caused her severe emotional distress." *Retherford v. AT & T Communications,* 844 P.2d 949, 967 (Utah 1992).[113]

### (b) Negligent Infliction of Emotional Distress

The Utah Supreme Court first expressly recognized a cause of action for negligent infliction of emotional distress in *Johnson v. Rogers,* 763 P.2d 771 (Utah 1988).

In *Johnson,* after surveying the various tests that courts in this country have developed to determine liability for the negligent infliction of emotional distress, we adopted the position taken by section 313 of the *Restatement (Second) of Torts* (1965), as explained in the comments accompanying that section. Section 313's approach, also referred to as the zone of danger approach, allows recovery to plaintiffs who suffer emotional distress because of another's negligence, though they do not suffer any physical impact, only if the plaintiffs are placed in actual physical peril and fear for their own safety. Johnson, therefore, does not provide recovery to plaintiffs who are not within the zone of danger created by a defendant's negligence.

*Boucher By and Through Boucher v. Dixie Medical Center,* 850 P.2d 1179, 1181 (Utah 1992).[114] The comments to *Restatement* § 313 "restrict the scope of a claim for negligent infliction of emotional distress"[:]

Comment "a" declares that the "rule stated in this Section does not give protection to mental and emotional tranquillity in itself." *Restatement (Second) of Torts* § 313 cmt. a (1965). Comment "c" articulates a form of "reasonable person" test by noting that in contrast to the section 312 rule for intentional creation of emotional distress, "one who unintentionally but negligently subjects another to such emotional distress does not take the risk of any exceptional physical sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it." *Restatement (Second) of Torts* § 313 cmt. c (1965). These comments recognize the fact that "[w]e cannot permit every claim for negligent infliction of emotional distress to go to a jury under such varying standards as

*Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

**112.** *Godbe* affirmed the district court's conclusion that the plaintiff's "intentional infliction of emotional distress claim could not survive summary judgment because Godbe's conduct was not outrageous and intolerable under *Samms." Id.*

**113.** Intentional infliction of emotional distress, in contrast to negligent infliction of emotional distress, does not require that plaintiff actually be at risk of bodily harm. *See Restatement (Second) of Torts* § 312.

**114.** Section 313 of the *Restatement (Second) of Torts* reads:

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.

*Restatement (Second) of Torts* § 313 (1965); *see also Hansen v. Sea Ray Boats,* 830 P.2d 236, 240–241 (Utah 1992) (discussing § 313).

each trial judge may choose." *Johnson,* 763 P.2d at 785 (Zimmerman, J., concurring in part).

*Harnicher v. University of Utah Medical Center,* 962 P.2d 67, 70 (Utah 1998). One restriction that "provides a check on feigned disturbances, thereby ensuring the genuineness of claims"[115] is the requirement that plaintiffs who claim to be the direct victim of negligent infliction of emotional distress must allege resulting illness or bodily harm, including clinically identifiable mental illness. *See id.* at 71–72 (affirming summary judgment against plaintiffs who "had not suffered any bodily harm or physical injury that would support an action for negligent infliction of emotional distress"); *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 974 (Utah 1993) ("emotional disturbance that is not severe enough to result in illness or physical consequences is likely to be in the realm of the trivial. Such a disturbance is likely to be so temporary and subjective that to attempt to compensate it would unduly burden defendants and the courts. *See Restatement (Second) of Torts* § 436A cmt. b (1965); . . .").[116]

■ Given that *Restatement (Second) of Torts* § 313(1) does not give protection to mental and emotional tranquility *per se,* "[c]onsequently, much of the ' "emotional distress" which we endure . . . is not compensable.' *Thing v. La Chusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 829 (1989) (denying recovery for negligent infliction of emotional distress where mother

of injured child arrived at the scene after accident had already occurred)." *Harnicher,* 962 P.2d at 72. To sustain a claim of negligent infliction of emotional distress, "the emotional distress suffered must be severe; it must be such that 'a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Mountain Fuel,* 858 P.2d at 975 (quoting *Rodrigues v. State,* 52 Haw. 156, 283, 472 P.2d 509, 520 (1970)).

**(c) The Part I Plaintiffs' Emotional Distress Claims**

Intentional and negligent infliction of emotional distress "are claims for . . . different torts, each with separate elements," and "[o]bviously, [a] plaintiff must make the necessary allegations in his complaint to support each separate claim, and at trial plaintiff must prove all of the elements of each claim to recover for that cause of action," each by a preponderance of the evidence. *Heiner v. Simpson,* 2001 UT 39, ¶ 8, 9, 23 P.3d 1041, 1043 (footnote omitted); *id.* 23 P.3d at 1043 n. 3.

Court and counsel reviewed the factual allegations underlying Ms. Lyman's claim of intentional infliction of emotional distress in light of this analytical framework at the Final Pretrial Conference. (*See infra* at 1203–04.)

**(18) Fraud**

■ Under Utah law,

The elements that a party must allege "to bring a claim sounding in fraud" are

---

115. *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 974 (Utah 1993).

116. As *Mountain Fuel* explains:
The language used in section 313 of the Restatement provides some guidance. Subsection (1) allows recovery for "illness or bodily harm." *Restatement (Second) of Torts* § 313(1) (1965) (emphasis added). The drafters' use of "or" rather than "and"

shows an intention to allow a plaintiff to recover not only where bodily harm results from emotional trauma, but where "illness" results as well. "Illness" is "an unhealthy condition of body or mind." *Webster's New Collegiate Dictionary* 566 (1981). From this we conclude that either physical or mental illness may support the . . . cause of action. 858 P.2d at 974–975.

(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996) (citations omitted); *Educators Mut. Ins. Ass'n. v. Allied Prop. & Cas. Ins. Co.*, 890 P.2d 1029, 1032 (Utah 1995); *accord Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 800 (Utah 1991). *Armed Forces Ins. Exchange v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35, 40.

■ Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." "Simply stated, a complaint must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir.1997) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991)). At a minimum, Rule 9(b) requires that a plaintiff set forth the "who, what, when, where and how" of the alleged fraud. *Williams v. WMX Tech.,*

*Inc.*, 112 F.3d 175, 179 (5th Cir.1997); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999) ("[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 590 (2d ed.1990)).

Thus, while a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule. One of the main purposes of the rule is to apprise the defendant of fraudulent claims and of the acts that form the basis for the claim.... In other words, "[i]n cases in which *fraud lies at the core of the action*, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action."

*Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985) (quoting *Lopez v. Bulova Watch Co., Inc.*, 582 F.Supp. 755, 766 (D.R.I.1984) (emphasis added)).[117] *See also* Annotation, *Construction and application of provision of Rule 9(b), Federal Rules of Civil Procedure, that circumstances constituting fraud or mistake be stated with particularity*, 27 A.L.R. Fed. 407, 1976 WL 38729 (1976 & Supp.2004).

---

**117.** Once past the pleading stage, a party must then prove the elements of fraud by clear and convincing evidence:

"A finding of fraud must be based on the existence of all its essential elements ....
'[F]raud is a wrong of such nature that it must be shown by clear and convincing proof and will not lie in mere suspicion or innuendo.'" *Taylor v. Gasor, Inc.*, 607 P.2d 293, 294–95 (Utah 1980) (internal citations omitted) (quoting *Lundstrom v. Radio Corp. of Am.*, 17 Utah 2d 114, 117–18, 405 P.2d 339, 341 (1965)).
*Armed Forces Ins. Exchange v. Harrison*, 2003 UT 14, ¶ 27, 70 P.3d at 43.

■ As discussed above, plaintiff Lyman alleges that her CPR certification cards, "a necessary component of her ability to obtain privileges were altered purposefully," that "the cards were stolen from her file at least on two if not three occasions," that "the forged documents were mailed to the American Heart Association," and that "the doctors would have profited from Mrs. Lyman not being able to work . . . ." (Proposed Pretrial Order at 1241–42 ¶ 255; *see also id.* at 1224–27 ¶¶ 129–131, 1226 ¶¶ 174–175.) No less than five essential elements of fraud are omitted from her allegations, *viz.*, that the altered cards were sent to the American Heart Association "[1] for the purpose of inducing the other party to act upon it and [2] that the other party, acting reasonably and in ignorance of its falsity, [3] did in fact rely upon it [4] and was thereby induced to act [5] to that party's injury and damage." *Secor v. Knight,* 716 P.2d 790, 794 (Utah 1986) (quoting *Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980)).

"[I]n order to prevail on a claim of fraud [or misrepresentation], *all the elements of fraud* must be established by clear and convincing evidence." *Id.* (emphasis added). Under Rule 9(b) those missing elements of reasonable reliance, causation and injury are among the "circumstances constituting fraud" that must be pleaded with particularity. Absent such pleading, plaintiffs' fraud claim remains vulnerable to dismissal pursuant to Fed.R.Civ.P. 9(b), independent of a motion under Rules 12(b)(6) or 56.

Would plaintiffs' state law fraud claim fare better in a Utah state court? In applying Utah's parallel civil rule, the Utah Supreme Court has held that "the mere recitation by a plaintiff of the elements of fraud in a complaint does not satisfy the particularity requirement." *Armed Forces Ins. Exch. v. Harrison,* 70

P.3d at 40. Rather, Utah Rule 9(b) requires a complaint to recite "[t]he relevant surrounding facts ' "with sufficient particularity to show what facts are claimed to constitute [the fraud] charges." ' " *Id.* (quoting *Williams v. State Farm Ins. Co.,* 656 P.2d 966, 971 (Utah 1982) (quoting *Heathman v. Hatch,* 13 Utah 2d 266, 372 P.2d 990, 991 (1962))). Moreover, as the Utah Court of Appeals recently observed in *Coroles v. Sabey,* 2003 UT App 339, 79 P.3d 974, "rule 9(b) also imposes a much more basic and fundamental requirement: a requirement of clarity and conciseness":

> In *Heathman* [*v. Hatch,* 13 Utah 2d 266, 372 P.2d 990 (1962) ], the Utah Supreme Court affirmed the dismissal of the plaintiff's complaint because the complaint, which was "33 legal size typewritten pages" in length, did not comply with rule 9(b). 372 P.2d at 991–92. The Court stated the following regarding the complaint's noncompliance with that rule:

> > Without burdening this opinion with the details of plaintiff's much too long and involved complaint, it is sufficient to say that its shortcomings are such that it was well within the discretion of the trial court to conclude that it failed to comply with [rules 8(a) and 9(b) ], and, accordingly, to grant the motion to dismiss. The objective of these rules is to require that the essential facts upon which redress is sought be set forth with simplicity, brevity, clarity and certainty so that it can be determined whether there exists a legal basis for the relief claimed; and, if so, so that there will be a clearly defined foundation upon which further proceedings by way of responsive pleadings and/or trial can go forward in an orderly manner.

> *Id.* at 992.

79 P.3d at 980 (footnote omitted). As *Coroles* explains, pleading a fraud claim without specifying the facts upon which it is based "essentially dumps upon the trial court ... the burden of sifting through the hundreds of paragraphs of alleged facts to ascertain whether Plaintiffs have 'allege[d] ... facts necessary to make all their elements of fraud.' *DeBry v. Noble,* 889 P.2d 428, 443 (Utah 1995)."

> Such an approach is unacceptable. It is Plaintiffs' responsibility, not the courts', to set forth "[t]he relevant surrounding facts" in such a manner that it is evident " ' "what facts are claimed to constitute [the fraud] charges." ' " *Armed Forces,* 70 P.3d at 40 (citations omitted) (emphasis added). *See Arena Land & Inv. Co. v. Petty,* No. 94–4196, 1995 WL 645678, at *1, 1995 U.S.App. LEXIS 31140, at *3 (10th Cir. Nov.3, 1995) ("The third amended complaint is wordy, repetitive and fails to allege the necessary elements of the claims it is asserting. Indicative of the complaint's inadequacy is the fact that it rambles on for sixty-four pages before reaching the first claim for relief. It is neither the court's nor the appellees' role to sift through a lengthy, conclusory and poorly written complaint to piece together the cause of action.").

*Id.* at 980–81 (footnote omitted).

Here, this court is—as was the Utah Court of Appeals in *Coroles*—"unable to ascertain ' "what facts are claimed to constitute [the fraud] charges." ' " 2003 UT App 339, ¶ 27 n. 12, 79 P.3d 974 (quoting *Armed Forces Insurance Exchange v.*

*Harrison,* 70 P.3d at 40 (citations omitted)).

**Summary re: the Part I Plaintiffs' Causes of Action**

Whether the Part I Plaintiffs' claims had any arguable legal merit or raised genuine issues for trial—a question of further formulation of the issues for trial under Fed. R.Civ.P. 16(c)(1)—was addressed in some detail at the Final Pretrial Conference. Accepting the Proposed Amended Complaint as the best articulation of the Part I Plaintiffs' claims as of the time of pretrial,[118] it becomes apparent that many of plaintiffs' theories of liability had already failed as a matter of law—one because the statute in question simply does not afford plaintiffs a private civil remedy, the others because they are legally meritless: either the essential elements of the cause of action have no bearing upon the specific facts alleged by these plaintiffs (even if those facts are taken as true and all reasonable inferences are drawn in their favor), or because the plaintiffs have pleaded the claims in conclusory terms, without alleging any specific facts that would provide a viable factual footing for these claims, that is, without a plain statement of the claim showing that they are entitled to relief. *See* Fed.R.Civ.P. 8(a)(2).[119] These legally meritless claims include those pleaded as arising under (*i*) RICO, 18 U.S.C. §§ 1961 *et seq.;* (*ii*) the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248; (*iii*) the Health Care Quality Improvement Act, 42 U.S.C. § 11112; (*iv*) the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.

---

**118.** As noted above, almost all of its allegations were repeated verbatim as the "Plaintiffs' Statement of Contested Issues of Fact" in Section 5 of the Proposed Pretrial Order.

**119.** Further, absent leave to amend her pleadings in some fashion, plaintiff Valdez' EMTALA claim—pleaded as a cause of action for

the first time in the Proposed Amended Complaint and mirrored in the Proposed Pretrial Order—was clearly time-barred. *See* 42 U.S.C. § 1395dd(d)(2)(C). Plaintiff Lyman's defamation claim may be time-barred as to any actionable conduct known of or reasonably discoverable prior to July 25, 1999.

§ 1395dd; (*v*) the "Medicare Patient Bill of Rights," or freedom-of-choice provision, 42 U.S.C. § 1395a; (*vi*) 42 U.S.C. § 1981; (*vii*) 42 U.S.C. § 1985(3); (*viii*) 42 U.S.C. § 1983; (*ix*) the federal antitrust laws; (*x*) the Utah Constitution, art. I, §§ 1, 7, 25, 26, 27; (*xi*) the Utah Unfair Practices Act, Utah Code Ann. §§ 13–5–1 *et seq.;* (*xii*) the Utah Civil Rights Act, Utah Code Ann. §§ 13–7–1 *et seq.;* (*xiii*) "Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing," including the implied covenant of good faith and fair dealing; (*xiv*) "privacy rights and statutory entitlements to have their credential files and patient files accurately kept by the district under Medicaid and Utah Health Department statutes and regulations"; (*xv*) negligent infliction of emotional distress; and (*xvi*) fraud. Those claims may properly be dismissed as frivolous pursuant to Fed. R.Civ.P. 16(c)(1) because they are based upon an indisputably meritless legal theory, or are footed upon conclusory assertions rather than specific facts, as reflected in the Proposed Amended Complaint and the Proposed Pretrial Order.[120] *Cf. Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (claim "based on an indisputably meritless legal theory" or founded on "clearly baseless" factual contentions may be dismissed as "frivolous" under 28 U.S.C. § 1915); *Green v. Seymour,* 59 F.3d 1073, 1077 (10th Cir.1995) (complaint is "frivolous" under 28 U.S.C. § 1915 " 'where it lacks an arguable basis either in fact or law.' "); *Olson v. Stotts,* 9 F.3d 1475, 1476 (10th Cir.1993) (claim is "frivolous" under 28 U.S.C. § 1915 "if the factual contentions supporting the claim are 'clearly baseless,' ... or the claim is based on a legal theory that is 'indisputably meritless,' "); *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir.2003) (to be "frivolous" under 28 U.S.C. § 1915, "a claim must rely on 'an indisputably meritless legal theory' or a 'clearly baseless' ... factual scenario"); *Taylor v. Johnson,* 257 F.3d 470, 472 (5th Cir.2001) (complaint is "frivolous" if it "lacks an arguable basis in law or fact, and a complaint lacks such a basis if it relies on an indisputably meritless legal theory."); *Walker v. City of Bogalusa,* 168 F.3d 237 (5th Cir.1999) (claim is "frivolous" under 42 U.S.C. § 1988 if "it is 'so lacking in arguable merit as to be groundless or without foundation' " (quoting *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1140 (5th Cir.1983) (construing 42 U.S.C. § 2000e–5(k)) (quoting *Jones v. Texas Tech University,* 656 F.2d 1137, 1145 (5th Cir.1981))); *Karam v. City of Burbank,* 352 F.3d 1188, 1195 (9th Cir. 2003) (complaint may be deemed "frivolous" under 42 U.S.C. § 1988 "only when the 'result is obvious or the ... arguments of error are wholly without merit' ") (quot-

---

**120.** Neither Fed.R.Civ.P. 16(c)(1) nor the accompanying advisory committee notes articulate the legal standard to be applied in determining whether a claim or defense is "frivolous" within the meaning of the rule. The advisory committee note to the 1983 amendment to Rule 16 makes general reference to a case from the D.C. Circuit, *Meadow Gold Products Co. v. Wright,* 108 U.S.App.D.C. 33, 278 F.2d 867 (D.C.Cir. 1960). That case states that "the primary purpose of the pre-trial procedure is to 'define the claims and defenses of the parties for the purpose of eliminating unnecessary proof and issues, lessening the opportunities for surprise and thereby expediting the trial,' " but does not speak of "frivolous" claims. 278 F.2d at 869 (quoting *Rosden v. Leuthold,* 107 U.S.App.D.C. 89, 92, 274 F.2d 747, 750 (D.C.Cir.1960)).

Some guidance may be gleaned from case law construing analogous rule and statutory language, *e.g.,* 28 U.S.C. § 1915(e) (2000). *Cf.* Fed.R.Civ.P. 11(b)(2) (claims and defenses "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law").

ing *McConnell v. Critchlow,* 661 F.2d 116, 118 (9th Cir.1981))); *Davis v. Target Stores Div. of Dayton Hudson Corp.,* 87 F.Supp.2d 492, 494 (D.Md.2000) (claim is "frivolous" under Title VII (42 U.S.C. § 2000e–5(k)) "if a plaintiff presents no evidence to support his claim or if he has gone forward on the basis of no colorable legal theory"); *see also* Annotation, *Standards for determining whether proceedings in forma pauperis are frivolous and thus subject to dismissal under 28 U.S.C.A. sec. 1915(d),* 52 A.L.R. Fed. 679, 1981 WL 167362 (1981 & Supp.2004); Annotation, *Right of defendant in civil rights case to receive award of attorney's fees under Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C.A. sec. 1988),* 104 A.L.R. Fed. 14, 1991 WL 741678 (1991 & Supp.2004); *Black's Law Dictionary* 601 (5th ed. 1979) ("A pleading is 'frivolous' when it is clearly insufficient on its face, and does not controvert the material points of the opposite pleading, and is presumably interposed for mere purposes of delay or to embarrass the opponent.").

## PRETRIAL DETERMINATION OF THE PART I PLAINTIFFS' CLAIMS

For the reasons explained in some detail above, the Final Pretrial Conference concluded with a bench ruling dismissing the Part I Plaintiffs' remaining federal claims on the grounds that they did not have an arguable basis in law and lacked sufficient support in plaintiffs' factual allegations to raise a triable issue, even where those allegations are taken as true and viewed in the light most favorable to the plaintiffs. (*See* Tr. 11/15/02, at 113:9–118:7 (the court); Fed.R.Civ.P. 16(c)(1).)

Plaintiffs' counsel subsequently objected to the dismissal of the Part I Plaintiffs' claims at the Final Pretrial Conference on the grounds that (1) no summary judgment motion was pending at the time of the Final Pretrial Conference, and plain-

tiffs did not receive ten days' notice that summary judgment would be considered; (2) no notice was given to the plaintiffs that the pretrial hearing was in actuality a hearing of dismissal of all of their claims; (3) several issues of material fact were raised in the pretrial conference; and (4) dismissal with prejudice, without leave to amend, operates as a "severe sanction" that should only be imposed in extraordinary cases. According to plaintiffs' counsel, there are "two types of dismissal" under the Federal Rules: Rule 12(b) dismissal and Rule 56 summary judgment— or three, *viz.,* as a discovery sanction (Rule 37(b)(2)(C))—a view that fails to take into account Rule 16(c)(1) and the function of the final pretrial conference. (*See supra* at 1212–14 ("The Final Pretrial Conference (Fed. R.Civ. P. 16(c))").)

The court's expectations concerning the proposed pretrial order and the final pretrial conference were spelled out for counsel in explicit terms at the hearing on August 22, 2002:

> THE COURT: A pretrial order is a joint product. *I'm interested in isolating the genuinely disputed factual issues. I'm interested in isolating the genuinely disputed legal issues if any.* I want a roster of all your witnesses on all sides. I want a roster of all your exhibits for your cases in chief.
>
> MS. ROSE: Roster of exhibits and witnesses.
>
> THE COURT: I'm interested in having the attorneys sign off on the suggested form of pretrial order so that I know that you've agreed to it even if you agree to disagree as to the identified issues, and I'm interested as I said in giving you a little more time here.
>
> \* \* \* \* \* \*
>
> We're interested in *identifying the issues, identifying both legal propositions*

*and factual propositions,* the witnesses, the exhibits.

And then at pretrial *I'm interested in counsel being prepared to talk theory, that is legal theory, legal authority, statutory authority or case authority and be able to talk facts,* this is what this witness is going to tell us Judge. That way *we can try to screen what's here and see what's genuinely disputed and what genuinely deserves a fact finder trial.*

(Transcript of Hearing, dated August 22, 2002, at 31:23–32:9, 32:25–33:9 (the court) (emphasis added).) And this was not the only occasion in which the court expressed its expectations concerning pretrial to counsel in open court, and on the record. (*See* Minute Entry, dated July 2, 2002 (dkt. no. 386); Minute Entry, dated October 8, 2002 (dkt. no. 427).) These expressed expectations comport with both the purpose and function of Rule 16(c) and the requirements of the court's Local Rules, particularly DUCivR 16–1(d): "Preparation for this final pretrial conference should proceed pursuant to Fed. R.Civ.P. 16 and should include (i) preparation by plaintiff's counsel of a recommended pretrial order . . ., and (ii) *preparation for resolution of unresolved issues in the case.*" (Emphasis added.)

As explained in some detail herein, this court addressed these plaintiffs' claims in the context of the Final Pretrial Conference, and did so pursuant to Rule 16(c)(1), applying Rule 16(c)(1) standards, using the parties' Proposed Pretrial Order as a guide—not pursuant to Rule 56, applying Rule 56(c) standards; not pursuant to Rule 12(b)(6), working solely within the confines of the written pleadings; and not in the context of the imposition of discovery sanctions against the plaintiffs pursuant to Rule 37(b)(2).[121]

### Claims Against San Juan County and the SJHSD

As explained above, the pretrial examination of the Part I Plaintiffs' causes of action leads to the conclusion that these plaintiffs have no viable federal causes of action against either San Juan County or the San Juan Health Services District. The remaining state tort law claims involve intentional torts allegedly committed by one or more individual defendants.

### Claims Against the Individual Defendants

The colloquy at the Final Pretrial Conference confirmed that as against the individual defendants—Commissioner Tyron Lewis, Commissioner Bill Redd, County Attorney Craig Halls, Reid Wood, Cleal Bradford, Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway, Dr. Lloyd Val Jones, Dr. Manfred Nelson, Rick Bailey, Marilee Bailey, Ora Lee Black, Gary Holliday, Carla Grimshaw, Gloria Yanito, and Julie Bronson—the Part I Plaintiffs have failed to allege legally viable § 1983 claims against these defendants, even taking plaintiffs' factual allegations as true and treating them in the light most favorable to the plaintiffs. Plaintiffs' federal antitrust claims fail as against these defendants as well.

As against County Attorney Craig Halls, the Part I Plaintiffs have alleged no wrongful conduct whatsoever. Essentially the same may be said for defendant Carla Grimshaw. Defendants Ora Lee Black and Gloria Yanito are alleged to have com-

---

121. *See, e.g., Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir.1992) (district court acted within its discretion under Fed.R.Civ.P. 37(b)(2)(C) in dismissing complaint with prejudice as sanction for violation of discovery order when securities fraud plaintiff failed to appear for scheduled deposition notwithstanding court's order and warning that court would dismiss complaint if plaintiff did not comply with order).

municated directions concerning Ms. Lyman's staff privileges that purportedly originated with Dr. Redd, the SJHSD medical director, or Ms. Schafer, the patient care director. By themselves, these allegations do not state an arguable legal claim under the plaintiffs' remaining state tort law theories. Nor does it appear that any remaining state law claim was pleaded against defendant Lori Wallace. (*See* Proposed Pretrial Order at 1213 ¶¶ (20)-(25).)

Likewise, the Part I Plaintiffs complain of the County Commissioners and SJHSD Board members *inaction* on their behalf, but allege no intentionally tortious acts by any of these defendants that establish any of the elements of the remaining state law causes of action for interference with contract, interference with prospective business relations, defamation and intentional infliction of emotional distress.

### Dr. MacArthur's State Law Tort Claims

As against defendant Julie Bronson (and possibly Marilee Bailey, Laurie Schafer and Cleal Bradford, (*see* Proposed Pretrial Order at 1222 ¶ 96)), Dr. MacArthur alleges facts that, when taken in the light most favorable to him, may support a state law defamation claim. Whether he alleged a non-frivolous claim of interference with contract or interference with prospective business relations against those few individual defendants who were directly involved with his request for full provisional staff privileges appears more doubtful. He did not allege facts that would support a claim for intentional infliction of emotional distress against any defendant.

Dr. MacArthur's federal claims having been dismissed pursuant to Fed.R.Civ.P. 16(c)(1), this court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) (2000) over his remaining state law tort claims of defamation against Ms. Bronson (or others), and interference with contract/prospective business relations against Dr. Redd, Mr. Bradford or others who had direct involvement with Dr. MacArthur's December 1999 request for full one-year provisional privileges pursuant to the SJHSD medical staff bylaws. *See* 28 U.S.C. § 1367(c)(3) (2000). Dr. MacArthur has pleaded no other non-frivolous state tort claims against any other defendant.

### Ms. Lyman's State Law Tort Claims

From an examination of the Proposed Amended Complaint, the Proposed Pretrial Order and through the colloquy at the Final Pretrial Conference, it became increasingly apparent that Ms. Lyman was not claiming a *denial* of practice privileges as much as she was alleging intentional interference by some defendants with the *exercise* of practice privileges which Ms. Lyman understood she had already been granted by the SJHSD and which remained in effect until December 22, 1999. She alleges a series of incidents in which her orders for laboratory tests, heart monitors, injections, x-rays and other routine procedures would be refused or ignored, often at the instance or direction of Dr. Redd. (*See supra* n. 69 and accompanying text.)

While such incidents may not amount to a constitutional deprivation actionable under § 1983—and subject to claims of qualified immunity—they may constitute at least a colorable state tort claim. An excluded practitioner may be able to avoid the qualified privilege barrier to § 1983 claims by pleading and proving that an individual defendant's actions were taken to satisfy a personal grudge, not in the best interests of the hospital, and therefore constituted an intentional tort, such as interference with contractual rela-

tions. *See, e.g., Straube v. Emanuel Lutheran Charity Bd.,* 287 Or. 375, 600 P.2d 381 (1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980). In addition, non-tort theories such as breach of contract may be available to remedy discrepancies between reasonable expectations as to practice privileges and restrictions imposed upon their actual exercise.

Because the Hospital bylaws constitute "a contract between the hospital and the physician," *Rees,* 808 P.2d at 1076, the Hospital must comply with those bylaws when taking actions which effect its staff. Moreover, we agree with the weight of authority which grants deference to hospital officials' professional judgment. Under this authority, courts require that a hospital only "substantially comply" with its bylaws. *See, e.g., Owens v. New Britain Gen. Hosp.,* 32 Conn.App. 56, 627 A.2d 1373, 1379–80 (1993), *aff'd,* 229 Conn. 592, 643 A.2d 233 (1994); *Friedman v. Memorial Hosp.,* 523 N.E.2d 252, 253 (Ind.App.1988); *Smith v. Our Lady of the Lake Hosp.,* 639 So.2d 730, 755 (La.1994); *Mahmoodian v. United Hosp. Ctr., Inc.,* 185 W.Va. 59, 404 S.E.2d 750, 755, *cert. denied,* 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991); *see also Piacitelli v. Southern Utah State College,* 636 P.2d 1063, 1066–67 (Utah 1981) (finding substantial compliance with policies in college personnel manual sufficient to withstand due process attack); *see generally* Kathleen M. Dorr, Annotation, *Exclusion of, or discrimination against, physician or surgeon by hospital,* 28 A.L.R. 5th 107, 1995 WL 900213, § 3, at 152–67 (1995 & Supp.1996) (collecting cases). Substantial compliance with the bylaws adequately serves their primary purpose, which is to ensure fair procedures for staffing decisions. *See, e.g., Owens,* 627 A.2d at 1379–80.

*Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.,* 933 P.2d 403, 408 (Utah Ct.App.1997).[122]

■ Plaintiff Lyman may also have viable state tort claims against Dr. Redd for defamation and intentional infliction of emotional distress. Defamation claims under Utah law are constrained by the one-year limitations statute, but claims for intentional infliction of emotional distress have a much longer temporal reach:

Utah Code section 78–12–25(3) permits an action for intentional infliction of emotional distress to be brought within four years of actionability. *See* Utah Code Ann. § 78–12–25(3) (2002) ("An action may be brought within four years ... for relief not otherwise provided by law."); *see also Retherford,* 844 P.2d at 975 (applying section 78–12–25(3) to determine the statute of limitations for the plaintiff's intentional infliction of emotional distress claim).

In *Retherford,* the Utah Supreme Court noted that "[b]ecause of the nature of [an intentional infliction of emotional distress] cause of action, it can be difficult to determine when all its elements—intentional, outrageous conduct proximately causing extreme distress— have come into being. Of particular difficulty is the element of injury—extreme emotional distress." 844 P.2d at 975. However, the difficulty in determining when the emotional distress occurred is generally limited to situations "where a defendant subjects a plaintiff not to a single outrageous act, but to a pattern or practice of acts." *Id.*

*Christensen v. Drossos,* 2005 WL 851700, *1. Furthermore, "[W]hen conduct that

---

**122.** In dealing with the enforcement of the terms of written hospital bylaws, presumably the Utah six-year limitations statute for actions based upon written contracts would apply. *See* Utah Code Ann. § 78–12–23(2) (2002).

would give rise to a claim of intentional infliction of emotional distress is continuous and ongoing, and it is unclear when the plaintiff suffered severe emotional distress, the statute of limitations begins to run from the time the last injury is suffered or the tortious conduct ceases." *Hatch v. Davis,* 2004 UT App 378, ¶ 44, 102 P.3d 774, 785 (footnote omitted).

Ms. Lyman's federal claims having been dismissed at the conclusion of the Final Pretrial Conference, this court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over her remaining state law tort claims. *See* 28 U.S.C. § 1367(c)(3). Those claims, therefore, will be dismissed *without* prejudice.

### Summary re: the Final Pretrial Conference

As the court explained at the conclusion of the Final Pretrial Conference, "The effort is again to sort out as best we can what the contentions are and the footings for those contentions," a process "resulting in the orders that the court has indicated." (Tr. 11/15/02, at 228:8–10 (the court).)

In revisiting that sorting process in the process of preparing this more formal written disposition of the issues presented, the court has elaborated upon the legal and factual bases for its bench ruling in somewhat greater detail. The court has also taken this opportunity to clarify the jurisdictional disposition of the plaintiffs' few remaining state law claims in the interest of avoiding at least some confusion concerning those matters.

Initially, the court had called upon counsel for the prevailing parties to prepare proposed forms of order memorializing the court's bench ruling at the pretrial conference, consistent with this court's local rule, DUCivR 54–1(a) & (b):

(a) *Orders in Open Court.* Unless otherwise determined by the court, orders announced in open court in civil cases must be prepared in writing by the prevailing party, served within five (5) days of the court's action on opposing counsel, and submitted to the court for signature pursuant to the provisions of section (b) of this rule.

(b) *Orders and Judgments.* Unless otherwise determined by the court, proposed orders and judgments prepared by an attorney must be served upon opposing counsel for review and approval as to form prior to being submitted to the court for review and signature. Approval will be deemed waived if no objections are filed within five (5) days after personal service or eight (8) days after service by mail.

The preparation of proposed forms of order led to another series of objections, revisions, hearings, and supplemental memoranda on the same. (*See* Plaintiff's Formal Objection to the Court assigning the drafting of the Final Dismissal Order to the Defense Counsel, filed November 20, 2002 (dkt. no. 458)); Proposed Final Order of Dismissal with Prejudice, received November 22, 2002; Proposed Order Denying Plaintiffs' Rule 15 Motion to Amend, received November 26, 2002; Plaintiffs' Objection to the Form of the Proposed Dismissal Order, filed November 27, 2002 (dkt. no. 465); Plaintiffs' Objection to the Defendants' Proposed Order Denying the Plaintiffs' Motion to Amend the Complaint, filed December 27, 2002 (dkt. no. 477); Transcript of Hearing, dated February 24, 2003, at 26:17–31:15, 71:8–12; Proposed Order of Dismissal With Prejudice, received March 4, 2003; Objection to the Defendants' Proposed Order of Dismissal With Prejudice, filed March 10, 2003 (dkt. no. 511); Transcript of Hearing, dated December 19, 2003; Supplemental Objections to the Final Orders of Dismissal of Federal and State Law Claims, filed December 29, 2003 (dkt. no. 585).

In preparing this written disposition of the Part I Plaintiffs' claims, the court has also taken the opportunity to address several of the objections raised by the plaintiffs to the proposed forms of order earlier submitted by counsel,[123] particularly where those objections were directed against the substance of the court's bench ruling or the conduct of the pretrial conference, as opposed to the *form* of the proposed orders reflecting that ruling. *Cf.* DUCivR 54–1(b).

## PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

It has long been understood that "[t]he Federal Rules encourage litigants to plead only a simple statement, in sequence, of the events which have transpired, coupled with a direct claim by way of demand for judgment." *Meadow Gold Products Co. v. Wright,* 278 F.2d 867, 869 (D.C.Cir.1960) (citing *Gins v. Mauser Plumbing Supply Co.,* 148 F.2d 974 (2d Cir.1945)). From the commencement of this litigation, plaintiffs' counsel has taken a dramatically different approach to pleading the Part I Plaintiffs' claims, at times shuffling each plaintiff's factual allegations and legal assertions together as one would a deck of playing cards, sacrificing narrative sequence in favor of argumentative characterizations and conclusory assertions.

Plaintiffs' Proposed Amended Complaint was no exception. Filed a week before the Final Pretrial Conference, "Plaintiffs' Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," and "Memorandum of Fact and Law in Support," filed November 6, 2002 (dkt. no.

438), sought leave to file the Proposed Amended Complaint in order to correct any deficiencies in the plaintiffs' pleadings referred to by the Tenth Circuit in *MacArthur v. San Juan County,* 309 F.3d 1216 (10th Cir.2002), and to amend plaintiffs' pleadings to conform to the evidence and clarify the remaining issues. *See* Fed. R.Civ.P. 15(b). The defendants did not have an opportunity to respond to that motion before the Final Pretrial Conference. began on November 14, 2002.

At the conclusion of the Final Pretrial Conference on February 15, 2002, the court made a bench ruling denying the motion for leave to amend:

> MS. ROSE: I've put in a motion to amend the complaint and I drafted it in 2 parts. Since these plaintiffs have been dismissed is there any way of procedurally just looking at amending the complaint for the second part?

> THE COURT: Well I dealt with the important aspect of the amended complaint, namely the emergency room problem and I've dealt with that and I'll simply deny the motion to amend.

> MS. ROSE: No, no, I meant no, Your Honor, I'm sorry, I didn't mean for these 3 plaintiffs that have been dismissed, I understand they are gone. What I'm talking about is I amended the complaint that I originally filed for Singer, Riggs and Dickson and is that motion for amending that part of the complaint still viable?

> THE COURT: No, the motion is denied.

---

123. (*See, e.g.,* Plaintiffs' Objection to the Form of the Proposed Dismissal Order, filed November 27, 2002 (dkt. no. 465), at 3, 5 ("[T]he Plaintiffs should be allowed to know what legal theories and facts and rules the Court was relying upon for dismissing each Plaintiffs' claim in the pretrial setting. Plaintiffs should not be forced to ferret out by intuition what the Court meant, was thinking at the time, or intended .... Plaintiffs respectfully request the Court itself to identify the claims of the Plaintiffs and the reasons for their dismissal." ).)

(Tr. 11/15/02, at 119:8–23.) The court again addressed the matter at the February 24, 2003 hearing on all pending motions. (*See* Transcript of Hearing, dated February 24, 2003, at 36:21–23 ("We dealt with the question of amendments and I have indicated to you that as an amendment the answer is no." (the court).)) A proposed form of order denying the motion was submitted to the court, as were objections thereto, and the proposed order has not been entered.

Having reviewed the record in this matter in preparing this written disposition, the court has again examined the motion for leave to amend as well as the Proposed Amended Complaint. The allegations of the Proposed Amended Complaint, prolix and circuitous as they are, correspond far more closely to the issues as framed by counsel in the Proposed Pretrial Order than do the even more prolix and partially obsolete allegations of the original Complaint, as earlier amended. (*See* Complaint (Verified), filed July 25, 2000 (dkt. no. 1); "Amendments to the Complaint; Correction of Errors," filed August 1, 2000 (dkt. no. 3).)

While generally, motions to amend a complaint to conform to the evidence "are made at trial or in the immediate aftermath of trial," Steven Baicker–McKee, et al., *Federal Civil Rules Handbook* 337 (2000 ed.), the express language of Rule 15(b) does not limit such motions to that context.

Viewing the Proposed Amended Complaint as the best statement of plaintiffs' claims as of the time of pretrial, and given the close relationship between the proposed pleading and the Proposed Pretrial Order, it likely would serve the interests of clarity of the record to grant the leave to amend as requested, and direct the filing of the Proposed Amended Complaint *nunc pro tunc* to November 14, 2002, the date of the Final Pretrial Conference. Granting leave to amend on that basis avoids confusion between the Part I Plaintiffs' claims as pleaded in the original Complaint and their claims as addressed in the context of pretrial, and does so without reviving any claims that were disposed of in the course of the Final Pretrial Conference. Granting leave to amend also serves to clarify the remaining plaintiffs' claims as pleaded in *Part II* of the Proposed Amended Complaint, concerning the enforcement of certain orders of the Navajo Tribal Court. Therefore, the court concludes that its earlier bench ruling concerning the "Plaintiffs' Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," filed November 6, 2002 (dkt. no. 438), should be vacated and the motion should be granted *nunc pro tunc* to November 14, 2002.

## THE PART I PLAINTIFFS' MOTIONS FOR RECONSIDERATION

In the months since the November 2002 pretrial conference, court and counsel have addressed matters concerning the claims of the remaining three plaintiffs, Singer, Riggs and Dickson, and the questions of Navajo Tribal Court jurisdiction they have raised. In addition, the court has heard, considered and ruled upon a series of motions filed by the parties, including a request for a settlement conference, which was granted, (*see* Minute Entry, dated July 6, 2004 (dkt. no. 657)), but apparently to no avail. (*See* Minute Entry, dated September 28, 2004 (dkt. no. 663).)

Shortly after the reported failure of the settlement conference, the Part I Plaintiffs' filed a series of motions for reconsideration of the court's bench rulings at the Final Pretrial Conference, coupled with motions for summary judgment in favor of the Part I Plaintiffs pursuant to Fed. R.Civ.P. 56. (*See* Plaintiff Valdez's Motion for the Court to Reconsider its Motion to

Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 664); Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670); Plaintiff Lyman's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' [sic] Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed December 28, 2004 (dkt. no. 695).) Responsive memoranda were filed by the defendants, followed by the plaintiffs' reply memoranda and several additional motions.[124]

 Except to the extent that a motion under Fed.R.Civ.P. 60(b) or Fed.R.Civ.P. 59(e) is deemed a "motion for reconsideration," the Federal Rules do not expressly provide for such motions. Nevertheless, in this circuit, a "motion for reconsideration" may be made on one or more specific grounds:

> Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. *See Brumark Corp. v.*

*Samson Resources Corp.*, 57 F.3d 941, 948 (10th Cir.1995). Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. *Servants of the Paraclete v. John Does, I–XVI*, 204 F.3d 1005, 1012 (10th Cir.2000).

Here, the Part I Plaintiffs urge reconsideration of this court's November 15, 2002 bench ruling on most, if not all of the available grounds. (*See* Memorandum of Points and Authorities Supporting Plaintiff Valdez's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 665), *passim*; Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), *passim*; Memorandum in Support of Plaintiff Lyman's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' [sic] Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed December 28, 2004 (dkt. no. 696), *passim*.) They also raise additional issues *not* addressed at pretrial, particularly as to the nature of the relationships between

---

**124.** (*See* "Plaintiffs' MacArthur, Lyman, Valdez' Motion for Sanctions," filed January 25, 2005 (dkt. no. 703); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Valdez' Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Motion for Summary Judgment, filed November 29, 2004 (dkt. no. 673); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff MacArthur's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross–Motion for Summary Judgment, filed December 13, 2004 (dkt. no. 682); Motion for an Extension of Time to Respond to MacArthur's November 29, 2004 Motion for Summary Judgment (Health District), filed December 14, 2004 (dkt. no. 684);

Health District Defendants' Joinder in Motion, filed December 21, 2004 (dkt. no. 690); Motion for an Extension of Time to Respond to Lyman's December 26, 2004 Motion for Summary Judgment (Health District), filed January 14, 2005 (dkt. no. 699); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Lyman's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross–Motion for Summary Judgment, filed January 18, 2005 (dkt. no. 701); Joinder in San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Lyman's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross–Motion for Summary Judgment, filed February 3, 2005 (dkt. no. 706).)

various defendants, their liability insurers and their counsel of record.

The court has reviewed and considered the Part I Plaintiffs' motions for reconsideration and supporting memoranda and exhibits as part of the process of preparing this written embodiment of that bench ruling, and has referred to them more than once in the foregoing analysis of the plaintiffs' various claims. The Part I Plaintiffs' "new evidence previously unavailable" consists largely of deposition testimony of a SJHSD officer obtained in another federal lawsuit relating conversations about nonparties, or evidence of collateral matters concerning the background and credibility of one or more of the individual defendants, (*e.g.,* unrelated prior criminal convictions). The plaintiffs also complain of materials not produced by the defendants in discovery in this action. They also use these motions as an opportunity to adjust their legal contentions and theories of liability.

In large part, however, the Part I Plaintiffs' motions for reconsideration simply reargue the same legal claims grounded upon the same factual allegations as were set forth in the Proposed Amended Complaint and the Proposed Pretrial Order, and discussed in some detail at the Final Pretrial Conference.

Having examined the motions for reconsideration, the court concludes that in each instance, the motion presents no exceptional circumstances justifying relief from the court's prior bench ruling as it has been further explicated herein. *Cf. Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.,* 909 F.2d 1437, 1440 (10th Cir.1990) ("Relief under Rule 60(b) is extraordinary

and may only be granted in exceptional circumstances."). The Part I Plaintiffs have failed to point to "new evidence previously unavailable" that materially alters the existing factual footing for their claims; nor have they established a "need to correct clear error or prevent manifest injustice" as to any claim that has been dismissed on its merits, as detailed above.

Therefore, the Part I Plaintiffs' motions for reconsideration should in each instance be denied in all respects.[125]

## CONCLUSION

With the determination of the Part I Plaintiffs' motions for reconsideration and for sanctions, this court's consideration of these plaintiffs' claims against the remaining defendants draws to a close. Based upon detailed examination in the context of the Final Pretrial Conference, the Part I Plaintiffs' claims have been dismissed pursuant to Fed.R.Civ.P. 16(c)(1), on the merits and with prejudice, with the exception of the remaining state tort law claims of plaintiffs MacArthur and Lyman for interference with contract, interference with prospective business relations, defamation and/or intentional infliction of emotional distress as against defendants Redd, Jones, Schafer, Nelson, and Bradford, as well as defendants Bronson and Marilee Bailey (defamation only), over which this court declines to exercise supplemental jurisdiction, *see* 28 U.S.C. § 1367(c); those claims shall be dismissed without prejudice.

The claims asserted and issues raised by the remaining plaintiffs, Singer, Riggs and Dickson, and the defenses and issues

---

**125.** The denial of plaintiffs' motions for reconsideration renders moot their accompanying motions for summary judgment. Thus, no further response by the defendants to the latter motions is required. (*See* Order re: Pend-

ing Motions, filed March 30, 2005 (dkt. no. 718), at 5–6.)

"Plaintiffs' MacArthur, Lyman, Valdez' Motion for Sanctions," filed January 25, 2005 (dkt. no. 703), shall likewise be denied.

raised by the remaining defendants in response to those plaintiffs' claims, currently remain under advisement, and will be addressed in a separate written disposition to be issued in due course. The claims of plaintiffs Singer, Riggs and Dickson having already been submitted for decision, the remaining defendants need not answer or otherwise respond to the plaintiffs' Amended Complaint, which has been directed to be filed herein, *nunc pro tunc* to November 14, 2002.

Good cause thus appearing therefor,

**IT IS ORDERED** that the "Plaintiffs' Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir. Court 10–7–02 Opinion," and "Memorandum of Fact and Law in Support," filed November 6, 2002 (dkt. no. 438), shall be and hereby is GRANTED *nunc pro tunc* to November 14, 2002; the Clerk of the Court is directed to file the proposed Amended Complaint annexed thereto in the record in this action (Civil No. 2:00–CV–584BSJ)[126] and enter the same upon the docket forthwith;

**IT IS FURTHER ORDERED** that the claims of plaintiff Dr. Steven MacArthur shall be and hereby are DISMISSED with prejudice as against all of the defendants named herein, except that the court declines to exercise supplemental jurisdiction over his claims for intentional interference with contract, intentional interference with prospective business relations and defamation as against defendants Dr. James Redd, Dr. L. Val Jones, Laurie Schafer, Dr. Manfred Nelson, and Cleal Bradford, Julie Bronson and Marilee Bailey, *see* 28 U.S.C. § 1367(c); those claims are hereby DISMISSED without prejudice;

**IT IS FURTHER ORDERED** that the claims of plaintiff Michele Lyman shall be

and hereby are DISMISSED with prejudice as against all of the defendants named herein, except that the court declines to exercise supplemental jurisdiction over her claims for intentional interference with contract, intentional interference with prospective business relations, defamation and intentional infliction of emotional distress as against defendants Dr. James Redd, Dr. L. Val Jones, Laurie Schafer, Dr. Manfred Nelson, and Cleal Bradford, *see* 28 U.S.C. § 1367(c); those claims are hereby DISMISSED without prejudice;

**IT IS FURTHER ORDERED** that the claims of plaintiff Helen Valdez shall be and hereby are DISMISSED with prejudice as against the defendants named herein, and in particular defendants Lori Wallace and the San Juan Health Services District;

**IT IS FURTHER ORDERED** that Plaintiff Valdez's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed October 26, 2004 (dkt. no. 664), is hereby DENIED;

**IT IS FURTHER ORDERED** that Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed November 23, 2004 (dkt. no. 670), is hereby DENIED;

**IT IS HEREBY ORDERED** that Plaintiff Lyman's Motion for the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' [sic] Discrimination Claims and Plaintiffs' Cross–Motion for Summary Judgment, filed December 28, 2004 (dkt. no. 695), is hereby DENIED;

**IT IS FURTHER ORDERED** that "Plaintiffs' MacArthur, Lyman, Valdez'

---

**126.** The caption of the Proposed Amended Complaint erroneously refers to "civil no. 92–C–1071TS," a case currently assigned to Chief Judge Benson.

Motion for Sanctions," filed January 25, 2005 (dkt. no. 703), is hereby DENIED; and

**IT IS FURTHER ORDERED** that a printed copy of the Proposed Pretrial Order, received by the court on November 12, 2002, shall be lodged by the Clerk of the Court in the file as part of the record in this action, and that an electronic (.pdf format) copy of the Proposed Pretrial Order shall be appended by the Clerk of the Court to the electronic (.pdf format) copy of this Memorandum Decision & Order and be made available as part of the permanent CM/ECF case record in this action.

## APPENDIX

### PRETRIAL ORDER

#### TABLE OF CONTENTS

1. JURISDICTION ...................................................1211
 a. Plaintiffs' Statement of Jurisdiction ....................................1211
 b. Defendants' Statement of Jurisdiction ..................................1211

2. VENUE ........................................................1211
 a. Plaintiffs' Statement of Venue .........................................1211
 b. Defendants' Statement of Venue ......................................1211

3. GENERAL NATURE OF THE CLAIMS OF THE PARTIES .................1212
 a. Plaintiffs' Statement of the Claims .....................................1212
 b. Defendants' defenses ................................................1213

4. UNCONTROVERTED FACTS ........................................1216

5. CONTESTED ISSUES OF FACT ......................................1216
 a. Plaintiffs' Statement of Contested Issues of Fact .......................1216
 b. Defendants' Statement of Contested Issues of Fact .....................1243

6. CONTESTED ISSUES OF LAW .......................................1246
 a. Plaintiffs' Statement of Contested Issues of Law .......................1246
 b. Defendants' Statement of Contested Issues of Law ......................1250

7. EXHIBITS ......................................................1251

8. WITNESSES ....................................................1251

9. REQUESTS FOR INSTRUCTIONS ....................................1254

10. AMENDMENTS TO PLEADINGS......................................1254

11. DISCOVERY ....................................................1254

12. TRIAL SETTING ................................................1254

13. POSSIBILITY OF SETTLEMENT .....................................1254

This matter came before the Court on November 14, 2002, at a pretrial conference held before Judge Bruce S. Jenkins, pursuant to Rule 16 of the Federal Rules of Civil Procedure. Susan Rose, having

appeared as counsel for plaintiffs Dr. Steven MacArthur, Michele Lyman, and Helen Valdez; Blaine J. Benard and Carolyn Cox, having appeared as counsel for defendants San Juan Health Services District (the "Health District"), Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday; and Robert R. Harrison, having appeared as counsel for defendants San Juan Health Service District, Cleal Bradford, Dr. James Redd, Dr. L. Val Jones, Dr. Manfred Nelson, Marilee Bailey, Ora Lee Black, Lori Wallace, Carla Grimshaw, Gloria Yanito, Julie Bronson, and San Juan County, Craig C. Halls, William B. Redd, Richard M. Bailey and J. Tyrone Lewis, and the following action was taken:

### SCOPE OF THIS ORDER [1]

This Order pertains only to the claims of Dr. Steven MacArthur, Michele Lyman and Helen Valdez. The claims for enforcement of the Navajo Court order are before the 10th cir. court at this time and this order does not deal with those Navajo Court enforcement issues.

1. *JURISDICTION.*

a. **Plaintiffs' Statement of Jurisdiction:**

*Subject matter jurisdiction:* Jurisdiction of this Court over this matter is found in Article III of the United States Constitution, 28 U.S.C. § 1331. Plaintiffs also assert this Court's jurisdiction under 28 U.S.C. § 1391, 15 U.S.C. § 4 et seq, 42 U.S.C. § 1981 et seq, 18 U.S.C. § 1961–1964, and the Court has authority to grant declaratory judgment relief sought herein under 28 U.S.C. §§ 2201 and 2202.

*Personal jurisdiction:* Plaintiffs assert the Court has jurisdiction over the persons of defendants who reside in Utah, as the damages sought will exceed $75,000.

*Pendant/Ancillary Jurisdiction:* Plaintiffs assert the jurisdiction for State claims is found in 28 USC 1367 and the ancillary and pendant powers of the Court, and the Court's inherent equity powers, ancillary and pendant powers of the Court and the U.S. Constitution's Supremacy Clause.

b. **Defendants' Statement of Jurisdiction.** This is an action by plaintiffs for monetary damages. Plaintiffs also claim to seek injunctive relief. Jurisdiction of the Court is invoked under 28 U.S.C. § 1331. The jurisdiction of the Court under 28 U.S.C. § 1331 is not disputed and is hereby determined to be present. Plaintiffs also assert that the Court has supplemental jurisdiction for state claims under 28 U.S.C. § 1367 and the ancillary and pendant powers of the Court. Defendants do not currently contest the Court's pendent jurisdiction over the state law claims but reserve the right to challenge such jurisdiction if plaintiffs' federal claims are dismissed.

2. *VENUE.*

a. **Plaintiffs' Statement of Venue.** Venue is proper in this Court under 28 U.S.C. sec. 1391 and 18 U.S.C. § 1965 and 15 U.S.C. § 1 et seq. is proper within the Central Division of the District of Utah under 28 U.S.C. § 125.

b. **Defendants' Statement of Venue.** Venue was determined by the Court to be proper pursuant to 28 U.S.C. § 1391. Venue is laid in the Central Division of the District of Utah. *See* 28 U.S.C. § 125.

---

1. Plaintiffs requested that this "Scope of the Order" section be included in the Pretrial Order.

### 3. GENERAL NATURE OF THE CLAIMS OF THE PARTIES.

**a. Plaintiffs' Statement of the Claims:**

*Plaintiffs Dr. MacArthur and Michele Lyman*

i. The Plaintiffs Dr. Steven MacArthur, Michele Lyman, Physician's Assistant bring this complaint involving injuries from the defendants' by way of

(1) 42 U.S.C. § 1983 civil rights violations regarding freedom to contract, free speech, free association, including 1985 conspiracy;

(2) retaliation for speaking and association,

(3) due process violations as guaranteed to the Plaintiffs Dr. MacArthur and Michele Lyman by way of 42 U.S.C. § 11112 and 42 U.S.C. § 1983, the U.S. Constitution Fifth and Fourteenth Amendment, and Utah's Constitution Article 1, Section 1, Section 7, Section 22, Section 26 and 27;

(4) 15 U.S.C. § 15 *civil* anti-trust violations,

(5) 18 U.S.C. § 1961 et seq. *civil* RICO violations,(a) mail fraud 18 U.S.C. § 1341; (b) witness tampering 18 U.S.C. § 1512; (c) interference with commerce by threats 18 U.S.C. § 1951; (d) illegal destruction or tampering with confidential documents in a federally contracted facility; (e) intimidation of witnesses for monetary gain;

(6) state *common law* defamation ( also a U.S. Constitutional right to reputation as guaranteed by the Ninth Amendment), negligent and intentional infliction of emotional distress, and fraud,

(7) violations of privacy rights and statutory entitlements to have their credential files and patient files accurately kept by the district under Medicaid and Utah Health Department statutes and regulations,

(8) interference with the patients' and Dr. and P.A.'s ability to freely contract for services with the District, with each other, with patients as guaranteed by the Fourteenth Amendment, Utah unfair Practices Act, and federal common law,

(9) denial of State license entitlements,

(10) denial of Medicaid entitlements,

(11) bad faith void contracts that lack fair dealing, and

(12) denial of their entitlement to a contract with the District that is based upon principles of good faith and fair dealing, with adequate consideration.

(13) conspiracy to deprive the Plaintiffs of their legal entitlements of due process, equal protection, privacy, rights of association, rights to contract.

(14) conspiracy to deprive the Plaintiffs' of their above stated rights and entitlements

(15) violation of the Utah Unfair Practices Act,

(16) violation of the guarantees found in the Health Quality Improvement Act, 42 U.S.C. § 11112,

(17) 18 U.S.C. § 248 denial of local patients to contract freely with Dr. MacArthur and Michele Lyman's for reproductive health care and free speech violations.

(18) violations of Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing. Utah Code Ann. §§ 78–12–25(1) (1996)

(19) were denied an accurate record of hearings pertaining to them, and denied all records of meetings that meet the open meetings definition of Utah Code Ann. 58–4–1–7.5, in order to verify their claims of

conspiracy and complicity between the County and District in deliberate refusal to take actions to enforce and uphold free competition in the area and protect their civil rights.

*Mrs. Valdez Claims*

(20) violation of Mrs. Valdez' Medicare Patient Bill of Rights to see the medicare provider of her choice;

(21) violation of Mrs. Valdez' 42 U.S.C. § 1983 civil rights and equal protection;

(22) violation of Mrs. Valdez' state right to receive services equally with all other patients as found in Utah Code Ann. 13–7–2.

(23) violation of Mrs. Valdez' entitlement to an equal standard of care and to be examined upon her presentation to the emergency room of the hospital as mandated by 42 U.S.C. § 1395dd and Utah's Nurse Practitioner Act;

(24) violation of Mrs. Valdez' Utah Constitutional rights under Article 1 sections 1, 7, 25, 26, 27;

(25) violation of Mrs. Valdez' U.S. Constitutional rights under the Fifth and Fourteenth Amendments to freely contract and associate with the provider of her choice as found in 42 U.S.C. § 1395a; to have due process of law if she is denied that right. At all times the defendants, jointly and severally, privately and officially, displayed deliberate indifference to the Plaintiffs' injuries. After Mrs. Valdez' harm, her ability to contract with local providers was chilled.

b. **Defendants' defenses.**

ii. Many of Plaintiffs' claims fail to state a claim upon which relief can be granted.

iii. Many of Plaintiffs' claims fail because Plaintiffs lack standing to assert them and the claims are not asserted on behalf of the real parties in interest.

iv. Many of Plaintiffs' claims fail because Plaintiffs failed to plead the claims in the Complaint, and Plaintiffs are attempting to raise them for the first time in this Pretrial Order. Claims to which no reference is made in the Complaint include, but are not limited to (1) the Health Quality Improvement Act; (2) 18 U.S.C. § 248, which prohibits, *inter alia*, interference by force or threat of force with a person obtaining reproductive health care; (3) 42 U.S.C. § 1395a; (4) 42 U.S.C. § 1395dd; and (5) 18 U.S.C. § 1951 as a predicate act for Plaintiffs' purported RICO claim.

v. Many of Plaintiffs' claims as stated by Plaintiffs are barred because they are stated defectively and fail to plead the elements of the purported causes of action.

vi. Many of Plaintiffs' claims as stated by Plaintiffs fail because no private cause of action may be based upon the statutes or constitutional provisions cited. These claims include, but are not limited to, those based on the Nurse Practice Act, Utah Code Ann. § 58–31b–801 *et. seq.*, the Ninth Amendment to the United States Constitution, Sections 1, 25, 26 or 27 of the Utah Constitution, and 42 U.S.C. § 1395a. Plaintiffs also cannot bring a private cause of action based on 42 U.S.C. § 1395dd because the statute protects only the rights of indigents who are denied treatment for economic reasons.

vii. With respect to each of the plaintiffs' discrimination and due process claims, San Juan County, the Health District, Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday are not liable because respondeat superior liability does not attach for purposes of 42 U.S.C. § 1983 unless the adverse treatment resulted from a policy or custom of the

Health District, of which there is no evidence in this case.

viii. Plaintiffs have not alleged any discriminatory conduct on the part of a number of defendants, including Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway, Gary Holliday, Dr. L. Val Jones, Dr. Manfred Nelson, Marilee Bailey, Ora Lee Black, Lori Wallace, Carla Grimshaw, Gloria Yanito, Julie Bronson or Reid Wood. Accordingly, plaintiffs may not assert claims based on 42 U.S.C. § 1983 against them.

ix. Because case law does not support claims of associational discrimination with respect to gender or religion, plaintiffs' claims based on those theories fail.

x. Dr. MacArthur's claim that he was discriminated against on the basis of age in connection with his application for privileges is barred in whole or in part because it is preempted by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634.

xi. Dr. MacArthur's claims are barred because he intentionally and knowingly waived his right to bring such claims against defendants when he was granted temporary privileges, which, according to the application he signed and to the Medical Staff Bylaws, released from any liability representatives of the hospital and the medical staff for acts taken in connection with the evaluation of his application.

xii. With respect to Lyman's claims, San Juan County and the Health District cannot be held liable for any allegedly discriminatory acts by Dr. James Redd or Cleal Bradford before they began working for the Health District, regardless of whether respondeat superior applies. Such claims are also barred by applicable statutes of limitation.

xiii. Plaintiffs' due process claims are barred because plaintiffs were not deprived of a liberty or property interest.

xiv. None of the plaintiffs can show that any of their allegedly adverse treatment was a result of their membership in a protected class.

xv. Plaintiffs' claim of defamation fails because truth is an absolute defense to the claim.

xvi. Plaintiffs' claim of defamation fails for lack of particularity because they cannot identify any individual who allegedly made a defamatory statement nor can they identify with particularity the alleged defamatory statement.

xvii. Plaintiffs' claim of defamation fails because there is no allegation or evidence that the alleged defamatory statement was published.

xviii. Plaintiffs' claim of defamation fails because they have not suffered any actual harm as a result of the allegedly defamatory statements.

xix. Plaintiffs' claim of defamation fails because defendants' alleged statements are subject to a qualified privilege.

xx. Plaintiffs' claim of defamation fails to the extent any alleged defamatory statement was made during the course of a legislative proceeding such as a meeting of the County Commission or the Health District Board of Trustees pursuant to Utah Code Ann. §§ 45–2–3 and 45–2–10.

xxi. Pursuant to the Utah Governmental Immunity Act, jurisdiction over Plaintiffs' claim of defamation is vested exclusively within the District Courts of the State of Utah. *See* Utah Code Ann. § 63–30–16.

xxii. Plaintiffs' defamation claim is barred by the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–1 *et*

*seq.,* including but not limited to §§ 63–30–3 and 63–30–10.

xxiii. Plaintiffs lack standing to assert an antitrust claim.

xxiv. To the extent Plaintiffs have stated an antitrust claim, the claim fails under the state action defense.

xxv. Plaintiffs' purported antitrust claim fails because any alleged activity did not occur in or affect interstate commerce, so antitrust jurisdiction is not present.

xxvi. Plaintiffs' purported antitrust claim fails because there is no agreement in the form of a contract, combination or conspiracy to restrain trade.

xxvii. Plaintiffs' purported antitrust claim fails for lack of antitrust injury.

xxviii. Plaintiffs' purported antitrust claim fails due to the lack of an unlawful motive on the part of Defendants.

xxix. Defendants are immune from Plaintiffs' purported antitrust claim under the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–152.

xxx. Plaintiffs' purported claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") fails because Plaintiffs have failed to specify what provision of the RICO statute they claim Defendants violated.

xxxi. Plaintiffs' purported RICO claim fails because Defendants were not engaged in and none of Defendants' alleged activities affected interstate commerce.

xxxii. Plaintiffs' purported RICO claim fails because Defendants did not commit any of the predicate acts alleged by Plaintiffs.

xxxiii. Plaintiffs' purported RICO claim fails because Defendants did not engage in a pattern of racketeering activity.

xxxiv. Plaintiffs' purported RICO claim fails because Plaintiffs have failed to identify an enterprise.

xxxv. Plaintiffs' purported RICO claim fails because Defendants have not received any income from, acquired any interest in, or conducted or participated in the conduct of an enterprise.

xxxvi. Because San Juan County and the Health District are political subdivisions of the State of Utah and the alleged acts and/or omissions by County commissioners, officials or employees or Health District trustees, employees or staff members, about which plaintiffs complain, were carried out within the scope of and pursuant to their official duties as trustees, employees or staff members of the Health District, plaintiffs' claims are barred by the doctrine of qualified immunity, including but not limited to the provisions of the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–1 *et seq,* including but not limited to § 63–30–3 and § 63–30–10.

xxxvii. Plaintiffs' claims are subject to the equitable defenses of unclean hands, laches, waiver and estoppel.

xxxviii. The activities alleged in the Complaint are not actionable because they conformed with and were undertaken pursuant to statutes, government regulations and industry standards based upon the state of knowledge existing at the time of the activities.

xxxix. Plaintiffs have not proved any facts showing that the conduct of defendants was the proximate cause of some or all of the alleged damages in the Complaint.

xl. Plaintiffs have not proved any facts showing that the conduct of defendants was the cause-in-fact of some or all of the damages claimed in the Complaint.

xli. The alleged actions of which plaintiffs complain do not support an award of punitive damages.

xlii. Plaintiffs' claims are barred by the applicable statutes of limitation, including but not limited to Utah Code Ann. §§ 63–30–15, 78–12–25(3), 78–12–29(4) and 78–12–30.

xliii. Plaintiffs have failed to mitigate their damages, if any.

xliv. Plaintiffs claims' for damages are remote, speculative and/or unavailable as a matter of law.

xlv. Plaintiffs' damages, if any, were proximately caused by their own fault and/or the fault of persons other than defendants.

xlvi. Plaintiffs' damages, if any, are limited in accordance with the provisions of Utah Code Ann. § 63–30–22.

xlvii. Defendants are entitled to reasonable attorneys' fees pursuant to 28 U.S.C. § 1927 because the proceedings in this action have been multiplied unreasonably and vexatiously.

xlviii. Defendants are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

4. *UNCONTROVERTED FACTS.* The following facts are established by admissions in the pleadings, by order pursuant to Federal Rule of Civil Procedure 56(d), or by stipulation of counsel:

a. Plaintiff Helen Valdez was a resident of Monticello, Utah at all relevant times.

b. Plaintiff Dr. Steven MacArthur is a medical doctor who specializes in obstetrics and gynecology ("Ob/Gyn").

c. Plaintiff Michelle Lyman is a physician's assistant who resides in Blanding, Utah.

5. *CONTESTED ISSUES OF FACT.*

a. **Plaintiffs' Statement of Contested Issues of Fact:**

*Summary of the Material Facts*

Dr. MacArthur was a qualified physician in good standing with the State of Utah. Michele Lyman, was a Physician's Assistant, in good standing with the State of Utah. Both of these medical providers were denied privileges at the only hospital and District facilities for miles around either by way of staff actions San Juan County and San Juan Health District displayed deliberate indifference toward resolving or by affirmative actions by the District and County personnel. Both received no due process hearing. Records of hearings are either incomplete or not recorded or not audible. Both had no avenue for having an impartial hearing to which they could appeal district staff actions. Both had to put up with negative and interfering nursing attitudes, false rumors, statements undermining their abilities in the site of their patients, and their patients receiving less of a standard of care than was required by the State and Federal regulations. Dr. MacArthur was subjected to a false incident report. Mrs. Lyman was subjected to false rumors directly related to the health care of her patients. Mrs. Lyman had patient files disappear, and patients confidentiality breached. Dr. MacArthur had to work with broken or at times, unsterile instruments, and the nursing staff refused to purchase equipment that would be paid by the patients' insurance to be used in the best interest of patients. Both suffered from missing documents in their credentialing packets. Mrs. Lyman suffered from altered documents in her packet.

Helen Valdez

Helen was a patient entitled by federal and state regulations to a certain level of

care. She presented to the emergency room of San Juan Hospital asking to see a dr. as she was sick. She was not asked what was wrong, how long she had been ill, nor was she given an examination. She was in the bathroom and Laurie Wallace, R.N. told the clerk to tell her to go to Dr. Penn's clinic. She was Dr. Penn's patient. The state found that Dr. Penn was not always told of the presence of his patients in the hospital. As a pattern and policy of practice, the hospital had problems with turning people away or sending them from one facility to another facility of lesser care to suit the convenience of a doctor. The State Medicaid officer Royale Simpson oversaw classes he mandated District personnel to attend.

Other older people in the area suffered from not receiving adequate care.

The District employees as a pattern sought to restrain competition, there was inadequate impartiality in 'peer review' or in issuing privileges since the people issuing the privileges are usually in economic competition with those they are giving privileges. Privileges for Mrs. Lyman were de facto denied by nursing personnel and medical staff without any action by the District governance board.

The governance board displayed a pattern of not holding doctors or others accountable for interfering in doctor /patient relations. The County was aware of the problems and did nothing to investigate, hold hearings, or resolve the provider and patients' and public's concerns as evidenced in petitions with hundreds of signatures.

Mrs. Valdez, Dr. MacArthur, Mrs. Lyman informed the District of their problems and to no avail. Dr. MacArthur and others reporting problems to Board member Patsy Shumway and John Housekeeper were labeled either troublemakers or Dr. Redd detractors.

One of the largest problems in this small, isolated area is the fear of patients to testify for fear they or their children or grandchildren might be turned away in an emergency. Mrs. Lyman is looking at the threats of non treatment in an emergency against her patients as extortionate in nature to obtain their accounts, forged documents were sent in the U.S. mail to harm her reputation with the American Heart Association who oversees the cpr classification certification programs Mrs. Lyman is obligated to pass. Mrs. Lyman taught them and signed Laurie Shafer's card. The type of rumors Mrs. Lyman was subjected to would per se disparage people from coming to her for care.

The damages for Mrs. Lyman and Dr. MacArthur are treble with compensation for federal antitrust and RICO claims. They are also seeking damages for civil rights and other common law and statutory and Constitutional claims.

*Congressional and State Designs to Foster Economic Competition*

1. The State of Utah legislatively made findings that free economic competition is in the best interest of citizens of the State. Utah Code Ann. 76–10–912; 76–10–923, 13–5–17, and binds itself to fostering free enterprise in its procurement contract. Utah Code 63–56–1.

2. "The attorney general shall have the authority and responsibility to advocate the policy of competition before all political subdivisions of this state and all public agencies whose actions may affect the interests of persons in this state." Utah Code 76–10–923. See also Unfair Practices Act Title 13 Chapter 5 fostering economic competition.

3. Congress through RICO and Antitrust statutes fosters free competition in

the United States. "In assessing the likelihood that efficiencies will be realized, the Agencies recognize that competition is one of the strongest motivations for firms to lower prices, reduce costs, and provide higher quality. Thus, the greater the competition facing the network, the more likely the network will actually realize potential efficiencies that would benefit consumers." Statement of Antitrust Enforcement Policy in Health Care, Department of Justice and Federal Trade Commission, August, 1996.

4. Congress and Utah acknowledge a problem of the shortage of health care professionals in rural areas.

5. Congress and Utah have enacted various regulations and statutes to raise the number of medical providers in rural areas through educational loan payback programs, J–1 immigration waiver programs, Community Impact Board grants and loans, and so forth.

6. Physician Assistants in Utah can operate and independently own health clinics in HPSA areas under Medicaid and Utah licensing divisions, as long as the supervising physician is available by phone, even though many miles away.

7. Utah Department of Professional Licensing (DOPL) approved Michele Lyman's Blanding Family Practice as a rural off-site clinic.

*Nature of the County and District*

8. The County is organized as a political subdivision of Utah under Utah's constitution and Title 17 of the Utah Code.

9. The District is organized as a special service district under the Utah Code 17A–2–1304.

10. In 1997, the District showed a profit.

11. At nearly all times, the District is supported in part by public tax funds.

12. Many private companies own, manage, and operate rural hospitals and health care clinics.

13. Private companies have managed the District in the past.

14. Revenues, not profits, exceed $50,000 a year.

15. The District hospital provides a substantial tax supported economic base for Monticello.

16. The District operated Blanding Urgent Care Center, Blanding Birthing Center, Monument Valley Clinic, Monticello clinic and San Juan Hospital.

17. Dr. Redd became a district employee in or about the spring of 1999.

18. When Dr. Redd sold his practice to the District, Blanding Clinic also came under San Juan District's control.

*Geographic market*

19. San Juan County is recognized formally as a Health Professional Shortage Area (HPSA).

20. San Juan County fits the State and Federal definition of rural and sometimes frontier health areas. "A county whose population density meets the "rural"(between 7 and 100 people per square mile) or the "frontier" (6 or fewer people per square mile) definition." Utah R432–106–3.

21. San Juan District boundaries coincide with San Juan County's boundaries.

*Product Market for Medical Services*

22. San Juan County's population is about 13, 836 for the U.S. Census 2001 estimate.

23. 50.1% of the County's population according to the 2000 census are female or 6392 female persons. id.

24. 49% of these female persons are estimated to be under 18 years old, leaving 3397 persons who qualify for female reproductive, obstetrical and gynecological health care. Id.

25. The largest population of the county is found in Blanding (approximately 3500 or so) and points south (about 8000). U.S. Census figures.

26. For Dr. MacArthur's claims, District employee doctors and Dr. Jones who was contracted with the District constituted about 80% or greater of the competing doctors in the area.

27. At all times, Dr. MacArthur and Michele Lyman were subject to District policies regarding their privileges as written and accepted by medical providers and physicians who economically competed with them.

28. For Mrs. Lyman's claims, at times the medical staff consisted of Dr. Penn, Dr. Mena, Dr. Jones, Dr. Nelson, Dr. Cook, Dr. Redd.

29. Dr. Penn and Dr. Mena either did not seek renewal of privileges or withdrew their application.

30. Drs. Penn and Mena claimed they did not seek further privileges or renewal of privileges due to hostile working conditions among other conditions.

31. Though Dr. Penn and Dr. Mena were staff members, Michele Lyman did not enjoy full privileges while supervised by them.

32. Dr. Redd and Dr. Jones and Dr. Cook and Dr. Nelson did not approve Mrs. Lyman having privileges unless her doctor was a medical staff member and then only if the physician was in the same town as she.

33. While the policy for P.A.s appears neutral, it effected only Michele Lyman in how it was applied, monitored, and carried out.

34. Mrs. Lyman had no other place to apply for hospital privileges.

35. Mrs. Lyman's patients at times stopped going to her as they needed to use the District emergency facilities for ailments and were told they could not.

*Interstate Commerce*

36. San Juan District provides medical services to people living in Arizona, Colorado, New Mexico and other states.

*Sole Provider of Hospital Services*

37. San Juan Hospital and Blanding Birthing Center are the only facilities in San Juan County for births and are operated solely by San Juan Health Services District.

38. Nearly all emergency ambulance deliveries are made to San Juan Hospital.

39. The next nearest hospital facility to San Juan Hospital in Monticello, Utah is about 65 miles away in either a north (Moab) or east (Cortez, Co.) direction, and about 85 miles from Blanding. Shiprock hospital is between 65 to 85 miles from southern areas of San Juan County in Shiprock, New Mexico.

40. San Juan Hospital is the sole provider for those persons with insurance but without transportation to go outside the county or with physical conditions requiring ambulance transportation.

*Necessity of Hospital Services for Independent*

*Physicians and independent clinics*

41. Any physician delivering babies in San Juan County would need to use the closest San Juan District facilities for patients in active labor.

42. Dr. MacArthur's limited temporary privileges preventing him from fully using the District facilities provided his patients

with limited options in where they could receive their care, and prevented some from becoming his patient.

43. With the exceptions of Dr. Jones and a Monument Valley clinic doctor, all other physicians and P.A.'s within San Juan District are employees of San Juan District.

44. No physician specializing in obstetrics was practicing during the times pertinent, within San Juan District.

45. Without Dr. MacArthur and Michele Lyman to treated obstetric patients, the patients if they wished a local delivery when they went into labor, had to go to a doctor not specialized in the area of obstetrics.

46. Dr. Redd receives pay for baby deliveries within San Juan District facilities over and above his base salary.

47. Dr. Jones receives contract pay for doing on call deliveries.

48. Dr. MacArthur's practice was in direct competition with District and District associated General Practitioners who delivered babies.

49. In making the determination of granting privileges, the medical staff and CEOs would analyze the effect of the independent practices of Dr. MacArthur and Michele Lyman upon their income outside any formal 'peer review' context and in regards to them obtaining privileges.

*Formal and de facto Policies of the County and District*

50. In areas of health care, Commissioner Ty Lewis is against a private entity that would or will compete with the District.

51. The District medical staff director, Dr. Redd has a long standing policy of animus toward women both as employees and as patients.

52. The County and District had a de facto policy of deliberate indifference to those who complained of suffering from Dr. Redd and other District staff members.

53. The County and District had a policy of harming the reputations of persons in retaliation for challenging their authority.

54. The District policy manuals are so ambiguous and without definitions as to be little understood.

55. Doctors who practice in the area are given these medical staff manuals that try to remove from the doctors all rights.

56. The medical staff manual as given to Dr. MacArthur had no page numbers, no board or ceo signatures, no due process hearing procedures for those persons seeking and obtaining temporary privileges from the CEO and not the governance board, they could be altered at will, had no evidence showing governance board approval, were drafted by a District employee.

57. A doctor wishing privileges has little choice but to sign for one.

*Nepotism as a practice and policy*

58. Dr. Redd is the nephew of County Commissioner Bill Redd.

50. Some District Board members were relatives of the County Commissioners.

51. County Attorney Craig Halls is the brother in law of Rick Bailey, District CEO and County Commission administrator.

52. The District CEO directly supervised his wife, Marilee Bailey, R.N. for a time, and then resigned noting this supervision as a reason.

53. San Juan District employees work in an 'at will' status. *Mrs. Valdez' rights of association, equal protection, Medicare Bill of Rights, and rights to contract un-*

der State and Federal statutory and common law.

54. Mrs. Valdez was Dr. Penn's patient.

55. Mrs. Valdez presented herself to the San Juan Health District emergency room.

56. The District nursing staff had failed to tell Dr. Penn of the presence of his patients from time to time.

57. Mrs. Valdez had two forms of identification.

58. Mrs. Valdez filled out an application with insurance information.

59. Mrs. Valdez was not asked what the problem was, what her symptoms were or spoken to about anything.

60. Mrs. Valdez was with her sister in law, Charlene Gonzalez.

61. Mrs. Valdez went into the bathroom.

62. Mrs. Valdez was having an attack of diverticulitis.

63. Mrs. Valdez was suffering from vomiting, cramping, diarrhea and pain.

64. Mrs. Valdez alleges she was passing blood and was very weak and tired.

65. Mrs. Valdez' sister-in-law was told by nurse Laurie Wallace that she and Helen could leave now and go to Dr. Penn's clinic.

66. Mrs. Valdez' neighbor who was a white young male and had not insurance was seen immediately.

67. Mrs. Valdez went home to suffer and sleep and try to calm her stomach down.

68. Mrs. Valdez went to Blanding Urgent care clinic a day or two later.

69. Mrs. Valdez was given oral antibiotics.

70. Mrs. Valdez then went to Cortez where she was hospitalized with IV fluids.

71. Mrs. Valdez then, a week or two after leaving Cortez, went to the University of Utah hospital wherein about 18″ of bowel was removed.

72. Diverticulitis was a long standing problem with Mrs. Valdez.

73. Mrs. Valdez was not examined to determine the severity of the situation.

74. Mrs. Valdez was not given the same standard of care as other patients.

75. The District nurses were required to take EMTALA courses under the direction of Royal Simpson to prevent other patients from being turned away and to give patients equal care.

76. Valdez was accompanied by her sister-in-law Charlene Gonzalez and arrived at the hospital prior to 8 a.m.

77. At no time was an examination performed or questions asked to determine Mrs. Valdez' problem.

78. Mrs. Valdez did not specify anyone to see her.

79. Mrs. Valdez did state she was sick and wished to be seen.

80. Mrs. Valdez was not taken to an examination area in the ER.

81. Mrs. Valdez was told by Mrs. Gonzales that Nurse Wallace had told the receptionist that Dr. Penn's clinic was open and Mrs. Valdez should go to the clinic.

82. After receiving treatment in the Cortez hospital for several days, Mrs. Valdez returned home and within a few days was sick again.

83. Mrs. Valdez went to the University of Utah and was operated upon for her diverticulitis.

Facts pertaining to Dr. MacArthur

84. Dr. MacArthur is a physician.

85. Dr. MacArthur at all times pertinent was a physician in good standing with the Utah State Department of Professional Licensing.

86. Dr. MacArthur applied for privileges with the District first in or around October of 1999, then again on or about December 9, 1999.

87. Dr. MacArthur was in the operating room watching and consulting with Dr. Nelson in a c-section within about the first two weeks of November, 1999.

88. Dr. MacArthur would have had to have had minimally temporary privileges to actively participate in this c section delivery.

89. Dr. MacArthur submitted a packet of documents in support of these applications both times.

90. Dr. MacArthur submitted an application and a packet of documents to the District prior to December 9, 1999. This first application can not be found. Dr. MacArthur submitted another application on or about December 9, 1999 with a packet containing minimally his medical license and DEA license.

91. Dr. MacArthur maintains that the District received his medical license and DEA license and he would not have received privileges without Dr. Redd and Cleal Bradford knowing those valid documents existed.

92. The District gave Dr. MacArthur temporary privileges.

93. On or about February 2, 2000, the District did not renew Dr. MacArthur's temporary privileges.

94. Dr. MacArthur was not informed by the District at any time prior to the District's lack of renewal of his temporary privileges on or about February 2, 2000, that his privileges application packet of documents lacked a medical license or DEA license.

95. Dr. MacArthur was subjected to rumors that he was a felon, had lost his license, and had spoken vulgarly about one of his obstetric patients.

96. Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report that he considers to be untrue.

97. Dr. MacArthur associated with Michele Lyman as her supervising physician when he had temporary privileges.

98. When CEO Mr. Bradford was discussing the initial grant of temporary privileges, Mr. Bradford asked Dr. MacArthur how many patients he was seeing and that he had to have a number. Dr. MacArthur said he could not predict if a woman might show up at the office having a miscarriage or something. Cleal Bradford said he could pad the number a little bit. Dr. MacArthur was never told he could make the number as large as he wished to take in any and all conceivable patients he might see.

99. Mr. Bradford and Dr. MacArthur understood this number to be a 'cap' or 'limit' for the patients Dr. MacArthur could see.

100. Dr. MacArthur said he was seeing five(5).

101. When Dr. MacArthur's privileges were extended through January 25, 2000, Mr. Bradford noted that Dr. MacArthur was seeing his sixth patient and the number limit would have to be changed to reflect this fact.

102. Less than 24 hours prior to the February 2, 2000 medical staff meeting, Carla Grimshaw called Mrs. Lyman's of-

fice to invite Mrs. Lyman and Dr. MacArthur to that meeting.

103. Dr. MacArthur's wife was scheduled for an angiogram on February 2, 2000.

104. No one from the District notified Dr. MacArthur directly of the February 2, 2000 meeting. Dr. MacArthur did not receive any letter written by Cleal Bradford notifying him that on February 2, 2000 his privileges would be reviewed by the medical staff for provisional or more permanent approval.

105. Mr. Bradford did not attend the February 2, 2000 meeting.

106. Dr. MacArthur was never charged criminally or civilly with being a tax protestor.

107. Dr. MacArthur resolved his tax issues with the IRS approximately a year prior to applying with San Juan District.

108. Dr. MacArthur paid malpractice insurance premiums while he was seeing patients in Blanding, Utah.

109. Reid Wood and Rick Bailey did nothing to assist Mrs. Lyman in exercising privileges with the District that the District Board never officially and formally terminated.

110. Reid Wood, Cleal Bradford, and Rick Bailey as CEOs never held the medical Staff chiefs accountable for policies effecting services of P.A.s, whether written or de facto.

111. Reid Wood, Cleal Bradford, and Rick Bailey as CEOs never contradicted the medical Staff chiefs for policies effecting services of Michele Lyman, whether written or de facto.

112. No one at the district, prior to the lack of medical staff renewal of his temporary privileges, told Dr. MacArthur that anything was missing from his application packet, though there was ample opportunity for doing so and he could have so provided the documentation.

a. Dr. MacArthur maintains that someone illegally stole the medical license and DEA license, conspired to keep any problem with a lack of records a secret, denied him 'notice' as to any problem with credentials, and did so for their own profit and gain.

b. The Defendant community leaders Rick Bailey, Ty Lewis, John Lewis, Karen Adams, Cleal Bradford, with the power and authority over the entire district, did nothing to investigate, find and hold accountable the responsible parties, and carried out a state identified de facto policy that diminished the standard of care for the patients.

*Facts pertaining to Mrs. Lyman*

113. Michele Lyman was a Physician's Assistant in good standing with the State of Utah Department of Professional Licensing.

114. Mrs. Lyman had sought privileges ever since they were de facto terminated by district policy after she began working for Dr. Penn, having left the practice of Dr. Redd.

115. Michele Lyman at the same time Dr. MacArthur had temporary privileges, was making application for privileges.

116. The District did not grant Mrs. Lyman privileges.

117. While working for Dr. Redd, Mrs. Lyman applied for and received privileges with the District, with the same scope of privileges as Dr. Redd.

118. Since March, 1999, Dr. Redd has been a District employee of the Health District. Since March, 1999, Dr. Redd has been a District employee and District pays his malpractice insurance.

119. In approximately October 1998, Mrs. Lyman was approached by the District to work in the Monticello clinic and to do ER coverage. Mrs. Lyman did so.

120. Dr. Redd did not formally end the designated services agreement with Mrs. Lyman.

121. In about December, 1999, Mrs. Lyman applied for privileges with the hospital.

122. In about December, 1999, Mrs. Lyman began working under the supervision of Dr. MacArthur.

123. Patients sought the care of Dr. MacArthur for reproductive health issues.

124. Patients sought the care of Mrs. Lyman for reproductive health issues.

125. After quitting work for Dr. Redd, Mrs. Lyman associated with Dr. Penn, Dr. Mena, and Dr. MacArthur. Each of these doctors was subjected to a hostile work environment within the hospital and district and either withdrew their application for privileges, or let them lapse, or was denied renewal for lack of documents the Dr. never had a chance to supply to the district because he was not told what was missing.

126. CEO's Cleal Bradford, Reid Wood, and Rick Bailey did nothing to help these doctors have improved working conditions within the district, or renew their licenses or privileges. All three doctors were not employees of the District when supervising Mrs. Lyman.

127. Without having privileges, these patients of Dr. MacArthur and Mrs. Lyman went other places for their reproductive health care.

128. The District medical staff discussed the economic ramifications upon themselves if full privileges were given to Dr. MacArthur and Michele Lyman.

129. Mrs. Lyman's CPR cards were forged.

130. Mrs. Lyman's forged cards were mailed to the American Heart Association.

131. The U.S. mail was used to mail the cards while the local doctors and medical providers could profit from limiting Mrs. Lyman's competition and reputation with the American Heart Association.

132. In approximately the last half of 1996 and in 1997, Mrs. Lyman covered the Blanding Urgent care center that was being operated like an emergency room, the Monticello hospital ER, the Blanding Birthing Center, the clinic she regularly worked at, and at times worked in the Blanding nursing home, for "[sic]

133. At all times the medical staff was aware of the approximate numbers of patients Mrs. Lyman was seeing and approximately how many might otherwise see the local doctors if Mrs. Lyman was not practicing in the area.

134. CEO Cleal Bradford made the determination in granting Dr. MacArthur limited temporary privileges that it was best for the District if referrals to the District facilities came from District doctors. Dr. MacArthur was not employed by the District.

135. County Commissioner Ty Lewis made the statement and determination in a public meeting that the County would drive out qualified private competitors.

136. The State Department of Professional Licensing found the District was out of compliance with its own by-laws, did not have an adequately qualified CEO operating the District, that the Director of Nursing/Patient Care Director had interfered in the patient care of Dr. Penn and Dr. Mena and that conflict conditions between the doctors and nurses was such that patient care was suffering, that two R.N.s who were not qualified were working in the ER

of the hospital, that the Blanding Urgent Care Center could no longer operate as an emergency room.

 a. The District worked a P.A. Bruce Bryant 24/7's at the Blanding Urgent Care Center at times without a physician in the same town

137. Dr. Redd, chief of medical staff, as compared to the other doctors, has about half a dozen malpractice claims suits filed against him that he has settled.

*Anti–Competitive Effect*

138. The likely and logical *per se* effect of not granting District privileges to Michele Lyman and Dr. MacArthur is that patients would not be able to choose Michele Lyman or Dr. MacArthur as providers if they wished to receive to receive their care at the hospital.

139. Patients of Michele Lyman were subjected to (1) threats of not being able to receive emergency care, threats of having to travel 25 miles to the Monticello District hospital rather than receive lab services readily available in Blanding, (2) threats of having no one to deliver their baby if Dr. MacArthur was not immediately in town, (3) breach of confidentiality of any medical treatment they did receive in the District facilities, (4) missing files, (6) false rumors as to their medical conditions, (7) threats of the possibility of their children or grand-children not being treated in an emergency, (8) Threats of not being seen when delivering as from women who had been denied birthing center care as Dr. MacArthur's patients.

140. There is no evidence that the District employee doctors and District contracted doctors, such as Dr. Jones and Dr. Walker, were inclined to send patients to any other facility outside the local county district, except for Shiprock, New Mexico, or Cortez or possibly Moab for testing or procedures unavailable at San Juan Hospital.

141. Dr. MacArthur, though he had privileges, was on his way to deliver a baby.

142. Dr. MacArthur's patient was not admitted to the birthing center.

143. Dr. Redd refused to cover for Dr. MacArthur though he was just next door in the Blanding Clinic or Urgent Care clinic.

144. Dr. MacArthur's patient was due a standard of care wherein the patient would be examined by the admitting nurse. This examination was not done.

*Private Capacity Actions*

145. The staff who competes with Mrs. Lyman and Dr. MacArthur control the privileges to which their competitors will be entitled, realizing those privileges are essential components of their business practices.

146. The County Commission and District Board, by not policing and supervising the medical staff and leaving carte blanch decisions on who gets on staff and does not get on staff, contributes directly to the private use of the staff's use of the governmental processes.

147. Staff members discussing a person seeking privileges in a negative fashion, poisons the staff members opinion as to whether privileges should or should not be granted.

148. The governmental processes in this instance are used to limit competition and prevent those seeking privileges from having a fair and impartial hearing.

*Nonfeasance and Private Action*

149. District Board members and CEOs stated they entrusted medical staff privileging to the medical staff or head of medical staff.

150. The lack of the District Board or County Commission in taking action to supercede medical staff and head of medical staff privilege-granting decisions, and deliberate indifference to investigating complaints, holding hearings, and exercising their government authority to foster economic competition as mandated by statutes, falls outside any 'political' action, and directly is intended to control the business processes of competitors of District employee physicians and P.A.s and those medical staff physicians directly contracting with the District.

151. Cleal Bradford and James Redd had access to District board members and County Commissioners and the County Attorney as relatives and close friends, in a highly rural and isolated area.

152. Dr. MacArthur and Michele Lyman did not have this familial and close friend relationship with Commissioners and District Board members.

153. Cleal Bradford who signed off on privileges as the District CEO lobbied the Board and County Commission, and medical staff, in meetings with a plurality of the decision-making body, without Mrs. Lyman or Dr. MacArthur being present.

*Credentialing Document Problems*

154. CPR educational cards are essential to obtaining privileges in San Juan District.

155. The district alleges Mrs. Lyman's CPR cards were not dated properly.

156. Mrs. Lyman and Carla Grimshaw, custodian for the records, acknowledge the CPR cards were missing from Mrs. Lyman's credentialing files while in the District's custody.

157. Cleal Bradford does not recall any missing documents in Mrs. Lyman's file.

158. Having a Medical License and DEA license are essential for physicians to have medical privileges at the District Hospital.

159. The district alleges Dr. MacArthur was missing his medical license and DEA license and that Dr. MacArthur filed no application or packet of documents in support of the application prior to December 9, 1999.

160. In both Dr. MacArthur and Mrs. Lyman's cases, documents essential to obtaining privileges were found to be missing from their credential files.

*Lack of Notice and Due Process*

161. Carla Grimshaw delivered copies of Mrs. Lyman's file to her.

162. Mrs. Lyman, upon finding the cards missing from her file agreed to fax them back to the Health District for her file.

163. Mrs. Lyman faxed back the cpr cards without noticing the dates.

164. Mrs. Shafer noticed the dates were in error in medical staff meeting.

165. The Medical staff and Cleal Bradford and Laurie Shafer discussed Mrs. Lyman's CPR card problems of wrong dates without Mrs. Lyman being present.

166. October 19, 1998–Mrs. Lyman took a basic life support class with Laurie Shafer, Laurie Vellario, Bobby Hazelwood, Mitch Bailey and Holly. Mrs. Lyman also taught the class. Belina Asbury was also an instructor. (cmplt. 113).

167. Mrs. Lyman's cards were altered.

168. Mrs. Lyman's cpr cards were altered while in the possession of the Health District.

169. Mrs. Lyman's cpr cards were removed from her file on more than one occasion, while her credentialing file was

under the sole care and custody of the District.

170. Mrs. Lyman's CPR cards were reviewed and found to be appropriate on more than one occasion by Carla Grimshaw and Laurie Shafer.

171. Approximately six months after Mrs. Lyman's cpr cards were reviewed and approved by the District, a problem as to dates was identified when Mrs. Lyman was requesting a renewal of privileges.

172. Mrs. Lyman taught cpr classes, signed of as the instructor for Laurie Shafer, and attended local classes for which there was a role of her attendance available.

173. The District refused to ask for a criminal investigation though Dr. Cook suggested such an investigation.

174. The medical staff and Cleal Bradford and Laurie Shafer unanimously decided to publish the altered cards to the American Heart Association by vote of the medical staff, who was considering privileges for Mrs. Lyman, without Mrs. Lyman being present.

175. The cpr cards were mailed via the U.S. Mail.

176. Mrs. Lyman was known to be a very popular medical provider.

177. The medical staff discussed the numbers of patients Mrs. Lyman was seeing.

178. The medical staff discussed the economic impact of Mrs. Lyman's practice on the District and their practices.

179. The medical staff discussed the economic impact of Dr. MacArthur on their practice.

180. Cleal Bradford stated it was necessary to assure there were enough patients to support the doctors in the area.

181. Having a Medical License and DEA license are essential for physicians to have medical privileges at the District Hospital.

182. The medical staff, Cleal Bradford, Laurie Shafer, Carla Grimshaw failed to notify Dr. MacArthur of any missing documents in his application packet.

183. Dr. Redd stated he saw Dr. MacArthur's medical license prior to giving Dr. MacArthur temporary privileges.

184. Carla Grimshaw, records custodian, stated that the medical license and DEA license was missing.

185. Dr. MacArthur's medical license was missing after it was submitted to the District while under the control of the District.

186. Dr. MacArthur's medical and DEA license were available by fax from Utah Department of Professional Licensing and his medical license was in a wallet form on his person at all times, available for the asking.

187. Dr. MacArthur sent in his application forms at least a month ahead of December 9, 1999.

188. Dr. MacArthur maintains he mailed a complete application packet. The defendants Bradford, Schafer, and Grimshaw, deny Dr. MacArthur did so.

189. Dr. Redd said he saw Dr. MacArthur's medical license, or he would never have signed off on Dr. MacArthur's temporary privileges without seeing the medical license.

190. Mr. Bradford stated he knew Dr. MacArthur had his license and never looked at the Dr.'s file.

191. Carla Grimshaw allegedly wrote a note to Mr. Bradford saying Dr. MacArthur was missing only his DEA license and State of Utah Medical License.

192. Mr. Bradford and Dr. Redd signed temporary privileges verbally ordering Dr. MacArthur to see very limited number of ob/gyn patients, stating to Dr. MacArthur no reason for doing so other than they needed some additional background research.

193. Mr. Bradford admitted to the effect that the District had to make sure the patient base could financially support the doctors in the District and Cleal stated it was better for the district, if referrals to the hospital came from 'district doctors's.

194. No defendants recall telling Dr. MacArthur that the allegedly missing Medical license or DEA license documents were the reason for his not getting privileges. Dr. MacArthur was given less than 24 hours notice, for a staff meeting deciding his application for SJHSD, when Mr. Bradford who must authorize privileges was out of town during that meeting.

195. Mr. Bradford did not inform Dr. MacArthur of his missing documents. The missing documents were readily available and on file with the Utah State Department of Professional Licensing. After Dr. MacArthur missed this February 2000 meeting, Cleal Bradford, Laurie Shafer, Dr. Redd met with San Juan Record editor Bill Boyle and discussed Dr. MacArthur's privileges with Mr. Boyle. Dr. MacArthur's privileges was private information.

196. Dr. MacArthur's credentials and qualifications were reviewed by Dr. Redd and others in the community. Dr. MacArthur had an excellent reputation with his patients and only one or two potential lawsuits over his about twenty years as a ob/gyn doctor. The idea that he was denied his ability to contract with as many patients has he pleased, and over constant two week renewal periods, just due to a lack of his medical license and DEA narcotics license is ludicrous.

197. When Dr. Fisher was seeking to contract with SJHSD as an employee, Cleal Bradford actually went to DOPL to pick up Dr. Fisher's credentials.

198. Dr. MacArthur was subject of a totally false medical incident report. People in the community were told by SJHSD personnel that he was a felon, had lost his privileges previously, and that he made a very vulgar remark about one of his ob/gyn patients. No one in the District discussed these issues with Dr. MacArthur. Dr. MacArthur was asked his age by Dr. Redd in staff meeting and asked how long he intended to live in the area.

199. After denial of his privileges, and considering the seriousness of the rumors and the possibility that he might falsely be reported to the doctor's database, the broken equipment, the refusal of nurses to follow his orders in treatment of his patients, Dr. MacArthur found a position in Ely, Nevada and left the area.

*Rights of Speech and Association*

200. On or about 22 December '99 Dr. MacArthur attended the SJHSD governance board meeting.

1. The SJHSD governance board met privately over other issues involving privileges for Dr. Penn, Dr. Mena, and Michele Lyman.

2. Dr. MacArthur stated in the recorded SJHSD executive session that Dr. Redd had referred to Dr. Penn as the "little New York Jew".

3. Dr. MacArthur explained the board could ask him any questions they like about MacArthur's background, that he made good healthy babies, and if they wished to contact anyone he was happy to assist them.

4. Dr. MacArthur was informed after the meeting that the SJHSD governance board was concerned that Dr. MacArthur was a felon, and had previously lost his privileges, and had served time in prison. The SJHSD governance board never disclosed this rumor to Dr. MacArthur at the time of his meeting with them, nor have they ever disclosed the source of this most spurious and fallacious rumor.

5. Dr. MacArthur admits freely to having once been put in jail for contempt of court because he wished to exercise his fifth amendment rights in a civil tax matter. Dr. MacArthur has NEVER lost his privileges and admitted his contempt jailing to the SJHSD's counsel, through his attorney. The civil tax matter was amicably resolved without any impairment of Dr. MacArthur's privileges. The SJHSD governance board and medical staff did not confront Dr. MacArthur with these accusations when Dr. MacArthur requested them to ask him anything and discuss any questions or concerns on Dec. 22, 1999. (Cmplt.# 52).

*Limitation of Dr. MacArthur's Privileges*

125. On 28 Jan 00 Dr. MacArthur met with Mr. Bradford. Bradford said that Dr. MacArthur was seeing his 6th patient and so the District needed to extend his temporary privileges until the next board meeting. Bradford apparently had forgotten that MacArthur's number 5 for patients to be seen was just an estimate for December and not January and was not intended to limit his ability to see more. Dr. MacArthur put Mr. Bradford on notice for the following issues: 1. That Dr. MacArthur expected to be treated the same as any other physician who came to San Juan County hospital. 2. That Dr. MacArthur had been questioned as to his age at the staff meeting and that he understood that was against the law. 3. That the nurses comments about his orders as being "outdated" and "old fashioned" were also age discrimination and that Dr. MacArthur wouldn't tolerate that. 4. That Dr. MacArthur expected the nurses to help Dr. MacArthur care for patients instead of trying to hinder Dr. MacArthur in everything Dr. MacArthur tried to do. 5. Dr. MacArthur told Bradford that Bradford was responsible for the nurses' conduct. 6. Bradford said they have meetings about that all the time. (Cmplt.# 65)

*Scope of Mrs. Lyman's Practice Limited to Near Zero After Dr. Redd*

126. Mrs. Lyman continued to work for Dr. Redd through 1996 and her duties included working at the Blanding clinic, covering the nursing home and covering the emergency room.

127. Mrs. Lyman's scope of privileges was originally for duties equal to Dr. Redd's.

*Drs. Assigned Mrs. Lyman Coverage of the ER Alone in Violation of Medical ByLaws and State laws and regs.*

128. In approximately the last half of 1996, Mrs. Lyman covered the emergency room for

1. Either Dr. Redd or Dr. Jones whenever they needed coverage; and,

2. For her own coverage and her own responsibilities; and,

3. For both doctors when they were both out of town.

129. During this time Mrs. Lyman did the following patient procedures:

a) Took care of acute head trauma's; and,

b) Put in chest tubes; and,

c) Delivered a couple of babies; and,

d) Sutured cuts; and,

e) Dealt with heart attacks; and,

f) Informed families of tragedies; and,

g) Ordered tests; and,

h) Prescribed medications and shots; and,

i) Prescribed tests to be run on the patients; and,

j) Admitted and discharged patients; and,

k) Consulted other specialists by phone; and,

l) Treated patients with infectious diseases; and,

m) Referred patients to the San Juan Hospital and to the other district facilities,

all without a Dr. at her side and without on site supervision, and with no Dr. even in town available for assistance.

130. Mrs. Lyman and Dr. Key, before he left, informed Dr. Redd and Dr. Jones that this practice of leaving Mrs. Lyman without either Dr. on call was wrong, and that the practice should be changed.

131. Until Mrs. Lyman quit working for Dr. Redd, he continued this practice. (Cmplt.# 80–83)

*Age Discrimination*

132. Dr. MacArthur alleges he was asked his age by Dr. Redd in medical staff.

133. On 16 December '99 Dr. MacArthur met with Dr. Redd, the then head of medical staff in Blanding at the Blanding clinic.

The following took place at that meeting:

A. Dr. Redd said that Dr. MacArthur was applying for privileges all wrong as Dr. MacArthur hadn't come and talked with the medical staff before he applied for privileges.

B. Dr. MacArthur told Dr. Redd that he hadn't met with the medical staff prior to applying for medical privileges at Utah Valley 19 years ago and didn't know that was a requirement.

C. Dr. Redd stated three different times how financially threatening it was to him for Dr. MacArthur to practice his OB/gyn care in the area.

D. Dr. Redd said what a problem Michelle Lyman was "playing doctor" down in her little clinic making $50,000 a year.

E. Dr. Redd told Dr. MacArthur that Mrs. Lyman was making "terrible medical mistakes."

F. Dr. Redd called Dr. Penn a "little New York Jew" that they had to get rid of.

G. Dr. Redd threatened, "I guess because you come from a big hospital that we are all supposed to fall down and give you privileges but it wasn't going to be that way." (cmplt.# 51.)

134. Dr. MacArthur alleges that District nurses referred to his techniques as old fashioned in front of his patients.

135. Dr. MacArthur alleges he was asked how long he intended to be in the District.

*More Violation of Rights of Association*

136. Mrs. Lyman was asked to open a clinic, after she left Dr. Redd's employ, to compete with Dr. Penn.

137. Mrs. Lyman was told that her friendship with Laurie Shafer would be over as she knew it if Mrs. Lyman associated herself with Dr. Penn.

138. Mrs. Lyman states that Dr. Penn was referred to as a 'stupid little Jew'.

139. Mrs. Lyman associated herself with Dr. Mena.

140. Dr. Mena was challenged as to his capabilities due to having done his clinic training in Mexico.

141. Dr. MacArthur associated with Mrs. Lyman.

142. Dr. MacArthur was investigating associating with Dr. Penn on a part time basis.

*Chief of Medical Staffs' long standing de facto policy of Sex discrimination*

143. Chief of Medical Staff has a long standing animus toward women.

144. Dr. Redd began inspecting her federal medicaid and Medicare 'superbills' and demanding that Mrs. Lyman charge more for certain services or add items on to her fee sheets. (Cmplt. # 86–101 below)

145. If Mrs. Lyman refused to charge for follow up appointments for such things as ear infections, he would get angry and call Mrs. Lyman an, "idiot". Office personnel were usually present when he would begin yelling and calling Mrs. Lyman names such as 'stupid' and 'idiot'. At about this same time, Dr. Redd was often quite irritated with the billing department and the nurses.

*"Incompetent Bitch"*

146. On several occasions Dr. Redd would refer to Kathy Johnson as an, "incompetent bitch" in Mrs. Lyman's presence.

147. Dr. Redd also frequently had the nurses upset or crying due to his fits of anger and name calling.

148. He appeared to delight in pitting the nurses against each other often telling one nurse something negative about another until they became angry and untrusting of each other.

149. Mrs. Lyman observed that each nurse, in order to avoid Dr. Redd's tirades would turn on each other or disassociate with the person who Dr. Redd targeted that day.

150. Thus, an atmosphere of distrust and hostility permeated the office creating a hostile work and patient environment.

*Reporting Dissatisfaction to District Administrator*

151. Mrs. Lyman *often* heard Dr. Redd degrading Dr. Jones, Dr. Porter, and Judy Berry, FNP to Craig Ambrosiani. If he was not happy with something that occurred between himself and one of the above providers, he would simply call Craig Ambrosiani and tell him he wanted something done about the situation.

152. Mr. Ambrosiani usually attempted to calm Dr. Redd down and appease him.

*"Dumb Bitches"*

153. In her presence, Dr. Redd also rather constantly told his staff how much he hated Monticello and frequently referred to the nurses as "dumb bitches" and 'fat bitches'.

154. Dr. Redd stated numerous times that whenever he drove through Monticello with his family, he would tell his kids to roll down the windows and dispose of any trash that might be in the vehicle. He stated several times that he would never work for those "SOB's".

*"Stupid Bitches"*

155. On one occasion, Dr. Redd called his nurse Christine Singer into his office for treating a brother from whom he was estranged. He yelled and called her a "stupid bitch" and threw missile from off his desk at either side of her head, including a clipboard, as she sat across from him. He stood up and walked over and shut the door as I was looking in after he threw the clipboard. He continued yelling at her for sometime while threatening her if she ever treated his brother or his family again.

### "Bitches" "Whores" and remarks Concerning Peritoneal Examinations

156. In Mrs. Lymans' and other personnel's presence, Dr. Redd often called women patients names such as "bitches" and "whores", he made fun of their appearance, and made remarks concerning their odor after a peritoneal exam. These instances were on such an ongoing and common basis it would be difficult to list each and every time they occurred.

157. The tirades and name calling were regular and consistent, but some instances were so outrageous that Mrs. Lyman kept note of them in her daytimer.

158. April 23, 1997–Mrs. Lyman began preparing to give testimony in a rape case in behalf of young lady she had examined. It was a young adolescent whose physical examination showed her to be a virgin at the time of the rape. Mrs. Lyman explained to Dr. Redd that she would have to have June 23–24 off so that she could testify since she had been subpoenaed to court. Dr. Redd became very angry stating that he did not pay Mrs. Lyman to defend "whores". He referred to her as a slut without examining her as a patient or having examined her.

### "Incompetent Idiots"

159. April 23, 1997–Dr. Redd and Mrs. Lyman began discussing trading nurses. Christina Brandt thought that her nurse was not working as effectively as she should and felt that if Dr. Redd were to take her for awhile that he could probably make her work better. While Dr. Redd and she discussed this option, he stated that it wouldn't matter because they were both "incompetent idiots".

### A Woman Told Not to Come to the Clinic

160. May 19, 1997–Patient # 15 [1] is nervous about coming back into the clinic to have a hurt shoulder looked at because she states that Dr. Redd had told her family never to return to the clinic again. Mrs. Lyman assured her that she was welcome to see her and that she had never been told by Dr. Redd to refuse her service and she would not. (Cmplt.# 86–101).

161. August 18, 1997–A woman patient 15A had been to see Dr. Redd due to rib pain. Pt. had injured herself in an accident and could not get relief from the pain. Xrays were ordered by Dr. Redd and pt. was told that she was fine. Pt. then returned to the clinic several days later and told Mrs. Lyman that she was in terrible pain and had been unable to sleep. Mrs. Lyman ordered another set of xrays. Mrs. Lyman noted that there were fractures and told Dr. Redd. He stated that Mrs. Lyman shouldn't tell the patient because there was nothing they could do for rib fractures anyway. (Cmplt.# 102).

162. October 30, 1997 -Dr. Redd's brother, Kirk Redd became very ill and came to see Mrs. Lyman at the clinic. Mrs. Lyman treated him and had her nurse draw his blood. Christine Singer was her nurse at the time. Dr. Redd found out that Mrs. Lyman had seen his brother and began yelling at Mrs. Lyman and Christine and told them they were both "dumb assholes". He proceeded to take Christine in his office wherein he yelled at her for some time and threw things across his desk to the right and left of her head. Mrs. Lyman saw this tirade since the door was open and Mrs. Lyman was in the hallway. Dr. Redd threatened Ms. Singer's job because supposedly she knew of the long standing contention them and that if she ever deceived him again that he would have her job. She was very

shaken from this experience and talked of quitting after this. He then proceeded to tell Mrs. Lyman that she would never work again if she ever saw, "that son of a bitch" again. Dr. Redd then demanded that Mrs. Lyman write a letter to Kirk and Kathleen Redd and tell them that Mrs. Lyman would never see them again. Mrs. Lyman refused. (Cmplt.# 102)

163. July 13, 1998 -Dr. Redd called Mrs. Lyman into his office and told her to shut the door. He stated that he was considering firing Kathy Johnson. When Mrs. Lyman asked him why, he stated that she was an "incompetent bitch" and that he had to call her that morning "to find out what the hell she's doing with her money". (cmplt.# 107).

### Dr. Redd Not Available for Female Emergency

164. October 6–Dr. Redd did not come to the office today. Instead he was out deer hunting. He told Mrs. Lyman could reach him by cell phone if she needed him. Mrs. Lyman was covering the clinic and E.R. About noon, a patient in her last trimester of pregnancy presented to the E.R. with severe headache and syncope. The patient stated that she was Dr. Redd's patient and that her blood pressure had been going up over the last couple of weeks. The patient stated her blood pressure was so high the day before that Dr. Redd had told her to come to the clinic and he would induce her on the 6th. Dr. Redd told Mrs. Lyman about this patient and Mrs. Lyman had not seen her before. Mrs. Lyman asked the birthing center to admit her and place her on a fetal monitor and monitor vital signs until Mrs. Lyman could get Dr. Redd. Mrs. Lyman tried his cell phone many times and could not get him so Mrs. Lyman tried contacting his wife at home to see if perhaps his wife could tell Mrs. Lyman where he had gone

hunting. Mrs. Redd did not know but promised to notify Dr. Redd of the problem if she heard from him. Mrs. Lyman then contacted a perinatologist in Salt Lake City and consulted with him, and diagnosed and treated the patient.

### "Absolute idiot", "retard", profanities, threats, "bitch"

165. Mrs. Lyman called Dr. Redd's home again after trying his cell phone again several times just to let him know that she had admitted the patient to the birthing center. Dr. Redd called Mrs. Lyman after she had returned home after work, and proceeded to give Mrs. Lyman the worst verbal abuse she had yet received by him. Dr. Redd commanded her to never call his house, never talk to his family about his activities and never call a specialist to make him look bad. Dr. Redd then proceeded to tell Mrs. Lyman that she was an "absolute idiot" and any "retard" would know what to do. Dr. Redd stated that Mrs. Lyman should have called Dr. Jones. When Mrs. Lyman explained that Dr. Jones was in Montezuma Creek and that he was then leaving town, Dr. Redd became even more angry. Dr. Redd stated he wanted to talk to "the idiots at the birthing center" and that he would call Mrs. Lyman back. Mrs. Lyman and her husband were upstairs tucking their children into bed when Dr. Redd called back. Dr. Redd was angry when the Lymans did not pick up the phone and began yelling profanities into the answering machine telling Mrs. Lyman to pick up the phone or he would be over to her home. Mrs. Lyman's husband said if Dr. Redd continued to verbally abuse Mrs. Lyman that she would not return to work. Mrs. Lyman picked up the phone, and Dr. Redd proceeded to call her a "bitch" saying, "I swear, I am surrounded by them" (Meaning bitches). (cmplt. # 108–109).

166. Dr. Mena reported to the District governance board on December 22, 1999, how he heard Mrs. Lyman referred to as a fat cow or bovine of some type by Dr. Redd. Dr. MacArthur stated to the Board how he had heard Cleal Bradford and Dr. Redd refer to Dr. Penn as a 'Jew'. (cmplt. # 131).

*Pattern and Policy of Denying Mrs. Lyman privileges*

167. Mrs. Lyman later signed up with three other Doctors that had some form or fashion of privileges at SJHSD. Dr. Penn, Dr. Mena, and Dr. MacArthur.

168. All three doctors worked under conditions they alleged to be hostile after associating with Mrs. Lyman.

169. Mrs. Lyman could not admit or discharge patients without first her supervising doctor initially and officially and physically signing off on the patient's admit or discharge. Their OB patient was not allowed be admitted to the Blanding Birthing Center by the District Doctor on call, Dr. Redd, and the patient was not examined and left.

170. December 16, 1998—On this day, Ms. Lyman attempted to send a patient to the E.R. in Blanding for treatment. As soon as the patient got to Blanding, Christine Singer (who began working for Dr. Penn in December 1998) took a call from Gloria Yanito, RN at the Blanding Urgent Care. Ms. Yanito stated that Ms. Lyman did not have privileges and that Ms. Lyman "can not give orders of any kind or use any of the county facilities". Ms. Singer then told Ms. Lyman, with several witnesses sitting in the office. Ms. Lyman immediately called Ms. Yanito back and asked Yanito to repeat the Message. Yanito repeated, "you do not have privileges. We are not supposed to take any orders from you and you are not allowed to set foot in any of the county facilities". Ms. Lyman asked Ms. Yanito who gave her this order and she stated that Laurie Schafer and Dr. Redd. Ms. Lyman then attempted to call Laurie Schafer and was told she was not in. Ms. Lyman spoke with Carla Grimshaw and told her she wanted this order in writing, Grimshaw stated that she would let Laurie know. Ms. Lyman also attempted to call Reid Wood, he was not in.(Cmplt.# 130)

185. Later, that same day, Ms. Lyman had a patient with a cardiac abnormality and decided to place a Holter monitor on her. Dr. Walsh had left a monitor at Dr. Redd's office for county residents to use when ordered by their health care providers. Mrs. Lyman requested that Christine call Dr. Redd's office and request the monitor but was told no. Ms. Lyman then called and requested the monitor and was told no.

186. Laurie Schafer called later in the day and stated that Ms. Lyman could use the lab and xray *only during Dr. Penn's office hours,* otherwise Ms. Lyman did not have privileges.

*Hostile Work Environment*

187. Ora Lee Black, as manager of Blanding clinic and birthing center, posted a paper on the walls within site of the patients stating that Mrs. Lyman had no privileges at SJHSD. Later the limited privileges of lab and exray were extended to her for her patients as required by State law.

188. Reid Wood and all other CEO'S in this complaint, ignored Mrs. Lyman's attempts to rectify her situation, or exacerbated it.

189. December 8, 1998—Mrs. Lyman requested Medical records on a patient and the Blanding clinic refused to send any records. Release of Medical records

had been signed by patient. (cmplt. 123–126)

### Administrator Reid Wood Does Not Return Calls

190. December 10,1998—Mrs. Lyman called SJHSD administrator Reid Wood twice to see if she could resolve some of the issues she was having with the nurses at the hospital since joining Dr. Penn and to resolve some of the problems with the clinic. Reid Wood did not return her calls. The third Mrs. Lyman called she was told by Carla Grimshaw that he was out of the office.

191. Jim Fraser, drug representative went to Dr. Redd's office and asked where Mrs. Lyman's new office was and was told by Karen Lee that Mrs. Lyman moved out of the county.

192. Mrs. Lyman called AAPA and called Department of Professional Licensing (DOPL) informing them that she had a new supervising physician and asked DOPL to please send a packet for change of supervising physician. She also called Reid Wood again to try and talk to him.

### Dr. Redd was Withholding Pts. Reports From Mrs. Lyman

193. December 14, 1998 -Blanding Clinic again refuses to fax any Medical records that are requested. Christine Singer just before quitting, took her mail off of Dr. Redd's desk that he had been holding including reports addressed to Mrs. Lyman on patients from a gastroenterologist, pulmonologist, urologist and several publications and brought them to Mrs. Lyman.

### Dr. Redd Charges for Medical Records Refuses to Mail them

194. December 15, 1998 -Medical records again requested and refused by Blanding clinic. Dr. Redd begins charging Mrs. Lyman's/Dr. Penn's patients $15.00 for all Medical records copied regardless of size and insists that all of their patients that intend to transfer their records go to his office to pick them up. He will not mail or fax them.

### Medical Staff Attributes Patient Death to Mrs. Lyman And Missing Patient Records

195. The District Medical Staff discussed a person who had died. They stated that the patients' death was partly attributed to the patient not having one of medical staff as her doctor. Some of Michele Lyman's patient records were missing. Confidentiality of her patients was broken on more than one occasion by medical staff and other SJHSD personnel.

### Horn Honking, flattened tires, and followed child

196. Dr. Redd was witnessed by others as driving by Mrs. Lyman's home, frequently honking.

197. Mrs. Lyman reports that Dr. Redd followed Mrs. Lyman's about 10 year old daughter in his car for a period of time, frightening the daughter.

198. Mrs. Lyman and her nurse Christine Singer, experienced numerous flat tires over a two week or so period, with no foreign items found in the tires. These flat tires occurred at the office and at their homes.

### Patient Encouraged to Sue Mrs. Lyman

199. Patient L.S. of Mrs. Lyman were encouraged to sue her by at least Dr. Redd who drafted threatening letter in the patient's behalf. The patient had been referred to a specialist. Mrs. Lyman would very frequently, usually multiple times a day refer patients to specialists outside the local area and/or consult with specialists outside the area. If a patient had a life threatening situation, at times, the local medical community would attrib-

 

ute that problem to Mrs. Lyman's care of the patient, even though the patient would claim that Mrs. Lyman's treatment of them is what saved them. To this day, SJHSD has at times, turned away Mrs. Lyman's patients.

200. December 29, 1998—Patient # 2 [2] had to utilize the Blanding Urgent Care Clinic (ER) on this day. She was told by Dr. Redd that she should go to Monticello as Dr. Penn was her physician and was told not to utilize the (SJHSD tax supported) Blanding Medical Clinic. The Blanding Medical Clinic is owned and operated by a govern Mental Special District, and Dr. Redd, though contracting with the District, was not yet their employee. The patient wrote a letter to SJHSD governance board about this treatment and received no reply. (Comp. 137–145)

### 1999

201. January 13, 1999—Patient # 3 [3] was on planned parenthood when Ms. Lyman left Dr. Redd's office. Typically, planned parenthood would send a patient's pills for the year and the medical provider would give them to the patient. When Ms. Lyman moved to Dr. Penn's office, some of the planned parenthood patients that followed her. When the patients requested their birth control, Ms. Lyman would send them to Dr. Redd's office to get their birth control pills. Dr. Redd refused to give several patients their birth control pills. Patient # 3 was one of those patients.

202. January 20, 1999–Patient # 4 [4] was another patient who was refused her birth control pills by Dr. Redd.

203. April, 1999, after working in Monticello under Dr. Penn, Ms. Lyman began a new practice *in Blanding* under the off-site direction of Dr. Nathaniel Penn.

204. DOPL approved this office as an 'off-site' facility.

### DOPL and Anonymous Complaints

205. May 4, 1999—Gail Oliver from DOPL called to say that he had an anonymous complaint faxed to him that said Ms. Lyman was practicing without direct supervision and quoting PA practicing guidelines. He also stated that the letter stated that Ms. Lyman was misrepresenting herself. Because it was not signed, Gail stated he would not take this seriously.

### Mrs. Lyman's Clinic is Approved for an Off Site Facility

206. May 16, 1999 Ms. Lyman spoke with Karen Rheimer. Ms. Rheimer stated that Ms. Lyman was okay with the State as Ms. Lyman had been approved for an off-site facility.

### Certifications are Reviewed and Placed in Her File

207. May 5, 1999–Andrea Bianchini (Ms. Lyman's secretary) faxes Ms. Lyman's ACLS, PALS and BLS heart resuscitation American Heart Association certification cards to Judy at the hospital at the administration's request. Dr. Penn and Ms. Lyman have been requesting her privileges be restored through Reid Wood. Andrea also called Carla Grimshaw to make sure that the certifications have reached her. Grimshaw states that the faxed cards have arrived and that Medical staff reviewed the certifications, found them in order, and the packet has been placed in her personnel file.

### Female Patient Told To go to Dr. Redd as Provider—Under threat.

208. June 1999–Patient # 6 [5] came to Ms. Lyman's office very apologetically today and was crying. The patient stated that last night she had to use the E.R. and was told by Dr. Redd that she must choose between Ms. Lyman/Dr. Penn and Dr. Redd as a health care provider. The patient was told that if the patient chose Ms. Lyman, the patient could never use the

E.R. again. Dr. Redd then proceeded to tell the patient that she had a lot of Medical problems that would require the E.R. and that Ms. Lyman did not have privileges. Ms. Lyman told patient # 6 that Ms. Lyman would not be offended if the patient thought she had to choose Dr. Redd. Ms. Lyman told her pain relief and use of the ER for her welfare was most important.

*Privileges Severely Limited by Dr. Redd and Dr. Jones With No Action by the Board of Directors*

209. Dr. Penn and Ms. Lyman attended the Medical staff Meeting for June, 1999. Dr. Penn and Ms. Lyman requested full privileges be restored and Dr. Redd and Jones both stated that only if Dr. Penn was willing to sit in Blanding with Ms. Lyman while Ms. Lyman took ER call and they would not supervise me. Mr. Bryant as a P.A. working under Dr. Jones while Dr. Jones was not in Blanding, had no such restraints. Mrs. Lyman pointed out that she covered the ER (Blanding urgent care clinic) in Blanding by herself on many occasions. There was no response. (Cmplt. 137–145) Staff had previously voted for her privileges and then the County, Board, and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied her the same. Some privileges as to labs and exrays were eventually restored.

210. Dr. Penn then suggested to medical staff that the only reason that Dr. Redd was against Ms. Lyman's privileges was because Dr. Redd was mad at Ms. Lyman for quitting Dr. Redd and Dr. Redd couldn't take it. To this Dr. Redd responded, "So what"! Dr. Jones then made the comment that Ms. Lyman had a rather large following of patients and that when he was taking ER call he didn't want Ms. Lyman to be able to see her patients

at will and thus "dip into his ER money". They left with the staff's edict that Ms. Lyman could call into the ER (Blanding Urgent Care) for shots. However, Ms. Lyman tried on several occasions to call in injections to the ER (Blanding Urgent Care Clinic) and was denied every time. Ms. Lyman always had to call Dr. Penn's office and have him call the order in.[6] (Cmplt. 146)

211. September, 1999 first part of September, Patient # 7, a patient from Bluff inquired at the clinic as to where he could find Ms. Lyman. He also told them that he needed some labs performed and wanted Ms. Lyman to order these for him. The patient was told Ms. Lyman could not order any labs and would not be provided any lab service. The patient wrote a letter to SJHSD to no avail.

213. September 16, 1999 -Etta ( Ms. Lyman's secretary) was told by Ora Lee Black that Ms. Lyman would not be allowed to order labs until Ms. Lyman sent a letter to Dr. Redd stating who her supervising physician was. ( Ms. Lyman had already sent a letter to administration stating that the State DOPL had approved Dr. Penn in Moab as her supervising physician and Dr. Robert Dr. Mena in Monticello as her back up supervising physician as he was closer that Dr. Penn and could back up any emergencies for admits for Ms. Lyman at the San Juan Hospital). By then, Dr. Mena had quit the San Juan Health Care Services as an employee and had started a private practice. (cmplt. # 149).

214. Without district governance board action, there is no' adverse action' to require a hearing in the medical staff bylaws.

*Mrs. Lyman associates with Dr. Mena-rumors start about Dr. Mena*

215. Patient 2A[7] voices her concerns to Ms. Lyman asking if she will be safe deliv-

ering with Dr. Mena as she has heard terrible things about him. She later writes a letter on behalf of Dr. Mena stating that she was more than satisfied with his care.

216. November 7, 1999 Dona Arthur stated that she had heard terrible things about Dr. Mena and Dr. Redd told her that Dr. Mena was incompetent. She also tells Christine Singer that Ms. Lyman is slandered at the birthing center by nurses and Dr. R Ledd. Dona Arthur also states that Dr. Redd told her he didn't understand why anyone would want to go to Ms. Lyman as a provider. (cmplt. # 156–158).

217. November 3, 1999 Christine Singer, Ms. Lyman's staff nurse, called the Blanding Birthing Center to get information on one of Ms. Lyman's/Dr. Penn/Dr. Mena's patients and was told that they could not release any information to Ms. Lyman. It could only be released to the doctors. Dr. Mena confirms this stating that this latest medical staff edict that was discussed in Medical staff Meeting. Etta also states that she was told this in a staff Meeting at Blanding Medical Center. (Cmplt. 162–168)

218. Again the SJHSD governance board had no meeting or hearing on this new 'policy'.

219. On December 1, 1999 Patient # 12 [8] is sent to lab for HGB electrophoresis checking for sickle cell trait. She was refused a blood draw and told they were much too busy at BMC although the patient reported that the nurses were just sitting around in the nurses station. The patient wrote a letter to SJHSD and noted to Ms. Lyman that she was treated rudely by Dr. Redd as soon as he realized that the patient had seen Ms. Lyman before coming to the ER (BUCC).

220. Dr. Redd announces in Medical staff Meeting that Ms. Lyman was rude to him on the phone when calling him about details of a heart attack patient that Ms. Lyman was sending to the BUC. Dr. Redd stated in Medical staff Meeting that if Ms. Lyman did not become "a lot nicer" to him that he would not take any more emergencies from Ms. Lyman in the BUC.

221. December 4, 1999 Patient 13 [9] is admitted to the Blanding Birthing Center having contractions. She was told that Dr. Mena would be notified but was later told that Dr. Mena did not have privileges because he would not fill out "proper paperwork" she was then told that Dr. Redd would have to deliver and the patient refused and drove to Provo to deliver there. Pt. has sent a letter to health care board.

222. December 5, 1999 Ms. Lyman requested that Christine Singer call the Blanding Birthing Center to check on Patient 13's status. Ms. Singer was told that the patient was there but that the Blanding Birthing Center staff could not release information to Ms. Lyman. Ms. Lyman called back and was told that they were about to deliver twins and they were much too busy to transfer her call to Patient 13. Called back later and found out that the patient was never there in the first place. She had left for Provo while in active labor—a four hour drive.

223. December 21, 1999 Ms. Lyman Attended San Juan Health Care Services board Meeting to discuss and attempt to resolve her problems with SJHSD staff with the SJHSD board. She requested to have a public meeting so the public could fully understand the issues involved in the health care system their tax dollars support.

224. SJHSD governance board chairman Roger Atcitty stated that he and SJHSD Patsy Shumway and SJHSD Karen Adams had discussed the situation be-

fore the official meeting and had decided that the grievance meeting with SJHSD governance board would be private. Such a decision being made before the meeting and without public input appears to be in violation of Utah's Open Meeting law. (cmplt. # 162–168).

225. December 25, 1999 Patient # 14 [10] went to the emergency care center in the Blanding Medical Care center because she was sick. ER staff was asked if Ms. Lyman could come up and see the baby and was told no because Ms. Lyman did not have privileges.

*No Privileges under Dr. MacArthur*

227. January 30, 2000 Dr. MacArthur and Ms. Lyman have a patient that delivers at San Juan Hospital. Dr. MacArthur calls the hospital and tells them that Ms. Lyman will be discharging this patient and baby under him care tomorrow. He writes this fact in the patient's chart. The staff tell him there is no problem. Ms. Lyman drives to Monticello in an attempt to see baby and mom the next day and is told that Dr. MacArthur must write the order. (cmplt. # 184–187)

228. January 31, 2000–Louisa Lyman, of the Utah State Public Health system calls Ms. Lyman's office and states that nurse Julie Bronson has said that Dr. MacArthur lost his privileges to perform epidurals due to a felony conviction, that during a delivery the nurse came to Dr. MacArthur in the Dr's lounge and told him that the OB was ready to push and he purportedly said, "I'm going to have an orgasm", and that Dr. MacArthur spent time in prison for tax evasionAll of which is totally untrue and without any foundation whatsoever. Louisa called her office and first spoke to Christine. Ms. Lyman called back and Louisa Lyman repeated this story. Ms. Lyman stated the story was untrue.

229. February 1, 2000 Carla Grimshaw calls Ms. Lyman's office to say that Ms. Lyman and Dr. MacArthur need to be at Medical staff Meeting in the a.m. at 0800. Ms. Grimshaw states nothing about their privileges being an agenda item, or that medical staff would making any decisions about those privileges.

230. On or about February 9, 2000 San Juan Record reports that Dr. MacArthur's privileges are not renewed because he did not show up for Medical staff Meeting. SJHSD governance board has taken no action as to Dr. MacArthur's or Ms. Lyman's privileges. *No one knows who voted to not renew the privileges because the notes of the event are not in the staff Meeting minutes.* Cleal Bradford, who must sign Dr. MacArthur's privileges is not there. Dr. MacArthur hears from Blanding City Counsel a rumor that his application is missing documents. No one from the district has told him documents are missing, and no one is telling him which documents are missing. Ms. Lyman is still missing documents from her file and having moved four times is not able to find the original cards.

### HELEN VALDEZ FACTS

*42 U.S.C. § 1983, denial of rights of association, equal protection, pt./dr. relationship, and right to contract, and the denial of uniform and considerate care.*

231. Helen Valdez is a patient. She was being seen regularly by Dr. Penn. She went to the emergency room to be seen for symptoms consistent with divurticulitis.

232. She had two forms of insurance. She was turned away, when accompanied by her Mexican–American appearing sister-in-law, by nurse Laurie Wallace. She was bleeding from the bowel and in severe pain, and very weak.

233. The white young male with no insurance in the ER waiting area was seen

by Dr. Penn almost immediately after Mrs. Valdez left. Dr. Penn was not notified of Mrs. Valdez' being at the hospital until Mrs. Valdez so informed him.

234. The State Health Department found that SJHSD staff would at times not tell Dr. Penn when one of his patients would come to see him at the hospital.

235. The Utah department of Health found that Mrs. Valdez had been turned away. Mrs. Valdez had an entitlement to be seen under the federal laws of EMPTALA and COBRA.

236. The Health District and County Commissioners were informed of these problems in a Board meeting, with an executive session attended by Commissioner Bill Redd and County Attorney Craig Halls.

237. The Health District and the County did not did not reprimand Dr. Redd or any other medical staff member for their treatment of Mrs. Lyman or Dr. MacArthur, or Helen Valdez.

*A Pattern of Patients being Punished for going to Providers not employed by the District*

238. The patients and prospective patients of Dr. MacArthur and Michele Lyman by way of threat and rumors were subjected to a) the threat or actual denial of use of SJHSD facilities, b) being threatened with being turned away in times of emergency and imminent labor in violation of EMPTALA and COBRA statutes, c) not being treated equally with those friends and patients of Dr. Redd, Dr. Jones and Dr. Nelsen, d) and being deprived of their records. Rumors of such treatment readily and rapidly travel among people in such a small isolated community.

239. The State found that nurses interfered between the patients of Dr. Penn and Dr. Mena to the detriment of the patients.

*Pattern of anger by Dr. Redd after he is a District employee*

240. A District employee witnessed Dr. Redd have a tirade calling all the women names.

241. Dr. Redd went to the head of the Blanding Health Board and in anger was yelling that the Board stop Mrs. Lyman from practicing in the area.

242. Dr. Redd kicked and punched Dr. Cook, a family member.

243. Dr. Redd with Mr. Hart apologized to Dr. Cook, no formal District board action was taken.

*Intimidation of witnesses*

244. Dr. Redd informed the head of the local nursing home that the nursing home patients would no longer see Dr. Cook as a result of making a witness statement.

245. Witnesses have requested that they not be used to give testimony due to fear of retaliation and loss of jobs.

246. One witness has stated she is petrified her relatives will not stay employed or her children will not be seen at District facilities if she testifies.

*Standards as set by the Chief of Medical Staff Dr. Redd*

247. The Board has a responsibility to make the Drs. accountable and monitor them for any possible malpractice or unprofessional conduct that might result in a suit. The State found they have not been doing so in the time in question.

248. Dr. Nelson sent a letter severely criticizing Mrs. Lyman and he is on Medical Staff and has never met her, spoken to her, or worked with her. His writings are the best evidence of the types of rumors he was being told, and the damages the

medical staff were seeking to inflict upon Mrs. Lyman.

249. Dr. Redd never finished a normal year or two year residency, has had about a half a dozen malpractice cases that either went to court or he settled.

250. Dr. Redd cut the nipples off of a mentally retarded gentleman in his office. If Dr. MacArthur would have done such a thing, he would probably not obtain privileges anywhere and would probably have his name on the National Physician Database. The patient was Native American so maybe the Board does not view them of equal value as a white man. No follow up was done on this patient, especially necessary since he was retarded, and so months later he presented to Mrs. Lyman with two 11 cm cuts that were repugnantly infected and draining.

251. Mrs. Lyman has treated a boy with a brain bleed that had fallen on his head in wrestling, that Dr. Redd diagnosed with an ear infection to account for the child's dizziness. Other misdiagnosis of patients has occurred that Mrs. Lyman caught and assisted in treating, usually with a specialist.

252. One lady patient complained of chest pains. She was given shot upon shot of morphine. She passed out, her heart stopped in Dr. Redd's office, she was taken next door to the Urgent Care Center and revived by Dr. Jones. There are no BUC records of this incident. Dr. Jones does not appear to remember it, and Dr. Redd denies it happened.

*ONGOING DAMAGES*

The damages to Mrs. Lyman is ongoing, and her patient's standard of care via ability to use District facilities is still in question.

253. Within the last 14 or so days, a patient of Dr. Jones and Michele Lyman's was told, when she called the Birthing Center in labor, that the Birthing Center was shut and she would just have to travel to Monticello. Dr. Jones' staff verified that indeed the BCC was claiming they were SHUT. The patient presented at Blanding Family Clinic, now owned by Utah Navajo Health Systems, and was found to be too far progressed to travel anywhere. Time was of the essence. Mrs. Lyman's supervising physician was denied patient care by the District he has full privileges with. The lady delivered in the Blanding Family Clinic and was then transported to Monticello for observation. The Blanding Family Clinic is taxpayer supported. There is no record of this type of patient of a Dr. Redd being told the Birthing Center was shut.

254. In another instance, a woman in labor was bleeding to death and she and the baby were in a very dangerous situation. Dr. Jones and Mrs. Lyman transported the woman to the Birthing Center and did an immediate c section on the unconcious or nearly unconcious mother. Both mom and baby were saved. As Dr. Jones was cleaning up, Dr. Fisher and Laurie Shafer were telling Mrs. Lyman and another nurse of Dr. Jones that they would have to leave. Mrs. Lyman and the nurse finished caring for the patient. This incident occurred prior to the Clinic being 'shut' when Michele's next patient was in labor and delivered in a clinic.

255. RICO CLAIMS—Mrs. Lyman's cpr cards, a necessary component of her ability to obtain privileges were altered purposefully, she was not notified immediately that her cards were in some way in error, the cards were stolen from her file at least on two if not three occasions, the forged documents were mailed to the American Heart Association, the doctors would have profited from Mrs. Lyman not being able to work, her patients were told

that even in an emergency they would not be seen by the District if they continued to visit Mrs. Lyman for health care. Mrs. Lyman believes threatening patients that emergency care will be denied in an emergency is extortion of the lowest kind. Mrs. Lyman lost some patients as a result of these threats. Since these patients are also potential witnesses, the threats also prevent persons from testifying accurately as to what occurred for further fear they will be subjected to such treatment. These acts were done to obtain an economic advantage in competing in business with Mrs. Lyman.

*Damages for Dr. MacArthur and Mrs. Lyman*

Under the Antitrust laws and RICO laws (for Mrs. Lyman) they are seeking attorneys fees, compensatory damages, and treble damages.

Dr. MacArthur paid thousands of dollars in UMIA malpractice insurance in order to practice in the Blanding area, lived away from his home in Springville part of the time, with little or no profitable income, due directly to the continual limits on his privileges both in time and number of patients to be seen and the District Board and County Commissioners' total deliberate indifference to the needs of patients, particularly female patients who would enjoy going to a specialist in the area, and deliberate indifference to a physician and state authorized physician's Assistant, who were competing with their relatives or good friends.

Each time Dr. MacArthur received temporary privileges limited in time and number of patients is a separate individual claim. Each time a rumor was stated about him being a felon is a claim. Each time a rumor about him talking vulgarly was stated there is a claim. Every time he was given a contract in bad faith with

ambiguities upon which he relied, he has a claim.

Dr. MacArthur is earning about 175,000 dollars gross at this time working at the William B. Ririe hospital in Ely, Nevada. Had Dr. MacArthur delivered about 20 babies a month at about 800 dollars net for each delivery, he would have earned 160,-000 a year, and that does not include gynecological work that would added possibly about another 30,000 or so estimated a year. Dr. MacArthur would likely have practiced in the area for about ten years.

Dr. MacArthur also suffered *per se* emotional strain and damages from the rumors circulated about him and from not knowing how he was to survive economically with the restrictions he was under, or if he would be threatened with being placed on the Physician's National Database for some small or insignificant event that did not measure up to 'their' standards as ill-defined and ambiguous in the medical staff bylaws. Dr. MacArthur is seeking damages in excess of $3.5 million dollars and attorney fees.

*Mrs. Lyman's damages*

Mrs. Lyman, in order to continue living in her community and working, eventually opened a clinic with Dr. Penn that she eventually bought out making it her own state approved off-site independent rural clinic. Mrs. Lyman showed no profitable income for about three years until she sold her practice and then the profit if any was minimal. Mrs. Lyman was deprived of money but also peace of mind in knowing she was safe from a Doctor (1) who had ranted at her, her nurse, his staff, and the Blanding Health board president, (2) followed her child creeping along in a car while the child walked the dog, (3) seeing this Doctor's car outside her clinic at about midnight or one a.m. when she was alone, (4) being subjected to horn honking outside her home, (5) and flattened tires, (6)

witnessing the distress this Doctor brought to his own brother and sister-in-law including understanding that there were dead animals placed around the parameters of his brother's yard and a hole large enough to potentially kill the brother dug in a dirt road to the brother's horses, and understanding the brother's lame horse was repeatedly run into a barbed wire fence to the point where the horse took about a year for it to heal completely, (7) hearing the threats reported to her by patients even to the threat of denial of emergency care if they continued to see her as a health care professional, (8) labeled her a bitch and a fat cow behind her back, let alone to her face, (9) and always wondering if anyone was going to sue her at Dr. Redd's behest. Mrs. Lyman was working steadily, 12 and 15 and more hour days to build her practice, keep up on charting, and deal with all the business issues associated with an independent clinic. Mrs. Lyman claims per se and reasonably demonstrable damages.

Mrs. Lymans' years of stress have played a role in her now having some health problems. Her relationships with her family have been severely strained at times. She has provided some health care for free when people had no money or insurance. Mrs. Lyman has not been sued by a patient, has not been reported nationally, and is the victim of bullies that are incapable of giving patients the level of sincere compassion, uniformity, and live in fear of the District, County and Dr. Redd who has not been held accountable by the Board or Commission for patient complaints or the community's hundreds of names who support Michele Lyman and her supervising doctors. Mrs. Lyman is praying for damages in excess of Six (6) Million Dollars, some of which is treble damages, due to unfair practices, use of the government to restrain trade in the community, and the use of the mail system to send fraudulent cards, use of extortionate threats against patients telling them even in an emergency they will not be seen if they continue to go to Mrs. Lyman, the actual turning away of patients in labor without so much as a statutorily required examination, and the terrorism of her children, and herself, and the spreading of rumors that equate to nothing less than criminal defamation for both Michele Lyman and Dr. MacArthur.

Mrs. Lyman is praying for damages in excess of 6 million dollars.

Helen Valdez and her husband are fearful of returning to the District and have a private ambulance carrier to take them to Cortez in an emergency. Helen is ill and elderly and weakened. Mrs. Valdez believes she suffered a sense of inferiority and negativity at a time when she was most vulnerable. No one took any actions to make the staff accountable. EMPTALA violations occurred about June of 1999, after Cleal had been warned about them. Mrs. Valdez is asking damages of $350,000.

b. **Defendants' Statement of Contested Issues of Fact:**

1. Defendant San Juan Health Services District (the "Health District"), which was created by San Juan County as a special improvement district pursuant to Utah Code Ann. § 17A–2–1304, owns and operates the San Juan County Hospital in Monticello, Utah.

2. Defendants Bill Redd and Ty Lewis were San Juan County Commissioners at all relevant times. Redd was a member of the Health District Board of Trustees for a brief period in late 1998 and early 1999, and Lewis was a member from late 1998 to mid–1999.

3. Defendants Roger Atcitty, John Lewis, John Housekeeper, Karen Adams,

Patsy Shumway and Gary Holliday are or were members of the Board of Trustees of the Health District. Defendant Cleal Bradford was also a member of the Board of Trustees from approximately February 1999 until June 1999. From approximately June 22, 1999 until April 2001, Bradford was executive director of the Health District.

4. On or about April 14, 1999, at approximately 8:15 a.m., Plaintiff Valdez went to San Juan Hospital suffering from vomiting and diarrhea.

5. Valdez had called earlier that morning, at approximately 6:30 a.m., to see if Dr. Penn would be in the hospital that morning. Valdez claims she was told that Dr. Penn would be making rounds at approximately 8:00 that morning.

6. After Valdez filled out some paperwork, including insurance information, Laurie Wallace, a hospital employee, told the desk clerk that Valdez and another man who was waiting could be set up in the Emergency Room to see a doctor.

7. During Valdez's visit to the San Juan Hospital on April 14, 1999, Valdez left the hospital waiting room to use the restroom. When Valdez returned, Charlene Gonzales, Valdez's sister-in-law who accompanied her to the hospital, told Valdez that Laurie Wallace said that Dr. Penn was at his clinic and Valdez could see him there.

8. Thereafter, Valdez and Gonzales left the hospital. Valdez did not ask anyone about Laurie Wallace's statement that Valdez could go see Dr. Penn at his office, and she neither went to Dr. Penn's office nor telephoned him after leaving the hospital.

9. Three days after her April 14, 1999 visit to the San Juan Hospital, Valdez went to a Health District facility, then known as the Urgent Care Center, located in Blanding, Utah, and was treated by Dr. Redd, an employee of the Health District.

10. Dr. Redd diagnosed Valdez with diverticulitis, prescribed two antibiotics, restricted her diet, and scheduled a colonoscopy for approximately ten days later for purposes of conducting further analysis.

11. Dr. Redd also instructed Valdez to contact him if she was not feeling better within 72 hours.

12. About two days after seeing Dr. Redd, Valdez became ill again. Rather than returning to Dr. Redd or attempting to see Dr. Penn, she went to a hospital in Cortez, Colorado.

13. Valdez never went to the colonoscopy scheduled by Dr. Redd.

14. Valdez is Caucasian. Her husband is Mexican American.

15. Valdez is over age 60.

16. As part of her physician's assistant education program, from approximately August 1995 until mid–1996, Lyman fulfilled a preceptorship at the Montezuma Creek Clinic, then owned by the Health District. Lyman worked with and was supervised by Dr. Jones in her preceptorship.

17. From approximately mid–1996 until early October 1998, Lyman worked for defendant Dr. James Redd in his private practice in Blanding, Utah. During this period, Dr. Redd served as Lyman's supervising physician.

18. During the period that Lyman worked for Dr. Redd in his private practice, Lyman also worked in the Health District's urgent care facility in Blanding, Utah.

19. While working for Dr. Redd, Lyman applied for and received mid-level provider privileges with the Health District, subject to Dr. Redd's supervision.

20. Prior to March 1999, while Dr. Redd had privileges at Health District facilities, Dr. Redd owned his own practice and was not an employee of the Health District.

21. In approximately November 1998, Lyman began working in Dr. Nathaniel Penn's office, which was located in Monticello, Utah. At this time, Dr. Penn had privileges at Health District facilities but was not a Health District employee. At this time, Dr. Penn became Lyman's supervising physician.

22. In approximately January 1999, Lyman opened a clinic in Blanding, Utah. While Dr. Penn remained Lyman's supervising physician, he maintained his practice in Monticello, but Lyman maintained an office and saw patients in Blanding. Dr. Penn did not see patients at Lyman's office on a regular basis.

23. In July 1999, Dr. Penn closed his Monticello practice and moved to Moab, Utah. When he moved to Moab, Dr. Penn relinquished his privileges at the Health District.

24. Beginning in approximately July 1999, in addition to Dr. Penn, Lyman was supervised by Dr. Robert Mena. Dr. Mena had provisional privileges with the Health District which expired in November, 1999, and he has not had privileges with the Health District since that date.

25. In approximately December 1999, Lyman submitted an application seeking renewal of her privileges with the Health District. At that time, Lyman indicated she would be supervised by Dr. MacArthur, who had also submitted an application for medical privileges with the Health District. Because Lyman had no other supervising physician with privileges, her application for renewal was moot or premature unless and until Dr. MacArthur obtained hospital privileges.

26. Therefore, after November 1999 and until sometime in 2001, Lyman did not have a supervising physician who had privileges with the Health District, other than for the brief period Dr. MacArthur had temporary privileges, assuming he had in fact been approved as her supervising physician.

27. Pursuant to the medical staff bylaws, a mid-level provider such as a physician's assistant may not have privileges with the Health District unless he or she is being supervised by a physician who maintains current Health District privileges.

28. Lyman's mid-level privileges expired of their own accord as of January 1, 2000.

29. Dr. MacArthur submitted an application for privileges with the Health District on approximately December 9, 1999.

30. In approximately December 1999, Dr. MacArthur began seeing patients in Michele Lyman's office.

31. On December 23, 1999, Dr. MacArthur was informed by Cleal Bradford that he had been granted temporary privileges, which would last from December 23 through January 5, 2000, while his application was being fully considered.

32. When Dr. MacArthur first discussed obtaining temporary privileges with Mr. Bradford, Bradford asked Dr. MacArthur to specify the number of patients that Dr. MacArthur thought he would treat during the temporary privilege period. When Dr. MacArthur indicated that it would be difficult to estimate exactly, Bradford told MacArthur to increase his estimate to cover any potential but unplanned patients. Ultimately, however, the authorization of temporary privileges did not contain any limitation on the number of patients that Dr. MacArthur could

see during the period of temporary privileges.

33. On January 10, 2000, Dr. MacArthur's temporary privileges were extended from January 5, 2000, through January 25, 2000.

34. On January 26, 2000, Dr. MacArthur was again granted an extension of temporary privileges for January 25 through February 2, 2000.

35. The Bylaws of San Juan County Hospital permit the granting of temporary privileges.

36. In late January 2000, the Health District had not acted on Dr. MacArthur's application for privileges because it was continuing its due diligence work on the application and awaiting certain documentation from Dr. MacArthur. Due to the Health District's belief that Lyman's application packet was not complete and that certain documentation contained in the packet was incorrect, and because the Health District could not act on Dr. MacArthur's application, the Health District had not acted on Lyman's application by late January or early February 2000.

37. On February 2, 2000, the privileges granted to Dr. MacArthur by the San Juan County Hospital lapsed.

38. Lyman and Dr. MacArthur were invited to a February 2, 2000 medical staff meeting at the Health District to discuss their applications for privileges.

39. Lyman and Dr. MacArthur did not attend the meeting.

40. No one informed anyone at the Health District why Lyman and MacArthur did not attend the meeting.

41. After failing to attend the February 2, 2000 medical staff meeting, and after his temporary privileges lapsed, Dr. MacArthur took no further steps in pursuit of privileges with the Health District and took a better paying job that he had been pursuing since before he applied for privileges with the Health District. The Health District understood that Dr. MacArthur had abandoned his application for privileges and no further action was taken on it. Because Lyman did not have a supervisory physician with privileges, no further action was taken on her application.

42. Drs. Redd, Jones and Nelson are over age 40, and Dr. Nelson is older than Dr. MacArthur.

43. Cleal Bradford is older than Dr. MacArthur.

44. Dr. MacArthur was in jail for twenty-four days on a charge of contempt of court in connection with his exercise of his Fifth Amendment rights in a tax protestor case.

45. Since May 1, 2000, Dr. MacArthur has been working in Ely, Nevada, where he is an employee of the William Bee Ririe Hospital and conducts a private practice. Dr. MacArthur was also the medical director at the Ely State Prison for several years. Dr. MacArthur began investigating employment possibilities in Ely, Nevada in approximately October 1999, before he visited San Juan County.

46. Dr. MacArthur currently earns more than $240,000 annually from his work in Ely, Nevada, an amount greater than he has earned at any other time in his career.

6. **CONTESTED ISSUES OF LAW.**

a. **Plaintiffs' Statement of Contested Issues of Law:**

LEGAL PRESUMPTIONS

The Plaintiffs assert that the facts as plead are entitled to a presumption of truthfulness unless they are rebutted. Under the Utah Fair Practices Act once a

prima facie case has been made in regards to inequality of providing goods and services, the burden of proof shifts to the defendants to show why any discrepancy in goods and service provisions was justified. Utah Code Ann. 13–5–3.

The District has illegally operated the district by having County Commissioners as board members, by not holding doctors accountable for violations of the law, by not following their own medical by-laws, by not applying policies equally across the board to all persons, by not overriding letters or memos of doctors that set policy, without board approval, while stifling economic competition in the area.

*State involvement with San Juan County and Health District defendants*

Utah State Department of Hospital Licensing has no statutory authority over San Juan Health Services District, "District", or San Juan County, "County", decisions regarding specifically what qualified individuals the District or County approves or disapproves for privileges to perform medical procedures within District facilities, or to determine the scope, time limits, or patient limits for privileges.

Utah State Department of Hospital Licensing has no regulatory authority over San Juan Health Services District, "District", or San Juan County, "County", decisions regarding specifically what qualified individuals the District or County approves or disapproves for privileges to perform medical procedures within District facilities, or to determine the scope, time limits, or patient limits for privileges.

Utah State provides no state agency administrative appeal processes for persons turned down for privileges in the District to appeal the decision.

*Legal Nature of the Defendants*

*San Juan County*

San Juan County is a governmental political subdivision of Utah. Utah Constitution Article XI, Sec. 1

San Juan County has no contractual obligations with any Utah State Agency to provide health care to San Juan County residents in behalf of the State.

San Juan County is not statutorily obligated to provide health care by way of a hospital or medical clinics to the people of San Juan County.

San Juan County has enumerated powers, derived from the 'rights' of the people, limited with specificity in statutes. Utah Constitution Article I, Sec. 2; Article XI, Section 8;

These limits on government are prohibitory and mandatory. Utah Constitution Article I, Sec. 26;

All Utah Statutes are to be read and applied uniformly. Utah Constitution Article I, Sec. 24.

San Juan County Commission is 'the 'governing authority' for the District. Utah Code Ann. 17A–2–1302 (3).

San Juan County Commissioners are the legislative body of San Juan County and have authority to exercise the legislative powers of investigations, hearings, supervision, audits, require witnesses to appear, take evidence, make rulings, appoint committees to carry out County business. Utah Code Ann. 17–53–106.

San Juan County is the proprietor of the Hospital and clinics.

*San Juan Health Services District*

San Juan Health Services District has enumerated powers, derived from the 'rights' of the people, limited with specificity in statutes. Article XI, Section 8.

San Juan Health Services District is a incorporated political subdivision of Utah. Utah Constitution Article XI, Section 8.

San Juan Health Services District is a government operated, public tax supported, Utah special services district formed under Utah Code Ann. 17A–2–1304.

San Juan Health Services District providers, obtain higher rates from Medicaid based on seeing higher numbers of medicaid patients. 42 C.F.R. § 440.20(D)(8), Attachment 4.19B pg. 4c, T.N. # 99.04, effective 4–1–99.

San Juan Health Services District and Blanding Family Clinic at the times pertinent were located in a Health Professional Shortage Area as designated by Medicaid and the U.S. Department of Health Care Financing.

San Juan Health Services District, its governance board members, and employees were bound to obey Medicaid and Medicare regulations, policies, and administrative decisions for those who receive federal funds for their programs.

San Juan Health Services District, the governance board members, and employees are obligated to provide medical care equally to all people whether new or old patients, indistinguishable based upon race, age, sex, religion, or national origin.

San Juan District governance board of directors is by statute a policy making, rather than advisory, board.

San Juan Health Services District is not an 'arm of the state'.

San Juan Health Services District has a legal obligation to keep and preserve all medical and personnel and medical staff files.

San Juan Health Services District has a legal obligation to prevent loss, destruction, fraud in the keeping of its personnel, medical and medical staff files.

San Juan Health Services District at the times pertinent provided services to Medicare patients.

San Juan Health Services District during the times pertinent was classified as a Rural Primary Care Hospital.

Medicare/Medicaid patients have an entitlement to have access to any provider qualified to provide medicaid and medicare services. 42 U.S.C. § 1395a.

San Juan Hospital has a rural hospital classification as defined in the rural health clinic services act. 42 U.S.C. § 1395x(e).

San Juan District has a legal obligation to preserve the privacy of patients and their records.

San Juan District has a legal obligation to preserve the privacy of medical staff records.

San Juan District has a legal obligation to preserve the privacy of anyone making application to the District.

San Juan District has a legal obligation not to discriminate based upon race, age, color, sex, creed, religion, or disability.

San Juan District has a duty to verify the medical license and DEA license necessary for a doctor to practice medicine prior to giving the medical professional privileges.

San Juan District qualified as a 'person' under the Utah Code Ann. 13–5–2.

San Juan County qualifies as a 'person' under the Utah Code Ann. 13–5–2.

*Legal Entitlements of the Plaintiffs to Records of all open meetings*

San Juan County is obligated to obey Utah's open meetings law. Utah Code Ann. 17–53–206.

Any 'open meeting' is defined as "the convening of a public body, with a quorum

present, whether in person or by means of electronic equipment, for the purpose of discussing or acting upon a matter over which the public body has jurisdiction or advisory power." Utah Code Ann. 52–4–2.

Utah's Open Meetings Act is Utah's legislative mandate that San Juan County and District conduct their business openly with public involvement. Utah Code Ann. 52–4–1.

San Juan County and District are obligated to make and keep, accurate records of its open meetings that reflect the substance of all matters proposed, discussed, or decided, and a record, by individual member, of votes taken; the names of all citizens who appeared and the substance in brief of their testimony; and any other information that any member requests be entered in the minutes. Utah Code Ann. 52–4–7.

*Legal Nature of the Plaintiffs*

*Michele Lyman, Physician's Assistant*

A Physician's Assistant is considered a 'primary provider' under P.L. 95–210, Rural Health Clinic Services Act, for purposes of meeting the rural health clinic's act's mandates for providing medical care in rural areas. 42 U.S.C. § 1395x(aa)(5).

Michele Lyman, P.A. provided services to Medicaid and Medicare patients while working at Blanding Family Practice.

Blanding Family Practice was a private corporation organized under Utah law.

Blanding Family Practice was classified as a Rural Health Clinic by Medicaid and the Department of Health Care Financing.

Blanding Family Practice was located in a Health Professional Shortage Area.

Michele Lyman was approved by the State Department of Professional Licensing to provide rural off-site services to the public.

Mrs. Lyman is a Physician's Assistant and was authorized by the Utah State Department of Professional Licensing to operate an rural off-site clinic. Mrs. Lyman had two supervising physician's accessible by phone. Utah has since done away with the off-site classification and now allows the supervising doctors the authority to determine how close they will supervise the physician's assistant working for them and how far away they can be.

Blanding Family Practice was classified as a rural off-site clinic by Utah DOPL.

Dr. MacArthur was a secondary supervising physician within the meaning of the Utah code.

*Dr. Steven MacArthur*

Dr. Steven MacArthur operated his business at the time in question as a sole proprietorship.

Dr. Steven MacArthur was the supervising physician within the meaning of the Utah Code.

Dr. Steven MacArthur was legally qualified to practice medicine anywhere in the State of Utah.

Dr. Steven MacArthur's DEA license and Medical License had to be kept in the offices of the Utah State Department of Professional Licensing, within the Department of Commerce. The Plaintiffs challenge the constitutionality of the San Juan District's medical staff by-laws as given to Dr. MacArthur and prior to Dr. MacArthur when Mrs. Lyman began working for the District.

The Plaintiffs challenge the constitutionality of the Utah statutory scheme Utah Code Ann. 1301–1332 wherein the County can own and operate and control the District by way of setting tax rates, collecting taxes, withdrawing administrative powers

from persons on the District's governance board selected by the County Commission, and in this case for a short time, the Commissioners were District board members, but still be considered a separate body politic under Utah Code Ann. 17A–2–1313.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63–30–3.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63–30–38.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63–30–10.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63–30–20.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63–30–22

No statute, federal or state, authorizes a public health facility or hospital to deny privileges to a Physician's Assistant who has access to her supervising physicians by phone in a Health Professional Shortage Area, or create working conditions so hostile as to interfere in the quality of care of the patients in the area.

*Helen Valdez*

Helen Valdez was a patient entitled to the benefit of the Patients' Bill of Rights.

*The Plaintiffs' Legal Entitlements*

Michele Lyman and Dr. Steven MacArthur were:

1. Entitled to be free from local prohibitions and limitations upon their practice of medicine.

2. Entitled to be free from interference between themselves and their patients;

3. Entitled to privacy of their clients' records and procedures;

4. Entitled to be free from injury, destruction or limitation of competition in the area.

5. Entitled to be free from discrimination in the use of the public facilities of the District and County.

6. Entitled to their business' good will not being harmed by their patients being treated in a manner lacking uniformity, consideration and care that is sensitive to each patients unique needs.

7. Entitled to be free of feeling physically threatened.

8. Entitled to be free of feeling like Mrs. Lyman's child may be in danger.

9. Entitled to be free of having credential files tampered with, having forged documents placed in the file, and having the forged document placed in the U.S. mail to discredit Mrs. Lyman with the American Heart Association and other medical providers in a meeting that she did not attend, while threatening patients seeing Mrs. Lyman with unavailability of services in a highly remote and isolated area.

10. Dr. MacArthur should be entitled to not have to inform any potential clinic area he may wish to relocate to that he was limited in privileges and denied privileges in San Juan District.

11. Dr. MacArthur is entitled to equipment that is working, that facilitates the care of the patients, and is prepared, sterile, and ready to use in emergencies.

b. **Defendants' Statement of Contested Issues of Law:**

1. Did defendants discriminate against Valdez on the basis of her age or gender or her association with her husband, Lyman or Dr. Penn in connection with her

April 14, 1999 visit to the San Juan County Hospital?

2. Did defendants deprive Valdez of due process in connection with her April 14, 1999 visit to the San Juan County Hospital?

3. Did defendants discriminate against Dr. MacArthur on the basis of his age or his association with Lyman in connection with his application for privileges?

4. Did defendants deprive Dr. MacArthur of due process in connection with his application for privileges?

5. Did defendants defame Dr. MacArthur?

6. Did defendants subject Lyman to discrimination or harassing treatment on the basis of her gender in connection with her practice as a physician's assistant in Blanding, Utah, or in connection with her late–1999 application for renewal of her mid-level provider privileges?

7. Did defendants deprive Lyman of due process in connection with her late–1999 application for renewal of her mid-level provider privileges?

8. Did defendants enter into a contract, combination in the form of trust or otherwise, or conspiracy in restraint of interstate trade or commerce and with an unlawful motive in connection with Lyman's or Dr. MacArthur's applications for privileges or Valdez' medical treatment?

9. Do plaintiffs have standing to maintain an antitrust claim and, if so, are defendants immune from the claim under the state action defense or the Health Care Quality Improvement Act?

10. Did defendants receive any income from, acquire any interest in, or conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in interstate commerce?

7. *EXHIBITS.* The following were received in evidence or were identified and offered:

a. Plaintiffs' exhibits: The Exhibit List will be filed separately.

b. Defendants' exhibits: The Exhibit List will be filed separately.

c. Exhibits received in evidence and placed in the custody of the clerk may be withdrawn from the clerk's office upon signing of receipts therefor by the respective parties offering them. The exhibits shall be returned to the clerk's office within a reasonable time and in the meantime shall be available for inspection at the request of other parties.

d. Exhibits identified and offered that remain in the custody of the party offering them shall be made available for review by the offering party to any other party to the action that requests access to them in writing.

e. If other exhibits are to be offered, the necessity for which reasonably cannot now be anticipated, they will be submitted to opposing counsel at least ____ [2] days before trial.

8. *WITNESSES.*

a. In the absence of reasonable notice to opposing counsel to the contrary:

i. Plaintiffs *will* call as witnesses: [3]

1. Candace Davis

---

**2.** Plaintiffs and Defendants do not agree on the number of days prior to trial by which additional exhibits must be provided to the opposing party. Defendants suggest fourteen days and Plaintiffs suggest five days.

**3.** Defendants reserve the right to call any of Plaintiffs' witnesses not called at trial by Plaintiffs.

2. Jennifer Senecker
3. Tanya Holladay
4. Sharon Kent
5. Andrea Bianchini
6. Maureen LaGigla
7. Christine Singer
8. Ora Lee Black
9. Gloria Yanito
10. Donna Arthur
11. LeAnn Jacobs
12. Letha St. Clair
13. Camille Yonkers
14. Gena Grover
15. Emy Paterson
16. Leatha Burtenshaw
17. Cindy Tumeh
18. Budd Hadley
19. Keele Johnson
20. Candace Laws
21. Christina Brendt
22. Linda Cacapardo
23. Nichole Roberts
24. Lisa Wright
25. Patsy Shumway
26. Ty Lewis
27. Craig Halls
28. Amy Byrd
29. Tracy Bradford
30. KD Perkins
31. Trudy Latham
32. Kim Glover
33. LeAnn Bowring
34. Robert Bowring
35. Mary Nielsen
36. Charlene Gonzalez
37. Michele Lyman
38. Dr. Steven MacArthur
39. Helen Valdez
40. Dr. Redd
41. Rick Bailey
42. John Lewis
43. Karen Adams
44. Gary Holladay
45. Cleal Bradford
46. Reid Wood
47. Laurie Shafer
48. Dr. Nelson
49. Venice Lyman
50. John Housekeeper
51. Dr. Val Jones
52. Gloria Yanito
53. Ora Lee Black
54. Marilee Bailey
55. Mary Maryboy
56. Roger Atcitty
57. Rick Bailey
58. Linda Swenson
59. Belina Ashbury
60. Louisa Lyman
61. Etta Shumway
62. Blen Freestone
63. Bryan Bolander
64. Juliane Robinson
65. Doug Springmeyer
66. Bart Lyman
67. Makenzie Lyman
68. John Lyman
69. Kirk Redd
70. Kathleen Redd
71. Judy Kesckeviciak

ii. Plaintiffs may call as witnesses:

1. Calvin Balch

2. Dale Slade

3. Norman Johnson

4. Leatha Burtenshaw

5. Dr. Stephen Morris at the University of Utah

6. Rayburn Jack

7. Dr. Terry Cook

8. Pat Hartsock

9. Marci Meiers

10. Craig Ambrosiani

11. Dr. Steve Bigler—Department Chair OB/gyn former med staff pres

12. Director of Utah Valley Regional Women's center

13. Dr. Joseph Glenn–Former Department Chairman ob/gyn at Utah Valley Regional Medical center

14. Dr. Steve Minton—Chairman of neonatology of Utah Valley Regional Medical Center

15. DR. Kent Gammett—Former Department chair of ob/gyn at Utah Valley Regional Medical Center.

16. Dr. George Gourleyob/gyn staff member at Utah Valley Hospital-cross covered with Dr. MacArthur

17. Mrs. Molitor—Lutheran Health Services Director of Nursing

18. Dana Barnett

19. Dr. Hoffmeister

20. Venice Lyman

21. Bart Lyman

22. McKensie Lyman

iii. Plaintiffs may use the following depositions: [4]

1. Laurie Shafer—May 13, 2002

2. Patsy Shumway—May 14, 2002

3. Gloria Yanito—Aug. 12, 2002

4. Gary Holliday—May 15, 2002

5. Dr. James Redd—May 15, 2002

6. Helen Valdez—12–8–2001

7. Charlene Gonzalez—Jan. 2002

8. Cleal Bradford—August 12, 2002

9. Carla Grimshaw—May 13, 2002

10. John Housekeeper—May 14, 2002

11. Dr. Jones—May 15, 2002

12. Reid Wood—August 12, 2002

13. Nicole Roberts—January 7, 2002

14. Julian Robinson

b. In the absence of reasonable notice to opposing counsel to the contrary:

i. Defendants *will* call as witnesses:

1. Roger Atcitty

2. John Lewis

3. John Housekeeper

4. Karen Adams

5. Patsy Shumway

6. Gary Holliday

7. Cleal Bradford

8. Dr. James Redd

9. Dr. L. Val Jones

10. Dr. Manfred Nelson

11. Richard Bailey

12. Craig Halls

13. Bill Redd

14. Marilee Bailey

15. Ora Lee Black

16. Lori Wallace

17. Carla Grimshaw

18. Gloria Yanito

**4.** Defendants object to the use of depositions at trial except as permitted under the applicable rules.

19. Julie Bronson

20. Laurie Schafer

21. Reid Wood

ii. Defendants *may* call as witnesses:

1. Terry Cook

2. Etta Shumway

3. Judy Ksaizkiewicz

c. In the event that witnesses other than those listed are to be called to testify at the trial, a statement of their names, addresses, and the general subject matter of their testimony will be served upon opposing counsel and filed with the court at least 14 days prior to trial. This restriction shall not apply to rebuttal witnesses whose testimony, where required, cannot reasonably be anticipated before the time of trial.

9. *REQUESTS FOR INSTRUCTIONS.* If the case is to be tried before a jury, requests for instructions to the jury and special requests for voir dire examination of the jury shall be submitted to the court pursuant to D.U. Civ. R. 51–1. Counsel may supplement requested instructions during trial on matters that could not reasonably be anticipated prior to trial.

10. *AMENDMENTS TO PLEADINGS.* Plaintiffs request permission to amend pleadings.

11. *DISCOVERY.* Discovery has been completed.

12. *TRIAL SETTING.* This case was set for trial by jury on _____, 2002, at _____ o'clock ___.m at Salt Lake City.

13. *POSSIBILITY OF SETTLEMENT.* Defendants deem the possibility of settlement to be poor. Plaintiffs deem the possibility of settlement to be good,

with the newly elected County Commissioners that take office after January 1, 2003. Two out of the three were elected.

Dated this 12th day of November, 2002.